**SLIP OP. 10-84**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

GPX INTERNATIONAL TIRE CORPORATION and HEBEI STARBRIGHT TIRE CO., LTD.,

Plaintiffs,

and

TIANJIN UNITED TIRE & RUBBER INTERNATIONAL

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and

BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, TITAN TIRE CORPORATION, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,

Defendant-Intervenors.

Before: Jane A. Restani, Chief Judge

Consol. Court No. 08-00285

**OPINION AND ORDER**

[Department of Commerce's redetermination results remanded for changes to its countervailing duty methodology to forego the imposition of the countervailing duty law on the nonmarket economy products at issue and to reconsider pursuant to its own request its antidumping duty determination in part.]

Dated: August 4, 2010

Winston & Strawn LLP (Daniel L. Porter, James P. Durling, Matthew P. McCullough, Ross E. Bidlingmaier, and William H. Barringer) for the plaintiffs.

Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP (Francis J. Sailer, Andrew T. Schutz, and Mark E. Pardo) and Greenberg Traurig, LLP (Philippe M. Bruno and Rosa S. Jeong) for the consolidated plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera, John J. Todor and Loren M. Preheim); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Matthew D. Walden and Daniel J. Calhoun), of counsel, for the defendant.

King & Spalding, LLP (Joseph W. Dorn, Christopher T. Cloutier, Daniel L. Schneiderman, J. Michael Taylor, Jeffrey M. Telep, Kevin M. Dinan, and Prentiss L. Smith) for defendant-intervenors Bridgestone Americas, Inc. and Bridgestone Americas Tire Operations, LLC.

Stewart and Stewart (Geert M. De Prest, Elizabeth A. Argenti, Elizabeth J. Drake, Eric P. Salonen, Terence P. Stewart, Wesley K. Caine, and William A. Fennell) for defendant-intervenors Titan Tire Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.

Restani, Chief Judge: As the court has previously explained, these consolidated actions challenge the Department of Commerce's ("Commerce") final determinations rendered in concurrent antidumping duty ("AD") and countervailing duty ("CVD") investigations of certain pneumatic off-the-road ("OTR") tires from the People's Republic of China ("PRC"). Motions for judgment on the agency record were filed by GPX International Tire Corporation ("GPX") and Hebei Starbright Tire Co., Ltd. ("Starbright"), Titan Tire Corporation and the United Steel, Paper and Forestry, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (collectively, "Titan"), Bridgestone Americas, Inc. and Bridgestone

America Tire Operations, LLC (collectively, "Bridgestone"), and Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC").

For the reasons stated below, the court finds that Commerce failed to comply with the court's remand instructions. Commerce must forego the imposition of the countervailing duty law on the nonmarket economy ("NME") products before the court because its actions on remand clearly demonstrate its inability, at this time, to use improved methodologies to determine whether, and to what degree double counting occurs when NME antidumping remedies are imposed on the same good, or to otherwise comply with the unfair trade statutes in this regard.

Additionally, GPX, Starbright, Titan, and Bridgestone have submitted motions for judgment on the agency record on other AD issues.[1] In its previous opinion, the court declined to rule on the merits of the AD issues raised in the parties' briefs to the extent that they did not relate to the CVD/NME AD coordination issue. See GPX Int'l Tire Corp. v. United States, 645 F. Supp. 2d 1231, 1235 n.1 (CIT 2009). For the reasons stated below, the court now denies the remainder of the motions of all parties relating to AD issues, except to the extent they are consistent with the Government's request for a voluntary remand on one issue, which request is

[1] Many of these other AD issues involve requested fine-tuning adjustments to NME factors of production ("FOP") methodology. In contrast with its more exacting market economy ("ME") AD methodology, which would require several of these minute adjustments, see generally 19 U.S.C. § 1677b(a), Commerce's NME AD methodology, which depends on unverified surrogate information, is analogous to a broad stroke of a brush, see generally 19 U.S.C. § 1677b(c). Commerce relies on the publicly filed documents of surrogate producers, which are not required to participate in the investigation, in order to value FOP. 19 U.S.C. § 1677b(c)(1). This results in normal value ("NV") which is compared to the price for exports to the United States. 19 U.S.C. § 1677b(a). The difference is the dumping margin. Id.

granted. TUTRIC's motion for CVD treatment consistent with that of GPX and Starbright is granted.

**BACKGROUND**

The facts of this case have been well documented in the court's previous opinion. See GPX, 645 F. Supp. 2d at 1235 36. The court presumes familiarity with that decision, but briefly summarizes the facts relevant to this opinion.

In August 2007, Commerce initiated AD and CVD investigations for certain pneumatic OTR from the PRC. See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Initiation of Countervailing Duty Investigation, 72 Fed. Reg. 44,122 (Dep't Commerce Aug. 7, 2007); Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, 72 Fed. Reg. 43,591 (Dep't Commerce Aug. 6, 2007). Commerce selected Starbright[2] and TUTRIC, Chinese producers/exporters of the subject merchandise, as two of the mandatory respondents for both investigations.[3] See Final AD Determination, 73 Fed. Reg. At 51,625; Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty

---

[2] GPX, a domestic importer of OTR tires, wholly owns the Chinese producer Starbright. (See Resp't Pls.' App. Tab 11, 3 4.)

[3] Other respondents included Guizhou Tyre Co., Ltd.("Guizhou") and Xuzhou Xugong Tyres Co., Ltd. ("Xugong"). See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 73 Fed. Reg. 51,624, 51,625 (Dep't Commerce Sept. 4, 2008) ("Final AD Determination") Guizhou has not contested the Final AD Determination. Titan Tire Corporation and Bridgestone challenged Commerce's Final AD Determination as to Xugong's zero dumping margin in a separate action. See Bridgestone Ams., Inc. v. United States, Slip Op. 10-55, 2010 WL 1962889 (CIT May 14, 2010) (affirming results of the remand determination in their entirety).

Determination and Final Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480, 40,483 (Dep't Commerce July 15, 2008) ("Final CVD Determination"). In its final determinations, Commerce calculated CVD margins of 14% for Starbright, and 6.85% for TUTRIC, Final CVD Determination, 73 Fed. Reg. at 40,483, and also utilized NME methodologies to calculate AD margins of 29.93% for Starbright, and 8.44% for TUTRIC, Final AD Determination, 73 Fed. Reg. at 51,625.

In September 2008, GPX and Starbright filed complaints challenging both the CVD and AD determinations on various grounds. In October 2008, Titan and Bridgestone filed complaints contesting these determinations as well. TUTRIC, however, filed a complaint in November 2008, challenging only the CVD determination. The court consolidated these actions (Order (Jan. 16, 2009) (Docket No. 161)), and shortly thereafter, GPX and Starbright, Titan, Bridgestone, and TUTRIC filed motions for judgment on the agency record under USCIT Rule 56.2. Pursuant to court order, the motions for judgment on the agency record were divided into three key issues: (1) CVD applicability and NME AD coordination issues; (2) all other AD issues; and (3) all other CVD issues. (Order (Jan. 16, 2009) (Docket No. 162).)

In GPX, the court held "that Commerce is not barred by statutory language from applying the CVD law to imports from the PRC, but that Commerce's . . . interpretation of the NME AD statute in relation to the CVD statute . . . was unreasonable." 645 F. Supp. 2d at 1234. In addition, the court concluded that Commerce's failure to address GPX and Starbright's request for market-oriented enterprise ("MOE") treatment and its adoption of a December 11, 2001, cut-off date for identifying and measuring subsidies in the PRC was arbitrary and unsupported by

substantial evidence. Id. at 1243 50. The court remanded this matter to Commerce, instructing it to "adopt additional policies and procedures for its NME AD and CVD methodologies to account for the imposition of the CVD law to products from an NME country and avoid to the extent possible double counting of duties" if it "is to apply CVD remedies where it also utilizes NME AD methodology," id. at 1234 35, or to exercise its "discretion not to impose CVDs as long as it is using the NME AD methodology," id. at 1243. The court also instructed Commerce to "address GPX's request for MOE status," id. at 1246, and "to determine the existence of countervailable subsidies based on the specific facts for each subsidy," id. at 1250.

On remand, Commerce "decided to continue to impose CVD remedies on imports of certain new pneumatic [OTR tires] from the PRC, but . . . offset[] those CVDs against GPX/Starbright's calculated AD cash deposit rate." Final Results of Redetermination Pursuant to Remand 2 (Dep't Commerce Apr. 26, 2010) (Docket No. 292) ("Remand Results"). Commerce next considered each of the countervailable subsidies individually, id. at 20 40, rather than relying on a universal cut-off date, but determined that the CVD margins for Starbright and TUTRIC remained unchanged, id. at 59. Commerce also considered whether it should treat Starbright as an MOE, and ultimately decided that such treatment was inappropriate. Id. at 12 20. Commerce then offset Starbright's AD margin of 29.93% by its CVD margin of 14.00%, resulting in a cash deposit rate of 15.93%. Id. at 59. Commerce, however, did not make an offset to TUTRIC's AD margin because "TUTRIC did not include double remedies as a cause of action in its Complaint, request relief on that issue, or address the issue in any brief that it filed with the Court." Id. at 53. GPX and Starbright, TUTRIC, Bridgestone, and Titan object to these

conclusions on various grounds. (See Resp't Pls.' Comments on Commerce's Final Redetermination Pursuant to Remand ("GPX's Comments"); TUTRIC's Comments Regarding the Department's First Remand Redetermination ("TUTRIC's Comments"); Bridgestone's Obj. Concerning Final Results of Redetermination Pursuant to Remand; (A) Obj. of Titan Tire Corp. to the Department of Commerce's Remand Redetermination, & (B) Titan's Reasons for Why this Court Should Not Remand this Case Again.) Additionally, as noted in GPX, several AD and CVD issues, which were raised in the parties' original briefs, remain before the court. See 645 F. Supp. 2d at 1235 n.1.[4]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court will uphold Commerce's final determinations in AD and CVD investigations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Offset of CVD Against NME AD

#### A. Starbright

During remand, Commerce considered itself to have only three options regarding the coordination of CVD and NME AD. See Remand Results at 8. Commerce identified those options as: (1) not to apply CVD law to the exports in this case; (2) apply the ME AD methodology to either Starbright or the PRC; or (3) offset CVD against NME AD cash deposit

[4] Because CVD remedies may not be imposed at all, it is unnecessary to address the additional CVD calculation issues.

rate. Id. In selecting offset, Commerce reasoned that it was the least confusing option. Id. at 9. GPX and Starbright, and TUTRIC challenge this decision as unreasonable and not in accordance with the court's remand instructions. (GPX's Comments 1.) GPX and Starbright's claim has merit.

Although the court recognizes that "the exact effect of subsidies on price is difficult to measure," it also acknowledges that "[t]here is an assumption that CVD remedies equalize the competitive playing field, by raising the price of the good when it is exported into this country." GPX, 645 F. Supp. 2d at 1243 (citing U.S.-China Trade: Commerce Faces Practical and Legal Challenges in Applying Countervailing Duties, GAO-05-474, at 33 (June 2005), available at http://www.gao.gov/new.items/d05474.pdf). In NME-designated countries, however, Commerce also "compares a subsidy-free constructed normal value (essentially using information from surrogate countries) with the original subsidized export price to calculate the AD margin." Id. at 1241. Thus, any resulting NME AD margin in theory also captures the competitive advantage that subsidies may provide because the constructed NV is subsidy-free, and presumably higher than a subsidized NV, while the U.S. price presumably reflects in some way the price-lowering benefits of the subsidies.[5] Thus, the margin is greater than it would be if subsidies were reflected on both sides of the comparison. These methodologies, therefore, when

---

[5] NME AD law is intended to counteract whatever gives rise to the unfair aspects of a dumped U.S. price. 19 U.S.C. § 1677b(a). The broad NME AD margin would cover measurable benefits from a subsidy, which a CVD margin is intended to counteract. See GPX, 645 F. Supp. 2d at 1242. At the very least, therefore, the court can presume that the NME AD margin normally will be higher than the CVD margin. Perhaps in some future investigation, the unusual case will occur and Commerce will be afforded the opportunity to explain the reasonableness of coordination given that particular set of facts. Under the facts of this case, however, the NME AD margin exceeds the CVD margin and presumably covers it.

used concurrently, result in a high likelihood of double counting because they effectively counteract the same behavior twice. See id. at 1242. For this reason, the court held that Commerce may have the authority under the statutory scheme to apply CVD law and AD law simultaneously to products of a NME country, id. at 1240, but only if such an application included methodologies to safeguard against this substantial potential for double counting, id. at 1243, which does not occur when NV and U.S. price are calculated based on data from the same country   the market economy approach.

In its remand order, the court presented Commerce with a choice between two alternatives. See id. at 1243. Commerce could either "reasonably . . . do all of its remedying though the NME AD statute, as it likely accounts for any competitive advantages the exporter received that are measurable," or it could "apply methodologies that make such parallel remedies reasonable." Id. In its remand redetermination, however, Commerce proposes guarding against double counting by merely offsetting CVD against NME AD after it uses its regular methodologies to calculate the CVD and NME AD margins. Remand Results at 9 10. The court notes that with this offset, the combination of the CVD margin and the NME AD cash deposit rate will always equal the unaltered NME AD margin. See id. at 59. This result, therefore, renders concurrent CVD and AD investigations unnecessary because the same remedial price adjustment can otherwise be obtained by merely conducting an NME AD investigation. As GPX and Starbright suggest, it is not reasonable to "force[] foreign parties to spend many months and large sums of money to go through an investigation, the end result of which is to calculate a CVD margin, but then to eliminate that CVD [margin] because it has been offset by some parallel

investigation." (GPX's Comments 6.) Perhaps even more importantly, the offset that Commerce now advances is inconsistent with 19 U.S.C. § 1677a, which lists the specific offsets to export price and constructed export price that are permissible. See 19 U.S.C. § 1677a(c) (d). Accordingly, the court holds that the offset does not comply with the statute and is also unreasonable due to the expense associated with conducting an additional investigation that is essentially useless.

Despite the court's instruction that "[i]f there is a substantial potential for double counting, and it is too difficult for Commerce to determine whether, and to what degree double counting is occurring, Commerce should refrain from imposing CVDs on NME goods until it is prepared to address this problem through improved methodologies or new statutory tools," GPX, 645 F. Supp. 2d at 1243, Commerce stubbornly adheres to the position that it does not have discretion to do so. Remand Results at 43. Commerce maintains that it is statutorily required to apply CVD law if it determines that a country is providing a countervailable subsidy. Id. As the court has previously explained, this interpretation of 19 U.S.C. § 1671 is misguided. GPX, 645 F. Supp. 2d at 1240, 1243. Rather, Georgetown Steel Corp. v. United States, 801 F.2d 1308 (Fed. Cir. 1986), "makes clear that Commerce need not apply CVD law to the same goods that are subject to NME AD calculations." GPX, 645 F. Supp. 2d at 1240. Commerce, therefore, is not statutorily required to apply CVD law under 19 U.S.C. § 1671.

In its remand redetermination, Commerce identified what it believed to be the only three procedural options remaining after GPX. See Remand Results at 8. There is no indication in the language used that this list was intended to be anything other than exhaustive.

The court, therefore, accepts this list as a tacit admission that, at this time, it is too difficult for Commerce to determine, using improved methodologies, and in the absence of new statutory tools, whether and to what degree double counting is occurring. In accordance with the court's remand instructions, the only option remaining for Commerce is not to apply CVD law to Starbright's NME goods.[6] Accordingly, the court remands this matter to Commerce with instructions to forego the imposition of CVD law on Starbright's merchandise at issue.

**B. TUTRIC**

In its remand redetermination, Commerce concluded that TUTRIC was not entitled to an offset of its CVD against its NME AD cash deposit rate because it "did not include double remedies as a cause of action in its Complaint, request relief on that issue, or address the issue in any brief that it filed with the Court." Remand Results at 53 54. Thus, Commerce determined that TUTRIC's CVD and AD margins remained the same at 6.85% and 8.44% respectively. See id. at 59; Final AD Determination, 73 Fed. Reg. at 51,625. TUTRIC, however, claims that equity requires Commerce to apply the remand results adjusting for double counting

[6] The court's previous remand instructions should not be interpreted as establishing any particular standard or methodology. Rather, after considering the relevant statutory provisions, the Court determined that the two options afforded were the only two possibilities given these circumstances. GPX, 645 F. Supp. 2d at 1243. The court never provided Commerce the option to adopt an offsetting methodology on remand because as indicated in the text, such an ad hoc procedure is unlawful and ignores the underlying problem of double counting during the calculation of CVD and NME AD. See id.

to its NME AD margin as well, despite its failure to raise the issue in its complaint.[7] (See TUTRIC's Comments 8.) TUTRIC's claim has merit.

At the outset, the court observes that TUTRIC's complaint gives it jurisdiction over Commerce's CVD determination with regard to TUTRIC. Next, although TUTRIC chose not to raise the CVD/NME AD coordination issue before the court until recently, the record clearly demonstrates that TUTRIC, like GPX and Starbright, exhausted this issue on the agency level. (See App. Supp. Pl. TUTRIC's Rule 56.2 Mot. J. Upon Agency R. Tab 9.) This is a purely legal issue, and the court's earlier decision covered new ground. Strict exhaustion under these circumstances is not required. See Former Employees of Quality Fabricating, Inc. v. U.S. Dep't of Labor, 343 F. Supp. 2d 1272, 1285 (CIT 2004). Moreover, the court only need require administrative exhaustion "where appropriate." 28 U.S.C. § 2637(d). Furthermore, if exhaustion were strictly applied to the coordination issue, which TUTRIC did not raise previously, the court would address various CVD issues, perhaps requiring Commerce to recalculate CVD, which the court has found may not be applied here. Applying the court's decision evenhandedly, therefore, is the appropriate disposition. See Carpenter Tech. Corp. v. United States, 26 CIT 830, 837 38

[7] Alternatively, in May 2010, TUTRIC filed a motion for leave to file an amended complaint containing a coordination allegation. (Consol. Pl. TUTRIC's Mot. Leave File Am. Compl.) This motion, however, was opposed by the Government, Titan, and Bridgestone. (See Def.'s Resp. Pl. TUTRIC's Mot. Leave Amend Compl.; Titan's Resp. "TUTRIC's Mot. Leave File Am. Compl."; Bridgestone's Opp'n TUTRIC's Mot. Leave File Am. Compl.) Amendment is unnecessary, as the relief sought is clear, and the Rules of this Court require no answer in this type of action. USCIT R. 7(a).

(2002). Accordingly, Commerce must refrain from applying CVD remedies to TUTRIC's merchandise as well.[8]

**II. Remaining AD Issues**

**A. Market-Oriented Enterprise**

In its final determination, Commerce declined to evaluate GPX and Starbright's request that Starbright be classified as a MOE for the purposes of the investigation solely on the basis that it "currently ha[s] no proceedings or standards in place to do so." Issues and Decision Memorandum for the Antidumping Investigation of Certain Pneumatic Off-the-Road Tires from the People's Republic of China, A-570-912, POR 10/01/2006 03/31/2007, at 153 (Dep't Commerce July 7, 2008) ("Issues and Decision Memo"), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf (last visited Aug. 2, 2010). In GPX, the court held that such a conclusion was arbitrary and capricious and unsupported by substantial evidence. 645 F. Supp. 2d at 1246. The court instructed Commerce to address this issue meaningfully. Id. Pursuant to the court's remand instructions, Commerce considered the merit of GPX and Starbright's request and concluded that MOE status was unwarranted because the evidence was insufficient to establish the reliability of Starbright's costs, as contemplated by 19 U.S.C. § 1677b(c)(1). Remand Results at 12 20. GPX and Starbright now claim that this determination was not supported by substantial evidence and was contrary to the remand instructions because Commerce's evaluation of the evidentiary record is flawed. (GPX's Comments 7, 10 15.) GPX and Starbright's claim lacks merit.

[8] TUTRIC's motion for leave to file an amended complaint, filed on May 11, 2010, is denied as moot. Similarly, Titan's motion to strike point two of TUTRIC's Comments, filed on May 19, 2010, is also denied as moot.

Under its NME AD methodology, Commerce calculates NV "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1). Surrogate values from market economy countries are used as a reliable measure of these costs. See id. An MOE classification, however, would allow an NME-country respondent to be treated as if it were an ME-country respondent for the purposes of an AD investigation. See Antidumping Methodologies in Proceedings Involving Certain Non-Market Economies: Market-Oriented Enterprise, 72 Fed. Reg. 29,302, 29,302 03 (Dep't Commerce May 25, 2007). Although Commerce currently uses its NME AD methodology when investigating allegations of dumping from the PRC, it recently acknowledged the possibility of developing an MOE test, Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Coated Free Sheet Paper from the People's Republic of China, A-570-906, POI 04/01/06 09/30/06, at 9 10 (Dep't Commerce Oct. 17, 2007), available at http://ia.ita.doc.gov/frn/summary/PRC/E7-21041-1.pdf (last visited Aug. 2, 2010), and requested comment on the issue, Antidumping Methodologies in Proceedings Involving Certain Non-Market Economies: Market-Oriented Enterprise; Request for Comment, 72 Fed. Reg. 60,649 (Dep't Commerce Oct. 25, 2007). Nevertheless, as Commerce had repeatedly maintained throughout this litigation, it has still yet to develop an MOE test. See Remand Results at 15.

Despite the lack of a test, it is clear that an NME-country respondent cannot be afforded ME AD methodologies under the statutory scheme if it cannot demonstrate that its price is derived from reliable costs. See 19 U.S.C. § 1677(18); id. § 1677b(c)(1). GPX and Starbright

claim that the facts of this case render "Starbright a compelling candidate for MOE treatment" and identify the three "key facts" as: (1) an American company owns 100% of Starbright; (2) Starbright is overwhelmingly focused on external markets; and (3) Starbright is subject to a companion CVD. (Resp't Pls.' Mem. P. & A. Supp. Their Mot. J. Agency Rs. Vol 2: All Other Issues ("GPX's Br.") 21 23.) In its remand redetermination, Commerce considered each of these facts and concluded that none guaranteed the reliability of production costs that are required to calculate NV under 19 U.S.C. §1677b(a). See Remand Results at 17 19.

The court finds Commerce's conclusion to be reasonable and supported by substantial evidence, as none of the facts asserted by GPX and Starbright necessitate a conclusion that Starbright's price was derived from reliable costs.[9] Moreover, as the court noted in GPX, "some adjustments [may] be made on an industry or sector-wide basis" if an NME-country respondent can show that reliable prices exist within those market categories. 645 F. Supp. 2d at 1244 n.12 (citing World Trade Organization, Protocol on the Accession of the People's Republic of China, pt. I, § 15(d) (Nov. 23, 2001), WT/L/432, available at http://www.wto.org/english/theWTO_e/acc_e/completeacc_e.htm). GPX and Starbright have failed to make such a showing, and their motion with respect to MOE treatment is denied.

**B. Indirect Selling Expenses**

[9] In addition, GPX and Starbright argue that Commerce's failure to analyze whether Starbright's data can be used to calculate NV was in violation of the remand instructions. (GPX's Comments 7 9.) Contrary to this claim, Commerce was merely told to address the merits of Starbright's MOE request so the court could determine whether such treatment was required. See GPX, 645 F. Supp. 2d at 1245. To extent that the court's instructions suggest otherwise, that language was merely alerting Commerce to the possibly of using MOE treatment to guard against double counting. Commerce, however, declined to use MOE treatment in this way.

When calculating NV, Commerce decided not to allow an offset for the Indian surrogate producers' indirect selling expenses despite adjusting for Starbright's allegedly similar expenses in its U.S. sales price calculation. Issues and Decision Memo at 149 50. GPX and Starbright claim that this decision was not supported by substantial evidence and was contrary to law because it resulted in an asymmetrical comparison that could "have the effect of artificially depressing the United States price below normal value." (GPX's Br. 4.) In support of this claim, GPX and Starbright cite to the Indian producers' financial statements, which they submitted during the AD investigation, for the propositions that the surrogate companies operated at a more advanced level of trade and that Commerce could have distinguished those companies' direct selling expenses from indirect selling expenses, excluding the latter from the surrogate value calculation. (Id. at 6 10.) This claim lacks merit.

In its final determination, Commerce explained that it would not allow a constructed export price ("CEP") offset or a circumstances of sales ("COS") adjustment in this investigation because Commerce "cannot accurately determine the specific indirect selling expenses incurred on sales reflected in the surrogate financial statements," despite GPX and Starbright's claims to the contrary. Issues and Decision Memo at 152. It is clear, pursuant to the plain language of the statute, that Commerce has the discretion to determine what other expenses will be included in its calculation of NV in an NME. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999). Typically, when using NME methodologies, NV includes "an amount for general expenses and profit plus . . . other expenses." 19 U.S.C. § 1677b(c)(1) (emphasis added). As the court has stated previously, Commerce has established a

practice of calculating surrogate values based on broad information from public documents. See GPX, 645 F. Supp. 2d at 1245 46 n.14 ("When Commerce calculates surrogate values, the information used is not gathered in response to questions asked of mandatory respondents, but rather, Commerce relies on broad information from public documents, which is not broken down in a way that Commerce needs in order to make fine-tuned adjustments."); see also, e.g., Issues and Decision Memorandum for the Final Results in the 2002/2003 Administrative Review of Honey from the People's Republic of China, A-570-863, AR 12/01/02 11/30/03, at 22 (Dep't Commerce June 27, 2005), available at http://ia.ita.doc.gov/frn/summary/prc/E5-3547-1.pdf (last visited Aug. 2, 2010); Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Ball Bearings and Parts Thereof from the People's Republic of China, A-570-874, 7/1/01 12/31/01, at 17, 22 (Dep't Commerce Feb. 27, 2003), available at http://ia.ita.doc.gov/frn/summary/prc/03-5300-1.pdf (last visited Aug. 2, 2010).[10]

GPX and Starbright's claim that they submitted other evidence Commerce might use is unavailing, as Commerce has no right to conduct verification of such evidence at surrogate (non-party) Indian businesses. Commerce's decision, therefore, to follow its longstanding practice and not make fine-tuning adjustments based on this unverified data is supported by substantial evidence and is not contrary to law. See Issues and Decision Memo at 152. Accordingly, GPX and Starbright's motion is denied in this regard.

### C. Input Valuation

[10] Commerce also maintains that it is statutorily prohibited from making such an offset. See Issues and Decision Memo at 149 152. The court, however, does not reach this issue; it merely holds, contrary to GPX and Starbright's contention, that 19 U.S.C. § 1677b(c)(1) does not require the offset.

During its investigation, Commerce used a surrogate value for rod in the calculation of Starbright and TUTRIC's NV. Issues and Decision Memo at 143. Despite Bridgestone and Titan's claim that Commerce "should value wire using HTS 7217.30.30, HTS 7217.30.20, or 7217.30.10"[11] of the Indian tariff schedule, id. at 142, Commerce valued the input using HTS 7213.91.90[12] solely on the basis that "[n]othing on the record contradicts Starbright's and TUTRIC's" characterization of the input as a rod, id. at 143. Bridgestone and Titan now challenge this decision as not supported by substantial evidence because the record indicates that wire, as opposed to the much less costly rod, was used in the production of the subject merchandise. (Mem. Titan, Qua Pls., Supp. Their Mot. J. Upon Administrative R. (Addressing "All Other" Antidumping Issues) ("Titan's Br.") 24  26; Bridgestone's Br. Supp. Mot. J. on Agency R. on Antidumping Issues ("Bridgestone's Br.") 12  13.) In response, the Government

---

[11] The relevant portion of Chapter 72, heading 7217 of the Indian Trade Classification (HS), reads:

| | | | |
|---|---|---|---|
| 7217 | | | WIRE OF IRON OR NON-ALLOY STEEL |
| . . . . | | | |
| | 721730 | | Plated or coated with other base metals: |
| | | 72173010 | Of a thickness of 18 SWG and below |
| | | 72173020 | Of a thickness above 18 SWG but up to 26 SWG |
| | | 72173030 | Of a thickness above 26 SWG |

[12] The relevant portion of Chapter 72, heading 7213 of the Indian Trade Classification (HS), reads:

| | | | |
|---|---|---|---|
| 7213 | | | BARS AND RODS, HOT-ROLLED, IN IRREGULARLY WOUND COILS, OF IRON OR NON-ALLOY STEEL |
| . . . . | | | |
| | ***Other:*** | | |
| | 721391 | | Of circular cross-section measuring less than 14 mm in diameter: |
| | . . . . | | |
| | | 72139190 | Other |

has requested a voluntary remand to "reconsider and give further explanation for its decision." (Def.'s Mem. Opp'n Pls.' & Def.-Intervenor's Memoranda Regarding AD Issues Supp. Their Mots. J. Upon Agency Rs. ("Def.'s Br.") 59.) For the following reasons, this request is granted.

At the outset, the court notes that it is not required to grant a remand merely because the Government voluntarily requests it. See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001). Rather, in the interest of finality in these tripartite proceedings and administrative regularity the court possesses the discretion to deny such a request "if the agency's request is frivolous or in bad faith," but will typically grant such a remand "if the agency's concern is substantial and legitimate." Id. The court, therefore, will examine the legitimacy of this request.

Although Commerce is not bound by strict classification methodology when using the Harmonized Tariff Schedule to approximate the costs of various FOP in the antidumping context, Gleason Indus. Prods. v. United States, 559 F. Supp. 2d 1364, 1370 71 (CIT 2008), Commerce is required to "articulate in what way the surrogate value chosen relates to the factor input," Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1308 (CIT 2006). In making its final determination, Commerce relied on Starbright and TUTRIC's characterization of the input as "irregularly wound iron rod coils of circular cross-section measuring less than 14 mm in diameter; not electrode or cold heading quality; no indentations, ribs, grooves or other deformations," Issues and Decision Memo at 143 (internal quotation marks omitted), despite evidence on the record to the contrary, (see, e.g., Public App. Supp. Def.'s Resp. Mots. J. Upon Agency R. Vol. Two ("Def.'s App. II") Tab 17 (characterizing the input as "steel wire"); Def.'s

App. II Tab 22 Attach. (article supporting Bridgestone and Titan's proposition that wire, not rod, is used to manufacture tires)). This evidence renders Commerce's terse explanation, that "[n]othing on the record contradicts Starbright's and TUTRIC's statements," Issues and Decision Memo at 143, inadequate, see Longkou Haimeng Machinery Co. v. United States, 581 F. Supp. 2d 1344, 1363 (CIT 2008) (holding that Commerce's brief explanation is inadequate and remand is appropriate when plaintiff cites mounting evidence on the record to the contrary). Accordingly, the court grants Commerce's request for a voluntary remand to reconsider or give further explanation for its decision.

**D. Value Added Tax**

In its final determination, Commerce decided to exclude respondents' unrefunded value added tax ("VAT") from its cost of production calculation. See Issues and Decision Memo at 21. Titan and Bridgestone now challenge that decision as not supported by substantial evidence, arguing that because VAT is typically added as part of the cost of production calculation for "constructed value" in an ME methodology, "[t]he same logic necessarily applies to NME producers and their 'constructed values.'" (Titan's Br. 16 17.) This claim lacks merit.

When calculating cost of production for the purposes of an NME AD investigation, Commerce assesses the FOP "based on the best available information regarding the values of such factors" in a surrogate ME country. 19 U.S.C. § 1677b(c)(1). Generally, Commerce's "normal methodology is to exclude income taxes or VAT from the [NME] antidumping calculations." Issues and Decision Memo at 21; see also Issues and Decision Memorandum for the Final Results of Polyethylene Retail Carrier Bags from the People's

Republic of China, A-570-886, POR 8/1/05 7/31/06, at 4 5 (Dep't Commerce Mar. 10, 2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-5300-1.pdf (last visited Aug. 2, 2010). This practice has been upheld because, by definition, "the surrogate values used [in an NME AD investigation] are independent of the elements of the cost or pricing structures in China, any adjustment for Chinese VAT would be unwarranted."[13] Bridgestone, 636 F. Supp. 2d at 1357 (emphasis added). Thus, "the amount of unrefunded VAT is irrelevant to the normal value calculation." Id.; see also GPX, 645 F. Supp. 2d at 1246 n.14. Titan and Bridgestone's contention, that the addition of VAT is required because "no Chinese producer, as a practical matter, in a hypothetical free-market China, could actually obtain the inputs without paying the applicable tax"(Titan's Br. 18), is unavailing, see supra note 1.

The court, therefore, concludes that Commerce's decision not to include VAT was supported by substantial evidence and not contrary to law. Accordingly, Titan and Bridgestone's motions are denied in this regard.

**E. Overhead Expenses**

During its AD investigation, Commerce allowed the respondents to exclude amounts of non-production related energy, which included some energy from factory overhead,

---

[13] Titan and Bridgestone argue that "the statute does not require Commerce to use only surrogate values for NME NV calculations." (Br. Titan Tire Corporation, Qua Pl., & United Steel Workers, Qua Pl.-Intervenor, Reply to Opp'n of United States, Def., and GPX and Starbright, Qua Def.-Intervenors, to Titan's Mot. J. Upon Agency R. as to "Other Antidumping Issues" 4 (emphasis removed).) While true that as part of its accorded deference, Commerce is not required always to use surrogate country values if it has reliable home country data for certain inputs, Shakeproof Assembly Components Div. of Ill. Tool Works v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001), Bridgestone Ams., Inc. v. United States, 636 F. Supp. 2d 1347, 1357 (CIT 2009), make it clear that Commerce is not required to include a NME producers' unrefunded VAT where it uses only surrogate FOP data.

from the energy related FOP in China under 19 U.S.C. § 1677b(c)(3), despite, for the purposes of calculating the surrogate overhead ratio, using financial statements that treated all Indian company energy consumption as a direct production expense. Issues and Decision Memo at 56 59. Titan and Bridgestone claim that this practice resulted in an understated NV that is not supported by substantial evidence and is contrary to law. (Titan's Br. 19 24.) Titan and Bridgestone propose that Commerce could have accomplished a more accurate calculation by either adjusting the surrogate financial ratios or requiring the respondents to include the full amount of their energy consumption in the China FOP. (Id. at 22) These claims lack merit.

Regarding Titan and Bridgestone's first proposal, that Commerce split the Indian producers' energy consumption between production and non-production for the calculation of the surrogate financial ratios, the court notes that Commerce has established a clear practice of not making this type of expense adjustment. See Notice of Final Determination of Sales at Less than Fair Value; Polyvinyl Alcohol from the People's Republic of China, 61 Fed. Reg. 14,057, 14,060 (Dep't Commerce Mar. 29 1996); Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the People's Republic of China, A-570-904, at 16 17 (Dep't Commerce Feb. 23, 2007), available at http://ia.ita.doc.gov/frn/summary/PRC/E7-3693-1.pdf (last visited Aug. 2, 2010). "Rather, once Commerce establishes that the surrogate produces identical or comparable merchandise, closely approximating the nonmarket economy producer's experience, Commerce merely uses the surrogate producer's data." Rhodia, Inc. v. United States, 240 F. Supp. 2d 1247, 1250 (CIT 2002). The Court of International Trade has upheld this practice, explaining that "Commerce is

neither required to duplicate the exact production experience of the Chinese manufacturers nor undergo an item-by-item analysis in calculating factory overhead." Id. (internal quotation marks and citations omitted). Moreover, the Federal Circuit has observed that "Commerce [has] broad discretion in valuing the factors of production on which factory overhead is based." Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1372 (Fed. Cir. 1999).

Titan and Bridgestone interpret Rhodia as "impl[ying] that normal practice must give way when evidence compels appropriate adjustments." (Titan's Br. 21.) In support of this understanding, they cite examples of Commerce's restating expenses in surrogate financial statements to avoid double counting. (Id. at 22 23.) These instances are distinguishable, however, because they do not involve overhead, and double counting was more easily determined. Nevertheless, even if this understanding of Rhodia were correct, Titan and Bridgestone have failed to demonstrate that the record evidence in this case is so different from the norm that Commerce must deviate from its practice. Titan and Bridgestone's statement that "the record permit[s] an appropriate correction" is unsupported and conclusory. (Id. at 22.) In fact, they admit that the Indian financial statements "did not distinguish between direct energy and overhead energy, so as to make it possible for Commerce to calculate an accurate surrogate overhead ratio." (Id. at 8.) Titan and Bridgestone's contention, therefore, that Commerce is required to adjust "the surrogate ratio by splitting the surrogate companies' energy consumption between 'production' and 'non-production' so as to parallel the respondent's reporting" is unavailing. (Id. at 22.)

Equally unavailing is Titan and Bridgestone's second proposal, that "manifest incongruity" dictates that Commerce "require the respondents to include in their calculations both their 'production' and 'non-production' energy" to determine the quantities reported for FOP. (Titan's Br. 8, 22.) When valuing factory overhead under an NME AD methodology, "Commerce need not use perfectly conforming information, only comparable information." Rhodia, 240 F. Supp. 2d at 1250 51 (internal quotation marks and citation omitted). Furthermore, the Federal Circuit has acknowledged Commerce's "broad statutory mandate" when valuing NME overhead, explaining that "[a]s factory overhead is composed of many different elements, the cost for individual items may depend largely on the accounting method used by the particular factory." Magnesium, 166 F.3d at 1372.

Indeed, these difficulties are illustrated by the facts of this case. Titan and Bridgestone assume that incongruity existed in Commerce's calculation because the Indian financial statements "did not distinguish between energy consumed for (a) production and (b) non-production." (Titan's Br. 20). Nevertheless, Titan and Bridgestone cannot state with any certainty that this surrogate value included any non-production energy because the Indian producers' accounting methods are ambiguous. (See id. at 8 (stating that "all of the Indian financial statements used to calculate the overhead ratio included only a single line item for energy consumed by the company in question usually entitled 'Fuel and Energy'")); see also Issues and Decision Memo at 58 (acknowledging that "the surrogate-company ratios may contain energy consumed for factory overhead" (emphasis added) (citation omitted)). It is for this very reason that Commerce is afforded such broad discretion when valuing NME overhead. See

Magnesium, 166 F.3d at 1372. Commerce's decision, therefore, not to require the respondents to include non-production energy in their reported FOP was well within its discretion.[14]

The court concludes that Commerce's decision not to make an adjustment to the surrogate financial ratio or to require the respondents to restate the amount of energy in their FOP was reasonable under the law and supported by substantial evidence. Accordingly, Titan and Bridgestone's motions are denied in this regard.

**F. Zeroing**

In its final determination, Commerce decided not to zero[15] respondent's fair value sales. See Issues and Decision Memo at 76 77. Bridgestone claimed in its brief that Commerce's decision to offset positive dumping margins with negative dumping margins in calculating its weighted-average dumping margin was contrary to law because zeroing is required under 19 U.S.C. § 1677(35)(A).[16] (Bridgestone's Br. 7.) In May 2009, however, Bridgestone

---

[14] Titan and Bridgestone also contend that 19 U.S.C. § 1677b(c)(3) compels the respondents to include the factory overhead, which was otherwise excluded as non-production energy, as a necessary FOP. (See Titan's Br. 24.) Such a categorical inclusion, however, is inappropriate due to the aforementioned ambiguous nature of the term "factory overhead." See Magnesium, 166 F.3d at 1372. Rather, this determination is more appropriately left to Commerce. See id.

[15] Zeroing is a practice in which Commerce gives the sales margins of merchandise sold at or above fair value prices an assumed value of zero. See Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1345 46 (Fed. Cir. 2005). With zeroing, Commerce only takes into account those sales margins of merchandise sold at less than fair value prices to calculate the final weighted-average dumping margin. See id. Offsetting, conversely, is "the practice whereby Commerce, when calculating the numerator in the weighted-average dumping equation, offsets sales made at less than fair value with fair value sales." U.S. Steel Corp. v. United States, 637 F. Supp. 2d 1199, 1204 n.4 (CIT 2009).

[16] Bridgestone also argues that Commerce failed to address this issue in its Final AD Determination and requests a remand so Commerce can make an initial determination.

(continued...)

filed a stipulation of partial dismissal, pursuant to USCIT Rules 1, 41(a)(1)(B), and 56.2, dismissing "Count I of [its] complaint (pertaining to zeroing)" (Stipulation of Partial Dismissal, May 28, 2009 (Docket No. 223)), and the court an Order of Partial Dismissal (May 29, 2009) (Docket No. 224). In May 2010, the court asked the parties (1) to advise whether any of the separate antidumping issues raised in their briefs were abandoned and (2) to provide citations to any important legal developments that have occurred since briefing. (Letter Filed by Court, May 18, 2010 (Docket No. 303).) Bridgestone responded, informing the court that it "continues to rely on its filed briefs with regard to the 'separate' antidumping issues, which it has not abandoned," yet proceeded to advise the court on legal developments concerning the first issue raised in its brief, zeroing. (Bridgestone's Resp. to May 18, 2010 Letter from the Court, June 4, 2010, at 2 ("Bridgestone's Letter") (Docket No. 316).) In light of this unclear signaling from Bridgestone, the court will address the issue raised in Bridgestone's original brief. Bridgestone's claim lacks merit.

Under 19 U.S.C. § 1677(35)(A), "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). Although, at one point, Commerce interpreted § 1677(35)(A) as allowing for only positive dumping margins, it has since announced that it

[16](...continued)
(Bridgestone's Br. 6.) Commerce explained, however, that it would follow its normal methodology of not zeroing "when using average-to-average comparisons for non-targeted sales in investigations." Issues and Decision Memo at 76 77. In addition, Commerce has made it clear that it no longer zeros negative margins. See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 Fed. Reg. 77,722, 77,722 (Dep't Commerce Dec. 27, 2006) ("Zeroing Modification"). A remand, therefore, is unnecessary.

would no longer zero negative margins in antidumping investigations involving comparisons of "average-to-average" prices. Zeroing Modification, 71 Fed. Reg. at 77,722. The Federal Circuit, in reviewing Commerce's zeroing practice, has held that zeroing is permissible under the language of 19 U.S.C. § 1677(35)(A), see Corus Staal, 395 F.3d at 1347, but has also made clear that such a practice is not required, see Timken Co. v. United States, 354 F.3d 1334, 1341 42 (Fed. Cir. 2004) ("[W]e are reluctant to find . . . that Congress expressly intended to require zeroing. . . . Accordingly, we conclude that Congress's use of the word exceeds does not unambiguously require that dumping margins be positive numbers."). Commerce's decision not to use zeroing in this investigation, therefore, was a permissible interpretation of 19 U.S.C. § 1677(35)(A).[17] Accordingly, Bridgestone's motion for judgment on the agency record is denied in this regard.[18]

**CONCLUSION**

[17] In this investigation, Commerce followed a practice of offsetting respondent's sales made at less than fair value with their fair value sales. In two recent decisions, the Court of International Trade held that the practice of offsetting is permissible under 19 U.S.C. § 1677. See Searing Indus. v. United States, 662 F. Supp. 2d 1327, 1335 36 (CIT 2009); U.S. Steel Corp., 637 F. Supp. 2d at 1213. The court notes that one of these cases is currently on appeal. For this reason, Bridgestone asks the court to preserve this issue. (See Bridgestone's Letter 2.) Bridgestone challenges the permissibility of offsetting under the statute only insofar as its allowance is inconsistent with Bridgestone's contention that the statutory language requires zeroing. As Timken makes clear, however, this issue already has been clearly decided. A stay, therefore, is unnecessary.

[18] Bridgestone also argues that portions of the statute would be rendered meaningless if offsets are permitted because "Commerce would get the same result whether it compared weighted-average normal values to weighted-average U.S. prices or to individual U.S. transaction prices." (Bridgestone's Br. 9 10.) Even if this statement were correct, this concern does not compel the court to conclude that zeroing is required under 19 U.S.C. § 1677(35)(A). Rather, as the Federal Circuit has made clear, zeroing is not required. See Timken, 354 F.3d at 1341 42.

For all the foregoing reasons, the court remands the matter for Commerce to forego the imposition of CVDs on the merchandise at issue and to reconsider or give further explanation for its decision to use an Indian surrogate value for rod in its investigation. Accordingly, the parties' motions for judgment on the agency record are otherwise denied.

Commerce shall file its remand determination with the court within thirty days of this date. GPX and Starbright, TUTRIC, Bridgestone, and Titan have eleven days thereafter to file objections, and the Government will have seven days thereafter to file its response.[19]

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated: This 4th day of August, 2010.
New York, New York.

[19] In correspondence dated June 4, 2010, TUTRIC informed the court of recent case law finding the labor valuation regulation, 19 C.F.R. § 351.408(c)(3), used in this AD investigation invalid. This issue, however, was never raised before the court and cannot be raised now.

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: August 4, 2010

By: /s/ Steve Taronji
Deputy Clerk