# WORLD TRADE

# ORGANIZATION

**WT/DS379/AB/R**
11 March 2011

(11-1239)

Original:  English

**UNITED STATES – DEFINITIVE ANTI-DUMPING AND COUNTERVAILING
DUTIES ON CERTAIN PRODUCTS FROM CHINA**

**AB-2010-3**

*Report of the Appellate Body*

I.     Introduction ......................................................................................................................... 1

II.    Arguments of the Participants and the Third Participants ........................................ 9

    A.    *Claims of Error by China – Appellant* ............................................................. 9

        1.    Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies ................................ 9

            (a)    The Ordinary Meaning of the Terms of the Treaty .......................... 10

                (i)    Dictionary Definitions ........................................................ 10

                (ii)    Context .............................................................................. 10

                (iii)    Object and Purpose of the *SCM Agreement* ......................... 12

                (iv)    Interpretation by the Appellate Body in *Canada – Dairy* ............................................................................... 14

                (v)    Reference to Municipal Laws .............................................. 15

            (b)    The ILC Articles ............................................................................ 16

                (i)    Status of the ILC Articles .................................................... 16

                (ii)    Relevance of the ILC Articles ............................................. 18

            (c)    The USDOC's "Public Body" Determinations ................................ 19

        2.    Article 2 of the *SCM Agreement*:  Specificity ................................................ 20

            (a)    Article 2.1(a) of the *SCM Agreement*:  "Subsidy" and "Explicitly" ................................................................................... 20

                (i)    Interpretation ...................................................................... 21

                (ii)    Application ......................................................................... 23

            (b)    Article 2.1(a) of the *SCM Agreement*:  "Certain Enterprises" .......... 23

            (c)    Article 2.2 of the *SCM Agreement* ................................................ 24

         3.    Article 14 of the *SCM Agreement*:  Calculation of the Benefit ...................... 26

            (a)    Article 14(d) of the *SCM Agreement*:  Input Benchmarks ............... 26

                (i)    Interpretation of Article 14(d) of the *SCM Agreement* ........ 26

                (ii)    Application of Article 14(d) of the *SCM Agreement* ........... 30

                (iii)    The USDOC's Rationale for Finding Distortion ................. 33

            (b)    Article 14(b) of the *SCM Agreement*:  Loan Benchmarks ............... 33

                (i)    Rejection of Interest Rates in China as Benchmarks under Article 14(b) of the *SCM Agreement* ......................... 34

                (ii)    Consistency with Article 14(b) of the Benchmarks Actually Used by the USDOC ............................................. 39

                      "Comparable" ..................................................................... 39

                      "Could Actually Obtain on the Market" .............................. 40

                      Article 11 of the DSU ......................................................... 41

         4.    Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994:  "Double Remedies" ................................... 41

            (a)    The Purpose of Countervailing Duties ............................................ 43

            (b)    Interpretation of Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994 ..................................................... 44

            (c)    Interpretation of Article 19.3 of the *SCM Agreement* ...................... 49

            (d)    Consequential Claims under Articles 10 and 32.1 of the *SCM Agreement* ............................................................................ 50

            (e)    Completion of the Analysis ............................................................ 50

    B.    *Arguments of the United States – Appellee* .................................................. 51

        1.    Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies .............................. 51

            (a)    The Ordinary Meaning of the Terms of the Treaty .......................... 51

                  (i)    Dictionary Definitions ........................................................ 51

                (ii)    Context .............................................................................. 52

                (iii)    Object and Purpose of the *SCM Agreement* ......................... 55

|  |  | (iv) | Reference to Municipal Laws | 56 |
|  | (b) |  | The ILC Articles | 56 |
|  |  | (i) | Status of the ILC Articles | 57 |
|  |  | (ii) | Relevance of the ILC Articles | 57 |
|  | (c) |  | Findings by Previous Panels | 59 |
|  | (d) |  | The USDOC's "Public Body" Determinations | 60 |
| 2. |  |  | Article 2 of the *SCM Agreement*: Specificity | 60 |
|  | (a) |  | Article 2.1(a) of the *SCM Agreement*: "Subsidy" and "Explicitly" | 60 |
|  |  | (i) | Interpretation | 61 |
|  |  | (ii) | Application | 62 |
|  | (b) |  | Article 2.1(a) of the *SCM Agreement*: "Certain Enterprises" | 63 |
|  | (c) |  | Article 2.2 of the *SCM Agreement* | 65 |
| 3. |  |  | Article 14 of the *SCM Agreement*: Calculation of the Benefit | 66 |
|  | (a) |  | Article 14(d) of the *SCM Agreement*: Input Benchmarks | 66 |
|  |  | (i) | Interpretation of Article 14(d) of the *SCM Agreement* | 67 |
|  |  | (ii) | Application of Article 14(d) of the *SCM Agreement* | 69 |
|  |  | (iii) | The USDOC's Rationale for Finding Distortion | 70 |
|  | (b) |  | Article 14(b) of the *SCM Agreement*: Loan Benchmarks | 71 |
|  |  | (i) | Rejection of Interest Rates in China as the Benchmark under Article 14(b) of the *SCM Agreement* | 72 |
|  |  | (ii) | Consistency with Article 14(b) of the Benchmarks Actually Used by the USDOC | 76 |
|  |  |  | "Comparable" | 76 |
|  |  |  | "Could Actually Obtain on the Market" | 76 |
|  |  |  | Article 11 of the DSU | 77 |
| 4. |  |  | Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994: "Double Remedies" | 78 |
|  | (a) |  | China's Accession Protocol | 78 |
|  | (b) |  | Interpretation of Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994 | 78 |
|  | (c) |  | Interpretation of Article 19.3 of the *SCM Agreement* | 80 |
|  | (d) |  | Context of the Relevant Terms of the *SCM Agreement* | 81 |
|  | (e) |  | Consequential Claims under Articles 10 and 32.1 of the *SCM Agreement* | 84 |
|  | (f) |  | Completion of the Analysis | 84 |
| C. |  |  | *Arguments of the Third Participants* | 85 |
|  | 1. |  | Argentina | 85 |
|  | 2. |  | Australia | 86 |
|  | 3. |  | Brazil | 89 |
|  | 4. |  | Canada | 90 |
|  | 5. |  | European Union | 91 |
|  | 6. |  | India | 96 |
|  | 7. |  | Japan | 96 |
|  | 8. |  | Mexico | 99 |
|  | 9. |  | Norway | 99 |
|  | 10. |  | Saudi Arabia | 100 |
|  | 11. |  | Turkey | 102 |
| III. |  |  | Issues Raised in This Appeal | 103 |
| A. |  |  | *Introduction* | 105 |

IV.    Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies.........................................106

       A.    *Introduction* ...............................................................................................106

       B.    *Article 1.1(a)(1) of the SCM Agreement* ...................................................108

             1.    The Meaning of the Term "Public Body" ....................................108
             2.    Further Allegations of Error....................................................125
             3.    Application of Article 1.1 of the *SCM Agreement* to the USDOC's
                   Determinations ...............................................................130
             4.    China's Consequential Claims under Articles 10 and 32.1 of the
                   *SCM Agreement* ...........................................................137

       C.    *Conclusion* ...............................................................................................137

V.     Article 2 of the *SCM Agreement*:  Specificity.......................................................138

       A.    *Article 2.1(a) of the SCM Agreement* .......................................................138

             1.    Interpretation of Article 2.1 of the *SCM Agreement* ...................139
             2.    Application of Article 2.1(a) of the *SCM Agreement*....................145
                   (a)    Whether the Panel erred in finding that the USDOC identified
                          an explicit limitation on access to the subsidy..............146
                   (b)    Whether the Panel erred in finding that the USDOC had a
                          sufficient basis on which to determine that the subsidy was
                          limited to "certain enterprises".......................................149

       B.    *Article 2.2 of the SCM Agreement* ...........................................................157

             1.    The Panel's Interpretation of the Term "Subsidy" in Article 2.2................158
             2.    The Panel's Statements Regarding a "Distinct Regime" ...............160

VI.    Article 14 of the *SCM Agreement*:  Calculation of the Benefit..............................163

       A.    *Article 14(d):  Benchmarks for Input Prices* ...........................................163

             1.    Introduction ...............................................................................163
             2.    Interpretation of Article 14(d) of the *SCM Agreement*................165
             3.    The Panel's Assessment of the USDOC's Determination Not to Rely on
                   In-Country Private Prices in China as Benchmarks for HRS Inputs ................171
             4.    Article 11 of the DSU ...............................................................174

       B.    *Article 14(b):  Benchmarks for Loans* .....................................................176

             1.    Introduction ...............................................................................176
             2.    Interpretation of Article 14(b) of the *SCM Agreement*................178
             3.    The Panel's Assessment of the USDOC's Decision Not to Rely on
                   Interest Rates in China as Benchmarks for SOCB Loans Denominated
                   in RMB ...............................................................................185
             4.    The Panel's Assessment of the Proxy Benchmark Actually Used by the
                   USDOC to Calculate the Benefit from RMB-Denominated SOCB
                   Loans ...............................................................................191
                   (a)    China's Claim under Article 11 of the DSU ...................192
                   (b)    Completion of the Analysis Regarding the Consistency of the
                          USDOC's Proxy Benchmark with Article 14(b) of the
                          *SCM Agreement* .......................................................198

VII.   Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the
       GATT 1994:  "Double Remedies" .......................................................................201

       A.    *Introduction* ...............................................................................................201

B. *Interpretation of Articles 19.3 and 19.4 of the SCM Agreement and Article VI:3 of the GATT 1994* ................................................................................204

    1. Article 19.3 of the *SCM Agreement* ............................................................205
    2. Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994 ....219
    3. Conclusion ..................................................................................................220

C. *Completion of the Analysis* ..................................................................................221

D. *Articles 10 and 32.1 of the SCM Agreement* ............................................................226

VIII. Findings and Conclusion ........................................................................................227


ANNEX I      Notification of an Appeal by China, WT/DS379/6

CASES CITED IN THIS REPORT

| Short title | Full case title and citation |
|---|---|
| *Argentina – Footwear (EC)* | Appellate Body Report, *Argentina – Safeguard Measures on Imports of Footwear*, WT/DS121/AB/R, adopted 12 January 2000, DSR 2000:I, 515 |
| *Australia – Apples* | Appellate Body Report, *Australia – Measures Affecting the Importation of Apples from New Zealand*, WT/DS367/AB/R, adopted 17 December 2010 |
| *Australia – Salmon* | Appellate Body Report, *Australia – Measures Affecting Importation of Salmon*, WT/DS18/AB/R, adopted 6 November 1998, DSR 1998:VIII, 3327 |
| *Australia – Salmon (Article 21.5 – Canada)* | Panel Report, *Australia – Measures Affecting Importation of Salmon – Recourse to Article 21.5 of the DSU by Canada*, WT/DS18/RW, adopted 20 March 2000, DSR 2000:IV, 2031 |
| *Brazil – Aircraft* | Appellate Body Report, *Brazil – Export Financing Programme for Aircraft*, WT/DS46/AB/R, adopted 20 August 1999, DSR 1999:III, 1161 |
| *Brazil – Aircraft (Article 22.6 – Brazil)* | Decision by the Arbitrators, *Brazil – Export Financing Programme for Aircraft – Recourse to Arbitration by Brazil under Article 22.6 of the DSU and Article 4.11 of the SCM Agreement*, WT/DS46/ARB, 28 August 2000, DSR 2002:I, 19 |
| *Canada – Aircraft* | Appellate Body Report, *Canada – Measures Affecting the Export of Civilian Aircraft*, WT/DS70/AB/R, adopted 20 August 1999, DSR 1999:III, 1377 |
| *Canada – Autos* | Appellate Body Report, *Canada – Certain Measures Affecting the Automotive Industry*, WT/DS139/AB/R, WT/DS142/AB/R, adopted 19 June 2000, DSR 2000:VI, 2985 |
| *Canada – Continued Suspension* | Appellate Body Report, *Canada – Continued Suspension of Obligations in the EC – Hormones Dispute*, WT/DS321/AB/R, adopted 14 November 2008 |
| *Canada – Dairy* | Appellate Body Report, *Canada – Measures Affecting the Importation of Milk and the Exportation of Dairy Products*, WT/DS103/AB/R, WT/DS113/AB/R and Corr.1, adopted 27 October 1999, DSR 1999:V, 2057 |
| *China – Auto Parts* | Panel Reports, *China – Measures Affecting Imports of Automobile Parts*, WT/DS339/R, WT/DS340/R, WT/DS342/R and Add.1 and Add.2, adopted 12 January 2009, as upheld (WT/DS339/R) and as modified (WT/DS340/R, WT/DS342/R) by Appellate Body Reports WT/DS339/AB/R, WT/DS340/AB/R, WT/DS342/AB/R |
| *EC and certain member States – Large Civil Aircraft* | Panel Report, *European Communities and Certain Member States – Measures Affecting Trade in Large Civil Aircraft*, WT/DS316/R, circulated to WTO Members 30 June 2010 (not yet adopted) |
| *EC – Countervailing Measures on DRAM Chips* | Panel Report, *European Communities – Countervailing Measures on Dynamic Random Access Memory Chips from Korea*, WT/DS299/R, adopted 3 August 2005, DSR 2005:XVIII, 8671 |
| *EC – Salmon (Norway)* | Panel Report, *European Communities – Anti-Dumping Measure on Farmed Salmon from Norway*, WT/DS337/R, adopted 15 January 2008, and Corr.1, DSR 2008:I, 3 |
| *EC – Sardines* | Appellate Body Report, *European Communities – Trade Description of Sardines*, WT/DS231/AB/R, adopted 23 October 2002, DSR 2002:VIII, 3359 |
| *Japan – Alcoholic Beverages II* | Appellate Body Report, *Japan – Taxes on Alcoholic Beverages*, WT/DS8/AB/R, WT/DS10/AB/R, WT/DS11/AB/R, adopted 1 November 1996, DSR 1996:I, 97 |

| Short title | Full case title and citation |
|---|---|
| *Japan – DRAMs (Korea)* | Appellate Body Report, *Japan – Countervailing Duties on Dynamic Random Access Memories from Korea*, WT/DS336/AB/R and Corr.1, adopted 17 December 2007, DSR 2007:VII, 2703 |
| *Japan – DRAMs (Korea)* | Panel Report, *Japan – Countervailing Duties on Dynamic Random Access Memories from Korea*, WT/DS336/R, adopted 17 December 2007, as modified by Appellate Body Report WT/DS336/AB/R, DSR 2007:VII, 2805 |
| *Korea – Commercial Vessels* | Panel Report, *Korea – Measures Affecting Trade in Commercial Vessels*, WT/DS273/R, adopted 11 April 2005, DSR 2005:VII, 2749 |
| *Korea – Dairy* | Appellate Body Report, *Korea – Definitive Safeguard Measure on Imports of Certain Dairy Products*, WT/DS98/AB/R, adopted 12 January 2000, DSR 2000:I, 3 |
| *Korea – Various Measures on Beef* | Appellate Body Report, *Korea – Measures Affecting Imports of Fresh, Chilled and Frozen Beef*, WT/DS161/AB/R, WT/DS169/AB/R, adopted 10 January 2001, DSR 2001:I, 5 |
| *US – Carbon Steel* | Appellate Body Report, *United States – Countervailing Duties on Certain Corrosion-Resistant Carbon Steel Flat Products from Germany*, WT/DS213/AB/R and Corr.1, adopted 19 December 2002, DSR 2002:IX, 3779 |
| *US – Continued Suspension* | Appellate Body Report, *United States – Continued Suspension of Obligations in the EC – Hormones Dispute*, WT/DS320/AB/R, adopted 14 November 2008, DSR 2008:X, 3507 |
| *US – Continued Zeroing* | Appellate Body Report, *United States – Continued Existence and Application of Zeroing Methodology*, WT/DS350/AB/R, adopted 19 February 2009 |
| *US – Corrosion-Resistant Steel Sunset Review* | Appellate Body Report, *United States – Sunset Review of Anti-Dumping Duties on Corrosion-Resistant Carbon Steel Flat Products from Japan*, WT/DS244/AB/R, adopted 9 January 2004, DSR 2004:I, 3 |
| *US – Cotton Yarn* | Appellate Body Report, *United States – Transitional Safeguard Measure on Combed Cotton Yarn from Pakistan*, WT/DS192/AB/R, adopted 5 November 2001, DSR 2001:XII, 6027 |
| *US – Countervailing Duty Investigation on DRAMS* | Appellate Body Report, *United States – Countervailing Duty Investigation on Dynamic Random Access Memory Semiconductors from Korea*, WT/DS296/AB/R, adopted 20 July 2005, DSR 2005:XVI, 8131 |
| *US – Countervailing Duty Investigation on DRAMS* | Panel Report, *United States – Countervailing Duty Investigation on Dynamic Random Access Memory Semiconductors (DRAMS) from Korea*, WT/DS296/R, adopted 20 July 2005, as modified by Appellate Body Report WT/DS296/AB/R, DSR 2005:XVII, 8243 |
| *US – Countervailing Measures on Certain EC Products* | Appellate Body Report, *United States – Countervailing Measures Concerning Certain Products from the European Communities*, WT/DS212/AB/R, adopted 8 January 2003, DSR 2003:I, 5 |
| *US – Export Restraints* | Panel Report, *United States – Measures Treating Exports Restraints as Subsidies*, WT/DS194/R and Corr.2, adopted 23 August 2001, DSR 2001:XI, 5767 |
| *US – FSC (Article 22.6 – US)* | Decision by the Arbitrator, *United States – Tax Treatment for "Foreign Sales Corporations" – Recourse to Arbitration by the United States under Article 22.6 of the DSU and Article 4.11 of the SCM Agreement*, WT/DS108/ARB, 30 August 2002, DSR 2002:VI, 2517 |

| Short title | Full case title and citation |
|---|---|
| *US – Gambling* | Appellate Body Report, *United States – Measures Affecting the Cross-Border Supply of Gambling and Betting Services*, WT/DS285/AB/R, adopted 20 April 2005, DSR 2005:XII, 5663 (Corr.1, DSR 2006:XII, 5475) |
| *US – Gambling* | Panel Report, *United States – Measures Affecting the Cross-Border Supply of Gambling and Betting Services*, WT/DS285/R, adopted 20 April 2005, as modified by Appellate Body Report WT/DS285/AB/R, DSR 2005:XII, 5797 |
| *US – Hot-Rolled Steel* | Appellate Body Report, *United States – Anti-Dumping Measures on Certain Hot-Rolled Steel Products from Japan*, WT/DS184/AB/R, adopted 23 August 2001, DSR 2001:X, 4697 |
| *US – Lamb* | Appellate Body Report, *United States – Safeguard Measures on Imports of Fresh, Chilled or Frozen Lamb Meat from New Zealand and Australia*, WT/DS177/AB/R, WT/DS178/AB/R, adopted 16 May 2001, DSR 2001:IX, 4051 |
| *US – Large Civil Aircraft (2nd complaint)* | *United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint)*, WT/DS353 (panel proceedings in progress) |
| *US – Line Pipe* | Appellate Body Report, *United States – Definitive Safeguard Measures on Imports of Circular Welded Carbon Quality Line Pipe from Korea*, WT/DS202/AB/R, adopted 8 March 2002, DSR 2002:IV, 1403 |
| *US – Softwood Lumber IV* | Appellate Body Report, *United States – Final Countervailing Duty Determination with Respect to Certain Softwood Lumber from Canada*, WT/DS257/AB/R, adopted 17 February 2004, DSR 2004:II, 571 |
| *US – Softwood Lumber VI (Article 21.5 – Canada)* | Appellate Body Report, *United States – Investigation of the International Trade Commission in Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada*, WT/DS277/AB/RW, adopted 9 May 2006, and Corr.1, DSR 2006:XI, 4865 |
| *US – Stainless Steel (Mexico)* | Appellate Body Report, *United States – Final Anti-Dumping Measures on Stainless Steel from Mexico*, WT/DS344/AB/R, adopted 20 May 2008, DSR 2008:II, 513 |
| *US – Steel Safeguards* | Appellate Body Report, *United States – Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS248/AB/R, WT/DS249/AB/R, WT/DS251/AB/R, WT/DS252/AB/R, WT/DS253/AB/R, WT/DS254/AB/R, WT/DS258/AB/R, WT/DS259/AB/R, adopted 10 December 2003, DSR 2003:VII, 3117 |
| *US – Underwear* | Appellate Body Report, *United States – Restrictions on Imports of Cotton and Man-made Fibre Underwear*, WT/DS24/AB/R, adopted 25 February 1997, DSR 1997:I, 11 |
| *US – Upland Cotton* | Appellate Body Report, *United States – Subsidies on Upland Cotton*, WT/DS267/AB/R, adopted 21 March 2005, DSR 2005:I, 3 |
| *US – Upland Cotton* | Panel Report, *United States – Subsidies on Upland Cotton*, WT/DS267/R, Corr.1, and Add.1 to Add.3, adopted 21 March 2005, as modified by Appellate Body Report WT/DS267/AB/R, DSR 2005:II, 299 |
| *US – Wheat Gluten* | Appellate Body Report, *United States – Definitive Safeguard Measures on Imports of Wheat Gluten from the European Communities*, WT/DS166/AB/R, adopted 19 January 2001, DSR 2001:II, 717 |

ABBREVIATIONS USED IN THIS REPORT

| Abbreviation | Description |
|---|---|
| *Anti-Dumping Agreement* | *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994* |
| CFS Paper Issues and Decision Memorandum | *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Coated Free Sheet from the People's Republic of China* (Panel Exhibit CHI-93) |
| China's Accession Protocol | Protocol on the Accession of the People's Republic of China, WT/L/432 |
| CWP | Circular welded carbon quality steel pipe |
| CWP Issues and Decision Memorandum | *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe from the People's Republic of China* (Panel Exhibit CHI-1) |
| DRAMS | Dynamic random access memory semiconductors |
| DSB | Dispute Settlement Body |
| DSU | *Understanding on Rules and Procedures Governing the Settlement of Disputes* |
| GATS | *General Agreement on Trade in Services* |
| GATT 1994 | *General Agreement on Tariffs and Trade 1994* |
| GNI | Gross national income |
| GOC Catalogue | *Guiding Catalogue of the Industrial Restructuring (2005)*, promulgated by the National Development and Reform Commission (Panel Exhibit CHI-70) |
| HRS | Hot-rolled steel |
| ILC | International Law Commission |
| ILC Articles | *Responsibility of States for Internationally Wrongful Acts.* Text adopted by the ILC at its fifty-third session, in 2001, and submitted to the United Nations General Assembly as a part of the ILC's report covering the work of that session. The General Assembly "[took] note of the articles on responsibility of States for internationally wrongful acts" for the first time in General Assembly Resolution 56/83 of 12 December 2001, corrected by document A/56/49(Vol. I)/Corr.4, and subsequently in Resolution 59/35 of 2 December 2004, Resolution 62/61 of 6 December 2007, and Resolution 65/19 of 6 December 2010. The ILC's report, which also contains commentaries on the draft articles, appears in the *Yearbook of the International Law Commission, 2001*, Vol. II, Part Two |
| Implementing Regulation | *Decision of the State Council on Promulgating the "Interim Provisions on Promoting Industrial Structure Adjustment" for Implementation* (Panel Exhibit US-87) |
| Industrial Park | New Century Industrial Park |
| LWR | Light-walled rectangular pipe and tube |

| Abbreviation | Description |
|---|---|
| LWR Issues and Decision Memorandum | *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Light-Walled Rectangular Pipe and Tube from the People's Republic of China* (Panel Exhibit CHI-2) |
| LWS | Laminated woven sacks |
| LWS Issues and Decision Memorandum | *Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination:  Laminated Woven Sacks from the People's Republic of China* (Panel Exhibit CHI-3) |
| NME | Non-market economy |
| OTR | Certain new pneumatic off-the-road tyres |
| OTR Issues and Decision Memorandum | *Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination:  Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of China* (Panel Exhibit CHI-4) |
| Panel Report | Panel Report, *United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, WT/DS379/R |
| RMB | Chinese renminbi |
| *SCM Agreement* | *Agreement on Subsidies and Countervailing Measures* |
| SOCB | State-owned commercial bank |
| SOE | State-owned enterprise |
| *Tokyo Round Subsidies Code* | Tokyo Round *Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade*, BISD 26S/56, entered into force 1 January 1980 |
| USDOC | United States Department of Commerce |
| *Vienna Convention* | *Vienna Convention on the Law of Treaties*, done at Vienna, 23 May 1969, 1155 UNTS 331;  8 International Legal Materials 679 |
| *Working Procedures* | *Working Procedures for Appellate Review*, WT/AB/WP/6, 16 August 2010 |
| WTO | World Trade Organization |
| *WTO Agreement* | *Marrakesh Agreement Establishing the World Trade Organization* |

WORLD TRADE ORGANIZATION
APPELLATE BODY

| | |
|---|---|
| **United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China** | AB-2010-3 |
| | Present: |
| China, *Appellant* | |
| United States, *Appellee* | Ramírez-Hernández, Presiding Member |
| | Bautista, Member |
| Argentina, *Third Participant* | Van den Bossche, Member |
| Australia, *Third Participant* | |
| Bahrain, *Third Participant* | |
| Brazil, *Third Participant* | |
| Canada, *Third Participant* | |
| European Union[1], *Third Participant* | |
| India, *Third Participant* | |
| Japan, *Third Participant* | |
| Kuwait, *Third Participant* | |
| Mexico, *Third Participant* | |
| Norway, *Third Participant* | |
| Saudi Arabia, *Third Participant* | |
| Separate Customs Territory of Taiwan, Penghu, Kinmen and Matsu, *Third Participant* | |
| Turkey, *Third Participant* | |

## I.  Introduction

1.     China appeals certain issues of law and legal interpretations developed in the Panel Report, *United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China* (the "Panel Report").[2]  The Panel was established on 20 January 2009 to consider a complaint by China with respect to definitive anti-dumping duties and countervailing duties imposed by the United States on each of the following four products from China:  (i) circular welded carbon quality

---

[1]This dispute began before the entry into force of the *Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community* (done at Lisbon, 13 December 2007) on 1 December 2009.  On 30 November 2009, the World Trade Organization received a Verbal Note (WT/L/779) from the Council of the European Union and the Commission of the European Communities stating that, by virtue of the *Treaty of Lisbon*, as of 1 December 2009, the "European Union" replaces and succeeds the "European Community".  On 13 July 2010, the World Trade Organization received a Verbal Note (WT/Let/679) from the Council of the European Union confirming that, with effect from 1 December 2009, the European Union replaced the European Community and assumed all the rights and obligations of the European Community in respect of all Agreements for which the Director-General of the World Trade Organization is the depositary and to which the European Community is a signatory or a contracting party.  We understand the reference in the Verbal Notes to the "European Community" to be a reference to the "European Communities".  Thus, although the European Communities reserved its right to participate in the Panel proceedings as a third party, and the Panel referred to the European Communities in its Report, the European Union filed its third participant's submission in this appeal after the entry into force of the *Treaty of Lisbon*, and we will thus refer to the European Union in this Report.

[2]WT/DS379/R, 22 October 2010.

steel pipe ("CWP");  (ii) light-walled rectangular pipe and tube ("LWR");  (iii) laminated woven sacks ("LWS");  and (iv) certain new pneumatic off-the-road tyres ("OTR").[3]

2.      In respect of each of the products, an anti-dumping and a countervailing duty investigation were initiated in tandem in July or August 2007.[4]  In each of the four anti-dumping investigations, the United States Department of Commerce (the "USDOC") treated China as a non-market economy ("NME") country for purposes of determining normal value and calculating the margins of dumping. For each product, the USDOC issued its final anti-dumping and countervailing duty determinations on the same day, in either June or July 2008.[5]  Pursuant to these determinations, the USDOC imposed definitive anti-dumping and countervailing duties on the four investigated products from China.[6]

3.      Among the determinations made by the USDOC in the four countervailing duty determinations were the following.  In the CWP and the LWR investigations, the USDOC determined that the government provision of hot-rolled steel ("HRS") to certain producers through State-owned enterprises ("SOE"s) constituted countervailable subsidies, that private prices in China could not be used as benchmarks to determine the existence and amount of benefit conferred by such subsidies and that, as a result, it was necessary to resort to alternative benchmarks in conducting its benefit determination.[7]  In the CWP, LWS, and OTR investigations, the USDOC found that the provision of preferential loans by government policy banks and State-owned commercial banks ("SOCB"s) constituted subsidies that were *de jure* specific, that it would not be appropriate to use the interest rates on loans issued by Chinese banks as a benchmark, and that it was necessary, instead, to construct a proxy interest rate to determine the existence and amount of benefit conferred by the loans.[8]  In the LWS investigation, the USDOC found that the government provision of land-use rights was a subsidy that was regionally specific, and used out-of-country benchmarks to determine the existence and

---

[3]Panel Report, para. 2.1.

[4]The CWP investigations were initiated on 5 July 2007;  the LWR investigations on 24 July 2007;  the LWS investigations on 25 July 2007;  and the OTR investigations on 7 August 2007. (Panel Report, paras. 2.2, 2.6, 2.7, 2.10, 2.11, 2.14, 2.15, and 2.18)  For each of the four countervailing duty investigations, the period of investigation was from 1 January to 31 December 2006. (*Ibid.*, paras. 2.2, 2.7, 2.11, and 2.15)  For each of the four anti-dumping investigations, the period of investigation was from 1 October 2006 to 31 March 2007. (*Ibid.*, paras. 2.6, 2.10, 2.14, and 2.18)

[5]The final determinations were issued on 5 June 2008 for CWP;  on 24 June 2008 for both LWR and LWS;  and on 15 July 2008 for OTR. (Panel Report, paras. 2.3, 2.6, 2.8, 2.10, 2.12, 2.14, 2.16, and 2.18)

[6]In respect of CWP, the countervailing duty rates ranged from 29.62 per cent to 616.83 per cent and the anti-dumping duty rates ranged from 69.20 per cent to 85.55 per cent;  in respect of LWR, the countervailing duty rates ranged from 2.17 per cent to 200.58 per cent and the anti-dumping duty rates ranged from 249.12 per cent to 264.64 per cent;  in respect of LWS, the countervailing duty rates ranged from 29.54 per cent to 352.82 per cent and the anti-dumping duty rates ranged from 64.28 per cent to 91.73 per cent;  and in respect of OTR, the countervailing duty rates ranged from 2.45 per cent to 14 per cent and the anti-dumping duty rates ranged from 5.25 per cent to 210.48 per cent. (Panel Report, paras. 2.3, 2.6, 2.8, 2.10, 2.12, 2.14, 2.16, and 2.18)

[7]Panel Report, paras. 2.4 and 2.9.

[8]Panel Report, paras. 2.5, 2.13, and 2.17.

amount of the subsidy benefits.[9]  In all four investigations, the USDOC determined that various SOEs that supplied goods to investigated companies should be characterized as "public bodies"[10], and it made the same determination in respect of certain SOCBs that provided loans to investigated companies in the OTR investigation.[11]

4.      Before the Panel, China claimed that the final USDOC determinations that led to the imposition of the duties, the orders imposing the duties themselves, and certain aspects of the conduct of the underlying countervailing duty investigations were inconsistent with the United States' obligations under the *Agreement on Subsidies and Countervailing Measures* (the "*SCM Agreement*") and the *General Agreement on Tariffs and Trade 1994* (the "GATT 1994").[12]  China also made both "as applied" and "as such" claims in connection with the alleged imposition by the United States of "double remedies" resulting from the application, in each of the four sets of investigations at issue, of anti-dumping duties calculated under the United States' NME methodology simultaneously with countervailing duties on the same products.[13]

5.      More particularly, with respect to the USDOC's findings of financial contribution, China claimed that the USDOC's determinations that certain SOEs and SOCBs constituted "public bodies" were inconsistent with Articles 1.1, 10, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994.[14]  China also claimed that the USDOC's determination that the preferential lending by SOCBs in the OTR investigation was *de jure* specific was inconsistent with Articles 2.1(a), 10, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994.[15]  With regard to regional specificity, China claimed that the USDOC's finding regarding the provision of land-use rights in the

---

[9]Panel Report, paras. 2.13 and 9.146.

[10]Panel Report, para. 8.99.  The Panel noted that "public bodies" are referred to as "authorities" in the relevant United States statute and thus in the USDOC's determinations as well.  The United States explained that, under its domestic law, the definition of the term "authority" includes the term "public entity", and this latter term means "public body".  There is no disagreement between the parties as to the equivalence of the terms "public entity" under United States law and "public body" in Article 1.1(a)(1) of the *SCM Agreement*. (*Ibid.*, para. 8.99 and footnote 199 thereto)

[11]Panel Report, para. 8.117.

[12]Panel Report, para. 2.1.  In its request for the establishment of a panel, China also made claims under Articles 2.4, 9.2, and 9.3 of the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994* (the "*Anti-Dumping Agreement*").  China did not pursue these claims before the Panel. (Panel Report, footnote 880 to para. 14.12)

[13]Panel Report, para. 2.1.

[14]Panel Report, paras. 8.1 and 8.2.  With regard to the USDOC's analysis of financial contribution, China also claimed that the USDOC's failure in the CWP, LWR, and OTR investigations to assess whether trading companies were entrusted or directed to make financial contributions was inconsistent with Articles 1.1(a)(1)(iv), 10, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994. (*Ibid.*, paras. 12.1 and 12.3)

[15]Panel Report, para. 9.1.

LWS investigation was inconsistent with Articles 2, 10, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994.[16]

6.      China made multiple claims with respect to the USDOC's benefit analyses.[17]   Among the claims relating to the USDOC's selection of benchmarks were claims that:  (i) in the CWP, LWR, and LWS investigations, the USDOC's rejection of Chinese private prices as benchmarks in respect of SOE-produced inputs (HRS in the CWP and LWR investigations, and biaxial-oriented polypropylene in the LWS investigation) was inconsistent with Articles 10, 14(d), and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994[18];  and that (ii) in the CWP, LWS, and OTR investigations, the USDOC's rejection of Chinese renminbi ("RMB") interest rates as benchmarks in respect of SOCB loans denominated in RMB and its use, instead, of a constructed proxy as a benchmark, were inconsistent with Articles 10, 14(b), and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994.[19]

7.      With regard to the issue of "double remedies", China claimed that, in each of the four sets of investigations, the USDOC's use of its NME methodology to determine normal value in anti-dumping determinations, concurrently with the imposition of countervailing duties on the same products, was

---

[16]Panel Report, para. 9.108.

[17]China claimed that the USDOC's failure in the OTR investigation to offset positive amounts of benefit with negative amounts was inconsistent with Articles 10, 14, 19.1, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994. (Panel Report, para. 11.1)  China also claimed, as an alternative to its claim in respect of financial contribution set out *supra*, footnote 14 of this Report, that the USDOC's methodology for the calculation of benefit in the CWP, LWR, and OTR investigations was inconsistent with Articles 1.1, 10, 14, 19.1, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994, because the USDOC failed to conduct a pass-through analysis to determine whether any subsidy benefits received by trading companies selling inputs were passed through to the investigated producers purchasing those inputs. (Panel Report, paras. 12.2 and 12.4)

[18]Panel Report, paras. 10.1, 10.2, and 10.24.  China also claimed that the USDOC's rejection of in-country benchmarks in respect of the provision of land-use rights in the LWS and OTR investigations and the use of benchmarks based on out-of-country prices were inconsistent with Articles 10, 14(d), and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994. (*Ibid.*, paras. 10.1, 10.4, 10.5, 10.67, and 10.164) Furthermore, in its request for the establishment of a panel, China made certain claims under Section 15 of the Protocol on the Accession of the People's Republic of China ("China's Accession Protocol") (WT/L/432), which, *inter alia*, addresses importing Members' methodologies for identifying and measuring the subsidy benefit for imports from China.  However, China did not pursue these claims and the Panel did not rule on them. (*Ibid.*, paras. 10.9-10.12)

[19]Panel Report, paras. 10.1, 10.6, 10.7, 10.85, and 10.192.  China also claimed that, in the OTR investigation, the USDOC acted inconsistently with Article 14(b) of the *SCM Agreement* in applying as a benchmark an annual average LIBOR-based interest rate, instead of the applicable daily rates, to United States dollar-denominated loans. (*Ibid.*, paras. 10.1, 10.8, 10.85, and 10.210)

inconsistent with Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI of the GATT 1994.[20]

8.      In addition, China made claims under Articles 12.1, 12.1.1, 12.7, and 12.8 of the *SCM Agreement* alleging that certain procedural aspects of the USDOC's conduct of the countervailing duty investigations were inconsistent with the United States' obligations under these provisions.[21]

9.      The Panel Report was circulated to Members of the World Trade Organization (the "WTO") on 22 October 2010.

10.      In respect of China's claims regarding the USDOC's determinations of financial contributions, the Panel found that China had not established that the USDOC had acted inconsistently with the obligations of the United States under Article 1.1(a)(1) of the *SCM Agreement* by determining in the relevant investigations at issue that SOEs and SOCBs constituted "public bodies".[22]

11.      In respect of China's claims regarding the USDOC's specificity determinations, the Panel found that:

> China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 2.1(a) of the SCM Agreement by determining in the OTR investigation that lending by SOCBs to the OTR tire industry was *de jure* specific;  [and]

---

[20]Panel Report, para. 14.8.  China also claimed that: (i) the USDOC's failure to extend to imports from China the same unconditional entitlement to the avoidance of double remedies that the USDOC extends to like products originating in other Members was inconsistent with Article I:1 of the GATT 1994 (*ibid.*, para. 14.9); (ii) the United States acted inconsistently with Articles 12.1 and 12.8 of the *SCM Agreement*, due to the USDOC's failure to provide interested parties notice of the information that the USDOC required to evaluate the existence of double remedies, and failure to inform China and interested parties of the essential facts under consideration that would "form the basis" for the USDOC's determinations in respect of the issue of "double remedies" (*ibid.*, para. 14.10);  and (iii) the United States' failure to provide sufficient legal authority for the USDOC to avoid the imposition of double remedies when it imposes anti-dumping duties determined pursuant to its NME methodology simultaneously with the imposition of countervailing duties on the same product was inconsistent with Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Articles I:1 and VI of the GATT 1994 (*ibid.*, paras. 14.11 and 14.12).

[21]China claimed that the USDOC's failure in the four investigations to afford interested parties a 30-day period to reply to the "supplemental" questionnaires and "new allegation" questionnaires was inconsistent with Article 12.1.1 of the *SCM Agreement* (Panel Report, para. 15.1), and that the USDOC's use of facts available in the LWR and CWP investigations in respect of provision of goods through transactions involving trading companies was inconsistent with Articles 12.1 and 12.7 of the *SCM Agreement* (*ibid.*, para. 16.1).

[22]Panel Report, para. 17.1(a)(i);  see also paras. 8.138 and 8.143.  The Panel also found that China had not established that the USDOC had acted inconsistently with the obligations of the United States under Article 1.1 of the *SCM Agreement* by failing to determine, in the CWP, LWR, and OTR investigations, that trading companies were "entrusted" or "directed" by the government to make financial contributions. (*Ibid.*, para. 17.1(a)(ii);  see also para. 12.38)

> The USDOC acted inconsistently with the obligations of the United States under Article 2 of the SCM Agreement by determining that the government provision of land-use rights, in the LWS investigation, was regionally-specific.[23]

12.     In respect of China's claims regarding the USDOC's benefit determinations, the Panel found, in part[24], that:

> China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 14(d) of the SCM Agreement by rejecting in-country private prices in China as benchmarks for HRS in the CWP and LWR investigations ... ;  [and]

> China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 14(b) of the SCM Agreement by rejecting interest rates in China as benchmarks for calculating the benefit from RMB-denominated loans from SOCBs,

---

[23]Panel Report, para. 17.1(b)(i) and (ii);  see also paras. 9.107 and 9.164.

[24]In respect of China's claims regarding the USDOC's benefit analyses, the Panel also found that China had not established that the USDOC had acted inconsistently with the obligations of the United States under the *SCM Agreement* or Article VI:3 of the GATT 1994:

    (a)    by failing to conduct a pass-through analysis in the OTR investigation to determine whether any subsidy benefits received by trading companies selling rubber inputs were passed through to the OTR producers purchasing those inputs (Panel Report, para. 17.1(c)(i);  see also para. 12.45);

    (b)    by not "offsetting" positive benefit amounts with "negative" benefit amounts, either across different kinds of rubber or across different months of the period of investigation, in the OTR investigation (*ibid.*, para. 17.1(c)(iv);  see also para. 11.68);

    (c)    by rejecting in-country private prices in China as benchmarks for ... [biaxial-oriented polypropylene] in the LWS investigation (*ibid.*, para. 17.1(c)(vi);  see also para. 10.66);  and

    (d)    by rejecting land-use prices in China as benchmarks for government-provided land-use rights in the LWS and OTR investigations, or [by virtue of] the benchmarks actually used (*ibid.*, para. 17.1(c)(ix);  see also para. 10.82).

The Panel further found, in respect of China's claims regarding the USDOC's benefit analyses, that:

    (a)    the USDOC had acted inconsistently with the obligations of the United States under Articles 1.1 and 14 of the *SCM Agreement* in failing to ensure that its methodology for benefit analysis did not calculate a benefit amount in excess of that conferred (*ibid.*, para. 17.1(c)(ii);  see also para. 12.58);  and

    (b)    the USDOC had acted inconsistently with the obligations of the United States under Article 14(b) of the *SCM Agreement* by using average annual interest rates as benchmarks for United States dollar-denominated loans from SOCBs in the OTR investigation (*ibid.*, para. 17.1(c)(viii);  see also para. 10.219).

in the CWP, LWS and OTR investigations, or that the benchmarks actually used in respect of the RMB-denominated loans were inconsistent with those obligations.[25]

13.    In respect of China's claims of consequential violations of Articles 10 and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994, the Panel applied judicial economy.[26]

14.    In respect of China's claims with respect to "double remedies", the Panel found, in part[27], that:

> China did not establish that the United States acted inconsistently with its obligations under Articles 10, 19.3, 19.4, and 32.1 of the SCM Agreement or under Article VI:3 of GATT 1994 by reason of the USDOC's use of its NME methodology in the four anti-dumping investigations at issue and the imposition of anti-dumping duties on that basis concurrently with the imposition of countervailing duties on the same products in the four countervailing duty investigations at issue.[28]

15.    The Panel also found, with respect to one of China's claims regarding procedural aspects of the countervailing duty investigations, that the United States had acted inconsistently with Article 12.7 of the *SCM Agreement* by applying facts available in the CWP and LWR investigations.[29]

---

[25]Panel Report, para. 17.1(c)(vi) and (vii);  see also paras. 10.61 and 10.148.  Before assessing China's claims in respect of the benchmarks actually used by the USDOC to calculate the benefit from the provision of loans and land-use rights in the CWP, LWS, and OTR investigations, the Panel made a finding that these claims fell within its terms of reference. (*Ibid.*, para. 17.1(c)(v);  see also para. 10.163)

[26]Panel Report, para. 17.1(d);  see also para. 13.1.

[27]The Panel also:  (i) ruled that the "omission" challenged by China, that is, the United States' alleged failure to provide sufficient legal authority for the USDOC to avoid the imposition of double remedies when it imposes anti-dumping duties determined pursuant to its NME methodology simultaneously with the imposition of countervailing duties on the same product, fell outside its terms of reference and that, therefore, China's "as such" claims under Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Articles I:1 and VI of the GATT 1994 equally fell outside its terms of reference (Panel Report, para. 17.1(e)(i);  see also para. 14.42); (ii) found that China had not established that the USDOC had acted inconsistently with the obligations of the United States under Articles 12.1 and 12.8 of the *SCM Agreement* by failing to give "notice" of the information it required to evaluate the existence of double remedies or to inform the Government of China and interested parties of the essential facts under consideration that would "form the basis" for its determination in respect of double remedies in the four countervailing duty investigations at issue (*ibid.*, para. 17.1(e)(iii);  see also para. 14.149);  and (iii) found that China had not established that the United States acted inconsistently with its obligations under Article I:1 of the GATT 1994 when, as a result of the investigations at issue, it concurrently imposed anti-dumping duties calculated under the United States' NME methodology and countervailing duties (*ibid.*, para. 17.1(e)(iv);  see also para. 14.182).

[28]Panel Report, para. 17.1(e)(ii);  see also paras. 14.123, 14.130, 14.138, and 14.139.

[29]Panel Report, para. 17.1(f)(ii);  see also para. 16.17.  In the light of this finding, the Panel applied judicial economy in respect of China's claims regarding the USDOC's benefit determinations in these two investigations on the provision of HRS by trading companies. (*Ibid.*, para. 17.1(c)(iii);  see also para. 12.40)  In contrast, the Panel found that China had not established that the USDOC had acted inconsistently with the obligations of the United States under Article 12.1.1 of the *SCM Agreement* by failing to provide the Government of China and investigated producers at least 30 days to respond to the "supplemental" questionnaires and "new allegation" questionnaires in the four countervailing duty investigations at issue. (*Ibid.*, para. 17.1(f)(i);  see also para. 15.49)  The Panel also found that China's claim under Article 12.1 of the *SCM Agreement* was outside the terms of reference of the Panel. (*Ibid.*, para. 17.1(f)(iii);  see also para. 16.18)

16.     Accordingly, the Panel recommended that the Dispute Settlement Body (the "DSB") request the United States to bring those measures found to be inconsistent into conformity with its obligations under the *SCM Agreement* and the GATT 1994.

17.     On 1 December 2010, China notified the DSB of its intention to appeal certain issues of law covered in the Panel Report and certain legal interpretations developed by the Panel, pursuant to Articles 16.4 and 17 of the *Understanding on Rules and Procedures Governing the Settlement of Disputes* (the "DSU"), and filed a Notice of Appeal[30] and an appellant's submission pursuant to Rules 20 and 21, respectively, of the *Working Procedures for Appellate Review* (the "*Working Procedures*").[31]   On 20 December 2010, the United States filed an appellee's submission.[32] On 22 December 2010, Argentina[33], Australia, Brazil, Canada, the European Union, Japan, Norway, and Saudi Arabia each filed a third participant's submission[34], and a third participant's submission was also received from Turkey.[35]  Bahrain, India, Mexico, and the Separate Customs Territory of Taiwan, Penghu, Kinmen and Matsu each notified its intention to appear at the oral hearing as a third participant.

18.     On 15 December 2010, the Appellate Body received an unsolicited *amicus curiae* brief.  After giving the participants and the third participants an opportunity to express their views, the Division hearing the appeal did not find it necessary to rely on this *amicus curiae* brief in rendering its decision.

19.     The oral hearing in this appeal was held on 13 and 14 January 2011.  The participants and 11 of the third participants (Argentina, Australia, Brazil, Canada, the European Union, India, Japan, Mexico, Norway, Saudi Arabia, and Turkey) made oral statements.  The participants and third participants responded to questions posed by the Members of the Division hearing the appeal.

---

[30]WT/DS379/6.

[31]WT/AB/WP/6, 16 August 2010.  This is the first appeal filed under this latest version of the *Working Procedures*, the provisions of which apply to appeals initiated on or after 15 September 2010.

[32]Pursuant to Rules 22 and 23(4) of the *Working Procedures*.

[33]On 23 December 2010, the Director of the Appellate Body Secretariat received the executive summary of Argentina's third participant's submission.  By letter dated 5 January 2011, the Division hearing this appeal informed Argentina that the executive summary would not be accepted because it had been submitted after 22 December 2010, the deadline for filing a third participant's submission.

[34]Pursuant to Rule 24(1) of the *Working Procedures*.

[35]We note that Turkey's third participant's submission was not received before the 17:00 deadline specified in Rule 18(1) of the *Working Procedures*.  While we are cognizant of the fact that this is the first appeal filed following recent amendments to the *Working Procedures*, including to Rule 18(1), we nevertheless wish to emphasize strongly the importance of timely filing of documents in appeals.

## II.   Arguments of the Participants and the Third Participants

### A.   *Claims of Error by China – Appellant*

20.   First, China appeals the Panel's interpretation of Article 1.1(a)(1) of the *SCM Agreement* and its finding that China had not established that the USDOC had acted inconsistently with the obligations of the United States by determining that SOEs and SOCBs constituted "public bodies". Second, with respect to the Panel's findings on specificity, China:   (i) appeals the Panel's interpretation of Article 2.1(a) of the *SCM Agreement* and its finding that China had not established that the USDOC had acted inconsistently with the obligations of the United States by determining in the OTR investigation that lending by SOCBs to the OTR industry was *de jure* specific;   and (ii) challenges the Panel's legal interpretation of Article 2.2 of the *SCM Agreement* in its evaluation of China's claim that the USDOC had acted inconsistently with the obligations of the United States under Article 2 of the *SCM Agreement* by determining in the LWS investigation that the government provision of land-use rights was regionally specific.   Third, China appeals the Panel's interpretation of Article 14(d) of the *SCM Agreement* and its finding that China had not established that the USDOC had acted inconsistently with the obligations of the United States by rejecting private prices in China as benchmarks for HRS in the CWP and LWR investigations.   Fourth, China appeals the Panel's interpretation of Article 14(b) of the *SCM Agreement* and its finding that China had not established that the USDOC had acted inconsistently with the obligations of the United States by rejecting interest rates in China as benchmarks for calculating the benefit from RMB-denominated loans from SOCBs, in the CWP, LWS, and OTR investigations, and by instead using a constructed proxy as a benchmark. Finally, China appeals the Panel's finding that China had not established that the United States had, by imposing anti-dumping duties calculated under an NME methodology and countervailing duties concurrently on the same products, imposed "double remedies" and acted inconsistently with its obligations under Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* or Article VI:3 of the GATT 1994.

### 1.   Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies

21.   China requests the Appellate Body to find that the Panel erred in its interpretation and application of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*, and that the Panel acted inconsistently with Articles 3.2 and 11 of the DSU by relying on municipal law usages in interpreting this term.   China requests the Appellate Body to reverse the Panel's finding that "any public body" in Article 1.1 means "any government-controlled entity", and to find that a "public body" is an entity that exercises authority vested in it by the government for the purpose of performing functions of a governmental character.   China also requests the Appellate Body to reverse

WT/DS379/AB/R
Page 10

the Panel's finding that China did not establish that the United States had acted inconsistently with its obligations under Article 1.1 of the *SCM Agreement* and to find, instead, that the United States did act inconsistently with these obligations in determining that the provision of inputs by SOEs and the provision of loans by SOCBs were financial contributions by "public bodies".  China further requests the Appellate Body to complete the analysis in respect of China's consequential claims and to find that the challenged measures are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

22.    China alleges that the Panel erred in concluding that government control established through majority ownership would be sufficient to conclude that an entity is a "public body".  In China's view, the Panel failed to interpret Article 1.1 of the *SCM Agreement* in accordance with the ordinary meaning of the terms of the treaty in their context and in the light of its object and purpose, and further failed to take account of the International Law Commission's (the "ILC") Articles on *Responsibility of States for Internationally Wrongful Acts*[36] (the "ILC Articles") in its interpretation. China submits that, when the term is properly interpreted, the defining characteristic of a "public body" is that it exercises authority vested in it by the government for the purpose of performing functions of a governmental character.

(a)    The Ordinary Meaning of the Terms of the Treaty

(i)    *Dictionary Definitions*

23.    With respect to the term "public body", China asserts that the most relevant dictionary definitions of the adjective "public", when used with the noun "body", denote a body acting on behalf of a nation or community as a whole, and under the authority of, or officially on behalf of, the nation or community as a whole.

(ii)    *Context*

24.    As regards the context relevant to the interpretation of the term "public body", China argues, first, that the most important contextual element is the fact that Article 1.1 of the *SCM Agreement* places "a government" and "any public body" in the same category for purposes of attributing financial contributions to Members.  China disagrees with the Panel's understanding that this

---

[36]*Responsibility of States for Internationally Wrongful Acts.*  Text adopted by the ILC at its fifty-third session, in 2001, and submitted to the United Nations General Assembly as a part of the ILC's report covering the work of that session.  The General Assembly "[took] note of the articles on responsibility of States for internationally wrongful acts" for the first time in General Assembly Resolution 56/83 of 12 December 2001, corrected by document A/56/49(Vol. I)/Corr.4, and subsequently in Resolution 59/35 of 2 December 2004, Resolution 62/61 of 6 December 2007, and Resolution 65/19 of 6 December 2010.  The ILC's report, which also contains commentaries on the draft articles, appears in the *Yearbook of the International Law Commission, 2001*, Vol. II, Part Two.

collective expression is merely a device to simplify drafting.  China quotes the Appellate Body's statement in *Canada – Dairy* that "the essence of 'government'" is its functions, powers, and authority, and submits that the same should apply to any entity deemed functionally equivalent to a government.[37]  Furthermore, while the use of the words "a", "or", and "any" may suggest that the terms "a government" and "any public body" have separate meanings, the mere fact that they have separate meanings reveals nothing about the content of each.  Likewise, according to China, the use of the word "any" suggests only that all entities that qualify as a "public body" are captured within the scope of Article 1.1, but gives no indication as to their nature or defining characteristics.

25.     Second, with respect to Article 1.1(a)(1)(iv) of the *SCM Agreement*, China notes that the Panel considered the relevant question to be whether wholly or majority government-owned enterprises that produce and sell goods and services are more appropriately categorized as "public bodies" or "private bodies" for the purposes of the *SCM Agreement*.  For China, the answer to this question is clear from the language of Article 1.1(a)(1)(iv) and the Appellate Body's interpretation thereof.  Under Article 1.1(a)(1)(iv), the conduct of a "private body" will be attributed to a Member only if a government or public body "entrusts or directs [it] to carry out one or more of the ... functions ... which would normally be vested in the government and the practice, in no real sense, differs from practices normally followed by governments".  This confirms that the focus of Article 1.1 is on attributing to Members functions that are governmental in nature, and that a "public body" must be vested with governmental authority in order to be capable of entrusting or directing a private body.  Such a view is reflected in the Appellate Body's interpretation of subparagraph (iv) in *US – Countervailing Duty Investigation on DRAMS* and was shared by investigating authorities in the United States, the European Union, and Japan in the various dynamic random access memory semiconductors ("DRAMS") proceedings.[38]  All of these investigating authorities treated government-owned entities as "private bodies" *unless* they were created by a government for the purpose of carrying out governmental functions and vested with the authority to do so.  China points out that the dictionary definitions of the terms "private enterprise" and "public sector", which the Panel considered as context, do not appear in the text of Article 1.1 and therefore cannot be relevant context for interpreting the terms "public body" and "private body".

---

[37]China's appellant's submission, paras. 41 (quoting Appellate Body Report, *Canada – Dairy*, para. 97) and 42.

[38]China's appellant's submission, paras. 57-59 (quoting Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, paras. 113 and 131;  and referring to Panel Report, *EC – Countervailing Measures on DRAM Chips*, paras. 7.35, 7.90, and 7.119;  Panel Report, *US – Countervailing Duty Investigation on DRAMS*, para. 7.8 and footnote 29 thereto;  and Panel Report, *Japan – DRAMs (Korea)*, paras. 7.50 and 7.55).

26.     Third, with respect to Article 1.1(a)(1)(i)-(iii) of the *SCM Agreement*, which the Panel considered to be a further contextual element, China disagrees with the Panel's premise that some of the functions listed in these subparagraphs are typically the business of firms or corporations rather than governments.   Rather, the provision of loans, goods, or services is neither inherently governmental nor inherently non-governmental.   Moreover, even accepting that the Panel's premise was correct, it does not follow that the term "public body" must mean any "government-controlled entity".

27.     Finally, China rejects the Panel's equation of China's arguments on "public body" with those of Korea in *Korea – Commercial Vessels*, as well as the Panel's corresponding observation that such an approach would "suffer from the same flaw of mixing considerations of benefit (behaviour in a particular instance) with determining the nature of the entity (without regard for its behaviour in a particular instance)".[39]   Under China's interpretation of "public body", whether an entity is vested with and exercises authority to carry out governmental functions would not require any analysis of whether the terms of a given transaction are commercial or not.

### (iii)     *Object and Purpose of the SCM Agreement*

28.     China recalls the Appellate Body's view that the *SCM Agreement* reflects a "delicate balance"[40] between Members that sought to impose more disciplines on the use of subsidies and those that sought to impose more disciplines on the application of countervailing measures.   The Panel, however, ignored this "delicate balance" and focused exclusively on the disciplines on the use of subsidies, because of its concern that interpreting the term "public body" too narrowly would allow avoidance of the *SCM Agreement*'s disciplines.   Yet the Panel's concern is misplaced for two reasons. First, the Panel wrongly believed that China's definition of "public body" was limited to "formal arms" or "organs" of government and could not encompass government-owned or -controlled entities. Second, even if a government-owned or -controlled corporation were not deemed a public body, its conduct could still be captured by the *SCM Agreement* under Article 1.1(a)(1)(iv), which, as the Appellate Body has recognized, is essentially an anti-circumvention provision intended to ensure that governments do not evade their obligations under the *SCM Agreement* by using private bodies to take actions that would otherwise fall within Article 1.1(a)(1).

---

[39]China's appellant's submission, para. 68 (quoting Panel Report, para. 8.72).
[40]China's appellant's submission, para. 76 (quoting Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, para. 115).

29.     China contests the Panel's view that it would "seriously undermine the entire SCM Agreement"[41] if subparagraph (iv) were deemed to encompass government-controlled corporate entities.  The investigating authorities of the United States, the European Union, and Japan all evaluated the conduct of government-owned or -controlled entities in their investigations on DRAMS as that of private bodies subject to the standard of entrustment or direction in Article 1.1(a)(1)(iv). Furthermore, in the WTO disputes related to these investigations, neither the panels nor the Appellate Body suggested that there might be any problem with such an approach.  The findings of these investigating authorities are "ample testament"[42] to the fact that a government's conduct will not escape the disciplines of the *SCM Agreement*.  Moreover, the Panel's reliance upon a concern that "Members 'could easily *hide behind* the presumptively "private" nature of such [government-owned or -controlled] entities, even while running those entities so as *deliberately* to provide trade-distorting subsidies'"[43], is inconsistent with Article 26 of the *Vienna Convention on the Law of Treaties*[44] (the "*Vienna Convention*").  This provision has been recognized as requiring panels and the Appellate Body to "assume that Members of the WTO will abide by their treaty obligations in good faith, as required by the principle of *pacta sunt servanda* articulated in Article 26 of the *Vienna Convention*".[45]

30.     Finally, with respect to the Panel's attempt to justify its "broad" interpretation of the term "public body" on the ground that the categorization of a given entity as a government, a public body or a private body under Article 1.1(a)(1) "is simply the 'first filter' in a multi-part analysis"[46], China observes that this "ignores the fact that the financial contribution requirement was *itself* designed to be a meaningful 'filter' in the subsidy analysis".[47]  China contends that the object and purpose of the *SCM Agreement* would be undermined if entities properly considered "private bodies" subject to the standard of entrustment and direction were automatically deemed "public bodies".  China insists that there is "no conceivable justification" for the Panel's interpretation, which "amounts to a *per se* rule that 51 per cent government ownership is sufficient, by itself, to conclude that an entity is a public body"[48], and cautions that such an interpretation would, if accepted, "have far-reaching and troubling implications for the proper application of the SCM Agreement".[49]

---

[41]China's appellant's submission, para. 82 (quoting Panel Report, para. 8.82).
[42]China's appellant's submission, para. 84.
[43]China's appellant's submission, para. 86 (quoting Panel Report, para. 8.82). (emphasis added by China)
[44]Done at Vienna, 23 May 1969, 1155 UNTS 331;  8 International Legal Materials 679.
[45]China's appellant's submission, para. 85 (quoting Appellate Body Report, *EC – Sardines*, para. 278).
[46]China's appellant's submission, para. 88 (quoting Panel Report, para. 8.76).
[47]China's appellant's submission, para. 89. (original emphasis)
[48]China's appellant's submission, para. 92.
[49]China's appellant's submission, para. 91.

(iv)     *Interpretation by the Appellate Body in Canada – Dairy*

31.     China asserts that its interpretation of the term "public body" is the only one consistent with the Appellate Body's interpretation of Article 9.1(a) of the *Agreement on Agriculture* in the *Canada – Dairy* dispute.  Because the Spanish and the French texts of that provision and of Article 1.1 of the *SCM Agreement* use "identical" or "highly similar" terms, the Panel should have treated the terms "public body" and "government agency" in the English texts "as functional equivalents".[50]  In support of this argument, China points to the "closely related" nature of these two provisions, to the notion that "a treaty interpreter must read all applicable provisions of a treaty in a way that gives meaning to *all* of them, harmoniously"[51], and to Article 33 of the *Vienna Convention*.[52]  For China, the Panel erred in law in refusing to adopt a single, harmonious interpretation of the terms "public body", "*organismo público*", and "*organisme public*", particularly given its express recognition that the dictionary definitions of these terms "could encompass"[53] an interpretation of such terms as meaning "an entity 'which exercises powers vested in it by a "government" for the purpose of performing functions of a "governmental" character'".[54]

32.     China notes that the Panel's sole reason for rejecting the significance of the Appellate Body's ruling in *Canada – Dairy* was that the Panel had found other definitions and usages showing a broader possible scope of the term "public body" in various municipal laws.  This is erroneous for three reasons.  First, the Panel mischaracterized China's position as categorically excluding that a government-owned or -controlled entity could constitute a "public body"/"*organismo público*"/"*organisme public*".  Second, the Panel identified no legal basis for its recourse to municipal law to interpret a multilateral treaty.  Neither Article 31 nor any other provision of the *Vienna Convention* would justify such an interpretative approach.  China adds that, if recourse to municipal law were accepted as a valid tool of treaty interpretation, multiple practical problems would arise, including:  whose municipal law should be examined;  what means should be used to conduct the survey;  and what would be the interpretative significance of complete or partial uniformity in municipal law?  China considers that many of these problems are evident in the Panel's arbitrary and ad hoc recourse to a few apparently randomly selected examples of municipal law in this dispute.

---

[50]China's appellant's submission, paras. 98 and 99.
[51]China's appellant's submission, para. 94 (quoting Appellate Body Report, *US – Upland Cotton*, para. 549 (original emphasis)).
[52]Article 33(1) of the *Vienna Convention* provides in pertinent part that, "[w]hen a treaty has been authenticated in two or more languages, the text is equally authoritative in each language".  Article 33(3), in turn, provides that "[t]he terms of the treaty are presumed to have the same meaning in each authentic text."
[53]China's appellant's submission, para. 101 (quoting Panel Report, para. 8.61).
[54]China's appellant's submission, para. 102 (quoting Appellate Body Report, *Canada – Dairy*, para. 97).

Such an "uncontrolled" survey of municipal law constitutes, according to China, an impermissible method of interpretation that is inconsistent with Article 3.2 of the DSU, as well as with the Panel's obligations under Article 11 of the DSU.

(v)      <em>Reference to Municipal Laws</em>

33.      China considers that, because the Panel's recourse to municipal law was erroneous, the Appellate Body need not examine the content of those laws.  Should the Appellate Body nevertheless consider those laws, China submits that the Panel's interpretation of each of the municipal laws referred to in its Report constitutes legal error.  None of the municipal laws cited by the Panel define an entity as a public body exclusively, or even primarily by reference to government control.

34.      China submits that, according to the official website of the Scottish Government, "public bodies" under Scottish law have been vested with the authority to perform functions of a governmental character, namely, "the delivery of public services" and "'important statutory, regulatory and advisory functions' that further the government's 'strategic objectives'".[55]   With respect to European Union law, the explanation on "public sector body" in the European Communities Commission Research Directorate note quoted by the Panel does not suggest that government ownership or control *per se* is sufficient to establish "public sector body" status under the law governing public contracts.  That note states that public sector bodies are "set up under public law", which indicates that such entities perform public service missions under authority formally vested in them by the State via special purpose legislation.[56]  As for Québec law, the website to which the Panel referred explains that a government agency is defined by "a plurality of ... criteria", including that the entity "has a mission of public interest" and "is created by the legislature or a government authority", and official Québec Provincial Government documents describe commercial services provided by State enterprises as "commercial services ... considered of general interest".[57]  Finally, with respect to Spanish law, China argues that the fact that the definition of "*organismo público*" under Article 43.1 of Spain's Law 6/1997 of 14 April 1997 includes so-called "*entidades públicas empresariales*" ("public business entities") does not, alone, establish that Spain considers government ownership or control sufficient to establish an entity as an "*organismo público*".[58]  To the contrary, three other Articles of the same law, as well as the Spanish Government's official inventory of "*entidades*

---

[55]China's appellant's submission, paras. 119 and 120 (quoting "About Scotland's Public Bodies", available at <http://www.scotland.gov.uk/Topics/Government/public-bodies/about>).
[56]China's appellant's submission, para. 123.
[57]China's appellant's submission, para. 126.
[58]China's appellant's submission, para. 128.

*públicas empresariales*", confirm that such entities are created under public law for the purpose of acting in the general interest and are vested with public service missions.[59]

(b)     The ILC Articles

35.     China contends that the Panel further erred in refusing to take into account the ILC Articles. Before the Panel, China argued that the rules of attribution codified in the ILC Articles, and in particular the three categories of attribution set out in Articles 4[60], 5[61], and 8[62], reflect customary international law and closely parallel the attribution of financial contributions to Members when they are provided by: (i) a "government";  (ii) any "public body";  or (iii) a "private body" that is entrusted or directed by a government or public body.   These provisions are, therefore, "relevant rules of international law applicable in the relations between the parties" to the *Marrakesh Agreement Establishing the World Trade Organization* (the "*WTO Agreement*") within the meaning of Article 31(3)(c) of the *Vienna Convention* and the Panel was under an obligation to take them into account when interpreting Article 1.1 of the *SCM Agreement*.   China adds that, had the Panel taken the ILC Articles into account, it would have had no choice but to accept that State-owned entities are presumptively private bodies, ordinarily covered by subparagraph (iv), unless they are exercising elements of governmental authority, in which case they would be considered public bodies.

(i)     *Status of the ILC Articles*

36.     China asserts that the Panel wrongly identified the threshold question as whether the ILC Articles are "recognized in the WTO" as rules of international law applicable in the relations between the parties, instead of whether the ILC Articles "constitute"[63] such rules.   China underlines that the ILC Articles reflect customary rules of public international law and, as such, are necessarily applicable in the relations between WTO Members.   In any event, the fact that the ILC Articles reflect

---

[59]China's appellant's submission, paras. 129 and 130 (referring to Articles 1, 2(3), and 53 of Spain's Law 6/1997 of 14 April 1997, *Ley de Organización y Funcionamiento de la Administración General del Estado* (Law on the Organization and Functioning of the General Administration of the State)).

[60]According to China, Article 4 establishes the "core principle of attribution" that the State is responsible for the conduct of its "organs" acting in that capacity. (China's appellant's submission, footnote 140 to para. 139 (quoting Article 4 of the ILC Articles (Panel Exhibit CHI-102)))

[61]China submits that Article 5 addresses the actions of "a person or entity which is not an organ of the State under Article 4", in which case its conduct will be attributed to the State only when it "is empowered by the law of that State to exercise elements of the governmental authority … provided the person or entity is acting in that capacity in the particular instance". (China's appellant's submission, footnote 141 to para. 139 (quoting Article 5 of the ILC Articles (Panel Exhibit CHI-102)))

[62]China describes Article 8 as addressing the conduct of private persons, whose conduct will be attributable to the State when they are "in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct". (China's appellant's submission, footnote 142 to para. 139 (quoting Article 8 of the ILC Articles (Panel Exhibit CHI-102)))

[63]China's appellant's submission, para. 148.

customary international law and/or general principles of law has been expressly recognized on multiple occasions in WTO jurisprudence[64];  the ILC Articles have been referred to on many more occasions without discussion of their status in international law;  and there has been no WTO decision finding that the ILC Articles are not customary international law.

37.    Although the Panel reasoned that panels and the Appellate Body have not identified the ILC Articles as "relevant rules of international law" within the meaning of Article 31(3)(c) of the *Vienna Convention*, China observes that the only basis upon which panels or the Appellate Body could have cited the ILC Articles when interpreting a covered agreement would have been pursuant to Article 31(3)(c) of the *Vienna Convention*, because the ILC Articles do not qualify under any of the other means of interpretation authorized in Article 31 or 32 of the *Vienna Convention*.  China cites the Appellate Body's treatment of the ILC Articles in *US – Line Pipe* as a "compelling illustration", explaining that the only reasonable conclusion that can be drawn from the sequence of the Appellate Body's analysis is that it considered the ILC Articles to be "rules of international law", within the meaning of Article 31(3)(c), that were "relevant" to its interpretation of Article 5.1 of the *Agreement on Safeguards*.[65]

38.    China considers that the Panel's statement, that the various citations to the ILC Articles in WTO dispute settlement reports have been "as conceptual guidance only to supplement or confirm, but not to replace" an analysis based on ordinary meaning, reflects a fundamental misunderstanding of the role of rules of international law in the interpretative exercise.[66]  As the Appellate Body and the panels that have referred to them have properly recognized, "rules of international law" are merely one aspect of the holistic interpretative process under Article 31 of the *Vienna Convention*.  With respect to the Panel's observation that, in some cases, panels and the Appellate Body have made explicit that the ILC Articles are not binding, China points out that the two decisions cited by the Panel state only that the ILC Articles are not binding "as such", meaning that they are not themselves equivalent to a treaty establishing binding obligations.  Yet, adds China, this is irrelevant because, as long as the ILC Articles reflect rules of customary international law or general principles of law, such rules are binding on States notwithstanding the fact that they are not codified in a treaty, as the past reliance upon them by panels and the Appellate Body confirm.

---

[64]China refers, in particular, to the Appellate Body reports in *US – Line Pipe* and *US – Cotton Yarn*, to the panel reports in *Australia – Salmon (21.5 – Canada)* and *US – Gambling*, and to the arbitral awards in *US – FSC (Article 22.6 – US)* and *Brazil – Aircraft (Article 22.6 – Brazil)*. (China's appellant's submission, para. 152 and footnotes 159-164 thereto)

[65]China's appellant's submission, paras. 157 and 158 (referring to Appellate Body Report, *US – Line Pipe*, para. 260).

[66]China's appellant's submission, para. 154 (quoting Panel Report, para. 8.87).

(ii)   <em>Relevance of the ILC Articles</em>

39.     China characterizes as "clearly erroneous"[67] the Panel's view that the ILC Articles are not "relevant" to the interpretation of Article 1.1 of the *SCM Agreement*.  Both Article 1.1 and the ILC Articles address the circumstances under which conduct by various entities may be attributed to a Member or a State.  The Appellate Body's reference in *US – Countervailing Duty Investigation on DRAMS* to the commentary on Article 8 of the ILC Articles when interpreting the meaning of the term "entrusts or directs" in Article 1.1(a)(1)(iv) of the *SCM Agreement* reflects this relevance.

40.     China contends that the three categories of attribution set out in Articles 4, 5, and 8 of the ILC Articles closely parallel the concepts of "a government", "any public body", and "a private body" that is entrusted or directed by a government or public body, in Article 1.1(a)(1) of the *SCM Agreement*. Article 8 of the ILC Articles reflects the principle that State-owned entities are considered "private bodies" whose conduct will be attributed to the State only if they are acting on the instructions of, or under the direction or control of, the government.  China also suggests that Article 5 of the ILC Articles, which addresses the conduct of entities that are empowered by the law of the State to exercise functions of a public character normally exercised by State organs, "naturally encompasses within its scope"[68] the type of entity that is characterized as a "public body" in Article 1.1(a)(1) of the *SCM Agreement*.

41.     China also rejects as implausible and erroneous two additional reasons given by the Panel in support of its view that the ILC Articles are irrelevant to the interpretation of Article 1.1 of the *SCM Agreement*.  To accept the Panel's statement that the ILC Articles "are not concerned with the substance of the underlying international obligations, but are rather concerned with determining whether a State is or is not responsible for a given action that may constitute a substantive breach of such an obligation"[69] would imply accepting that the ILC—the same body responsible for both the ILC Articles and codifying the obligations in Article 31 of the *Vienna Convention*—meant to exclude categorically from Article 31 any recourse to customary international law when questions of State responsibility are implicated in treaty interpretation, which "would make no sense at all".[70]  Second, with respect to the Panel's view that Article 1.1 of the *SCM Agreement* constitutes *lex specialis* within the meaning of Article 55 of the ILC Articles, thus displacing the customary rules of attribution in the ILC Articles, China argues, relying on the commentary on Article 55, that a treaty interpreter must examine both the potential "special rule" and the "general rule" to evaluate whether the treaty drafters

---

[67]China's appellant's submission, para. 166 (referring to Panel Report, para. 8.90).
[68]China's appellant's submission, para. 144.
[69]China's appellant's submission, para. 171 (quoting Panel Report, para. 8.90).
[70]China's appellant's submission, para. 177.

intended to depart from customary international law, and if so, to what extent.  The Panel, however, simply assumed that, merely because Article 1.1 of the *SCM Agreement* deals with the same subject matter as the ILC Articles, it must be *lex specialis*, with no further interpretative inquiry.  According to China, nothing in the text of Article 1.1 of the *SCM Agreement* or its negotiating history suggests an actual inconsistency between the rules of attribution in Article 1.1 and those in the ILC Articles.  To the contrary, contends China, with their respective three categories of attribution, the two sets of rules "appear largely congruent".[71]

(c)       The USDOC's "Public Body" Determinations

42.     China asserts that, because they were based on an erroneous interpretation of the term "public body", all of the Panel's findings upholding the USDOC's "public body" determinations must be reversed.  China also requests the Appellate Body to find that the USDOC's determinations that SOEs and SOCBs are "public bodies" are, on their face, inconsistent with the proper meaning of that term under Article 1.1 of the *SCM Agreement*.

43.     China underlines that the USDOC made no finding on whether SOEs or SOCBs are vested with the authority to exercise governmental functions in connection with the provision of the various inputs or loans at issue.  With respect to SOEs, in each of the four investigations the USDOC simply applied a rule of majority ownership.  As for the SOCBs determined to be "public bodies" in the OTR investigation, the USDOC did not take account of the fact that the relevant banks were established pursuant to and operate under company and commercial banking laws.  The USDOC referred to a previous case, CFS Paper[72], in which it had identified a number of features of the commercial banking system in China as allowing for continued government control of SOCB lending decisions, but in that same case the USDOC itself acknowledged that this evidence was "mixed".  Although these findings might be relevant to an examination of whether SOCBs were "directed" to provide loans within the meaning of Article 1.1(a)(1)(iv), they are, China maintains, "inadequate, on their face"[73], to support a conclusion that SOCBs are public bodies.

44.     In China's view, the USDOC should instead have begun with the presumption that the SOEs and SOCBs at issue were private bodies, and then evaluated whether they were exercising governmental authority to perform governmental functions by considering factors such as: (i) whether they were created by special decrees or under company and commercial banking laws;

---

[71]China's appellant's submission, para. 188.
[72]China's appellant's submission, para. 198 (referring to *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Coated Free Sheet from the People's Republic of China* (Panel Exhibit CHI-93) (the "CFS Paper Issues and Decision Memorandum")).
[73]China's appellant's submission, para. 199.

(ii) the purposes for which they were formed;  (iii) the nature of the functions they perform;  (iv) the nature and scope of governmental authority vested in them;  and (v) the laws and regulations under which they operate.  For China, the USDOC's failure to evaluate any of these factors renders its "public body" determinations as to SOEs in all four investigations, and as to SOCBs in the OTR investigation, inconsistent with Article 1.1(a)(1) of the *SCM Agreement*.

2.    Article 2 of the <em>SCM Agreement</em>:  Specificity

45.    China requests the Appellate Body to reverse the Panel's findings that China did not establish that the United States acted inconsistently with its obligations under Article 2.1(a) of the *SCM Agreement* in respect of the SOCB lending in the OTR investigation.  In particular, China considers that the Panel erred in interpreting the terms "subsidy" and "explicitly", as well as in applying the term "certain enterprises".  China also maintains that the Panel erred in interpreting the term "subsidy" in Article 2.2 of the *SCM Agreement* and in suggesting that a subsidy would be regionally specific if it is provided as part of a "distinct regime", even if the identical subsidy is available elsewhere.

(a)    Article 2.1(a) of the <em>SCM Agreement</em>:  "Subsidy" and "Explicitly"

46.    China requests the Appellate Body to reverse the Panel's conclusion that China did not establish that the United States acted inconsistently with its obligations under Article 2.1(a) of the *SCM Agreement* in finding the alleged "policy lending" subsidy in the OTR investigation to be *de jure* specific to certain enterprises.  China also requests the Appellate Body to complete the analysis and find that the USDOC's specificity determination was inconsistent with Article 2.1(a) of the *SCM Agreement* and, as a consequence, also inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

47.    China recalls that the Panel described how the *Decision of the State Council on Promulgating the "Interim Provisions on Promoting Industrial Structure Adjustment" for Implementation*[74] (the "Implementing Regulation") of the 11th Five-Year Plan of the Government of China created four categories of industrial activity in China—(i) the "encouraged" category;  (ii) the "restricted" category;  (iii) the "eliminated" category;  and (iv) the "permitted" category—and that the industries that fall within the "encouraged", "restricted", and "eliminated" categories are described in the *Guiding Catalogue of the Industrial Restructuring (2005)*[75] (the "GOC Catalogue").  After noting that

---

[74]Panel Exhibit US-87.  See Panel Report, para. 9.53.
[75]Panel Exhibit CHI-70.  After approval of the State Council, the GOC Catalogue was promulgated by the National Development and Reform Commission. (See Panel Report, para. 9.6)

the alleged subsidy was the provision of loans by SOCBs to OTR producers on allegedly below-market terms, and that the USDOC's finding of *de jure* specificity was based on the fact that the radial tyre industry is one of 539 different industries classified as an "encouraged" industry, China advances three independent grounds for reversal of the Panel's finding.  First, China asserts that the Panel's interpretation of Article 2.1(a) and, in particular, of the terms "subsidy" and "explicitly", was legally in error.  Second, China contends that, even accepting the Panel's interpretation of these terms, the Panel erred in applying its interpretation to the facts, because it failed to identify any relevant limitation on access to the subsidy.  Third, China contends that the Panel's finding that the 539 "encouraged" industries constitute "certain enterprises" within the meaning of Article 2.1(a) amounts to legal error, because it involved the improper application of a treaty term to the facts or a characterization of municipal law, or, alternatively, because the Panel's assessment of the facts was not "objective" and was thus inconsistent with its obligations under Article 11 of the DSU.

(i)     *Interpretation*

48.     China emphasizes that the term "a subsidy" in Article 2.1(a) of the *SCM Agreement* is a reference to a subsidy as defined in Article 1, that is, a financial contribution that confers a benefit. Accordingly, specificity must be analyzed at the level of the *subsidy*.  Referring as well to the word "explicitly" and its consideration by the panel in *EC and certain member States – Large Civil Aircraft*[76], China contends that the ordinary meaning of Article 2.1(a) requires investigating authorities to establish that the actual words of the legislation pursuant to which the granting authority operates limit access to the particular financial contribution *and* to the associated benefit that have provisionally been found to constitute the subsidy.  If the legislation provides no indication that the recipient of a financial contribution will obtain a benefit in some degree, the legislation cannot "explicitly limit[] access to a subsidy".

49.     China highlights that, instead of properly interpreting Article 2.1(a) in accordance with Article 31 of the *Vienna Convention*, the Panel adopted a "functional" interpretation in order to find that a subsidy can be *de jure* specific under Article 2.1(a) if the relevant legislation explicitly limits access *either* to a financial contribution or to a benefit.  This "functional" approach ignored the word "subsidy", effectively read the term "explicitly" out of Article 2.1(a), was inconsistent with the object

---

[76]China quotes the following statement from that panel:  "[I]t follows from the ordinary meaning of the word 'explicit' that it is not any limitation on access to a subsidy to certain enterprises that will make it specific within the meaning of Article 2.1(a), but only a limitation that '[d]istinctly express[es] all that is meant; leaving nothing merely implied or suggested'; a limitation that is 'unambiguous' and 'clear'."  (China's appellant's submission, para. 211 (quoting Panel Report, *EC and certain member States – Large Civil Aircraft* (not yet adopted), para. 7.919))

and purpose of Article 2.1(a), and supplanted a proper interpretation based on the text of the provision.

50.      China considers that any interpretation of Article 2.1(a) that would find a subsidy to be "specific" when it is broadly available throughout an economy is inconsistent with the object and purpose of the *SCM Agreement* as reflected in Article 2, namely, to filter out subsidies that are broadly available and widely used throughout an economy.  Yet this is precisely the consequence of the Panel's "interpretation".  China points, in this regard, to evidence on the record that most commercial borrowers in China obtained loans at interest rates that fell within a band between the lending rate floor (90 per cent of the benchmark rate set by the People's Bank of China) and the benchmark rate itself, irrespective of whether the loan was issued by an SOCB or a non-SOCB.  Because the interest rates of the investigated loans fell within or above this band, they were neither "preferential" nor "non-commercial".  Not only was the alleged subsidy not explicitly limited to certain enterprises, it was not so limited *in fact*, because every borrower in China that obtained a loan from an SOCB at prevailing RMB interest rates received the alleged financial contribution (a loan from an SOCB) and benefit (the interest rates that the USDOC considered to confer a benefit).  This, asserts China, further illustrates that the Panel's erroneous interpretation deprived Article 2.1(a) of its ability to catch only subsidies that are not broadly available throughout an economy.

51.      China also takes issue with the concern expressed by the Panel that accepting China's interpretation of Article 2.1(a) would narrow the scope of coverage of the *SCM Agreement*.  On the face of Article 2.1, this concern is without basis because subsidies that are not *de jure* specific under Article 2.1(a) can still be *de facto* specific under Article 2.1(c).  The Panel, however, seems to have favoured a "broad" interpretation of Article 2.1(a) because it considered that *de facto* specificity is more difficult for investigating authorities to establish than *de jure* specificity.  Yet a proper approach to treaty interpretation—including taking proper account of the "delicate balance" in the *SCM Agreement* between disciplines on subsidies and disciplines on the use of countervailing duties—is not consistent with an approach that favours a particular interpretative outcome on the ground that it is more convenient for the investigating authorities, or makes it more likely that they will reach an affirmative determination of countervailability.  Thus, China submits that each of the separate bases for a finding of specificity in Article 2.1 must be interpreted according to its own terms and be given equal standing in the interpretative process.

52.      China argues that the Panel's finding on the USDOC's determination of *de jure* specificity with respect to the alleged policy lending in the OTR investigation must be reversed because this finding was based on the Panel's misinterpretation of Article 2.1(a).  China further requests the

Appellate Body to complete the analysis and find that the USDOC's *de jure* specificity determination was inconsistent with Article 2.1(a), on the ground that it is undisputed that the economic planning documents on which the USDOC relied in reaching its finding did not explicitly limit access to the alleged lending by SOCBs at "preferential" interest rates.   China points, in particular, to the concession of the United States before the Panel that the economic planning documents "do not necessarily require banks to lend at preferential interest rates" and do not, by their own terms, "reduc[e] the price of credit" for borrowers in the "encouraged" category of industries.[77]

(ii)     <em>Application</em>

53.     Should the Appellate Body uphold the Panel's interpretation of the terms "subsidy" and "explicitly" in Article 2.1(a), then China conditionally appeals the Panel's finding that the economic planning documents relied upon by the USDOC explicitly limited access to the relevant financial contribution (loans by SOCBs), and requests the Appellate Body to complete the analysis and find that there was no such explicit limitation of access in the measures at issue.

54.     China recalls that the Panel found that "a reasonable and objective investigating authority could have determined that pursuant to [the economic planning documents], SOCBs (among other financial institutions) were instructed to provide financing to the 'encouraged' projects."[78]  Yet, such "instruction" does not identify an explicit limitation of access to the relevant financial contribution. The economic planning documents did not require SOCBs to provide loans exclusively to the "encouraged" industries.  Rather, the universe of companies to which the SOCBs *may* provide loans included the "encouraged" category of industries as well as the "*permitted*" category of industries.  It follows, in China's view, that, because the Panel failed to identify an explicit limitation of access to loans by SOCBs to the "encouraged" industries, its findings were legally insufficient to sustain the USDOC's determination of specificity, even under the Panel's incorrect interpretation of Article 2.1(a), and must be reversed.

(b)     Article 2.1(a) of the <em>SCM Agreement</em>:  "Certain Enterprises"

55.     China submits that the Appellate Body must reverse the Panel's finding that the "encouraged" category of industries constituted "certain enterprises", or the specificity requirement under Article 2 of the *SCM Agreement* "will effectively become a dead letter".[79]  China characterizes the Panel's interpretation and application of the term "certain enterprises" to the relevant facts as "plainly in

---

[77]China's appellant's submission, para. 235 (quoting United States' first written submission to the Panel, paras. 364 and 365).
[78]China's appellant's submission, para. 238 (quoting Panel Report, para. 9.106).
[79]China's appellant's submission, para. 256.

error"[80] and emphasizes, in this regard, that the GOC Catalogue identified 539 "encouraged" industries spread across 26 broad economic sectors.

56.     China recalls that the panel in *US – Upland Cotton* interpreted "certain enterprises" as meaning a "limited group of producers of certain products" and considered that a subsidy is provided to "certain enterprises" if the recipients of the subsidy constitute no more than a "discrete segment" of the economy of the Member granting the subsidy.[81]  In addition, the panel in *EC and certain member States – Large Civil Aircraft* found that subsidies available to a "wide array of economic sectors" are not subsidies provided to "certain enterprises".[82]  With these in mind, China contests the Panel's view that the 539 "encouraged" industries are "described in very specific and narrowly-circumscribed terms" and "singl[e] out ... very particular types of projects".[83]   Since the 95 categories of investments/indicators considered in *EC and certain member States – Large Civil Aircraft* were described in terms that are directly comparable to the descriptions of encouraged industries in this dispute, and were found in that dispute to be "expressly intended to benefit recipients well beyond a particular enterprise or industry or group of enterprises or industries"[84], the 539 "encouraged" industries in this dispute—more than five times as many as 95 categories—do not constitute "certain enterprises".  In addition, the 539 "encouraged" industries cover a much broader range of industries than those that the United States claimed were not "certain enterprises" in *US – Upland Cotton* and *US – Large Civil Aircraft (2nd complaint)*.  While acknowledging that the concept of "certain enterprises" contains "a certain amount of indeterminacy at the edges", China insists that it is "impossible to characterize 539 industries spanning 26 different economic sectors as a 'discrete segment' of the Chinese economy".[85]

(c)     Article 2.2 of the *SCM Agreement*

57.     With respect to the USDOC's determination in the LWS investigation that the provision of land-use rights in the New Century Industrial Park (the "Industrial Park") for less than adequate remuneration was regionally specific, China agrees with the Panel's conclusion that the USDOC's determination was inconsistent with Article 2.2 of the *SCM Agreement*.  China nevertheless appeals this finding because it disagrees with the basis on which the Panel reached this conclusion.  Citing the

---

[80]China's appellant's submission, para. 250.
[81]China's appellant's submission, para. 248 (quoting Panel Report, *US – Upland Cotton*, paras. 7.1142 and 7.1151).
[82]China's appellant's submission, para. 248 (quoting Panel Report, *EC and certain member States – Large Civil Aircraft* (not yet adopted), para. 7.931).
[83]China's appellant's submission, para. 250 (quoting Panel Report, para. 9.68).
[84]China's appellant's submission, para. 253 (quoting Panel Report, *EC and certain member States – Large Civil Aircraft* (not yet adopted), para. 7.931).
[85]China's appellant's submission, para. 255.

"systemic importance to the proper interpretation and functioning of Article 2"[86], China requests the Appellate Body to:  (i) find that the Panel erred in interpreting Article 2.2 of the *SCM Agreement* to permit a finding of specificity based solely on a finding that the financial contribution—rather than the *subsidy*—was geographically limited;  and (ii) reverse the Panel's finding that the existence of a distinct regime is relevant to a determination of specificity under Article 2.2 of the *SCM Agreement*.

58.     With respect to the first point, China asserts that the USDOC was required to find that the provision of land-use rights for less than adequate remuneration (the subsidy) was regionally specific, but it found only that the provision of land-use rights (the financial contribution) was regionally specific.  This finding was both legally insufficient, and factually untrue, given that undisputed evidence on the record demonstrated that other companies located outside the Industrial Park received land-use rights from Huantai County at the same price or at a lower price and, thus, the provision of land-use rights at a price that the USDOC considered to represent less-than-adequate remuneration was not limited to companies that purchased land-use rights within the Industrial Park.  China contends, as it did in its arguments on Article 2.1(a), that the reference to a "subsidy" in Article 2.2 is a reference to a "subsidy" as defined in Article 1, and not to either a "financial contribution" or a "benefit".

59.     With respect to the second point, China expresses concerns about the Panel's statements that the USDOC failed to identify any evidence "that the provision of land-use rights in the Industrial Park constituted a *distinct regime* for the provision of that financial contribution, compared with the provision of financial contributions in the form of land-use rights outside the Park"[87], and that it would have reached a different conclusion if the United States had demonstrated that the provision of land-use rights within the Industrial Park "constituted a land-use regime that was clearly distinguishable from the general provision of land-use rights by the county government".[88]  China views these statements as the Panel's endorsement of an interpretation of Article 2.2 that would permit a subsidy to be found to be regionally specific when it is part of a "distinct regime", even if the identical subsidy is available to all enterprises located throughout the jurisdiction of the granting authority.  Such an interpretation would have important implications for the compliance obligations of the United States in this dispute, and for the operation of Article 2 generally.  China seeks reversal of this finding because such an interpretation of Article 2.2 of the *SCM Agreement* would fail to filter out subsidies that are provided throughout the jurisdiction of the granting authority.

[86]China's appellant's submission, para. 264.
[87]China's appellant's submission, para. 265 (quoting Panel Report, para. 9.159). (emphasis added by China)
[88]China's appellant's submission, para. 265 (quoting Panel Report, para. 9.163).

3.      Article 14 of the *SCM Agreement*:  Calculation of the Benefit

(a)      Article 14(d) of the *SCM Agreement*:  Input Benchmarks

60.      With respect to the USDOC's rejection, in the CWP and LWR investigations, of private prices for HRS in China as the applicable benefit benchmark under Article 14(d) of the *SCM Agreement*, China requests the Appellate Body to:  (i) find that the Panel erred in interpreting Article 14(d) to permit investigating authorities to reject in-country private prices as a benchmark based solely on evidence that the government is the predominant supplier of the good in question;  (ii) reverse the Panel's finding that China did not establish that the USDOC had acted inconsistently with the obligations of the United States under Article 14(d) of the *SCM Agreement* by rejecting private prices in China as benchmarks for HRS inputs;  and (iii) find that the Panel acted inconsistently with Article 11 of the DSU by appearing to attribute to the USDOC a rationale for its finding of distortion other than the rationale that appears in its published determinations.  Upon and as a consequence of such findings, China further requests the Appellate Body to complete the analysis in respect of China's consequential claims and to find that the challenged measures are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

(i)      *Interpretation of Article 14(d) of the SCM Agreement*

61.      China notes that, as the Panel acknowledged, China's claim under Article 14(d) of the *SCM Agreement* presented a "straightforward question of legal interpretation", namely, "whether record evidence that the government was the predominant supplier of a good can be sufficient, on its own, to establish market distortion"[89] and thereby justify the rejection of in-country private prices as a benefit benchmark.  China asserts that, by answering this question in the affirmative, the Panel erred in its interpretation of Article 14(d), and departed from the standard articulated by the Appellate Body in *US – Softwood Lumber IV*, namely, that an investigating authority may resort to a benchmark other than private prices in the country of provision only "when it has been *established* that [] private prices are distorted, because of the predominant role of the government in the market as a provider of the same or similar goods".[90]

62.      China first recalls four aspects of the Appellate Body's decision in *US – Softwood Lumber IV* that are central to this issue on appeal.  First, the "text of Article 14(d) [of the] SCM Agreement does not ... explicitly refer to a 'pure' market, to a market 'undistorted by government intervention', or to a

---

[89]China's appellant's submission, para. 272 (quoting Panel Report, para. 10.38).
[90]China's appellant's submission, para. 281 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 103). (emphasis added by China)

'fair market value'".[91]  Second, Article 14(d) "emphasize[s] by its terms that prices of similar goods sold by private suppliers in the country of provision are the *primary benchmark that investigating authorities must use* when determining whether goods have been provided by a government for less than adequate remuneration."[92]  Third, in certain situations, the use of private prices as a benchmark would fail to capture the full extent of the subsidy and thereby undermine the subsidy disciplines in the *SCM Agreement*.  Finally, "the possibility under Article 14(d) for investigating authorities to consider a benchmark other than private prices in the country of provision *is very limited.*"[93]  China asserts that the Appellate Body's conclusion that evidence of "significant" or "predominant" government market share is insufficient, on its own, to demonstrate the distortion of private prices reflects a proper interpretation of Article 14(d) and is consistent with basic principles of economics.[94]

63.      China contests the Panel's view that Article 14(d) does not "prohibit, *a priori*, a finding of market distortion ... where the only relevant evidence was that the government is the predominant supplier of the good"[95], and asserts that the only reasoning offered by the Panel for this view was that paragraph 102 of the Appellate Body report in *US – Softwood Lumber IV* drew a legal distinction between the government acting as a "significant" supplier of a good and the government acting as a "predominant" supplier of a good.  This reasoning implies that an investigating authority's finding that the government is a "predominant", rather than a "significant", supplier, would be legally sufficient, on its own, to reject private market prices as a benchmark under Article 14(d).[96]  China stresses that the Appellate Body could not have meant to establish such a *per se* rule in *US – Softwood Lumber IV*.  Rather, the Appellate Body stated in that case that the determination of whether private prices are distorted because of the government's predominant role in the market must be made on a case-by-case basis according to the particular facts underlying each investigation.  If the government's predominant role were sufficient to establish distortion, then there would be no need to make a "case-by-case" determination.  China contends that nothing in the Appellate Body's interpretation of Article 14(d) suggests that there is some quantitative threshold of "predominance" at which a finding of "distortion" can be inferred in the absence of any other evidence, and that, in fact, there is no threshold of "predominance" at which private market prices will necessarily "align" with a government price that is "artificially low".

---

[91]China's appellant's submission, para. 277 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 87).
[92]China's appellant's submission, para. 278 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 90). (emphasis added by China)
[93]China's appellant's submission, para. 280 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 102). (emphasis added by China)
[94]China's appellant's submission, para. 282.
[95]China's appellant's submission, para. 293 (quoting Panel Report, para. 10.45).
[96]China's appellant's submission, para. 297.

64.      China considers that the "implausibility"[97] of the Panel's reading of *US – Softwood Lumber IV*
is further highlighted by the reasons given by the Appellate Body for not completing the analysis in
that appeal.  The *undisputed* facts included the market shares of the single government suppliers in
each relevant Canadian province (which ranged from 83 to 99 per cent), the fact that the prices of
government-supplied harvesting rights in each province were administratively set and the fact that
there were (and could be) no imports of such rights.  Even though, based on these undisputed facts,
the Appellate Body was able to characterize the role of the provincial governments in Canadian
timber markets as "predominant", the Appellate Body found that it could not complete the analysis
because there were insufficient undisputed facts "relating to the alleged distortive effects on prices of
the provincial governments' participation in the market for standing timber", and noted, in particular,
the disputed character of the "evidence relied on by USDOC to conclude that private prices for
stumpage in Canada were distorted".[98]  China claims, therefore, that the Appellate Body did not
complete the analysis in *US – Softwood Lumber IV* because it did not consider "predominance", on its
own, to be a sufficient basis for rejecting private market prices under Article 14(d).

65.      China also points out that the USDOC itself did not perceive a distinction between a
"predominant" supplier and a "significant" supplier.  Indeed, the USDOC never used the word
"predominant" in its distortion analysis, but instead articulated its standard for finding distortion as
whether the government provides a majority or a substantial portion of the market for a good.

66.      China observes that this appeal also presents an interpretative issue related to Article 14(d)
that the Appellate Body did not address in its report in *US – Softwood Lumber IV*, namely, the types
of evidence that would be relevant to a "distortion" inquiry under that provision.  In contrast to the
Panel's interpretation, which would enable an investigating authority to reject private market prices as
a benchmark based only on evidence of market share, China considers that, consistently with the
Appellate Body's interpretation of Article 14(d), evidence relating to government market share can
never be sufficient, as a matter of either law or economics, to reject private market prices as
"distorted".  Rather, investigating authorities must examine and evaluate evidence concerning actual
market conditions for the good in question.

67.      For China, the Appellate Body's reasoning in *US – Softwood Lumber IV* suggests that the
types of evidence that are relevant are those that enable an investigating authority to determine
whether the government's "predominant role" as a provider of the good has caused private suppliers of

---

[97]China's appellant's submission, para. 301.
[98]China's appellant's submission, para. 303 (quoting Appellate Body Report, *US – Softwood Lumber IV*,
para. 115).

the good to "align their prices" at a level that is "artificially low", such that the use of private prices as a benchmark would fail to capture "the full extent of the subsidy".[99]  While recognizing that the case-by-case nature of the distortion inquiry may lead to different types of evidence being relevant in different cases, China nevertheless considers that certain general principles can be identified.

68.    As a starting point, China argues that the fact that prices are aligned does not indicate that those prices are suppressed or artificially low, because it is an ordinary feature of markets that prices tend to align at a market clearing price that equilibrates supply with demand, especially in markets for commodity products like HRS.  This remains true even where government suppliers have a significant or predominant share of the market, because market power is associated with supracompetitive pricing, that is, prices that are "artificially high" rather than "artificially low".

69.    China observes that, in the Panel proceedings, the United States understood the Appellate Body's reasoning in *US – Softwood Lumber IV* to reflect an economic theory known as the "dominant firm" model.  China finds it unclear why the United States believes that the Appellate Body had in mind a theory of supracompetitive pricing when its fundamental concern was that benchmark prices might be artificially *low*, not artificially *high*.  In any event, China stresses that the dominant firm model does not conclude that any firm with a significant or predominant share of the market has the ability, for that reason alone, to dictate the market price.  Rather, what makes a dominant firm "dominant" is not its market share, but the unique cost advantage that it possesses relative to other suppliers.

70.    China suggests that the United States' reliance upon the dominant firm model in order to explain *US – Softwood Lumber IV* may amount to an argument that a "dominant firm" could cause private prices to be "artificially low" if it acted as an "irrational" dominant firm, that is, a firm that does not take full advantage of the market power that it possesses.  China asserts that, if this is indeed the United States' position, it is flawed as a matter of law, logic, and economics.  There is no basis to assume, *a priori*, that a "dominant" government supplier will sell its output at a price that is lower than the profit-maximizing price described by the dominant firm model.  Furthermore, even if it were to do so, and this were to have an effect on the prices charged by private suppliers, it does not follow that private prices could no longer provide a valid benchmark for determining the adequacy of remuneration.   Article 14(d) does not require government suppliers to supply goods at a supracompetitive price and extract whatever monopoly or oligopoly rents might be available to them.  Thus, the fact that a government "dominant firm" sells its output at a price that is lower than the

---

[99]China's appellant's submission, para. 308 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 100).

*maximum* supracompetitive price that it could charge does not mean that private prices will be "artificially low" as a benchmark and fail to capture the full extent of a subsidy benefit.  On the contrary, China argues, private prices in these circumstances would continue to be "artificially high" in the sense that they reflect the market power of the dominant firm.

71.      Finally, China refers to a situation where a government supplier does not have a unique cost advantage.  In such a situation, the only means by which the government supplier could cause private prices to be artificially low is to price its own output below its cost of production.  If the government supplier adopts such pricing strategy and is able to satisfy the entirety of market demand, private suppliers would eventually exit the market.  Therefore, evidence of the existence of private suppliers in the market suggests that the government supplier does not sell its output at below-cost price or that it is not able to satisfy the entirety of market demand.  In addition, if the government supplier is selling its output below its cost of production, it would soon become unprofitable as an enterprise. Therefore, China asserts, evidence that government suppliers are profitable is a strong indication that they are not selling their outputs at a price below their costs of production.

72.      Based on the above arguments, China asserts that it is these types of objective indicators, rather than government market share alone, that are relevant in evaluating whether the effect of the government's pricing strategy is to cause private prices to be "artificially low" and, therefore, inappropriate as a benchmark under Article 14(d).  For China, a proper distortion inquiry under Article 14(d) should assess whether private prices are "artificially low" by focusing on whether there is any evidence in the relevant market that government suppliers are selling the good at a price below their costs of production, and whether the effect of this action is to cause private suppliers to price their own output below their own costs of production.

(ii)      *Application of Article 14(d) of the SCM Agreement*

73.      China emphasizes that, in the CWP and LWR investigations, the USDOC's rejection of Chinese market prices as a benchmark was predicated exclusively on evidence relating to the market share of SOE suppliers of HRS.  China cites certain passages from the USDOC's Issues and Decision Memoranda in these two investigations in order to illustrate that the determinations reveal, on their face, the USDOC's reliance on a quantitative test based solely on government market share, and that, although China had placed evidence on the record relating to factors *other than* SOE market share, the USDOC considered that such evidence was not relevant, or did not "mitigate the fact that the

government accounts for a significant portion of production".[100]  China further recalls that, before the Panel, the United States defended the USDOC's findings in the CWP and LWR investigations based on the proposition that the "predominant" role of the government as a supplier of the good is sufficient, as a matter of law, to reject private market prices under Article 14(d).

74.     China highlights the evidence that it placed on the record of the USDOC in the CWP and LWR investigations concerning the actual nature and structure of the Chinese HRS industry, which, in its view, was precisely the type of objective evidence that is relevant to a proper distortion inquiry under Article 14(d).  China asserts, in particular, that it demonstrated, on the basis of undisputed facts, that:  (i) SOE producers of HRS are profitable;  (ii) private investment in the Chinese HRS industry has been growing;  (iii) many SOE producers of HRS are publicly listed corporations that operate under the same Chinese company law as companies with no State ownership;  (iv) the Chinese HRS market is heavily fragmented, with numerous SOE and non-SOE suppliers competing for sales;  (v) there is no uniform or government-set price for HRS;  and (vi) prices for HRS fluctuate by producer, by time, and by region.

75.     Taking each of these elements in turn, China first argues that the evidence that it introduced before the USDOC that both SOE producers and private suppliers were profitable on their HRS sales both generally and during the period of investigation was highly probative of whether the government's role as a supplier had suppressed private market prices for HRS.  The USDOC, however, stated unequivocally that such evidence was "not relevant".  Second, the evidence that private investment in the HRS industry, particularly in the large publicly listed SOEs, had grown significantly in recent years was related to profitability, and also demonstrated that investors view these companies as seeking to maximize returns to their shareholders.  Third, the evidence showing that many of the largest SOEs producing HRS were structured as publicly listed corporations incorporated under Chinese company law, and that the four largest SOEs were publicly listed and had private ownership ranging from 18 to 49 per cent distinguished the CWP and LWR investigations from the circumstances in *US – Softwood Lumber IV*, where the goods at issue were provided directly by government ministries to harvesters.  While there may have been some basis in *US – Softwood*

---

[100]China's appellant's submission, paras. 285 and 286 (quoting *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe from the People's Republic of China* (Panel Exhibit CHI-1) (the "CWP Issues and Decision Memorandum"), pp. 64 and 65;  and *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Light-Walled Rectangular Pipe and Tube from the People's Republic of China* (Panel Exhibit CHI-2) (the "LWR Issues and Decision Memorandum"), pp. 35 and 36).

*Lumber IV* to infer that the government was providing the good on terms and conditions that were designed to fulfil government policy objectives rather than to maximize returns, no such inference is warranted where the "government" is providing the good through publicly listed corporations that are legally obligated to act in the best interests of their shareholders, and that are subject to the same requirements of corporate governance and financial disclosure as companies having no State ownership.

76.     Fourth, the evidence submitted by China demonstrating the fragmented and "atomized" nature of the Chinese HRS industry, including the fact that there are multiple SOE providers, undercut the USDOC's apparent assumption that the government is selling the good at a price that is lower than its cost of production, and that its market share forces private suppliers to "align" their own prices with the government's price.  This assumption of a single government pricing strategy is even more unwarranted when the "government supplier" is not a single entity, but rather a large number of separate companies in which the State has varying degrees of ownership interest.  Fifth, the undisputed fact that there is no government agency in China that sets prices for HRS, regulates the prices charged by either SOEs or private producers of HRS, or regulates the steel industry in general indicated that there is no obvious means for the government to induce or compel private suppliers to align their prices with the SOEs' prices, and undermined the USDOC's assumption that SOE suppliers acted in concert to sell HRS at below-market prices.  Finally, data placed on the record by China showed that prices for HRS varied by producer, by month, and by region, with no clear pattern of higher or lower prices by producer, which strongly contradicted the proposition that SOE suppliers of HRS acted as a cartel with control over market prices.  China contends that such evidence of price variation, rather, supported the conclusion that HRS prices in China are determined in accordance with normal market forces.

77.     China emphasizes that all of the evidence discussed above was relevant to a proper determination of whether private market prices for HRS were "distorted".  In the CWP and LWR investigations, however, the USDOC eschewed any examination of whether market forces were actually at work in favour of a "distortion" test that merely assumed that market forces were *not* at work, and rejected the need to examine any evidence that would detract from this assumption. According to China, this approach was not consistent with Article 14(d), as interpreted by the Appellate Body in *US – Softwood Lumber IV*, and, in accepting the USDOC's rejection of this evidence as not relevant to its distortion inquiry, the Panel erred in its interpretation and application of that provision.

(iii)     *The USDOC's Rationale for Finding Distortion*

78.     China addresses, as a final matter, the suggestion made by the Panel in paragraphs 10.55 and 10.56 of its Report that the USDOC "considered" arguments and evidence relating to factors other than government market share in reaching its findings of "distortion".   China contests, first, the Panel's characterization of China's argument as an assertion that the USDOC applied an unlawful "*per se*" test whereby the evidence that the government was the majority supplier of a good led *ipso facto* to the determination that the Chinese market prices for HRS were distorted.   What China meant by a "*per se*" test is that, in the CWP and LWR investigations, the USDOC relied exclusively on evidence relating to the government market share.   China did not make "as such" claims against the USDOC's "distortion" test.

79.     China submits that, if the Panel meant to suggest that, as long as the USDOC received and considered arguments and evidence relating to factors other than the government market share, the USDOC's exclusive reliance on evidence relating to the government market share in finding "distortion" was consistent with Article 14(d) of the *SCM Agreement*, then such a conclusion suffers from two errors.   First, China recalls its argument, as well as the Appellate Body's finding in *US – Softwood Lumber IV*, that an investigating authority's exclusive reliance on government market share to support a finding that private prices are distorted is inconsistent with a proper interpretation of Article 14(d).   Second, the Panel appears to attribute to the USDOC a rationale that the USDOC did not adopt.   China highlights in this regard that the "rationale or explanation" provided by the USDOC in its determinations was based exclusively on government market share, and it was solely on this basis that the Panel could examine the consistency of these determinations with the covered agreements.   Thus, to the extent that the Panel attributed to the USDOC an implicit "consideration" of other factors and evidence, this was inconsistent with the Panel's obligation under Article 11 of the DSU to limit its examination to the USDOC's stated rationale.

80.     China argues that, if the Panel's view was, rather, that the USDOC not only received and considered, but expressly relied upon, the arguments and evidence relating to factors other than the government market share, then such view is plainly incorrect.   China emphasizes that there is not a single reference in the CWP and LWR investigations to any factor other than SOE market share.

(b)     Article 14(b) of the *SCM Agreement*:   Loan Benchmarks

81.     China requests the Appellate Body to reverse the Panel's finding that China did not establish: (i) that the United States acted inconsistently with its obligations under Article 14(b) of the *SCM Agreement* by rejecting observed interest rates in China as benchmarks to calculate the benefit

conferred by loans denominated in RMB;  and (ii) that the benefit benchmark that the USDOC actually used to compare to the rates of the RMB loans was inconsistent with Article 14(b) of the *SCM Agreement*.  China also requests the Appellate Body to find that the Panel acted inconsistently with Article 11 of the DSU by failing to assess the conformity of the benchmark used by the USDOC with the legal requirements of Article 14(b).  Upon and as a consequence of such findings, China further requests the Appellate Body to complete the analysis in respect of China's consequential claims and find that the challenged measures are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

82.     China explains that, in the CWP, LWS, and OTR investigations, the USDOC rejected the use of any RMB interest rates on the ground that they were distorted by government intervention in the banking sector.  Instead, the USDOC used a model based on interest rates from over thirty different countries, selected from a World Bank grouping based on their per capita gross national income ("GNI"), which the USDOC regressed based on an institutional quality rating assigned to each of these countries.  This model produced a proxy interest rate that the USDOC compared to the interest rates on the SOCB loans to determine whether a benefit was conferred.  China asserts that the Panel's evaluation of the USDOC's finding of distortion due to the role of the Chinese Government in the banking sector reflects a clear legal error.  China emphasizes that the Panel's "distortion" standard turned on whether government interventions "effectively dictate" the interest rates for loans denominated in a particular currency.  Since, however, all governments "effectively dictate" benchmark interest rates in the ordinary course of implementing monetary policy, all interest rate benchmarks would be considered "distorted" under the Panel's standard.  China also contends that the Panel erred in finding that the USDOC's multi-currency regression model was consistent with Article 14(b) because its finding was based on multiple errors of legal interpretation, and on a failure to evaluate whether this benchmark was, as this provision requires, a "comparable commercial loan which the firm could actually obtain on the market".

(i)      *Rejection of Interest Rates in China as Benchmarks under Article 14(b) of the SCM Agreement*

83.     China requests the Appellate Body to find that the Panel erred in its interpretation and application of Article 14(b) of the *SCM Agreement* in concluding that the USDOC had a lawful basis to reject observed RMB interest rates as benchmarks in the CWP, LWS, and OTR investigations.

84.     For China, the central question of legal interpretation before the Panel was what constitutes a "comparable commercial loan which the firm could actually obtain on the market" and not, as the Panel stated, "whether, and if so under what circumstances, Article 14(b) of the SCM Agreement

permits the rejection of in-country interest rates as benchmarks for government-provided loans".[101] Article 14(b) does not have an express notion of territoriality, and, therefore, the paradigm of "in the country" versus "out of the country" does not arise.  The Panel should, therefore, have asked whether, and if so under what circumstances, Article 14(b) permits the use of a loan benchmark that is not "comparable" or that is not consistent with some other aspect of the Article 14(b) standard.

85.      China contests the USDOC's rejection of RMB interest rates as benchmarks in the light of the "distortion" of China's banking sector due to the Chinese Government's predominant role and other alleged interventions in the commercial banking sector.  Before the Panel, China argued that the concept of interest rate "distortion" made no sense, because the nature of benchmark interest rates is that they are determined by government "intervention", whereas the United States contended that there is a significant difference between China's intervention and that of most other governments. Thus, the issue that was before the Panel and that is now before the Appellate Body is whether there is a meaningful and relevant difference between the effect on benchmark interest rates that all governments have through their implementation of monetary policy, on the one hand, and the effect that governments have through a separate and independent category of intervention, that can properly be classified as "distortions", on the other hand.  The Panel, maintains China, erred in finding that there was a clear distinction between these two categories of intervention.

86.      China argues that the Panel erred in concluding that loans are not "commercial" if they are made in an environment in which the government effectively establishes benchmark interest rates. Since, however, all governments with their own currency "effectively establish" benchmark interest rates, this alone cannot prevent loans from being "commercial".  Commercial banks are providers of a service, rather than a good, and what matters to the lender's profitability is the spread between its deposit rate and its lending rate, rather than the absolute level of market interest rates.  China explains that there are banks in China that provide "commercial" loans, and gives the example of the four largest SOCBs, which are among the largest commercial banks in the world, are publicly listed, highly profitable, and provide loans with the objective of making a profit.  China also contends that the Panel erred to the extent it considered that the fact that the Government of China holds ownership interests in certain banks renders all of their loans *ipso facto* "non-commercial", and points out, in this regard, that Article 14(b) requires a comparison between "the government loan in question" and a "commercial" loan, *not* a "non-governmental" loan.  Thus, the Panel's "distortion" analysis was based on an erroneous interpretation of the word "commercial".

---

[101]China's appellant's submission, para. 398 (quoting Panel Report, para. 10.105).

87.     China also points to two notions central to the Panel's analysis of distortion:  (i) that interest rates are ordinarily determined by market forces;  and (ii) that government interventions in the market that effectively establish interest rates are an aberration that can be classified as distortion.  Although the Panel appeared to view them as such, China contends that "market forces" and "government interventions" are not conflicting alternatives.  Rather, when it comes to money supply and interest rates, "market forces" and "government interventions" are the norm.  China points, in this regard, to the example of the relationship between the United States Federal Funds rate, maintained by the Federal Reserve, and the prime rate, based on observed rates, which is consistently about three percentage points above the Federal Funds rate.  China asserts that, as the standard benchmark for commercial borrowing in the United States, the prime rate is, without question, a reliable indicator of the amount that a creditworthy commercial borrower "would pay" on a "comparable" dollar-denominated loan that it "could actually obtain on the market".  Yet, if the Panel's distortion standard were applied, this benchmark interest rate would have to be rejected as "distorted" since it is, on the Panel's formulation, "effectively established" by the "interventions" of the Federal Reserve.  This example illustrates, in China's view, that, as a matter of macroeconomics, the Panel's standard was based on a false dichotomy between "market forces" and "government interventions".

88.     China underlines that the necessary consequence of the Panel's "distortion" standard is that all interest rate benchmarks are "distorted", and that there is no such thing as a "commercial" loan.  This manifestly absurd interpretation of Article 14(b) would permit investigating authorities to reject observed interest rates as a benchmark for loans denominated in any currency and must, China urges, be rejected by the Appellate Body.

89.     China also disagrees with the Panel's perception that there is a "clear distinction" between the implementation of monetary policy, on the one hand, and the government participating as a lender and/or otherwise intervening in the lending market, on the other hand.  The Panel never explained what this "clear distinction" is and, in China's view, it is both illusory and meaningless, because the implementation of monetary policy frequently involves actions that could be characterized as "the government participating as a lender and/or otherwise intervening in the lending market as such".[102] Yet, the means by which central banks "effectively establish" benchmark interest rates are immaterial to the result they achieve.  It follows, according to China, that this "clear distinction", which underpins the Panel's entire "distortion" analysis, lacks any legal or economic foundation and that this alone is a sufficient basis on which to reverse the Panel's findings and conclusions under Article 14(b).

---

[102]China's appellant's submission, para. 427 (quoting Panel Report, para. 10.126).

90.     China asserts that the Panel's review of the specific factors that the USDOC relied upon to support its "distortion" determination further reveals the legal and economic errors underlying the Panel's concept of interest rate "distortion".  In its assessment of the USDOC's analysis, the Panel required none of the elements that, under the Panel's understanding of Article 14(b), should have been demonstrated, and limited its substantive assessment of the USDOC's "distortion" finding to a single paragraph.

91.     China argues, more specifically, that, in reviewing the USDOC's finding, the Panel failed to evaluate how the government's role as a commercial lender could have had any effect on benchmark rates.  Instead, the Panel simply accepted the unsubstantiated assertion that the Government of China's "predominant role" as a lender had "distorted" interest rates.  China speculates that the Panel may have assumed:  that the provision of loans by the government at below-market interest rates could "drag down" benchmark interest rates to an "artificially low" level in a way that would be "clearly distinct" from monetary policy;  that government-owned banks will provide loans at below-market rates when they have a large market share;  and that this will cause other banks to "align" their rates to such below-market interest rates.[103]  Such a theory would, however, be erroneous because the only way that commercial banks can affect observed interest rates is to lend an amount that is smaller than what they are allowed to lend under the reserve-deposit ratio established by the central bank, which would cause interest rates to *rise*.  Moreover, if the government were to provide loans to commercial borrowers at below-market interest rates, other commercial banks could not lower their rates to "align" with such rates because they cannot create more money to satisfy the increased demand for loans at the lower rate.  This, submits China, is why State ownership of commercial banks has no bearing on observed interest rates that is distinct from the role of government in the implementation of monetary policy.  Even assuming that commercial banks could affect observed interest rates by providing loans at low interest rates, the central bank always has the ability to reduce the money supply to return benchmark interest rates to the level that it desires.  For these reasons, China contends, the Panel erred in accepting that the government's "predominant role as a lender" was a valid basis for rejecting observed interest rates as a benchmark under Article 14(b).

92.     China argues that the Panel's consideration of three other alleged government interventions identified by the USDOC suffered from similar deficiencies.  First, China maintains regulatory limits on the interest rate that banks can provide on deposits, and imposes a floor on the minimum interest rate that banks can charge on loans to borrowers.  As China explained to the Panel, such regulations are not "distortions".  Rather, they contribute to the safety and soundness of commercial banks and are

---

[103]China's appellant's submission, para. 440.

ordinary features of bank regulatory systems worldwide.  Although neither the Panel nor the United States explained how China's lending and deposit rate regulations would affect interest rates, it is undisputed that they cause interest rates to be *higher*, which means that using observed RMB interest rates as a benchmark would, if anything, tend to overstate the subsidy benefit.

93.     Second, the Panel considered that the USDOC was "not unjustified" in relying upon its previous finding in CFS Paper that lending rates in China were largely undifferentiated, with most loans made at rates close to the government-set benchmark rate as evidence that market forces were not operating and that banks lacked adequate risk management and analysis skills.[104]  China disagrees that the fact that observed interest rates tend to cluster around an interest rate determined by the central bank constitutes no such evidence, and recalls, in this regard, that in the United States the prime rate moves in lock-step with the Federal Funds rate.  Moreover, even if it were true that Chinese banks still lack adequate risk management and analysis skills, neither the United States nor the Panel explained how this would affect observed interest rates.  Indeed, China asserts, nothing in Article 14(b) suggests that the existence or non-existence of adequate risk management and analysis skills is relevant to the selection of a benchmark under Article 14(b).

94.     Third, in reviewing the USDOC's determination, the Panel referred vaguely to various pieces of evidence that the USDOC had relied upon to conclude that the Government of China continued to play a role and have influence in the Chinese commercial banking sector, which China considers may have been a reference to the USDOC's finding that the Government of China allegedly influences bank lending decisions by SOCBs, and its finding that the SOCBs allegedly make loan decisions in accordance with State industrial policies.  While China disagrees with these factual findings made by the USDOC, in the context of Article 14(b) the important point is that the Panel failed to evaluate how the alleged role and influence of the Chinese Government had any effect on observed RMB interest rates and, in particular, how it caused them to be lower than they otherwise would have been in a way and to an extent that is clearly distinct from the implementation of monetary policy.

95.     China submits that the Panel's analogy to the Appellate Body's decision in *US – Softwood Lumber IV* was misplaced because there is a fundamental difference between benchmark prices for goods under Article 14(d) and benchmark interest rates for loans under Article 14(b).  Governments do not ordinarily establish prices for goods, whereas they do ordinarily establish benchmark interest rates.  China explains that:  (i) a comparison of interest rates is different from a comparison of prices because even the observed interest rates are effectively determined by the government's decisions concerning the money supply;  (ii) commercial banks, whether government owned or not, have no

---

[104]China's appellant's submission, para. 456 (quoting Panel Report, para. 10.146).

effect on benchmark interest rates;  and (iii) benchmark interest rates cannot be "artificially low" since such rates reflect a government's policy choices and there is no objectively "correct" set of interest rates that would prevail in the absence of government "distortion".

96.     As a final matter, China expresses the view that the Panel's "distortion" rationale under Article 14(b) is "dangerously devoid of legal content"[105] and "entirely lacking in economic substance"[106], and cautions that, if it is left uncorrected by the Appellate Body, this will stand as an open invitation to investigating authorities to reject benchmark interest rates in favour of manufactured "proxies" that serve no other purpose than to generate artificial subsidy benefits and open the door to the use of countervailing duties as a means of sitting in judgment upon, or seeking to counteract, the monetary policies pursued by other WTO Members.

(ii)     *Consistency with Article 14(b) of the Benchmarks Actually Used by the USDOC*

97.     China requests the Appellate Body to reverse the Panel's conclusion that the USDOC's loan benchmark was not inconsistent with Article 14(b) of the *SCM Agreement*.  According to China, there was no basis for finding that the USDOC's multi-currency regression model based on per capita GNI and institutional quality was a "comparable commercial loan which the firm could actually obtain on the market".  Moreover, the Panel's conclusion to the contrary was based on clear errors of legal interpretation and a failure to undertake an objective assessment of the matter in accordance with Article 11 of the DSU.

98.     China considers that there are three essential elements that a benchmark rate must satisfy in order to be consistent with Article 14(b), namely, it must be:  (i) comparable;  (ii) commercial;  and (iii) one that the firm receiving the government-provided loan could actually obtain on the market. For China, the fundamental flaws in the USDOC's loan benchmark were that it was not comparable and was not one that the respondent borrowers could actually obtain on the market.

"Comparable"

99.     China argues that the meaning of the word "comparable" is informed by the context provided by Article 14(b).  That provision requires a comparison of interest rates for determining whether the recipient of the government loan is "better off" than it would have been in the absence of the government loan.  China agrees with the Panel that a "comparable" loan is one that was provided at approximately the same time, has the same interest rate structure, has a similar maturity, is for

---

[105]China's appellant's submission, para. 472.
[106]China's appellant's submission, para. 473.

approximately the same amount, and is denominated in the same currency, as the government-provided loan.  Among these, the currency in which the loan is denominated is of fundamental importance because real interest rates differ by the currency in which the loan is denominated and the country in which the loan is issued.  China presents the real interest rates for 30 out of the 33 countries used by the USDOC for its 2006 benchmark to illustrate that, even when countries are similar in many respects, their real interest rates differ significantly, to the extent that loans denominated in their different currencies cannot be considered "comparable" to each other.  China claims that the Panel ignored the importance of the currency in which a loan is denominated, and asserts that the Panel should have examined, for example, whether the USDOC's regression model had any foundation in the economic literature, and whether there was any empirical support for the use of per capita GNI and "institutional quality" as a means of assessing differences in interest rates across different currencies.

100.    China considers that the Panel's evaluation of the USDOC's methodology of constructing a proxy interest rate was cursory and uncritical.  The Panel found that the USDOC's methodology was "permissible" and "not unreasonable" under the circumstances of the investigations without providing any explanation for these conclusions.  For instance, the Panel did not ask whether the 20 percentage point disparity in real interest rates among the countries in the World Bank's grouping of lower-middle-income countries undermined the USDOC's assertion that the use of per capita GNI would permit loans denominated in different currencies to be made "comparable" to each other.  China also points out that the Panel did not demand any foundation for the USDOC's assertions that there is a broad inverse relationship between real interest rates and income levels and that the institutional quality of countries relates to the comparability of loans denominated in different currencies.

"Could Actually Obtain on the Market"

101.    While agreeing with the Panel that the credit rating of the borrower is relevant to identifying an appropriate benchmark, China contends that the phrase "could actually obtain on the market" in Article 14(b) has a broader meaning than the one the Panel attributed to it.  Pointing in particular to the words "actually" and "market", China argues that any benchmark loan must be one that the borrower could in fact obtain, given the sources of credit that are actually available to it.  Loans denominated in certain currencies (such as the United States dollar) can be borrowed in international markets, whereas those denominated in other currencies (such as the RMB) can be borrowed only in the country issuing the currency.  In addition, a wide variety of commercial and regulatory factors may affect the ability of a particular borrower to obtain loans from sources outside its home country or in currencies other than those in which it principally does business.  China highlights that the

purpose of benefit calculation is to determine whether the recipient of a financial contribution is "better off" than it would have been in the absence of the financial contribution, and contends that hypothetical "loans" from credit markets that do not exist cannot serve this purpose.

<u>Article 11 of the DSU</u>

102.    China observes that the Panel framed its inquiry as whether the USDOC's proxy benchmark "sufficiently approximate[d]" the requirements of Article 14(b), and whether its methodology was "aimed at generating" a proxy RMB interest rate that was consistent with the requirements of Article 14(b).[107]  Yet, according to China, the Panel was in fact required to evaluate the USDOC's benchmark for its "conformity" with Article 14(b), not to ask whether it was a "sufficient approximation" of the standard set out in that provision.  Moreover, the Panel considered whether the USDOC "aimed at generating" a benchmark that was consistent with Article 14(b), but failed to consider whether the USDOC actually succeeded in doing so.  Instead, the Panel saw its task as limited only to "evaluat[ing] the internal logic of the methodology employed, and the soundness and appropriateness of the data relied upon by the USDOC, in constructing the proxy".[108]  On this basis, the Panel conducted—in a single paragraph—a perfunctory examination of the USDOC's benchmark and concluded that it was "not … unreasonable under the circumstances".[109]  China emphasizes that such an approach was inconsistent with the standard of review established by Article 11 of the DSU.  The "not unreasonable" standard of review that the Panel applied is one that the Appellate Body has explicitly rejected as inconsistent with the "critical and searching analysis called for by Article 11 of the DSU".[110]

4.    <u>Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994:  "Double Remedies"</u>

103.    In its appeal of the Panel's findings regarding "double remedies", China requests the Appellate Body to:  (i) find that the Panel erred in its interpretation and application of Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994;  (ii) reverse the Panel's finding that China did not establish that the United States had acted inconsistently with its obligations under these provisions by imposing anti-dumping duties calculated under its NME methodology concurrently with the imposition of countervailing duties on the same products, without

---

[107]China's appellant's submission, para. 374 (quoting Panel Report, paras. 10.204 and 10.206).
[108]China's appellant's submission, para. 375 (quoting Panel Report, para. 10.206).
[109]China's appellant's submission, para. 375 (quoting Panel Report, para. 10.207).
[110]China's appellant's submission, para. 377 (quoting Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 113).

taking steps to avoid offsetting the same subsidies twice;  and (iii) complete the analysis and conclude that the USDOC acted inconsistently with the obligations of the United States under Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994, in all of the investigations at issue, by failing to take steps to avoid offsetting the same subsidies twice.

104.    China notes that the Panel found that the simultaneous imposition of anti-dumping duties calculated under an NME methodology and of countervailing duties likely results in any subsidy granted in respect of the good at issue being offset more than once.  This is because the dumping margins calculated under an NME methodology are generally higher than would otherwise be the case because they result from a comparison of export prices to market-determined (unsubsidized) costs of production, rather than to a producer's actual (subsidized) costs of production and, therefore, reflect not only price discrimination, but also economic distortions affecting the producer's costs of production, including domestic subsidies.  The Panel nonetheless also found that the relevant provisions of the covered agreements do not prevent an investigating authority from offsetting the same subsidy more than once.  This, asserts China, is "one of the most surprising and anomalous conclusions in the history of dispute settlement"[111] and "flies in the face of the remedial purpose of countervailing duties and the objective of imposing meaningful disciplines on the use of countervailing measures".[112]

105.    China contends that an importing Member is under an affirmative legal obligation to ensure that it does not impose countervailing duties to offset a subsidy that it simultaneously offsets through the manner in which it calculates anti-dumping duties in respect of the same imported product.  This obligation arises from:  (i) Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994, which prohibit Members from levying countervailing duties in excess of the amount of the subsidy found to exist;  (ii) Article 19.3 of the *SCM Agreement*, which requires investigating authorities to impose countervailing duties in the "appropriate" amounts;  (iii) Article 10 of the *SCM Agreement*, which requires Members to "take all necessary steps to ensure that the imposition of a countervailing duty ... is in accordance with the provisions of Article VI of [the] GATT 1994 and the terms of [the SCM] Agreement";  and (iv) Article 32.1 of the *SCM Agreement*, which prohibits Members from taking "specific action against a subsidy of another Member ... except in accordance with the provisions of [the] GATT 1994, as interpreted by [the SCM] Agreement".  China emphasizes that the Panel erred in its interpretation of these provisions and in reasoning that, because the *SCM Agreement* does not contain a provision *expressly* prohibiting a Member from offsetting the same domestic

---

[111]China's appellant's submission, para. 476.
[112]China's appellant's submission, para. 487.

subsidies through the imposition of two different duties, it was the intention of the drafters of the *SCM Agreement* to *authorize* such actions.

106.    By way of background, China recalls that, in 2006, the USDOC reversed its longstanding position that it would not apply countervailing duties to imports from any country designated as an NME.[113]  Since then, the USDOC has initiated over 23 simultaneous anti-dumping and countervailing duty investigations in respect of imports from China, and has imposed parallel anti-dumping and countervailing duty measures in 21 of these investigations.  The USDOC maintains that, under United States law, it has no authority or obligation to avoid the imposition of double remedies.  China points out that, in *GPX International Tire Corporation v. United States*, the United States Court of International Trade (the "CIT") recently rejected this position and held that the USDOC is required, under United States law, to avoid the imposition of double remedies when it uses its anti-dumping NME methodology in conjunction with countervailing duties.[114]

(a)    The Purpose of Countervailing Duties

107.    China recalls that footnote 36 of the *SCM Agreement* defines a countervailing duty as "a special duty levied for the purpose of offsetting any subsidy bestowed directly or indirectly upon the manufacture, production or export of any merchandise", and reasons that the concept of "offsetting" a subsidy makes clear that countervailing duties serve remedial, rather than punitive purposes.  That the purpose of countervailing duties is to *offset* actionable subsidies that *exist* in respect of imported products and, thereby, *remedy* the injury that the subsidized imports are *causing* is evident throughout the architecture of Article VI:3 of the GATT 1994 and the *SCM Agreement*, and notably in: (i) Article VI:3 of the GATT 1994 and Article 19.4 of the *SCM Agreement*, which prohibit Members from applying countervailing duties "in excess of" the amount of subsidy that "exists" and can be "attributed to the imported products under investigation";  (ii) Articles 15.5 and 19.1 of the *SCM Agreement*, which require the investigating authorities to determine that subsidized imports are causing injury to the domestic industry;  and (iii) Articles 19.2 and 21.1 of the *SCM Agreement*, which reflect the linkage between the imposition of countervailing duties and the goal of removing the injury that subsidized imports are causing to domestic producers.  China also emphasizes that any interpretation of the *SCM Agreement* must take into account its object and purpose, which is "to increase and improve GATT disciplines relating to the use of both subsidies *and* countervailing

---

[113]China's appellant's submission, para. 483 (referring to Panel Report, para. 14.4).

[114]*GPX International Tire Corp v. United States*, 645 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) (Panel Exhibit CHI-169).  This decision, which relates to the same OTR countervailing duty determination at issue in this WTO dispute, has been appealed to the United States Court of Appeals for the Federal Circuit. (United States' responses to questioning at the oral hearing)

measures".[115]  For China, the Panel's findings on "double remedies" are at odds with both the remedial purpose of countervailing duties and the object and purpose of the *SCM Agreement*.

> (b)    Interpretation of Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994

108.    China points out that Article 19.4 of the *SCM Agreement* prohibits Members from applying countervailing duties in excess of the amount of subsidy that "exists", and that the corresponding discipline is set forth in Article VI:3 of the GATT 1994.  China argues that a subsidy "exists" within the meaning of Article 19.4 only if it can be attributed to the imported product as a cause of injury to domestic producers.  If, however, a subsidy has been "offset" through the manner in which the importing Member calculates anti-dumping duties, the subsidy no longer "exists" because it can no longer be attributed to the imported products as a cause of injury to domestic producers.  Noting that the ordinary meaning of "offset" includes "cancel out by", China submits that, if a subsidy in respect of an imported product has been "cancelled out", it cannot be "cancelled out" a second time.

109.    China recalls that the Panel accepted that Article 19.4 of the *SCM Agreement* would preclude the cumulative levying of two countervailing duties in excess of the amount of the subsidy found to exist, but that the same provision "is oblivious to any potential concurrent imposition of anti-dumping duties".[116]  For China, however, these two situations are indistinguishable.  Thus, if it is inconsistent with Article 19.4 to offset the same subsidy twice through the imposition of two countervailing duties, it is equally inconsistent to offset the same subsidy twice through the imposition of a countervailing duty simultaneously with an anti-dumping duty that effectively offsets subsidies.  China questions the Panel's asserted distinction between the purpose and the nature of anti-dumping duties as opposed to countervailing duties, but stresses that, in any event, the legally relevant question is what *effect* a duty has.  If a duty has the effect of offsetting a subsidy, then, China contends, it must be taken into account when determining whether there remains a subsidy to offset through the imposition of countervailing duties under Article 19.4.

110.    China argues that the Panel's interpretation of Article 19.4 is inconsistent with Appellate Body jurisprudence regarding the privatization of SOEs and the sale of subsidized inputs in arm's-length transactions, which supports the view that, when an importing Member imposes countervailing duties to offset a subsidy that cannot be attributed to the imported product, such countervailing duties

---

[115]China's appellant's submission, para. 497 (quoting Appellate Body Report, *US – Carbon Steel*, para. 73). (emphasis added by China)
[116]China's appellant's submission, para. 501 (referring to Panel Report, para. 14.112).

are "in excess" of the amount of the subsidy under Article VI:3 of the GATT 1994 and, by extension, Article 19.4 of the *SCM Agreement*.

111.    China regards the Appellate Body decisions in *US – Countervailing Measures on Certain EC Products* and *US – Softwood Lumber IV* as establishing that a Member may not impose countervailing duties if, as a result of events external to the determination of financial contribution and benefit, such as privatization or a relevant arm's-length sale, the subsidy can no longer be attributed to the imported product under investigation.   China understands *US – Countervailing Measures on Certain EC Products*, where the Appellate Body found that the United States had acted inconsistently with its obligations under Articles 10 and 19.4 of the *SCM Agreement*, as establishing that the continued "existence" of the subsidy depended on whether the subsidy could still be attributed to the imported products under investigation as a source of injury, not merely on whether it "existed" in the sense that it was possible to identify a financial contribution and benefit.   Similarly, China views the Appellate Body's finding in *US – Softwood Lumber IV* that, in the wake of an arm's-length sale, investigating authorities are required to undertake an analysis to ensure that they do not impose countervailing duties "*in excess* of the amount of the total subsidy accruing to" the imported product, as affirming that a subsidy must be attributable to the imported product for it to be "offset" through the imposition of countervailing duties.[117]

112.    China dismisses, as "empty formalism"[118], the Panel's disregard of these two Appellate Body reports on the grounds that:  (i) there is a distinction between "extinguishing" a subsidy, as discussed in these two cases, and "offsetting" it;  and (ii) privatization is a "real world event", whereas the imposition of an anti-dumping duty is merely a "remedy".   According to China, regardless of whether a subsidy has been offset or extinguished, the legal effect is identical, that is, there is no longer a subsidy that can be attributed to the imported product for the purpose of imposing countervailing duties, and it is immaterial whether a subsidy is offset as a result of some external commercial event or as a result of the imposition of a duty.   Either way, the subsidy no longer exists in respect of the imported product.

113.    China also takes issue with the Panel's statement that Article 19.4 of the *SCM Agreement* is "oblivious" to the imposition of anti-dumping duties.   The Panel appears to regard the *SCM Agreement* and the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994* (the "*Anti-Dumping Agreement*") as entirely unrelated to each other.   The Panel's apparent acceptance that there is no obligation to take into account how measures imposed under these two

---

[117]China's appellant's submission, para. 515 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 141). (original emphasis)
[118]China's appellant's submission, para. 518.

Agreements might interact in a particular instance ignores the fact that, because the *Anti-Dumping Agreement* and the *SCM Agreement* are integral parts of the same treaty, that is, the *WTO Agreement*, a treaty interpreter must read all applicable provisions of the treaty in a way that gives meaning to all of them harmoniously.

114.    China quotes, in this regard, the Appellate Body's statements that the different provisions of the *WTO Agreement* should be read "in a coherent and consistent manner which gives full and effective meaning to all of their terms", and that Members "must be mindful of their other WTO obligations" when taking action under the different agreements that make up the *WTO Agreement*.[119]  China argues that, if a privatization or the sale of a subsidized input is an external event that the importing Member must take into account in determining whether a subsidy continues to exist, the imposition of another remedy available under the *WTO Agreement* must also be taken into account, particularly given that this is an action taken by the importing Member itself.

115.    Lastly, China contends that the Panel's interpretation of Article 19.4 of the *SCM Agreement* is antithetical to the object and purpose of the *SCM Agreement*, and would convert measures meant to be remedial into measures that are essentially punitive in nature.  The object and purpose of the *SCM Agreement* is to strengthen and improve GATT disciplines relating to the use of both subsidies and countervailing measures while, at the same time, recognizing the right of Members to impose such measures under certain conditions.  The *SCM Agreement* thus reflects a delicate balance and Part V, in particular, "is aimed at striking a balance between the right to impose countervailing duties to offset subsidization that is causing injury, and the obligations that Members must respect in order to do so".[120]  China emphasizes that chief among such obligations is Article 19.4.

116.    China adds that, even though an analysis of object and purpose is an integral part of the general rule of interpretation prescribed by Article 31(1) of the *Vienna Convention*, the Panel did not address whether its interpretation of Article 19.4 was consistent with the object and purpose of the *SCM Agreement*.  Indeed, the Panel only dealt with object and purpose in order to dismiss an argument that China never made, namely, that the object and purpose of the *SCM Agreement* is to impose disciplines with respect to not only the use of countervailing duties but also the use of anti-dumping duties.  China clarifies that its argument was, and remains, that it is inconsistent with the object and purpose of the *SCM Agreement* to permit Members to impose countervailing duties without

---

[119]China's appellant's submission, paras. 520 and 521 (quoting Appellate Body Report, *US – Upland Cotton*, paras. 549 and 550).
[120]China's appellant's submission, para. 523 (quoting Appellate Body Report, *US – Carbon Steel*, para. 74).

taking into account the fact that they offset the same subsidies through the manner in which they calculate anti-dumping duties.

117.     China addresses three elements of "context" taken into account by the Panel in its interpretation of Article 19.4:  (i) Article VI:5 of the GATT 1994;  (ii) the Tokyo Round *Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade*[121] (the "*Tokyo Round Subsidies Code*");  and (iii) the Protocol on the Accession of the People's Republic of China to the WTO[122] ("China's Accession Protocol").  China submits, however, that the *Tokyo Round Subsidies Code* is not "context" within the meaning of Article 31 of the *Vienna Convention* but, at most, a circumstance surrounding the conclusion of the *SCM Agreement* and thus a supplementary means of interpretation under Article 32 of the *Vienna Convention*.  China further questions how its Accession Protocol, negotiated subsequent to Article 19.4, could provide evidence of the intent of the drafters of that provision.

118.     China disagrees with the Panel that its interpretation of Article 19.4 is supported by Article VI:5 of the GATT 1994.  Using *a contrario* reasoning, the Panel observed that, because Article VI:5 of the GATT 1994 prohibits a Member from offsetting the same subsidy twice in the case of export subsidies, this provision *permits* offsetting the same subsidy twice in the case of domestic subsidies.  The Panel then used this *a contrario* interpretation as context to interpret Article 19.4 of the *SCM Agreement* as not prohibiting the imposition of double remedies.  It is not disputed that Article VI:5 of the GATT 1994 is premised on the assumption that an export subsidy will reduce a producer's export price relative to normal value and therefore create a dumping margin that would not otherwise exist.  As such, this provision addresses a particular instance in which double remedies could be imposed in respect of the same unfair trade practice.  China contends that the Panel engaged in an extraordinary interpretative leap to conclude, from this relatively narrow provision, that the drafters of the *SCM Agreement* affirmatively intended to permit double remedies in the case of domestic subsidies.

119.     China argues that, in considering Article VI:5 of the GATT 1994, the Panel should have sought to interpret all of the provisions before it in a way that gave meaning to *all* of them, harmoniously, and points to the Appellate Body's approach in *US – Upland Cotton* as an example as to how this might have been done.  In that case, the Appellate Body noted that Article 6.3 of the *Agreement on Agriculture* does not specifically refer to import substitution subsidies, but reasoned that, because Article 3.1(b) of the *SCM Agreement* expressly *prohibits* import substitution subsidies,

---

[121]BISD 26S/56, entered into force 1 January 1980.
[122]WT/L/432.

the drafters of the *Agreement on Agriculture* "would have included 'an equally explicit and clear provision' if they had intended to *authorize* import substitution subsidies within the Current Total AMS".[123]  On a similar approach, according to China, the Panel should have referred to the absence of any indication that the drafters of Article VI:5 considered the issue of double remedies beyond the narrow circumstances in which an export subsidy literally creates a "situation of dumping", and examined Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994 in the light of Appellate Body jurisprudence and the object and purpose of imposing meaningful disciplines on the use of countervailing measures.  The Panel should also have taken account of the paradoxical outcome produced by its *a contrario* interpretation of Article VI:5, namely, that double remedies are prohibited in respect of export subsidies but are permitted in respect of domestic subsidies, even though export subsidies are prohibited under Article 3 of the *SCM Agreement* whereas domestic subsidies are merely actionable.  China submits that, if the drafters of the *SCM Agreement* had intended to permit double remedies in respect of subsidies that are merely actionable, they would have explicitly provided for such a result.

120.    China contends that the Panel erred in considering that the non-inclusion in the *SCM Agreement* of a provision like Article 15 of the *Tokyo Round Subsidies Code*, which requires Members to choose between the use of an NME anti-dumping methodology or the imposition of countervailing duties, suggested that the drafters of the *SCM Agreement* intended to permit the imposition of double remedies with respect to domestic subsidies.  China alleges that, whether as context or as a supplementary means of interpretation, the only inference that can be drawn from the absence of a similar provision in the *SCM Agreement* is that Members no longer intended to prohibit the concurrent application of these two remedies.  This does *not* mean that the drafters of the *SCM Agreement* affirmatively considered and decided that Members should be allowed to apply these two remedies concurrently in a manner that results in offsetting the same subsidies twice.  China adds that there is no evidence that the avoidance of such double remedies was the original rationale for Article 15 of the *Tokyo Round Subsidies Code*.  China also distinguishes this dispute from *US – Underwear*, to which the Panel referred, where the Appellate Body held that the absence, in the *Agreement on Textiles and Clothing*, of a provision expressly authorizing the backdating of import restraint measures, such as the one that had existed under a predecessor agreement, simply reinforced its interpretative conclusion that such retroactive application was no longer permissible.

121.    China contests the Panel's understanding that Section 15 of China's Accession Protocol, which does not contain an express prohibition on the imposition of double remedies, suggests that

---

[123]China's appellant's submission, para. 535 (quoting Appellate Body Report, *US – Upland Cotton*, para. 547).

Article 19.4 of the *SCM Agreement* was not intended to address the issue of double remedies. China also argues that the absence of a provision prohibiting the imposition of double remedies in Section 15 of China's Accession Protocol is equally consistent with the proposition that the drafters of the Protocol were aware that Article 19.4 of the *SCM Agreement* already addressed this concern.

(c)     Interpretation of Article 19.3 of the *SCM Agreement*

122.    China recalls that Article 19.3 of the *SCM Agreement* requires that countervailing duties be levied in the "appropriate" amounts, and considers that, if an importing Member has offset a subsidy through a manner in which it calculates anti-dumping duties, it must take this into account in determining the "appropriate" amount of a countervailing duty to levy. In this regard, the panel in *EC – Salmon (Norway)* considered, in interpreting the corresponding provision in Article 9.2 of the *Anti-Dumping Agreement*, that the "appropriate" amount of an anti-dumping duty must be an amount that results in offsetting or preventing dumping. Applying the same reasoning to the interpretation of Article 19.3, China argues that, according to Article VI:3 of the GATT 1994 and footnote 36 to Article 10 of the *SCM Agreement*, the purpose of a countervailing duty is to "offset" the amount of any subsidy attributable to the imported product under investigation and that, therefore, the "appropriate" amount of a countervailing duty can be no greater than the amount necessary to offset the subsidy.

123.    China disagrees with the Panel's statement that "the imposition of anti-dumping duties calculated under an NME methodology has no impact on whether the amount of the concurrent countervailing duty is 'appropriate' or not."[124] Unlike the interpretative approach taken by the panel in *EC – Salmon (Norway)*, the Panel's interpretation of Article 19.3 is divorced from any consideration of the purpose of countervailing duties, and treats anti-dumping and countervailing duties as "hermetically isolated" from each other, notwithstanding the Panel's recognition that certain methods of calculating anti-dumping duties can have the effect of offsetting subsidies, and notwithstanding the fact that anti-dumping and countervailing duties are both remedies in respect of unfairly traded imports whose legal parameters are defined by the same treaty. China reiterates that any determination of the "appropriate" amount of a countervailing duty must take into account the extent to which the investigating authority offsets the same subsidies through the manner in which it calculates anti-dumping duties in respect of the same imported products and that, for this reason, as well as for the reasons discussed in connection with its arguments regarding the interpretation of Article 19.4, the Panel's findings under Article 19.3 were in error.

---

[124]China's appellant's submission, para. 553 (quoting Panel Report, para. 14.128).

(d)    Consequential Claims under Articles 10 and 32.1 of the *SCM Agreement*

124.    China requests the Appellate Body to reverse the Panel's rejection of China's consequential claims under Articles 10 and 32.1 of the *SCM Agreement*.  These Panel findings were made in the light of its findings regarding Articles 19.3 and 19.4 of the *SCM Agreement*.  Because China considers that the Panel's prior findings on Articles 19.3 and 19.4 were in error, China requests the Appellate Body to reverse these findings and to complete the analysis and find that the USDOC acted inconsistently with the obligations of the United States under Articles 10 and 32.1 of the *SCM Agreement* by imposing and maintaining countervailing duties without determining whether those duties simultaneously offset the same subsidies by virtue of the methodology used to calculate anti-dumping duties.

125.    China contests the Panel's finding that the USDOC had no obligation under Article 10 of the *SCM Agreement* to consider whether the use of an NME methodology in a parallel anti-dumping investigation had the "effect" of offsetting the same alleged subsidies.  The Panel's finding was premised on its prior, erroneous finding that the imposition of anti-dumping duties calculated under an NME methodology is not an "event" that investigating authorities must take into account in determining the amount of a countervailable subsidy that is attributable to the imported product under investigation.  China argues that, having acknowledged the potential for "double counting", the USDOC was required to take all necessary actions to ensure that the imposition of countervailing duties did not result in offsetting the same subsidies twice, but that it took no steps whatsoever to investigate and avoid the imposition of double remedies.

(e)    Completion of the Analysis

126.    Based on all of the above arguments, China contends that the Panel's finding with respect to "double remedies" was based on multiple errors of legal interpretation and that, properly interpreted, multiple provisions of the *SCM Agreement* establish that Members are obliged to investigate and avoid the imposition of double remedies in respect of the same subsidies.  Accordingly, China requests the Appellate Body to reverse the Panel's finding and to complete the analysis and find that the USDOC acted inconsistently with Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994, in all of the investigations at issue, by failing to take steps to avoid offsetting the same subsidies twice.

127.    China argues that it is undisputed that the USDOC took no steps to investigate and avoid the imposition of double remedies, notwithstanding its recognition of the possibility of "double counting".

The reason for this—that the USDOC considered that it had neither an obligation nor the authority under United States law to do so—is immaterial to the United States' obligations under the covered agreements.  China contends that, contrary to an apparent suggestion by the Panel, it was not for China to "conclusively establish"[125] that double remedies resulted from the concurrent imposition of anti-dumping duties calculated using an NME methodology and countervailing duties in the investigations at issue.  Rather, the USDOC had an affirmative obligation to determine whether, and in what amount, double remedies would occur in the facts of these investigations.  Since it indisputably did not do so, the Appellate Body may reach a finding of inconsistency upon reversal of the Panel's legal interpretation of the relevant provisions.  In any event, China also refers to submissions that it made before the Panel that it considers shows that China did, in fact, demonstrate, based on undisputed evidence in the record, that double remedies occurred in the investigations at issue.

      B.     *Arguments of the United States – Appellee*

      1.     <u>Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies</u>

128.    The United States requests the Appellate Body to uphold the Panel's finding that the USDOC's determinations that certain SOEs and SOCBs are "public bodies" were not inconsistent with Article 1.1(a)(1) of the *SCM Agreement*, and to find that the Panel did not act inconsistently with Articles 3.2 and 11 of the DSU.  The United States argues that the Panel examined the ordinary meaning of the term "public body" in its context and in the light of the object and purpose of the *SCM Agreement*, and correctly found that the term "public body" means an entity controlled by a government and that such entities are not necessarily, as China contends, limited to entities vested with government authority to perform governmental functions.

      (a)     The Ordinary Meaning of the Terms of the Treaty

      (i)     *Dictionary Definitions*

129.    The United States recalls the dictionary definitions of the words "public" and "body" examined by the Panel, which indicate that the ordinary meaning of the term "public body" includes corporations or entities belonging to the community or nation.  The Panel also considered the relevant provisions in the French and Spanish versions of Article 1.1(a)(1) of the *SCM Agreement* ("*organisme public*" and "*organismo público*") and found that the definitions of the words "*public*" and "*público*" include the notion of belonging to, or being controlled by, the State or government, and not

---

[125]China's appellant's submission, para. 561 (quoting Panel Report, para. 14.76).

necessarily the performance of governmental functions.  On this basis, the Panel properly concluded that such definitions indicate that the ordinary meaning of "public body" may encompass, but is not limited to, entities authorized by law to perform functions of a governmental or public character and, in fact, performing acts in the exercise of such authority.  The United States reiterates that the ordinary meaning of this term refers to entities owned or controlled by a government.

(ii)   <em>Context</em>

130.     According to the United States, all of China's contextual arguments attempt to make the point that a "public body" is no different from a government agency.  The Panel, however, rightly rejected such an interpretation and properly concluded, instead, that the context supports an interpretation of the term "public body" as referring to an entity controlled by a government.  The United States argues that the use of the distinct terms "a government" and "any public body" as part of a disjunctive phrase in Article 1.1(a)(1) of the <em>SCM Agreement</em> suggests that these terms have distinct and different meanings.  The word "government" refers to the formal apparatus of a State (its ministries, agencies, and other offices) that has the power and authority to govern.  Because China's interpretation of the term "public body" differs in no significant way from the word "government"—which includes government agencies—accepting such an interpretation would reduce the term "public body" to a redundancy.  The United States also points out that China's proposed standard for determining whether an entity is a "public body" is exactly the same as the standard articulated by the Appellate Body in <em>Canada – Dairy</em> for determining whether an entity is a "government entity", even though Article 1.1(a)(1) of the <em>SCM Agreement</em> lacks the type of direct textual linkage between the two terms that are found in the phrase "government <em>or their agencies</em>" in Article 9.1 of the <em>Agreement on Agriculture</em>.

131.     The United States also agrees with the Panel that the word "any" preceding the term "public body" suggests a broader, rather than a narrower, meaning of this term, that is, "public bodies of any kind".  Some such entities might, as China suggests, be more akin to government agencies, but all are entities controlled by the government and, thus, properly considered public bodies.  In addition, the use of the word "any" suggests that the term "public body" does not relate back to the term "government".  The language actually used in Article 1.1(a)(1) must be given effect, and this provision does not refer to "government or public body", "government or its public bodies", "government or another public body", or "government or similar public bodies".

132.     Like the Panel, the United States considers that the grouping of the terms "a government" and "public body" into a collective reference as "government" is simply a drafting technique to avoid repeating the phrase "a government or any public body within the territory of a Member".  This

drafting technique is similar to that used in Article 2.1 of the *SCM Agreement*, which refers to "an enterprise or industry or group of enterprises or industries" as "certain enterprises", notwithstanding that the terms "enterprise" and "industry" clearly have different meanings.  Although it considers that China "greatly overstates the significance of the use of the shorthand term 'government'"[126], the United States asserts that, even assuming that the grouping of the terms "a government" and "public body" under the term "government" has some meaning besides as a drafting technique, such meaning is that, as the panel in *Korea – Commercial Vessels* found, if an entity is controlled by the government (or other public body), any action by that entity is attributable to the government, and should therefore fall within the scope of Article 1.1(a)(1) of the *SCM Agreement*.

133.    As for the context provided by the term "private body" in Article 1.1(a)(1)(iv) of the *SCM Agreement*, the United States observes that dictionary definitions and everyday notions suggest that the word "public" is "the opposite of private", and that "private" refers to something unrelated to government.  Although China objects to it, the United States considers that the Panel's reference to the term "private enterprise" instead of "private body" was of no moment because the word "body" is defined to include "corporation" or other groups of people working toward some common purpose or, in other words, an enterprise.  The important context provided by the term "private body", which China ignores, is that enterprises owned or controlled by the government cannot be considered "private bodies" without eviscerating the meaning of the word "private".  This too supports the view that such enterprises must be "public bodies".  The United States argues that the requirement for entrustment or direction of functions described in Article 1.1(a)(1)(i)-(iii) does not mean that a public body must be vested with governmental functions so that it can entrust or direct a private body to carry them out.  The language in subparagraph (iv) simply refers back to the functions described in subparagraphs (i)-(iii) that would otherwise normally be carried out by, and vested in, governments or any public bodies.  There is nothing inherently governmental about the functions described in subparagraphs (i) and (iii), and the language of subparagraph (iv) simply ensures that only the actions covered in subparagraphs (i)-(iii) are captured by instances of entrustment or direction of a private body by a government or public body.  The United States contests China's understanding that the interpretation that a public body must be vested with governmental authority is confirmed by the various determinations in the DRAMS cases.  The DRAMS investigation was something of an anomaly, because government ownership of the banks was temporary and due to the Korean financial crisis.  Thus, the DRAMS investigation is not fully reflective of the USDOC's analysis of the "public body" issue, and in other cases the USDOC has found ownership or control to be indicative of public body status.

---

[126]United States' appellee's submission, para. 75.

134.    With respect to Article 1.1(a)(1)(i)-(iii), the United States points out that the Appellate Body stated in *Canada – Dairy* that the essence of "government" is that it enjoys the effective power to "regulate", "control", or "supervise" individuals.[127]  This definition does not include any notion of the government being inherently involved with lending, selling, or any other activity in the marketplace. The United States argues that, accordingly, the Panel correctly concluded that the activities listed in Article 1.1(a)(1)(i)-(iii) are more inherently those of businesses or firms.  Thus, limiting the term "public body" to entities performing governmental functions would deprive much of Article 1.1(a)(1) of meaning in many cases.

135.    Finally, the United States asserts that the Panel correctly declined to treat Article 9.1 of the *Agreement on Agriculture* and the Appellate Body's interpretation of that provision in *Canada – Dairy* as "decisive context" for the meaning of the term "public body" in the *SCM Agreement*.  The terms of Article 9.1 of the *Agreement on Agriculture* are different from the terms of Article 1.1(a)(1) of the *SCM Agreement* in *all three languages*[128], and both the English and French versions of Article 9.1 link the term "governments" or "*pouvoirs publics*" and the term "agencies" or "*organismes*" through the word "their" or "*leurs*", a link which is noticeably absent from Article 1.1(a)(1) of the *SCM Agreement*.  There is no reason why the Appellate Body's interpretation of a different term, situated in a different context, in a different agreement that has its own object and purpose, should dictate the interpretation of "public body".  Moreover, the United States alleges that, in its arguments, China repeatedly cites to the first part of the following sentence from the Appellate Body report in *Canada – Dairy*, while omitting the last (italicized) part of the sentence:  "[a governmental agency is] an entity which exercises powers vested in it by a 'government' for the purpose of performing functions of a 'governmental' character, *that is, to 'regulate', 'restrain', 'supervise' or 'control' the conduct of private citizens*."[129]  This description of what constitutes "government functions" illustrates just how restrictive China's proposed interpretation of the term "any public body" is.  It follows, for the United States, that the context of the term "public body" supports an interpretation of that term that includes entities controlled by a government, but not necessarily exercising governmental functions, and that the terms in Article 9.1 of the *Agreement on Agriculture*, as interpreted by the Appellate Body in *Canada – Dairy*, do not provide relevant context that requires a different result.

---

[127]United States' appellee's submission, para. 91 (quoting Appellate Body Report, *Canada – Dairy*, para. 97).

[128]Article 9.1(a) of the *Agreement on Agriculture* refers to "governments or their agencies";  "*les pouvoirs publics ou leurs organismes*";  "*los gobiernos o por organismos públicos*".  Article 1.1(a)(1) of the *SCM Agreement* refers to "a government or any public body within the territory of a Member";  "*des pouvoirs publics ou de tout organisme public du ressort territorial d'un Membre*";  "*un gobierno o de cualquier organismo público en el territorio de un Miembro*". (United States' appellee's submission, para. 94)

[129]United States' appellee's submission, para. 96 (quoting Appellate Body Report, *Canada – Dairy*, para. 97). (emphasis added by the United States)

(iii)     *Object and Purpose of the SCM Agreement*

136.    The United States recalls that "the object and purpose of the *SCM Agreement* ... includes disciplining the use of subsidies and countervailing measures while, at the same time, enabling WTO Members whose domestic industries are harmed by subsidized imports to use such remedies"[130], and submits that the *SCM Agreement* must not be interpreted rigidly or formalistically in a manner that would undermine its disciplines on trade-distorting subsidization.  Interpreting the term "public body" as referring to entities controlled by the government preserves the strength and effectiveness of the subsidy disciplines, and inhibits circumvention by ensuring that governments cannot escape those disciplines by using entities under their control to accomplish tasks that would potentially be subject to those disciplines if the governments themselves undertake them.  In contrast, China's restrictive interpretation would render some subsidization unreachable, which would be at odds with the object and purpose of the *SCM Agreement*.

137.    The United States suggests that China's argument that Article 1.1(a)(1)(iv) operates as the exclusive anti-circumvention provision in the *SCM Agreement* has no support in the Agreement. Requiring proof of government entrustment or direction of an entity it owns or controls would be akin to inquiring whether the government entrusted or directed itself, and proving entrustment or direction in such circumstances would be difficult or impossible.  With respect to the DRAMS cases, to which China refers as proof that the entrustment or direction provision works even when the entrusted or directed entities are government owned, the United States points out that, in those cases, the government ownership was temporary and in place due to the Korean financial crisis, and that the fact that the investigating authority could make a determination of entrustment or direction in one case does not demonstrate that it would not be possible for a government to hide evidence of entrustment or direction in other situations.  The United States disagrees, in this regard, with China's assertion that the Panel's finding that majority government ownership is sufficient to establish that an entity is a "public body" is not logical, given that government ownership alone cannot establish entrustment or direction.  This is because an entrustment or direction analysis is an analysis of the *actions* of the government or public body, whereas ownership is not an action but a *state*, and an analysis of whether an entity is a public body is an analysis of the state, or the nature, of that entity.

138.    Finally, the United States agrees with the Panel that an interpretation of the term "public body" as meaning an entity controlled by a government is not so broad that it undermines the object

---

[130]United States' appellee's submission, para. 102 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 95).

and purpose of the *SCM Agreement*.  To the contrary, it simply ensures that such entities are subject to the *potential* disciplines of the Agreement subject to the other elements of a subsidy that must also be examined.

(iv)     <em>Reference to Municipal Laws</em>

139.    The United States asserts that China is incorrect in characterizing the Panel's reference to municipal laws as the "sole reason" why the Panel did not agree with China's proposed interpretation of the term "public body" and in asserting that such reference "infected"[131] key elements of the Panel's decision.  Rather, the Panel examined the dictionary definitions of the term "public body" and its French and Spanish counterparts, and found that these were not limited to the meaning suggested by China.  Since the Appellate Body has cautioned that dictionary definitions alone are not always capable of resolving the question of interpretation, the Panel's further reference to the definitions and practices in different jurisdictions as to what types of entity are considered "public bodies" was appropriate.  This examination of the use of the term "public body" in the "municipal law" of various jurisdictions was merely part of the Panel's consideration of the ordinary meaning of that term, consistently with the requirements of the *Vienna Convention*.  In response to China's suggestion that the Panel erred in its analysis because public bodies are not defined exclusively or even primarily by reference to government control in the jurisdictions referred to by the Panel, the United States points out that the Panel's task was to determine whether the term "public body" is limited to entities vested with authority from the government to perform governmental functions and in fact performing such functions.  The United States submits that the Panel properly found that usage of the term in various jurisdictions confirmed that its ordinary meaning is not so limited, and can cover a wide array of entities.

(b)     The ILC Articles

140.    The United States considers that the Panel correctly found that the ILC Articles are not relevant rules of international law that must be taken into account in the interpretation of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*.  The United States points out that China devotes more than 25 per cent of its arguments on the "public body" issue to the ILC Articles, and contends that this heavy reliance is misplaced and simply reinforces how disconnected China's proposed interpretation is from the actual text of the *SCM Agreement*.  In the view of the United States, the Panel properly asked whether the ILC Articles "would override [its] analysis and

---

[131]United States' appellee's submission, para. 59 (referring to China's appellant's submission, paras. 103-132).

conclusions based on the text of the SCM Agreement itself"[132], and correctly answered this question in the negative.

(i)      <em>Status of the ILC Articles</em>

141.    The United States asserts that the ILC Articles are not a subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions because they make no reference to the *SCM Agreement* or its provisions, and also because they are not an "agreement" between any parties, as the United Nations General Assembly has merely "take[n] note of" them.  The United States adds that the ILC Articles are not subsequent practice in the application of the treaty, which establishes the agreement of the parties regarding its interpretation, and notes that China has not suggested that they are.

142.    With respect to the status of the ILC Articles, the United States recalls that in *US – Line Pipe* the Appellate Body explained that "the International Law Commission's Draft Articles ... do not constitute a binding legal instrument as such".[133]   While the Appellate Body has recognized that certain parts of the ILC Articles may be understood as setting out recognized principles of customary international law, the United States notes that, given the level of detail and fine line distinctions constructed in Articles 5 and 8 of the ILC Articles, it remains an open and contested question whether all of these details and distinctions have risen to the status of customary international law.  Only if these Articles were customary international law could they be said to be "applicable in the relations between the parties" and, as a result, potentially relevant in this dispute under Article 31(3)(c) of the *Vienna Convention*.

(ii)      <em>Relevance of the ILC Articles</em>

143.    The United States asserts that, even assuming that the ILC Articles could be considered as "rules of international law applicable in the relations between the parties", the Panel correctly found that they are not "relevant" to the interpretation of the term "public body" because their purpose is not to define the primary rules establishing obligations under international law, but rather to define when a State is responsible for a breach of primary rules.  The primary rule in the context of countervailing duties is contained in Article 10 of the *SCM Agreement*, which requires compliance with the provisions of Article VI of the GATT 1994 and of the *SCM Agreement* including Article 1.1(a)(1). The question in this dispute is whether the United States breached this primary obligation.  The ILC

---

[132]United States' appellee's submission, para. 109 (quoting Panel Report, para. 8.84).

[133]United States' appellee's submission, para. 114 (quoting Appellate Body Report, *US – Line Pipe*, para. 259).

Articles are not helpful in determining *whether* such a breach occurred.  Rather, they would be relevant only if there was some question as to whether the actions of the USDOC were attributable to the United States.  Furthermore, the question as to whether a "public body" provided goods or loans in China is not a question of attribution of "wrongful" acts to China, because Article 1.1 of the *SCM Agreement*, which defines a "subsidy", does not itself impose any obligation on Members.  The United States agrees with the Panel's recognition that a determination that a government-controlled entity is a "public body" under the *SCM Agreement*, or that such public body has provided a financial contribution, is not a determination that the Member has engaged in "wrongful conduct".

144.    Even assuming that providing a financial contribution is a wrongful act within the meaning of the ILC Articles and that the ILC Articles are not otherwise inapplicable, the United States asserts that the *SCM Agreement* contains special rules of international law that govern when a financial contribution occurs and is attributable to a State, and is, thus, *lex specialis* within the meaning of Article 55 of the ILC Articles.  In response to China's argument that, in order for a provision to be *lex specialis*, there must be some "actual inconsistency" with or "discernible intention" to exclude the other provision, the United States submits that there is such inconsistency between China's interpretation of the ILC Articles and the proper interpretation of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*, because the interpretation of the ILC Articles advocated by China is inconsistent with the ordinary meaning of the term "public body".

145.    The United States recalls that, although Korea made similar arguments in *Korea – Commercial Vessels* to those made by China in this dispute, that panel rejected the same test drawn from Article 5 of the ILC Articles that China proposes here, and did not find that the ILC Articles are relevant rules of international law, applicable in the relations between the parties, that must be taken into account when interpreting the term "public body".

146.    The United States maintains that China misreads the Appellate Body report in *US – Countervailing Duty Investigation on DRAMS*.  The issue in that case was, unlike this dispute, whether certain private bodies were entrusted or directed by the government within the meaning of Article 1.1(a)(1)(iv) of the *SCM Agreement*.  Although the Appellate Body referred to the ILC Articles in passing in a footnote, it did not state that they were relevant rules of international law or that Articles 5 and 8 of the ILC Articles must be taken into account in interpreting Article 1.1 of the *SCM Agreement*.  The United States also argues that the corporate law principle of the separateness of owners from corporations or firms, upon which the commentary on Article 8 of the ILC Articles relies, is not always applicable in the context of the *SCM Agreement*, and that a reference to that commentary in a footnote in an Appellate Body report does not confirm that an entity cannot be a

"public body" unless exercising elements of governmental authority.  The United States also points out that, in *US – Countervailing Duty Investigation on DRAMS*, the Appellate Body acknowledged the panel's statement that the relevant investigating authority might have been entitled to treat a 100-per cent government-owned entity as a public body, and that the panel in *EC – Countervailing Measures on DRAM Chips* made a similar statement.

(c)        Findings by Previous Panels

147.    The United States takes the view that the Panel provided a thorough, objective, reasoned legal analysis of the meaning of Article 1.1(a)(1) of the *SCM Agreement*, in accordance with the customary rules of interpretation of international law, and correctly interpreted the term "public body" as not limited to an entity vested with authority to perform governmental functions, but rather as including any entity that is controlled by a government.  The United States further observes that previous panels have interpreted "public body" in the same way and that, while the Appellate Body is not bound by the findings of these panels, their consistent approach indicates that a consensus has emerged among panels, and that WTO Members have "legitimate expectations" as to the meaning of the term "public body".

148.    The United States points out that the panel in *EC and certain member States – Large Civil Aircraft* found a government-owned financial institution to be a "public body"[134], and that the panel in *Korea – Commercial Vessels* concluded that "an entity will constitute a 'public body' if it is controlled by the government (or other public bodies)".[135]   The latter panel rejected Korea's argument that an organization is a public body only when it acts in an official capacity or is engaged in governmental functions, which the United States considers is essentially identical to China's argument in this dispute, although China asserts otherwise.  Both Korea's position in *Korea – Commercial Vessels* and China's position in this dispute imply that an entity could change from a public to a private body on a daily or even a transactional basis, depending on the function it performs, which only underscores that, as the United States contends and the Panel found, the "public body" question must relate to the *nature* of an entity and not to its actions or behaviour in any given instance.  The United States further points out that both of these arguments confuse the separate legal elements of "financial contribution" and "benefit" and that, partly for this reason, the *Korea – Commercial Vessels* panel also declined Korea's invitation to import concepts from the ILC Articles.

---

[134]United States' appellee's submission, para. 135 (referring to Panel Report, *EC and certain member States – Large Civil Aircraft* (not yet adopted), para. 7.1359).

[135]United States' appellee's submission, para. 136 (quoting Panel Report, *Korea – Commercial Vessels*, para. 7.50).

(d)     The USDOC's "Public Body" Determinations

149.    The United States submits that the Panel, based on its correct legal interpretation of the term "public body", properly found that the USDOC's determinations in the CWP, LWR, LWS, and OTR investigations that certain SOEs are "public bodies" and in the OTR investigation that certain SOCBs are "public bodies" were not inconsistent with Article 1.1(a)(1) of the *SCM Agreement*, and that the Appellate Body should affirm this finding.

150.    The United States notes, in this regard, that the Panel found that there was "no legal error, in analyzing whether an entity is a public body, in giving primacy to evidence of majority government-ownership"[136], and noted that, in the USDOC proceedings, the respondents and the Government of China did not provide evidence, and for the most part there was none on the record, beyond evidence of government ownership.  The United States underlines that China does not challenge these aspects of the Panel's findings, and does not argue that government ownership did not equate to government control, that the records in the investigations did not support the USDOC's findings of ownership or control, or that the Panel erred in concluding that the USDOC properly found the relevant entities to be owned or controlled by the government.

2.      Article 2 of the *SCM Agreement*:  Specificity

(a)     Article 2.1(a) of the *SCM Agreement*:  "Subsidy" and "Explicitly"

151.    The United States requests the Appellate Body to uphold the Panel's finding that the USDOC's determination in the OTR investigation, that the policy lending subsidy was *de jure* specific, was not inconsistent with Article 2.1(a) of the *SCM Agreement*.  Chinese policy documents at the national, provincial, and municipal levels establish "encouraged" projects to which lending is provided and "restricted" and "eliminated" projects to which lending is prohibited, and demonstrate that access to the policy lending subsidy was explicitly limited to certain enterprises, including the OTR industry.  After examining the totality of the evidence that the USDOC considered, the Panel correctly concluded that the evidence on the record supported the USDOC's specificity determination. The United States submits that the Panel's interpretation of Article 2.1(a) was correct and its analysis of the evidence was thorough.

---

[136]United States' appellee's submission, para. 147 (quoting Panel Report, para. 8.136).

152.    The United States asserts that, contrary to the allegations made by China, the Panel properly interpreted the text of Article 2.1(a) consistently with the customary rules of interpretation.  The United States observes that, in criticizing the Panel's "functional" interpretation of Article 2.1(a), China mischaracterizes the Panel as having departed from the text.  In fact, the Panel's functional approach was a method for analyzing the text and, in particular, the phrase "explicitly limits access to a subsidy".  The Panel considered China's proposed "textual" analysis and the definition of the word "subsidy", but having looked at the text "from a functional standpoint"[137], disagreed with China's view of the significance of the word "subsidy" for the purpose of interpreting Article 2.1(a).

153.    With respect to the requirement in Article 2.1(a) that a limitation be "explicit", the United States contends that the Panel did not find an "implied or suggested" limitation to be sufficient for the purposes of *de jure* specificity, as China argues.  The Panel recognized that there are many ways in which access to a subsidy could be explicitly limited, including an explicit limitation on access to a financial contribution, which would necessarily also explicitly limit access to the subsidy. As for the Panel's alleged failure to examine the ordinary meaning of the term "explicitly", the mere fact that the Panel did not refer to any dictionary definition of the word "explicitly" does not demonstrate any such failure.  The United States points out that Article 31 of the *Vienna Convention* does not oblige a treaty interpreter to consult a dictionary in all cases, and the absence of any indication in the Panel Report that the Panel did so does not, in itself, constitute legal error.

154.    The United States also recalls that, before the Panel, China acknowledged that there was no disagreement among the parties that an "explicit" limitation is one based on the "actual words of the law"[138], and that there is also no disagreement as to whether the USDOC correctly reported the "actual words" used in the various policy planning documents.  Thus, there was no need for the Panel to consider the meaning of the term "explicitly" in isolation.

155.    The United States considers that the Panel properly examined the context in which the text of Article 2.1(a) of the *SCM Agreement* should be interpreted.  The Panel properly noted that nothing in Article 2 would narrow down the possible forms of subsidization that fall within the definition in Article 1 and that Article 1.2 treats the concepts of subsidy and specificity as separate, and recalled that the Appellate Body in *Brazil – Aircraft* found that "financial contribution" and "benefit" are independent concepts.  The United States highlights that the Panel also signalled its agreement with

---

[137]United States' appellee's submission, para. 165 (quoting Panel Report, para. 9.25).
[138]United States' appellee's submission, para. 170 (quoting China's response to Panel Question 64 after the first Panel meeting, para. 201).

previous panels that analyzed the question of specificity separately from financial contribution and benefit.

156.    According to the United States, the Panel's interpretation of Article 2.1(a) of the *SCM Agreement* is also consistent with the object and purpose of the *SCM Agreement*, that is, to strengthen and improve GATT disciplines relating to the use of both subsidies and countervailing measures, while recognizing the right of Members to impose such measures under certain conditions. The Panel concluded that China's proposed interpretation, which would require explicit limitation of both the financial contribution and the benefit, would open considerable scope for circumvention of the *SCM Agreement* and is inconsistent with the object and purpose of the *SCM Agreement*.   The United States notes, in this respect, that the relevant object and purpose under Article 31 of the *Vienna Convention* is that of the treaty itself, and asserts that China's arguments, which focus on the object and purpose of Article 2 of the *SCM Agreement*, are not germane to the proper interpretative analysis. Finally, the United States emphasizes that, while China dismisses the Panel's concerns about circumvention with the assertion that "[s]ubsidies that are not *de jure* specific under Article 2.1(a) can still be *de facto* specific under Article 2.1(c)"[139], China never seriously addresses those concerns, namely, that accepting China's proposed interpretation of Article 2.1(a) "would have the effect of treating as non-*de jure* specific *a wide variety of subsidies* to which access was explicitly limited" and that, "where the details as to the actual distribution of the subsidy could not be obtained, the subsidy would be left outside the scope of the SCM Agreement in spite of its undeniably being explicitly limited to particular beneficiaries."[140]

(ii)    <em>Application</em>

157.    The United States requests the Appellate Body to reject China's conditional appeal of the Panel's finding that the economic planning documents relied upon by the USDOC established that its specificity determination was consistent with Article 2.1(a) of the *SCM Agreement*.

158.    The United States characterizes as "misleading and incorrect"[141] China's argument, on appeal, that policy lending by the SOCBs to the tyre industry could not be found to be specific because SOCBs, in addition to providing loans to the "encouraged" category, also provided loans to the "permitted" category.  There is no evidence in the record before the Panel or before the USDOC to support China's contention that SOCBs provided loans to the permitted category, and China does not

---

[139]United States' appellee's submission, para. 179 (quoting China's appellant's submission, para. 227).
[140]United States' appellee's submission, para. 180 (quoting Panel Report, para. 9.30). (emphasis added by the United States)
[141]United States' appellee's submission, para. 185.

identify any such evidence.  Moreover, according to the United States, reading Articles 12 and 13 of the Implementing Regulation together makes clear that the "'permitted' projects, due to their exclusion from the GOC Catalogue, are also excluded from government lending pursuant to the policy lending subsidy".[142]  As the Panel recognized, the existence of the "permitted" category further demonstrates that the policy lending subsidy was not generally available within the Chinese economy.  The United States adds that, even assuming *arguendo* that the "permitted" category is relevant to the specificity analysis, China is incorrect in asserting that the "permitted" and "encouraged" categories, taken together, are too broad to constitute "certain enterprises", because the entries in the GOC Catalogue's list of projects to which lending is prohibited are much more numerous than the entries in the list of projects in the encouraged category, which suggests that the policy lending subsidy is not generally available within the Chinese economy.

159.     The United States asserts that China's conditional appeal of the Panel's finding that the economic planning documents relied upon by the USDOC limited access to the policy lending subsidy is based entirely on Article 13 of the Implementing Regulation.  China thus ignores the totality of the evidence before the USDOC, which included a number of central, provincial, and municipal planning documents.  In this regard, the United States recalls the Appellate Body's ruling in *Japan – DRAMs (Korea)* that a panel reviewing a determination on a particular issue based on the totality of the evidence relevant to that issue must conduct its review on the same basis, and observes that, in this case, the Panel properly examined the totality of the evidence before the USDOC and found that it supported the USDOC's determination of *de jure* specificity.

(b)     Article 2.1(a) of the *SCM Agreement*:  "Certain Enterprises"

160.     The United States requests the Appellate Body to reject China's contention that the Panel erred in its interpretation of the term "certain enterprises" and its application to the relevant facts.  The United States considers that China's argument ignores virtually all of the evidence on the record and depends entirely on a factual premise that was expressly rejected by the Panel, namely, that the policy lending subsidy is available to an entire sector of the Chinese economy.

161.     The United States sets out an extensive summary of the Panel's detailed analysis of the totality of evidence before the USDOC, at the central, provincial, and municipal levels, for the purpose of illustrating the comprehensiveness of the Panel's analysis and contrasting it to the narrowness of China's appeal.  The United States considers that the Panel's reasoning shows that it properly determined, on the facts of this dispute, that a reasonable and objective investigating

---

[142]United States' appellee's submission, para. 187.

authority could, on the basis of the evidence on the record, have reached the conclusions that the USDOC reached in the OTR investigation and, therefore, that China failed to establish that the USDOC's *de jure* specificity finding was inconsistent with Article 2.1(a) of the *SCM Agreement*.

162.    The United States also observes that, while it is clear that the Panel considered the provincial and municipal policy documents, it is unclear how much weight the Panel accorded to these documents.  Although some of the Panel's statements may suggest that the provincial and municipal policy documents are less probative than the central government policy documents, the Panel recognized that the USDOC based its specificity determination on the totality of the evidence.  The United States hypothesizes, in this connection, a situation in which central government policy documents might suggest, without clearly establishing, that access to the subsidy is limited, and considers that, in such circumstances, provincial and municipal policy documents could flesh out the subsidy programme and provide the evidence necessary to substantiate clearly that access to the subsidy programme is explicitly limited to certain enterprises within the meaning of Article 2.1(a) of the *SCM Agreement*.

163.    The United States points out that the Panel agreed with the *US – Upland Cotton* panel that a subsidy is provided to "certain enterprises" if the recipients of the subsidy constitute no more than a "discrete segment" of the economy of the Member granting the subsidy, which can only be determined on a case-by-case basis.[143]   The United States contests China's assertion that the Panel erred in finding that the policy lending subsidy was limited to "certain enterprises" on the ground that it is impossible to characterize 539 industries spanning 26 different economic sectors as a discrete segment of the Chinese economy, for the following reasons.

164.    First, the United States characterizes as "simply inaccurate" China's assertion that the GOC Catalogue identifies 539 encouraged "industries", and highlights that the Panel found that the Catalogue lists "individual project types, described in very specific and narrowly-circumscribed terms", and that the overall impression that it gave "is not one of broad availability but rather of singling out of very particular types of projects".[144]   In the view of the United States, China appears to be challenging the Panel's factual finding in respect of the contents of the items listed in the encouraged category.  This, however, is not an issue of law, and thus, is not an appropriate matter for appellate review under Article 17.6 of the DSU.  Moreover, in response to China's criticism of the Panel's reference to the restricted and eliminated categories, the United States argues that the Panel's

---

[143]United States' appellee's submission, para. 213 (referring to Panel Report, para. 9.41).
[144]United States' appellee's submission, para. 215 (quoting Panel Report, para. 9.68).

reference to these other categories, and the large number (539) of listings that they contained, was part of its examination of the totality of the evidence and that its conclusion was correct.

165.    Second, with respect to China's argument that interpreting the term "certain enterprises" to cover the range of economic sectors included in the encouraged category would be inconsistent with the finding of the panel in *EC and certain member States – Large Civil Aircraft* that access to European Investment Bank loans was not limited to certain enterprises, the United States argues that the facts in that case are different from those in this dispute, and points out that the panel report in that case has not yet been adopted by the DSB.

166.    Third, the United States claims that China's reference to the purported position of the United States on the issue of what constitutes "certain enterprises" in previous cases is "a distraction".[145]   China mischaracterizes the United States' position in *US – Large Civil Aircraft (2nd complaint)* and *US – Upland Cotton*, and ignores key distinctions between the facts in those disputes and the facts in this dispute.   The issue in this dispute is whether the Panel properly determined that the USDOC's determination of specificity was consistent with Article 2.1(a) of the *SCM Agreement*, and the United States submits that it did.

(c)    Article 2.2 of the *SCM Agreement*

167.    With respect to China's appeal regarding the Panel's assessment of the regional specificity determination made by the USDOC in the LWS investigation, the United States requests the Appellate Body to uphold the Panel's findings and legal interpretations of Article 2.2 of the *SCM Agreement*.

168.    With respect to the first point raised by China, based on its interpretation of the word "subsidy", the United States refers to its argument about the definition of this word presented in the context of Article 2.1(a), which reinforces that the mere use of the term "subsidy" does not signify that an investigating authority must determine that both the financial contribution and the benefit are regionally specific in order for a subsidy to be regionally specific within the meaning of Article 2.2.

169.    With respect to the second point raised by China, concerning the Panel's reference to a "distinct regime", the United States submits that it does not appear that the Panel made any "finding" that the existence of a distinct or unique regime for the provision of a subsidy is legally relevant to a determination of specificity under Article 2.2 of the *SCM Agreement*.   The statement to which China refers is simply a passing statement by the Panel about an analytical approach that the USDOC did not

---

[145]United States' appellee's submission, para. 224.

adopt and evidence to which the United States did not point.  In this regard, China's arguments suggest that China itself appears to be aware that the Panel did not make a "finding".  Furthermore, the Panel expressly stated that it was not making a factual finding, and there is no indication that it was making a legal finding of the sort alleged by China.  The United States recalls that the subject of an appeal must be an issue of law or legal interpretation and, thus, asserts that China's appeal on this point does not appear to be properly before the Appellate Body.

170.    The United States also deems "unfounded"[146] China's concerns about the implications of the Panel's statement for the United States' implementation obligations and for the operation of Article 2 generally.  The Panel did not, at the conclusion of its Report, suggest ways in which the United States might implement the recommendations, as is contemplated under Article 19.1 of the DSU, and there is no indication in the Panel's statements that they are intended to be, or actually constitute, such a suggestion.  Thus, the statements have no implications, either for the compliance obligations of the United States, or for the operation of Article 2 generally.

171.    Finally, the United States asserts that the crux of China's appeal with respect to this point appears to be China's contention that the Panel would have found regional specificity if the land-use rights had been provided as part of a distinct regime, even when the identical subsidy was available elsewhere in Huantai County, and notes that the Panel never discussed what it would have found in the event that the identical subsidy were available elsewhere in Huantai County.

3.      Article 14 of the *SCM Agreement*:  Calculation of the Benefit

(a)      Article 14(d) of the *SCM Agreement*:  Input Benchmarks

172.    The United States submits that China's arguments in support of its appeal related to Article 14(d) of the *SCM Agreement* are without merit.  The United States requests the Appellate Body to find that the Panel did not err in determining that the USDOC did not act inconsistently with the *SCM Agreement* in rejecting private prices in China as benchmarks in determining the benefit from the government provision of HRS to respondents in the CWP and LWR investigations.

173.    At the outset, the United States notes its agreement with China that China's claim, before the Panel and on appeal, presents a "straightforward question of legal interpretation", namely, "whether record evidence that the government was the predominant supplier of a good can be sufficient, on its own, to establish market distortion".[147]  Unlike China, however, the United States considers that the

---

[146]United States' appellee's submission, para. 243.
[147]United States' appellee's submission, paras. 248 (quoting China's appellant's submission, para. 272) and 250 (quoting Panel Report, para. 10.38)).

Case 1:08-cv-00285-JAR   Document 382-1   Filed 01/07/13   Page 79 of 246

Panel correctly answered this question in the affirmative, and that the Panel's interpretation of Article 14(d) was consistent with the customary rules of interpretation and in line with the Appellate Body's interpretation of this provision in *US – Softwood Lumber IV*.

174.    The United States points to what it characterizes as a "fundamental flaw" in the arguments raised by China.  In its view, China misunderstands the problem identified by the Panel, and by the Appellate Body in *US – Softwood Lumber IV*, when it characterizes the question as whether government predominance in the market will cause private market prices to be "artificially low".  However, the problem with government predominance in the market is, rather, that private prices will align with the government price such that a comparison of the government price to a benchmark price from the private market in the country of provision would be circular, that is, would be tantamount to comparing the government price to itself.  Such circularity in turn results in a benefit calculation that is "artificially low".  The question of whether the government price is "artificially low" is the very question addressed by the benefit analysis and, in order to answer that question, the investigating authority must first identify a commercial benchmark, free from the influence of the government's own pricing strategy, with which to compare the government price.  In the view of the United States, China's basic misunderstanding of this issue permeates and undermines its appeal.

(i)    *Interpretation of Article 14(d) of the SCM Agreement*

175.    In the view of the United States, the Panel properly interpreted Article 14(d) and, consistent with a correct understanding of the Appellate Body's interpretation of that provision in *US – Softwood Lumber IV*, properly concluded that evidence that the government is the predominant supplier of a good in a country is sufficient to justify the rejection of in-country private prices a benchmark for determining the benefit from the government provision of that good.  In other words, the United States elaborates, there is no requirement in Article 14(d) to establish price distortion, in addition to the predominance of the government in the market, before resorting to an out-of-country benchmark.

176.    The United States recalls that the chapeau of Article 14 refers to "any method" used by an investigating authority and describes the subparagraphs that follow as "guidelines".  The Appellate Body stated, in *US – Softwood Lumber IV*, that "the use of the term 'guidelines' in Article 14 suggests that paragraphs (a) through (d) should not be interpreted as 'rigid rules that purport to contemplate every conceivable factual circumstance'."[148]  The Appellate Body also recognized that investigating

---

[148]United States' appellee's submission, para. 261 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 92).

authorities may use a benchmark other than private prices in the country of provision under Article 14(d) in certain circumstances, because it may not always be the case that private prices in the market of provision will represent an appropriate measure of the "adequacy of remuneration" for the provision of goods.  China reads the Appellate Body report in *US – Softwood Lumber IV* as establishing a rule that, in order to reject in-country private prices a benchmark, investigating authorities must not only find that the government plays a predominant role in the market, but also make an entirely separate finding that private prices are distorted (artificially low) by virtue of the government's predominant role.  However, the Panel did not read this report in such a way, and the United States agrees with the Panel's approach.

177.    The United States recalls that, in *US – Softwood Lumber IV*, the Appellate Body reasoned that requiring the use of in-country private prices as a benchmark in all circumstances would frustrate the purpose of Article 14 and make it impossible to calculate benefit, notably in circumstances where "the government's role in providing the financial contribution is so predominant that it effectively determines the price at which private suppliers sell the same or similar goods, so that the comparison contemplated by Article 14 would become circular".[149]   The United States views this statement as evincing the Appellate Body's acceptance that it is the government predominance itself that is the cause of the price distortion.   Thus, the Appellate Body did not interpret Article 14(d) of the *SCM Agreement* as requiring investigating authorities to make a separate finding that private prices are distorted.

178.    The United States also highlights that, in *US – Softwood Lumber IV*, the Appellate Body found little distinction between the situation where the government is the sole supplier of the good and the situation where the government is a predominant supplier because, whenever the government is a predominant supplier, it can affect, through its own pricing strategy, the private prices to the point where there may be little difference between the government price and the private prices.   The United States notes that the Panel took the same position.

179.    The United States contests China's argument that the only reasoning provided by the Panel to support its interpretation of Article 14(d) was that there is a legally significant difference between the government acting as a significant supplier of a good and the government acting as a predominant supplier of a good.  Like the Appellate Body in *US – Softwood Lumber IV*, the Panel emphasized the identity between the government acting as the sole and a predominant supplier, rather than the difference between the government acting as a significant versus a predominant supplier.   The

---

[149]United States' appellee's submission, para. 267 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 93).

United States adds that the Panel also addressed, and properly dismissed, China's contention that the Appellate Body used the terms "predominant" and "significant" interchangeably. As the Panel understood, the Appellate Body used two distinct terms to express two distinct concepts.

180.    The United States disputes China's assertion that the Appellate Body's inability to complete the analysis in *US – Softwood Lumber IV* demonstrates that the Appellate Body considered that "predominance" alone is not a sufficient basis to reject in-country private prices as a benchmark. The Appellate Body did not complete the analysis, not because the undisputed facts relating to government predominance were insufficient to find that private prices could be rejected as a benchmark, but because the panel had not made findings concerning the weight to be ascribed to disputed facts and evidence on the panel record in addition to the evidence of government predominance. The United States also points out that, even if the Appellate Body had completed the analysis of whether the USDOC was allowed to reject in-country private prices as the benchmark, the Appellate Body would not have been able to examine whether the benchmark actually used by the USDOC related or referred to, or was connected with, prevailing market conditions in Canada, as required by Article 14(d).

181.    The United States argues that, unlike China's assertion, in the relevant investigations, the USDOC used "predominance" as a standard. The United States recalls that the USDOC described the Chinese Government's involvement in the HRS market as "overwhelming" and explained that the market is "so dominated" by governmental presence, which is synonymous with "predominant".

(ii)    *Application of Article 14(d) of the SCM Agreement*

182.    The United States submits that the economic analysis and discussion of various evidentiary items that China presents in its appellant's submission are irrelevant, because China's position is based on the flawed assumption that the foundation of the USDOC's determinations, the Panel's finding, and the Appellate Body's interpretation of Article 14(d) in *US – Softwood Lumber IV* is that a government's predominant role as a supplier of a good will result in "artificially low" prices for the good in that country. In fact, the United States contends, the reason why investigating authorities may utilize a benchmark other than in-country prices is that comparing the government price to an in-country price aligned with it would be circular and would result in an artificially low benefit.

183.    The United States asserts that China fails to understand that there is no way for investigating authorities to determine whether prices are artificially low or not without comparing the prices to some benchmark. It is first necessary, before getting to the question of whether the government prices are artificially low, to find something with which to compare the financial contribution. Thus,

contrary to China's assumption, the reason an investigating authority may disregard in-country prices as a benchmark under the interpretation of Article 14(d) elaborated by the Appellate Body in *US – Softwood Lumber IV* is that there is no way of knowing whether those prices are too low in the first place. It follows, submits the United States, that China's efforts to establish that the fact that the government is the predominant supplier of a good does not prove that prices in the country are artificially low are fundamentally flawed. Likewise, China's arguments that there was evidence before the USDOC relevant to a "proper distortion inquiry" are mistaken. The evidence to which China points as showing that private HRS suppliers could not have been selling at "suppressed", "below-market", or "below-cost" prices is irrelevant because it is not necessary to show separate evidence of market distortion—much less evidence that in-country private prices are below market or below cost—when the government is a predominant supplier and therefore prices are inherently aligned or distorted. Thus, reasons the United States, the Panel did not err in concluding that nothing in Article 14(d), or in the Appellate Body's report in *US – Softwood Lumber IV*, "would prohibit, *a priori*, a finding of market distortion, and a decision to depart from in-country private prices, where the only relevant evidence was that the government is the predominant supplier of the good."[150]

(iii)     *The USDOC's Rationale for Finding Distortion*

184.     The United States maintains that, because the Panel did not err in its analysis of the legal issue, it also properly found that the USDOC's determinations in the CWP and LWR investigations were not inconsistent with the *SCM Agreement*.

185.     The United States observes that, although China argues that the USDOC itself did not distinguish between the government as a "predominant" supplier and the government as a "significant" supplier, it is undisputed that the Chinese Government was the predominant supplier of HRS during the relevant periods of investigation in the CWP and LWR investigations, because of the fact that SOEs accounted for 96.1 per cent of HRS production in China. Even if it did not use the word "predominant", the USDOC explained that the government's involvement in the HRS market was "overwhelming" and cited to its Softwood Lumber determination in explaining its practice when the market is "so dominated by the presence of the government".[151] For the United States, it follows that the USDOC's determinations were based on a finding of predominance.

186.     As for China's allegation that the Panel failed to discharge its duties pursuant to Article 11 of the DSU, the United States recalls that China's principal argument before the Panel was that the

---

[150]United States' appellee's submission, para. 295 (quoting Panel Report, para. 10.45).
[151]United States' appellee's submission, para. 285 (quoting CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 64; and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36).

USDOC impermissibly relied upon a *per se* rule of government predominance to justify its use of out-of-country benchmarks, and that this argument assumed, incorrectly, that government predominance alone was insufficient to justify a finding of market distortion and the use of prices other than in-country prices as benchmarks.  The United States also points out that the Panel appropriately considered whether the USDOC examined all the evidence and arguments on the record, in keeping with the Appellate Body's instruction that a decision to disregard in-country prices as the benchmark must be made on a case-by-case basis.

187.     The United States also rejects China's intimation that the Panel attributed to the USDOC's determinations a rationale or explanation other than that provided by the USDOC.  As its Report reflects, the Panel summarized the evidence that the USDOC had indicated was before it, and explained that the USDOC properly found that much of that evidence was irrelevant, because it did not negate the fact that any comparison to in-country prices would be circular due to the government's predominant position.  Thus, the Panel examined the USDOC's own rationale for its determination. The United States also finds it significant that the Panel discussed the USDOC's analysis of the role of imports into the Chinese market in all four countervailing duty investigations, something which China ignores.  In both the CWP and LWR investigations, the USDOC noted that the volume of imports of HRS amounted to only three per cent of total Chinese HRS production and concluded that imports were insufficient to serve as a reliable benchmark.  The Panel contrasted this with the situation in the OTR investigation where, despite the government's share of domestic production of rubber, the USDOC relied upon import prices and other in-country prices as benchmarks due to the large penetration of rubber imports in China's rubber market and the lack of other evidence demonstrating that SOEs or government agencies had distorted this market.

188.     Accordingly, the United States submits that the Appellate Body should find that the Panel did not err in determining that the USDOC did not act inconsistently with the *SCM Agreement* in deciding not to use in-country prices as benchmarks in the CWP and LWR investigations.

(b)     Article 14(b) of the *SCM Agreement*:  Loan Benchmarks

189.     The United States requests the Appellate Body to reject China's claims related to Article 14(b) of the *SCM Agreement*.  The United States considers that the Panel correctly found that the USDOC's rejection of Chinese interest rates as benchmarks in the CWP, LWS, and OTR investigations and the benchmarks actually used by the USDOC were consistent with Article 14(b) of the *SCM Agreement*. The United States also contends that the Panel did not act inconsistently with Article 11 of the DSU.

190.    Like the Panel, the United States considers that China proposes an "excessively formalistic interpretation" of Article 14(b), which "would effectively limit an investigating authority's ability to identify an appropriate benchmark, forcing it instead to fall back on a choice from among inappropriate benchmarks".[152]   The United States also argues that China's arguments are premised on an erroneous conflation of "benchmark interest rates" and "commercial" interest rates used as benchmarks to measure benefit under Article 14(b), and that this undermines China's legal and economic arguments.   As for China's allegations under Article 11 of the DSU, the United States regards them as based on misrepresentations and mischaracterizations of the Panel Report and, as such, without merit.

(i)     *Rejection of Interest Rates in China as the Benchmark under Article 14(b) of the SCM Agreement*

191.    The United States considers that the Panel properly interpreted Article 14(b) of the *SCM Agreement* as permitting the use of a proxy loan, including a loan denominated in a different currency, and requests the Appellate Body to uphold the Panel's interpretation of this provision.   The United States further submits that the Panel correctly found that China failed to establish that the USDOC's decision, in the CWP, LWS, and OTR investigations, not to rely on Chinese interest rates as benchmarks for SOCB loans denominated in RMB was inconsistent with the obligations of the United States under Article 14(b) of the *SCM Agreement*.

192.    The United States first acknowledges China's criticism of the Panel's formulation of the central question of legal interpretation and accepts that China correctly points out that, because Article 14(b), unlike Article 14(d), does not have an express notion of territoriality, the paradigm of "in the country" versus "out of the country" does not arise.[153]   Yet, according to the United States, such a geographical limitation on the benchmark that may be selected is nevertheless implicit in China's arguments that the currency of the benchmark loan must be the same as the currency of the financial contribution, and that RMB loans may only be obtained in China.

193.    The United States recalls that the Appellate Body has stated that paragraphs (a) through (d) of Article 14 of the *SCM Agreement* should not be interpreted as rigid rules covering all possible circumstances, that WTO Members have some latitude in the methods used to calculate benefit, and that the marketplace provides an appropriate basis for comparison in determining whether a benefit has been conferred.   The Appellate Body also recognized, in *US – Softwood Lumber IV*, that investigating authorities may use a benchmark other than private prices in the country of provision

---

[152]United States' appellee's submission, para. 305 (quoting Panel Report, para. 10.121).
[153]United States' appellee's submission, para. 307 (quoting China's appellant's submission, para. 398).

under Article 14(d) in certain circumstances, because it may not always be the case that private prices in the country of provision will represent an appropriate measure of the "adequacy of remuneration" for the provision of goods.

194.     The United States sets out, and agrees with, the main elements of the Panel's interpretation of Article 14(b), including:  (i)  the comparator to be used must be, first and foremost, "commercial"; (ii) the "ideal" benchmark would be an actual loan from a commercial lender of the same size, maturity, structure, and currency, to the investigated entity, taken out on the same day as the investigated government loan, although, in practice, the existence of such an ideal benchmark loan will be extremely rare;  and (iii) Article 14(b), by its own terms, makes allowance for the use of proxies when an identical or nearly identical loan is not available as a benchmark.

195.     In the view of the United States, China's argument that the Panel erred in its interpretation of the term "comparable" amounts to a denial of the possibility that an investigating authority could ever make adjustments sufficient to render a benchmark loan denominated in another currency comparable, or, in other words, to a requirement to use loans within China as the benchmark.  The Panel rejected the same argument because it considered the logic of the Appellate Body's finding in *US – Softwood Lumber IV* to be equally applicable under Article 14(b).  The Appellate Body held that Article 14(d) allows investigating authorities to reject in-country prices as a benchmark under certain circumstances, notably where a comparison with in-country private prices would be inherently circular.  The United States considers that the Panel's reference to the Appellate Body report in *US – Softwood Lumber IV* was appropriate because the potential for a circular comparison is as great under Article 14(b) as it is under Article 14(d), and dismisses China's arguments to the contrary.

196.     The United States asserts, in this regard, that China misunderstands the significance of the Appellate Body report in *US – Softwood Lumber IV* and its focus on the problem of avoiding a comparison that is circular.  China's argument that there is no evidence of "distortion" in the Chinese lending market misses the point, because the concern is not that Chinese interest rates are "artificially low", but that they are effectively established by the government.  The United States adds that the Panel's interpretation of Article 14(b) is consistent with the object and purpose of the *SCM Agreement*, which includes disciplining the use of subsidies and countervailing measures while enabling Members whose domestic industries are harmed by subsidized imports to use such remedies, and that China's interpretation would effectively limit investigating authorities' ability to identify an appropriate benchmark.

197.     Turning to the question of whether the Panel correctly found that the USDOC could, consistently with Article 14(b), decide not to use Chinese interest rates as benchmarks for SOCB

loans denominated in RMB in the CWP, LWS, and OTR investigations, the United States recalls that the Panel observed that the USDOC had determined that none of the sources of Chinese interest rates could be used as benchmarks because it considered, based on its determination in the CFS Paper case, that there was no functioning market for loans in China. The United States points out, in particular, that the Panel noted that the USDOC had determined, *inter alia*, that: China's banking system was still under State-control; China's banking system still operated in accordance with governmental planning policies; interest rates were regulated by the government; foreign-owned banks in China were subject to the same restrictions as SOCBs; and foreign currency lending rates in China were unsuitable for measuring the benefit of loans denominated in RMB.

198.    As an initial matter, the United States identifies what it considers to be the fundamental flaw in China's arguments on appeal, namely, that China appears to confuse "benchmark interest rates", which are set or influenced by the government's monetary policy, with "commercial" interest rates, which are, under normal circumstances, set by commercial banks operating in the market. Article 14(b) is concerned with "commercial" interest rates, that is, interest rates determined by the "market". As China recognizes, "benchmark interest rates" may be "effectively dictated" by government monetary policy. Commercial banks, however, as China also recognizes, charge different interest rates to different borrowers, based on their assessment of the borrower's credit, and this interest rate differentiation is a way of managing a bank's risk. The United States submits that the kind of "commercial" loan interest rate that is suitable for use as a benchmark for measuring benefit under Article 14(b) is, in virtually all cases, going to be different from the "benchmark interest rate" for a particular currency and that, for these reasons, all of China's legal and economic arguments that relate to "benchmark interest rates" are beside the point.

199.    China's example of the relationship between the United States' federal funds rate and its prime rate is, the United States asserts, based on this confusion. Although China makes much of the fact that the prime rate closely tracks the federal funds rate, China wrongly equates the two concepts and also overlooks that the interest rate formation "processes" in China and the United States are fundamentally different. In the United States, the Federal Reserve influences wholesale (inter-bank) rates, whereas in China the People's Bank of China effectively dictates retail (bank-to-customer) rates. In the United States, retail rates are market based, because banks construct their retail rates upon the base of the federal funds rate. To the extent that the prime rate tracks the federal funds rate, that is a function of the market. In China, there is no market-based building process underlying retail rates. Instead, the People's Bank of China itself changes retail lending rates by administratively determining the floors that constrain them.

200.     The United States regards as "without basis in fact"[154] China's challenge to the consideration by the USDOC and by the Panel of specific factors relevant to "distortion", and China's related suggestion that the Chinese Government's participation in and regulatory control of the Chinese lending market is equivalent to the implementation of monetary policy by the United States Government and governments of other countries.  The United States highlights that the USDOC found, based on record evidence, that China controls banks' lending through the regulation of interest rates, and that these regulatory controls were considered necessary because the SOCBs were not at a point where they could lend without such controls.  By maintaining both a deposit rate cap and a lending rate floor, China ensures that banks can retain profits while lending at the floor rate.  The United States stresses that the use of the floor on lending rates together with the cap on deposit rates is fundamentally different from what are considered traditional regulatory controls.  In response to questioning at the oral hearing, the United States explained that this is because the floor on lending rates is set at a level that is higher than the cap on deposit rates.

201.     With respect to the lack of differentiation in interest rates on loans in China, and China's allegation that the Panel and the USDOC failed to explain why the Chinese Government's role or intervention in the market caused interest rates to be "artificially low", the United States reiterates that China misunderstands the problem.  The problem is not that the Government's predominant role in the Chinese commercial lending market necessarily causes interest rates to be "artificially low", but that the Government's predominant role in the Chinese commercial lending market, both as a lender and in terms of controlling the operation of this market, results in the problem of an inherently circular comparison.  Therefore, in order to determine whether Chinese interest rates are low, a comparison must be made to something other than a Chinese interest rate.

202.     Finally, the United States dismisses as "unfounded"[155] the caution expressed by China that accepting the Panel's interpretation of Article 14(b) would open the door to the use of countervailing duties as a means of sitting in judgement upon, or seeking to counteract, the monetary policies pursued by other WTO Members.  The United States emphasizes that it was not China's monetary policies that led the USDOC and the Panel to conclude that the Chinese lending market was distorted. Rather, it was the Government's predominant role in the Chinese lending market both as a lender and in terms of controlling the operation of the market, which distorted interest rates, that led the USDOC and the Panel to conclude that observed rates in China were not suitable as benchmarks.

---

[154]United States' appellee's submission, para. 344.
[155]United States' appellee's submission, para. 349.

(ii)     *Consistency with Article 14(b) of the Benchmarks Actually Used by the USDOC*

203.     The United States contends that, having adopted a proper approach in its assessment of the loan benchmark actually used by the USDOC to calculate the benefit from RMB-denominated SOCB loans, the Panel correctly found that such benchmark was not inconsistent with Article 14(b) of the *SCM Agreement*.  The United States requests the Appellate Body to uphold this finding and to dismiss China's appeal.

"Comparable"

204.     The United States notes that, although China accepts all of the comparability factors identified by the Panel, China argues that the currency in which the loan is denominated is of "fundamental importance" because real interest rates differ by currency and the country in which the loan is issued.  Indeed, to the United States, it appears that China considers the currency to be the *only* relevant factor in determining whether a loan is comparable.  Although China argues that a loan in one currency cannot be compared to a loan in another currency because differences in interest rates are idiosyncratic to each currency, the United States observes that this argument is no criticism of the loan benchmark used by the USDOC.  The United States explains that the USDOC used a group of interest rates, rather than a single out-of-country interest rate, as it considered that various factors can impact national averages for interest rates.  To ensure that the constructed benchmark approximated a "comparable commercial loan", the USDOC selected countries that had similar GNIs to China on the basis that there is a broad inverse relationship between income levels and lending rates, and performed a regression analysis of those rates, GNI data, and World Bank governance indicators to determine a yearly comparison interest rate.  The USDOC also adjusted for inflation as a proxy for an adjustment for exchange rate expectations.  At the oral hearing, the United States explained that the USDOC had determined in consultation with other government agencies which were the most relevant factors to use in order to make adjustments to the regression model.  Although China complains of the 20 percentage point spread in real interest rates among the countries considered by the USDOC, the United States considers that this variation supports the appropriateness of performing a multi-currency analysis, rather than relying on data from one country alone.

"Could Actually Obtain on the Market"

205.     Although China asserts that its interpretation of the phrase "could actually obtain on the market" is broader than that of the Panel, the United States considers that it is, in fact, a far narrower interpretation.   Accepting China's formalistic interpretation, namely, that any benchmark must

represent a loan from a "market" in which a firm "could actually obtain" a "comparable commercial loan" given the sources of credit that are actually available to it, would, as the Panel found, limit an investigating authority's ability to identify an appropriate benchmark and force it to resort instead to inappropriate benchmarks.  The United States also highlights that China's proposed interpretation appears to be inconsistent with the proposal made by Chinese respondents in the relevant investigations, that the USDOC should use a weighted average of interest rates charged by Chinese banks, both State-owned and non-State-owned, during the period of investigation.  Since a weighted average of interest rates is necessarily not a loan that the borrower could, in fact, obtain, the United States views this as a concession by China that something other than an "actual" loan may be used as a benchmark, consistently with Article 14(b).  The United States observes that the USDOC's multi-currency regression model was, itself, a weighted average of interest rates, albeit one that also took account of additional factors in order to improve its reliability as a benchmark.

<u>Article 11 of the DSU</u>

206.     The United States contests China's assertion that the Panel failed to undertake an objective assessment of the matter before it, in accordance with Article 11 of the DSU.  The United States alleges that China has not discharged the burden, which the Appellate Body has described as a heavy one, of establishing the Panel's failure to comply with Article 11.

207.     The United States observes that China repeatedly criticizes the brevity of the Panel's analysis, noting, for example, that the Panel analyzed an issue in a single paragraph or in a single sentence.  For the United States, these arguments appear to be made under Article 12.7 of the DSU, although China has raised no claim of error on appeal under that provision.  In any event, the Appellate Body has explained that a panel has discretion to address only those arguments it deems necessary to resolve a particular claim.  The United States further considers that China misrepresents the Panel's analysis.  The Panel engaged in a thorough and objective examination of the evidence on the record and provided well-reasoned and complete explanations for all of its findings.  That the Panel may not have addressed certain economic arguments that were not relevant to its analysis cannot constitute grounds to find that it acted inconsistently with Article 11 of the DSU.

208.     Finally, in response to China's argument that the Panel applied a standard of "sufficient approximation" to, rather than "actual conformity" with, Article 14(b) of the *SCM Agreement*, the United States contends that it is clear, from a full reading of the Panel Report, that the Panel did not apply a standard of "sufficient approximation" of conformity with the relevant covered agreements.

4.      Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994:  "Double Remedies"

209.    The United States requests the Appellate Body to dismiss China's appeal with respect to the concurrent application of countervailing duties and anti-dumping duties and alleged "double remedies", and to reject China's request to complete the analysis.  The United States considers that the Panel properly interpreted the relevant provisions of the covered agreements, and correctly concluded that China failed to establish that the USDOC's use of its NME methodology in the anti-dumping determinations at issue in this dispute, concurrently with its imposition of countervailing duties on the same products, was inconsistent with Articles 10, 19.3, 19.4, or 32.1 of the *SCM Agreement* or with Article VI:3 of the GATT 1994.

(a)      China's Accession Protocol

210.    The United States contends that China's Accession Protocol provides supportive context for the Panel's interpretation of Articles 19.3 and 19.4 of the *SCM Agreement*.  The United States points out that China's Accession Protocol is an integral part of the *WTO Agreement* and, as such, must be interpreted in accordance with the customary rules of interpretation of public international law.  In addition to agreeing to be bound by the text of the *SCM Agreement*, China agreed to the requirements of the Protocol including, notably, Paragraph 15, which expressly authorizes the application of anti-dumping duties and countervailing duties to imports from China, including specifically anti-dumping duties calculated using an NME methodology and countervailing duties based upon benefit calculations using benchmarks outside of China.  Significantly, Paragraph 15 imposes no limit on the concurrent application of both remedies.  The United States recalls that the Panel interpreted Articles 19.3 and 19.4 of the *SCM Agreement* as not conditioning the application of countervailing duties on the existence, or a lack thereof, of anti-dumping duties calculated under an NME methodology, and submits that China's Accession Protocol is consistent with this interpretation.

(b)      Interpretation of Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994

211.    In the view of the United States, the Panel properly interpreted Article 19.4 of the *SCM Agreement* in accordance with Article 31 of the *Vienna Convention*, correctly found that Article 19.4 does not provide a legal basis for China's claims, and rightly rejected China's argument that, where an NME anti-dumping duty may theoretically have offset part of a subsidy, such subsidy no longer "exists" for purposes of Article 19.4.  The Panel correctly recognized that Article 19.4 is not concerned with the existence of subsidies, but with ensuring that any countervailing duties imposed do not exceed the subsidies attributable to the imported goods, in terms of subsidization per unit.

212.     The United States emphasizes that the text of Article 19.4 limits the amount of countervailing duties that may be levied to "the amount of the subsidy found to exist".  The existence of subsidies for purposes of the *SCM Agreement* is governed by Articles 1 and 14 of the *SCM Agreement*, and has nothing to do with the imposition of anti-dumping duties based on an NME methodology.  Moreover, as the Panel explained, by its own terms, Article 19.4 only imposes disciplines with respect to countervailing duties (not anti-dumping duties) and is, thus, "oblivious to any potential concurrent imposition of anti-dumping duties".[156]

213.     The United States asserts that the imposition of anti-dumping duties calculated under an NME methodology has no bearing on the "existence" of a subsidy under the *SCM Agreement*.  Such imposition of NME anti-dumping duties on some fraction of the goods produced by a subsidy recipient neither extracts the subsidy from the recipient and returns it to the government nor extinguishes the benefit.  The United States also points out that Article 19 as a whole lists circumstances in which subsidies may not be countervailed, including when they have been withdrawn (Article 19.1), and on imports from sources that have renounced the relevant subsidies (Article 19.3).  Similarly, Article 7.8 of the *SCM Agreement* offers two alternative options as remedies for an actionable subsidy:  to remove the adverse effect of the subsidy;  or to withdraw the subsidy. The United States argues that these provisions show that the *SCM Agreement* distinguishes between the existence and withdrawal of a subsidy, on the one hand, and the effects and the removal of effects of a subsidy found to exist, on the other hand.

214.     The United States contends that the limitation in Article 19.4 of countervailing duties to "subsidization per unit of the subsidized and exported product" means that the amount of countervailing duties cannot exceed the portion of the total subsidy attributable to the imports in question.  The United States cautions that accepting China's interpretation would replace this logical rule with a host of difficulties and unforeseen consequences.  For example, a variety of problems with timing and sequences could arise.  For instance, in the United States, countervailing duty rates are usually determined before anti-dumping duty rates.  Therefore, the USDOC would not know at the time of the countervailing duty determination whether the NME anti-dumping duty rate would be positive and, thus, could not know whether the subsidy had, under China's reasoning, ceased to "exist".  Another example is the question of whether other Members could impose countervailing duties on products after the same products had been subject to the United States' anti-dumping duties calculated under an NME methodology, given that, under China's reasoning, the relevant subsidies must be deemed no longer to "exist".  The United States also points out that, in a retrospective duty assessment system, the duties collected may be lower than the dumping margin calculated for the

---

[156]United States' appellee's submission, para. 396 (quoting Panel Report, para. 14.112).

period of investigation, or even none at all.  Thus, reasons the United States, China's argument that the application of anti-dumping duties calculated under an NME methodology automatically causes subsidies to cease to exist also conflicts with such retrospective systems.

215.    For the United States, these difficulties underline why a prohibition on "double remedies" should not be read into the *SCM Agreement*.  If the drafters had intended to create such a prohibition, then they would logically have included an obligation for investigating authorities to go back and amend a countervailing duty rate when anti-dumping duties are subsequently imposed or adjusted, but they did not.

216.    The United States contends that China is incorrect in asserting that the Panel's interpretation of Article 19.4 is inconsistent with the Appellate Body's findings in *US – Countervailing Measures on Certain EC Products* and *US – Softwood Lumber IV*.  The United States rejects the analogy that China draws between the effect of an arm's-length sale of a subsidy recipient and the imposition of NME anti-dumping duties on goods manufactured by a producer whose ownership has not changed.  Unlike in *US – Countervailing Measures on Certain EC Products*, where the Appellate Body found that an arm's-length, fair-market-value privatization terminated the benefit and, therefore, the existence of the subsidy, the imposition of NME anti-dumping duties does not terminate the benefit to the subsidy recipient and, thus, does not affect the existence of a subsidy.  *US – Softwood Lumber IV* also does not support China's arguments.  The Appellate Body found, in that dispute, that the producer of the product had not received a subsidy, because the subsidy to the manufacturer of an input did not pass through to that producer.  For the United States, such a situation is clearly distinct from a situation in which a subsidy recipient is subject to NME anti-dumping duties.

(c)        Interpretation of Article 19.3 of the *SCM Agreement*

217.    The United States alleges that, contrary to the arguments advanced by China, the Panel engaged in extensive consideration of the *SCM Agreement*, including reference to the definition of the phrase "appropriate amounts" in Article 19.3.  The United States agrees with the Panel that the imposition of anti-dumping duties calculated under an NME methodology has no impact on whether or not the amount of the concurrent countervailing duty collected is "appropriate", and that the concurrent application of countervailing duties and anti-dumping duties calculated using an NME methodology is not inconsistent with Article 19.3 of the *SCM Agreement*.  Thus, the Panel's findings with respect to Article 19.3 of the *SCM Agreement* should be upheld.

218.     The United States contends that the panel report in *EC – Salmon (Norway)* lends no support to China's interpretation of Article 19.3 of the *SCM Agreement*.  Article 19.3 can and should be interpreted in a similar fashion to the way in which Article 9.2 of the *Anti-Dumping Agreement* was interpreted in that case, namely, that the "appropriate" amount of countervailing duties must be an amount no greater than the subsidies attributable to the subject merchandise when all other requirements for the imposition of countervailing duties have been fulfilled.  The United States points out that it is not disputed that the amount of the subsidies calculated, or found to exist, by the USDOC corresponded to the countervailing duties imposed by the USDOC.

219.     The United States adds that, as the Panel noted, the manner in which the dumping margin is calculated—through an NME methodology or otherwise—has no impact on the existence of subsidies, which may be found to exist in a parallel countervailing duty investigation, and the potential "double remedies" that may result from the imposition of anti-dumping duties based on an NME methodology do not transform such anti-dumping duties into countervailing duties.

(d)     Context of the Relevant Terms of the *SCM Agreement*

220.     The United States contends that the Panel correctly observed that Article VI:5 of the GATT 1994 sets forth the sole limitation on a Member's ability to apply anti-dumping and countervailing duties concurrently.  Two things are clear from Article VI:5:  (i) Members understood that, as a general matter, anti-dumping duties and countervailing duties can be applied concurrently to the same product;  and (ii) Article VI:5 applies only to concurrent anti-dumping and countervailing duty proceedings on the same product that involve "the same situation of dumping or export subsidization".  The United States argues that, if Members had intended to constrain concurrent application in other situations, they would have provided so explicitly, as they did in Article VI:5.

221.     The United States also considers that the second *Ad* Note to Article VI:1 of the GATT 1994, which recognizes that, in the case of NME countries, an investigating authority conducting an anti-dumping duty proceeding may need to look beyond the exporting country to find appropriate prices for comparison with prices in the importing country, provides further contextual support for the Panel's findings under Articles 19.3 and 19.4 of the *SCM Agreement*.  The second *Ad* Note to Article VI:1 was added to the GATT in 1955, but was not, at the time, accompanied by a modification to Article VI:5, or to any other provision, requiring the offsetting of countervailing duties against anti-dumping duties, or vice versa, in cases of concurrent investigations.

222.     The United States further asserts that, since only imported goods are subject to anti-dumping duties or countervailing duties, reading Article VI:5 as encompassing situations in which domestic

subsidies granted to exported goods are countervailed would effectively read the term "export" out of the relevant sentence of that provision, which is inconsistent with the principle of *effet utile*.

223.    The United States regards China's arguments regarding the Panel's allegedly improper, *a contrario* approach to Article VI:5 as unpersuasive, and its attempt to draw an analogy with the interpretative approach of the Appellate Body in *US – Upland Cotton* as mistaken.  The Panel did not find, and the United States did not argue, that the drafters of Article VI:5 affirmatively intended to *permit* double remedies in the case of domestic subsidies.  To the contrary, what the Panel and the United States considered to be relevant is that the prohibition in Article VI:5 does not address domestic subsidies, but only "export subsidization".  As for the Appellate Body's approach in *US – Upland Cotton*, that case involved reconciling an express allowance in one of the covered agreements with an express prohibition in another, which is not the issue in this dispute.  In any event, according to the United States, *US – Upland Cotton* stands for nothing more than the proposition that express language represents the essential starting point in interpreting the *WTO Agreement*.

224.    The United States is of the view that the Panel properly interpreted the significance of Article 15 of the *Tokyo Round Subsidies Code* and of the absence of a similar provision in the *SCM Agreement*.  Article 15 directly confronts the fundamental issue in this dispute:  whether a Member must choose between anti-dumping duties and countervailing duties when the methodology used to calculate the dumping margin does not rely on domestic prices or costs of the exporting party. The inclusion of Article 15 in the *Tokyo Round Subsidies Code* provides meaningful evidence that parties to that Code considered that no other provision in the GATT 1947 contained such an "either/or" requirement, because otherwise the inclusion of Article 15 in the Code would have been superfluous.  Furthermore, argues the United States, the existence of a provision in the *Tokyo Round Subsidies Code* specifically prohibiting the concurrent application of anti-dumping and countervailing duties to certain countries, followed by the disappearance of that provision in the successor *SCM Agreement*, demonstrates that such a prohibition no longer exists and reinforces the presumption, created by the express limitation in Article VI:5 itself, that WTO Members never agreed on such a prohibition.  The United States adds, in this connection, that this is an issue that was not addressed by China in its accession.

225.    The United States argues that the Appellate Body's finding in *US – Underwear* supports the Panel's interpretative approach.  The Appellate Body attributed significance to the meaning of a provision in the Multifibre Arrangement, and to the absence of such a provision in its successor agreement, the *Agreement on Textiles and Clothing*, which is the same as the Panel's approach in this case.

226.     Turning to object and purpose, the United States expresses the view that the Panel correctly construed the object and purpose of the *SCM Agreement* and found that it does not speak to the remedies available under the *Anti-Dumping Agreement* or to the level of remedies to be imposed in situations where there are parallel anti-dumping and countervailing duty investigations.   The United States points out that Article 31 of the *Vienna Convention* is clear that it is the object and purpose of the Agreement as a whole that is relevant, and characterizes China's attempt to assign an object and purpose to only Part V of the *SCM Agreement* as erroneous.   The United States also observes that, in any event, the object and purpose of an agreement cannot supersede the ordinary meaning of Article 19.4 or any of the other relevant provisions.

227.     The United States considers that, under the WTO agreements, Members created two distinct remedies for two separate unfair trade practices:  dumping and subsidies.  Anti-dumping duty rules compare prices at which a company sells products in its home and export markets, whereas countervailing duty rules focus on subsidies bestowed on products by governments.   The United States notes that, under the GATT 1994, as well as under the *Anti-Dumping Agreement* and the *SCM Agreement*, neither the provisions permitting the imposition of anti-dumping duties nor those permitting the imposition of countervailing duties include any reference to the other remedy.  Instead, footnote 24 of the *Anti-Dumping Agreement* and footnote 56 of the *SCM Agreement* each makes clear that trade remedy action under the other Agreement would not be precluded.  Accordingly, contends the United States, the WTO agreements recognize that anti-dumping and countervailing duties are separate remedies that address distinct unfair trade practices, and that those remedies may be applied to the fullest extent of the dumping margin or subsidy found to exist, regardless of the existence of parallel anti-dumping or countervailing duty investigations.

228.     The United States adds that the GATT Contracting Parties reinforced the distinctness of the remedies available in anti-dumping and countervailing duty proceedings by providing for only one instance—set out in Article VI:5—where both remedies may not be applied to the full amount.  This provision clearly reflects the understanding of Members that, as a general matter, anti-dumping duties and countervailing duties could be applied concurrently to the same product, and also reinforces the conclusion that they did not intend to prohibit the concurrent application of remedies in any other circumstances.

          (e)      Consequential Claims under Articles 10 and 32.1 of the *SCM Agreement*

229.    The United States requests the Appellate Body to uphold the Panel's finding that the condition for China's consequential claims under Articles 10 and 32.1 of the *SCM Agreement* has not been fulfilled. As they were before the Panel, China's claims under Articles 10 and 32.1 of the *SCM Agreement* depend upon the success of its claims that the United States acted inconsistently with Articles 19.3 and 19.4 of the *SCM Agreement*. As discussed above, the United States considers that the Panel properly interpreted Articles 19.3 and 19.4 and that its findings in this regard should be upheld. Accordingly, the Panel's findings with respect to China's claims under Articles 10 and 32.1 of the *SCM Agreement* should also be upheld.

          (f)      Completion of the Analysis

230.    The United States requests the Appellate Body to decline China's request to complete the analysis. The United States contends that the burden of establishing the existence of double remedies would be on China, and that the Panel made no finding regarding whether China had conclusively established that double remedies resulted from the concurrent imposition of countervailing duties and anti-dumping duties in this dispute.

231.    The United States notes that China argues that an importing Member must establish, in the course of countervailing duty and anti-dumping investigations, whether and in what amount a subsidy remains attributable to the imported product, and observes that China appears to believe that this means that the burden of proof would be on the importing Member in a WTO dispute as well. The United States argues that no such requirement exists, and that China's approach would confuse the obligations of Members conducting an investigation with the burden of proof in a WTO dispute settlement proceeding. The United States emphasizes that China, as the complaining party in this dispute, bears the burden of making out a *prima facie* case of violation of a relevant WTO obligation.

232.    Second, the United States highlights that, while it accepted that the concurrent application of countervailing duties and anti-dumping duties calculated using an NME methodology was "likely" to produce remedies that overlapped to "some" extent[157], the Panel made *no* findings as to whether double remedies resulted from the concurrent application of anti-dumping duties calculated under an NME methodology and countervailing duties, in the determinations for any of the four products at issue. In the absence of any such finding, there is no basis for the Appellate Body to conclude that double remedies occurred as a factual matter.

---

[157]United States' appellee's submission, para. 454 (quoting Panel Report, para. 14.75).

233.    The United States contests China's assertions that there are no disputed facts that the
Appellate Body need examine to rule on this issue, that a finding of inconsistency would follow
directly from the reversal of the Panel's legal interpretations, and that China's submissions before the
Panel amounted to a demonstration, based on undisputed evidence, that double remedies occurred in
the investigations at issue.  China made no attempt, in any of the proceedings before the USDOC, to
present evidence that double remedies had occurred, and also failed to place undisputed facts on the
Panel record.  Before the Panel, China simply argued that subsidies in market economies would lower
dumping margins on a pro rata basis (thus avoiding any "double remedies"), but that subsidies have
no effect whatsoever on dumping margins in NME countries.  The United States emphasizes that
China provided no evidence to support either of these theoretical assumptions.

   C.  *Arguments of the Third Participants*

     1.  <u>Argentina</u>

234.    With respect to the definition of "public body" under Article 1.1(a)(1)(i) of the
*SCM Agreement*, Argentina agrees with the Panel's interpretation of "public body" as meaning "any
government-controlled entity".[158]  The question of whether an entity is a "public body" relates to the
nature, not the behaviour, of that entity.  The broad interpretation given by the Panel to the term
"public body" is correct, and consistent with the object and purpose of the *SCM Agreement*.  In
contrast, the narrow interpretation put forward by China, which equates "public body" with
"government", is contrary to the ordinary meaning of the term, and would potentially provide WTO
Members with a means to evade the obligations that they have assumed under that Agreement.  This
is because, under the narrow definition of "public body" put forward by China, wholly or majority
government-owned enterprises would not necessarily be covered by the *SCM Agreement*, yet such
entities cannot, by their very nature, be considered to be "private entities" without rendering the
differentiation between "public" and "private" meaningless.  Therefore, accepting China's position
would mean that a category of entities controlled by the State but that do not have government powers
and that are engaged in activities involving the supply of goods and services would remain outside the
framework of the *SCM Agreement*.  Argentina adds that, even if, under China's narrow interpretation,
a State-owned entity could qualify as a "private body", then the analysis of whether that "private
body" has granted a financial contribution would need to be conducted under Article 1.1(a)(1)(iv),
which would, as the Panel explained, amount to enquiring whether the government entrusted or
directed itself to provide a financial contribution.

---

[158]Argentina's third participant's submission, para. 16 (quoting Panel Report, para. 8.83;  and referring
to para. 8.84).

235.     With respect to the simultaneous imposition of anti-dumping duties and countervailing duties, Argentina considers that such simultaneous imposition is in accordance with WTO rules provided that the countervailing duties aim to offset domestic subsidies and not export subsidies.  The principle *expressio unius est exclusio alterius* suggests that, as the WTO rules contain a specific prohibition on the simultaneous application of certain measures, but no specific prohibition on the simultaneous application of anti-dumping duties determined using the surrogate country methodology and countervailing duties, then the concurrent application of duties in the latter case is consistent with WTO rules.   Argentina also contests China's presumption that the application of an NME methodology in an anti-dumping investigation necessarily addresses subsidization, and notes that the purpose of an NME methodology is to mirror market economy conditions by using undistorted analogue country prices and costs, rather than trying to offset the use of subsidies.

2.     Australia

236.     Australia agrees with the Panel's interpretation of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* as "an entity controlled by a government"[159], and that such control may be determined principally, but not solely, on majority ownership.   However, the Panel's findings in rejecting China's arguments based on the ILC Articles went beyond those of previous panels and the Appellate Body.  Although the ILC Articles are not themselves binding, many of the principles they embody reflect customary international law, as panels and the Appellate Body have regularly recognized.   The Panel Report reflected such principles of customary international law when it attributed the conduct of all levels of government in China to the State.   Principles of customary international law are "rules of international law applicable in the relations between the parties" within the meaning of Article 31(3)(c) of the *Vienna Convention* and, as such, are to be taken into account when interpreting WTO provisions.   Nonetheless, the ILC Articles cannot assist with the question of the meaning of the term "public body", because Article 1.1 of the *SCM Agreement* is not an attribution rule, and because the ILC Articles do not purport to define the content of the term "public body". Rather, Article 1.1 simply determines which subsidies granted by which bodies will be included in the coverage of the *SCM Agreement*, and the ILC Articles are concerned only with whether behaviour by *any* body, regardless of its characterization, will be attributed to the State.   Even if the Panel were correct that Article 1.1 of the *SCM Agreement* is an attribution rule and that there is, therefore, some overlap between the provision and the ILC Articles, this alone is not sufficient for a finding of *lex specialis*.   For the *lex specialis* principle to apply, there must be some actual inconsistency between the two overlapping provisions or a discernible intention that one provision is to exclude the

---

[159]Australia's third participant's submission, para. 4 (quoting Panel Report, paras. 8.74-8.80).

other, yet the *SCM Agreement* does not evince any intention to differ from the principles of customary international law relating to the attribution of responsibility to the State.  Australia considers, in this regard, that China erred and "misalign[ed]"[160] the relevant categories in suggesting that there is a direct correlation between Article 5 of the ILC Articles and "public bodies", and between Article 8 and "private bodies" that have been "entrusted or directed" by government.  In Australia's view, it is, rather, Article 8 of the ILC Articles that more closely resembles the definition of "public body" and Article 5 that more closely resembles the principle of "private bodies" that have been "entrusted or directed" by a government.   When the relevant provisions are appropriately aligned, submits Australia, it follows that the Panel was correct in finding that Articles 4, 5, and 8 of the ILC Articles were not of assistance in this dispute.

237.    With respect to the interpretation of Article 2.2 of the *SCM Agreement*, Australia agrees with the Panel's interpretation of the terms "certain enterprises" and "designated geographical region" and its articulation of the relationship between paragraphs 1 and 2 of Article 2.  The Panel correctly found that regional specificity can be determined on the basis of a geographical limitation alone, and does not require an additional limitation to certain enterprises.  Otherwise, it would be difficult to envisage a situation covered by Article 2.2 that would not be already covered by Article 2.1(a) through (c), which would render Article 2.2 meaningless and of no effect.  Australia also agrees with the Panel's finding that the term "designated geographical region" can encompass any identifiable tract of land within the jurisdiction of a granting authority, and with its criticism that the USDOC's reasoning—that the provision of the land-use rights was regionally specific because the land was physically located in the designated area within the jurisdiction of the granting authority—was essentially circular, given that land is itself a location.  As for the Panel's statement regarding a possible "distinct regime", Australia regards the Panel as having left open the question of whether, for an area to be treated as geographically distinct, the region needs to have some character aside from the simple provision of land-use rights, or whether the land-use rights themselves can provide that distinct character as long as the particular provision of land-use rights is different for that particular area.  Nonetheless, certain statements by the Panel suggest that it considered that the latter would suffice, and Australia agrees with this view.

238.    With respect to the issue of the appropriate market benchmark to be applied under Article 14(b) of the *SCM Agreement*, Australia, first, expresses the view that, in a situation where there is no loan that the investigated borrower "could actually obtain on the market", for example because the borrower is not creditworthy, this does not mean that there is no benchmark and that, therefore, the benefit amount is zero.  Rather, in such circumstances, as well as in circumstances

---

[160]Australia's third participant's submission, para. 22.

where there is no market at all for a particular type of loan, the entire amount of the government loan would constitute the benefit.  In a case where the market is distorted, however, it is, as the Panel found, reasonable to construct a benchmark based on market principles.  The only other alternatives would have been for the Panel to have found that no analysis could be conducted due to the inability to find a comparable loan and thus that no benefit was conferred, or to have found that no such loan existed on the market and therefore that the entire amount of the loan constituted the benefit.  The former approach would exempt Members with distorted markets from the market-based obligations under the *SCM Agreement*, while the latter approach would have involved treating loans on China's distorted loan market in the same way as loans that no commercial lender would ever grant.  Australia also agrees with the Panel's view that the currency in which a loan is denominated is one of its most important characteristics, but that currency differences do not necessarily pose an insurmountable hurdle, as there are means to determine the equivalence of loans expressed in different currencies.

239.    With respect to the simultaneous imposition of anti-dumping duties calculated under an NME methodology and countervailing duties, Australia agrees with the Panel's strict reading of Articles 19.3 and 19.4 of the *SCM Agreement*, and cautions that a broader reading of these provisions would compromise the integrity of individual investigations in the pursuit of preventing an outcome (double remedies) that it is by no means clear Members intended to prevent.  Anti-dumping and countervailing measures are trade remedies that address two distinct trade practices and have different purposes and effects.  Neither the *Anti-Dumping Agreement* nor the *SCM Agreement* address concurrent or parallel anti-dumping and countervailing duty investigations.  The covered agreements contain no prohibition on such investigations and, indeed, Article VI:5 of the GATT 1994 reinforces the right of Members to conduct both.  The Panel correctly found that the "appropriate amount" referred to in Article 19.3 is the appropriate amount to offset the subsidy, and that Article 19.4 is oblivious to any potential concurrent imposition of anti-dumping duties.  In cases where double remedies do not arise, it will be important that these provisions only permit countermeasures for the specific subsidy that has been investigated and not take into account factors outside of the investigation.  Australia suggests, nevertheless, that the Appellate Body might consider the question of whether Article 11.2 of the *Anti-Dumping Agreement* or Article 21.2 of the *SCM Agreement* could address the situation of double remedies, because it seems possible that investigating authorities might find, in a review subsequent to the imposition of anti-dumping and countervailing duties, that the relevant duty would no longer meet the test that the continued imposition is necessary to offset dumping or subsidization nor that the injury would be likely to continue or recur if the duty were removed or varied.

3.      Brazil

240.    With respect to Article 1.1(a)(1) of the *SCM Agreement*, Brazil takes no position on whether the Chinese companies involved in the investigations at issue constitute public bodies in the sense of that provision or whether they are private bodies entrusted or directed by the Government of China. However, Brazil contends that the Panel's sweeping interpretation of the term "public body" impermissibly expands the scope of subsidy disciplines beyond what WTO Members agreed to in the *SCM Agreement*.   Contrary to what the Panel found, a "public body" "is an entity vested with the authority to, in the regular course of its activities, perform functions and exercise attributions that are typical of a government".[161]

241.    Brazil contends that the criterion of government control of an entity, which the Panel considered determinative for finding that the entities at issue were "public bodies", is just *one* of numerous factors that should be considered when evaluating the nature of the company.  Government ownership and control do not, in and of themselves, establish a presumption that a company is a "public body".  The determination of whether an entity constitutes a public body is a case-by-case assessment based on an overall analysis of all relevant attributes of the entity, including the stated objectives and the legal regime under which the entity operates, its day-to-day activities, as well as ownership and control.  In any event, Brazil is of the view that the notion of "control" must in all cases exceed the boundaries of shareholding and involve an assessment of other factors, such as the company's internal structure and composition of management boards, its decision-making processes, and the legal regime under which it operates.

242.    Brazil explains that, according to the Panel's interpretation, any company whose shares are majority owned by a government will automatically be deemed to be a "public body", and, thus, its everyday commercial transactions could be deemed to be financial contributions in the sense of Article 1 of the *SCM Agreement*.   Furthermore, ownership is an inherently unstable criterion, especially for a publicly traded company and should thus not be the sole criterion for distinguishing a public body from a private body.  Brazil recalls that the panel in *Korea – Commercial Vessels* rejected a test that would result in classifying an entity as a "public body" on one day and a "private body" the next, solely on the basis of its behaviour on those days.  A similar dilemma would arise from relying exclusively on ownership of a company as a criterion to distinguish between public and private bodies, because the ownership of a publicly traded company constantly fluctuates through the normal sale and trading of shares in the stock market.  Depending on the magnitude of the trading, a company could be majority owned by a government at one moment, but not at the next.

---

[161]Brazil's third participant's submission, para. 3.

4.      Canada

243.    Canada requests the Appellate Body to uphold the Panel's findings that SOEs and SOCBs are public bodies within the meaning of Article 1.1(a)(1) of the *SCM Agreement*.  Canada submits that the Panel was correct in finding that an entity controlled by a government is a "public body", and that a government may exercise such control through whole or majority ownership.   The Panel's interpretation is consistent with the context of Article 1.1(a)(1) and the object and purpose of the *SCM Agreement*, as it ensures that the disciplines of the *SCM Agreement* are given a sufficiently broad scope in terms of the entities to which they apply.  By contrast, China's interpretation would reduce the term "public body" to inutility and unduly limit the scope of the subsidy disciplines by excluding entities that are controlled by government and that make financial contributions that are listed in Article 1.1(a)(1).    Canada further asserts that China's interpretation would allow circumvention of the *SCM Agreement*, because a government could simply have entities that it controls perform the functions listed under Article 1.1(a)(1) instead of performing them itself.

244.    With respect to Article 14(d) of the *SCM Agreement*, Canada requests the Appellate Body to reverse the Panel's finding that the government's predominance as a supplier of goods, in and of itself, justifies an investigating authority's use of out-of-country benchmarks.  Canada submits that the Panel erred in so finding, and erred in its reading of the Appellate Body report in *US – Softwood Lumber IV*.  The Appellate Body made clear that the circumstances in which investigating authorities could resort to out-of-country benchmarks are "very limited"[162], and specifically stated that the role of the government as a provider of goods in the market is not sufficient, in and of itself, to establish that in-country private prices are distorted and therefore cannot be used as benchmarks.  Under the Appellate Body's interpretation of Article 14(d) of the *SCM Agreement*, positive evidence of the distortion of private prices found on a case-by-case basis is always necessary, yet the false distinction that the Panel created between the government as a "significant" supplier and the government as a "predominant" supplier would effectively negate this requirement.  Canada also observes that the USDOC could have justified its use of out-of-country benchmarks by relying on Section 15(b) of China's Accession Protocol, which permits investigating authorities to calculate a Chinese subsidy benefit on the basis of costs or prices outside China if there are "special difficulties"[163] in the application of Article 14 of the *SCM Agreement*.

---

[162]Canada's third participant's submission, para. 26 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 102).
[163]Canada's third participant's submission, para. 44 (quoting China's Accession Protocol, para. 15(b), and China's Accession Working Party Report, para. 150).

245.     Canada requests the Appellate Body to uphold the Panel's finding that China did not establish
that the United States had acted inconsistently with its WTO obligations under the *SCM Agreement* or
the GATT 1994 by applying countervailing duties and anti-dumping duties concurrently where
normal values were calculated using costs and prices from outside China.  The *WTO Agreement* treats
dumping and subsidization as two different causes of injury to domestic industries and provides
distinct sets of rules for each.  When an imported product happens to be both dumped and subsidized,
and causes injury, an importing Member may impose both an anti-dumping duty equal to the margin
of dumping and a countervailing duty equal to the amount of the subsidy.  That Member's right to do
so is both confirmed and circumscribed by Article VI:5 of the GATT 1994.[164]   Nothing in the
GATT 1994, the *Anti-Dumping Agreement*, or the *SCM Agreement* prevents the concurrent
application of duties determined on the basis of prices or costs found outside the market of the
exporting Member whose products are under investigation, but the second *Ad* Note to Article VI:1 of
the GATT 1994 expressly authorizes an importing Member to calculate the normal value of products
from centrally planned economies using costs or prices in a surrogate country instead of domestic
prices.  China's Accession Protocol also confirms the possibility of concurrent anti-dumping and
countervailing duties even when they are not based on prices or costs found in China.  In Canada's
view, if WTO Members had intended to prohibit such concurrent application when anti-dumping
duties on Chinese products are calculated on the basis of subparagraph 15(a)(ii) of China's Accession
Protocol, then they would have included such a prohibition in China's Accession Protocol, as they had
done earlier in the *Tokyo Round Subsidies Code*.  Under Article 19.4 of the *SCM Agreement*, a
countervailing duty on a Chinese product will be in "the amount of the subsidy found to exist" if it is
calculated in accordance with Article 14 of the *SCM Agreement* or paragraph 15(b) of China's
Accession Protocol.  No other method for calculating the amount of the subsidy is prescribed.
Nothing in the *Anti-Dumping Agreement* has any legal relation to such calculation, and the imposition
of anti-dumping duties does not extinguish the benefit of a subsidy.  Therefore, as long as the
importing Member calculates the amount of subsidy in accordance with either of these provisions, the
countervailing duty will be in the "appropriate amount" as required by Article 19.3 of the
*SCM Agreement*.

### 5.     European Union

246.     The European Union submits that the Panel's interpretation and application of the term
"public body" in Article 1.1(a)(1) of the *SCM Agreement* as including, in this particular case, entities
controlled by the government does not amount to a legal error, even though the European Union
considers that the Panel made statements that were unnecessary for the purpose of resolving this

---

[164]Canada's third participant's submission, para. 40.

dispute.  The European Union suggests that the Appellate Body uphold the Panel's findings, but make it clearer that ownership or control is not necessarily dispositive of this matter in all cases.

247.    The European Union views the actual dispute between the participants as relating to presumptions, burden of proof, and evidence before an investigating authority, with China appearing to argue that a publicly owned or controlled enterprise should be considered to be *presumptively* private and the United States appearing to argue that such enterprises should be considered *presumptively* public.  Therefore, the question is whether the Panel erred in finding that the evidence before the USDOC reasonably supported the determination of "public body" in the investigations at issue, and the answer to this question appears to be affirmative.  The European Union notes that China could have submitted to the USDOC evidence indicating the role of the market and the absence of government interference.  A fundamental element in the determination of financial contribution is that the action of the entity must be somehow attributed to the government.  The distinction between public body and private body is relevant to this question of attribution, and control of the entity is a relevant element to establish whether an entity is a public or private body. The European Union considers that a high level of government ownership is a very relevant, potentially determinant, factor, depending on the level of cooperation from the responding parties and the evidence on the record.  The degree or nature of *control* that government ownership entails is also relevant.  As the Panel found, there could be cases where government ownership would not lead to government control, since, in a determination of whether an entity is a public body, all relevant facts and evidence should be taken into account.

248.    The European Union characterizes China's interpretation of the term "public body" as incorrect and overly rigid, because it equates "public body" with "government agency", would preclude investigating authorities from taking into consideration the totality of facts and evidence, and places a whole category of government-controlled entities outside the scope of the definition of "public body".  The European Union agrees with the Panel that Article 1.1(a)(1) joins the terms "government" and "public body" as a shorthand in order to avoid repetition, not because the concepts should be equated.  In this regard, the European Union notes that items (j) and (k) of the Illustrative List of Export Subsidies in Annex I to the *SCM Agreement* refer to government control as a separate and distinct criterion.  As for China's assertion that "public body" must be interpreted harmoniously with the term "government agency" in Article 9.1 of the *Agreement on Agriculture*, the European Union considers that neither the Appellate Body report in *Canada – Dairy* nor Article 33 of the *Vienna Convention* supports China's view, and that the Panel did not provide different meanings to similar terms.  In referring to municipal laws, the Panel was not using Article 31(3)(b) of the *Vienna Convention*, but interpreting the ordinary meaning of the term "public body" under

Article 31(1), starting with dictionary meanings and then examining other "common" meanings found, *inter alia*, in the municipal laws of WTO Members.  Finally, the European Union notes that although China refers to the ILC Articles in support of its narrow interpretation of "public body", the Commentaries to those Articles themselves make reference to the question of a State's *control* of the conduct of an entity.

249.    With respect to the interpretation of Article 2.1(a) of the *SCM Agreement*, the European Union submits that financial contribution, benefit, and specificity are three separate, cumulative, and sequential elements, and that the specificity analysis takes place *after* it has been established that a subsidy exists.  Article 2.1(a) focuses on whether access to the subsidy that has been found to exist is explicitly limited in law, and does not require the explicit identification of both financial contribution and benefit.  As the Panel observed, if the text of the law contains a financial contribution that is limited to "certain enterprises", it follows that only those enterprises will have access to it.  With respect to China's challenge to the Panel's interpretation and application of the term "certain enterprises", the European Union notes that the factual situation appears to be more complicated than that presented by China, and considers that the following factors strongly suggest that the subsidies were granted to a "sufficiently discrete segment" of the Chinese economy as to be limited to "certain enterprises" within the meaning of Article 2.1(a):  (i) the USDOC found that SOCBs were instructed by means of central and provincial planning documents to provide financing to an identified *subset* of "encouraged" projects;  (ii) the "encouraged" projects were described in very specific and narrowly circumscribed terms and accounted for only a part of the activities covered by the 26 sectors concerned;  and (iii) only part of the tyre industry is included in the "encouraged" category.  The European Union further argues that, in general, Article 2.1(a) requires a comprehensive and flexible determination of specificity based on a range of principles as dictated by the circumstances of a particular case.  The European Union points to the wording of the chapeau of Article 2.1 and Article 2.1(c), the overlap between the principles under subparagraphs (b) and (c), and the immediate context in which all three subparagraphs are placed and observes, in this respect, that the criteria in Article 2.1(b) and (c) may become relevant for the analysis of *de jure* specificity.

250.    With respect to the interpretation of Article 2.2 of the *SCM Agreement*, the European Union understands China to argue that, if there is a broader "programme" whereby the granting authority provides land at below-market prices to all companies within its jurisdiction, the examination of an ad hoc subsidy would be too narrow.  The European Union considers that, if there is evidence of a subsidy programme whereby the granting authority sells land at a below-market price to all companies within its territory, then it would be artificial to conclude that an ad hoc subsidy to one company within the same region is specific under Article 2.2.  However, the existence of a broader

programme is a factual question that requires evidential support in accordance with Article 2.4 of the *SCM Agreement*. The fact that Article 2.2 refers to a "subsidy" rather than a "subsidy programme" is irrelevant, because the *SCM Agreement* does not always systematically distinguish between these two. Rather, submits the European Union, like the rest of Article 2, a subsidy in Article 2.2 includes ad hoc/individual instances of subsidization as well as subsidy programmes, the existence of which has to be proven in accordance with Article 2.4.

251. With respect to the rejection of in-country benchmarks under Article 14(d) of the *SCM Agreement*, the European Union considers, based on its understanding of the Appellate Body's findings in *US – Softwood Lumber IV*, that the fact that the government is the predominant supplier of certain goods in the market may be a determining factor when examining all the relevant facts and evidence in order to ascertain whether market prices established by private parties can be used as the benchmark for the benefit determination, or whether, in a particular case, another benchmark should be used. In *US – Softwood Lumber IV*, the Appellate Body focused on the impact that the government's role as a supplier of the product concerned has on prices in the market and not on whether the prices charged by the government are below-market prices. If the government's role implies that prices set by private operators follow those of the government, then examining prices of private operators would not be useful as a market benchmark. Thus, reasons the European Union, the Appellate Body's view was that, when the government is the predominant supplier of certain goods, it is *likely* (as a logical presumption) that private prices cannot be used since private operators would align their prices to those of the predominant supplier. The Appellate Body also accepted that a government's role as a "significant" supplier of the good in question is distinct from that of a "predominant" supplier of the good in question, and reflects a different degree of how such a role may distort private prices in the market. The European Union notes that "predominant" refers to both quantitative and qualitative elements, whilst "significant" deals more with the quantitative aspect, and that, in terms of quantity, "predominant" indicates a higher amount than "significant". In this dispute, the European Union understands that the USDOC's rationale for using an alternative benchmark was *primarily* (not exclusively) based on the preponderant market share of SOEs in China. Although China seems to consider that reliance on the government as a predominant supplier coupled with the use of facts available to examine the role of the government in the Chinese market of the product concerned was not a proper examination of the facts, China did not challenge the use of facts available before the Panel. Therefore, absent more information about the market situation, the European Union considers that the Panel properly concluded that the USDOC's determinations were not based on a *per se* rule—that, if the government were the predominant supplier of a particular good, this would be a sufficient reason to reject private in-country prices as the benchmark—but on the specific facts of the case.

252.     With respect to the issue of loan benchmarks under Article 14(b) of the *SCM Agreement*, the European Union believes that the interpretation of Article 14(d) by the Appellate Body in *US – Softwood Lumber IV* is also relevant for clarifying the meaning of Article 14(b).  The Appellate Body reasoned that, if the relevant market conditions were distorted, the comparison contemplated by Article 14 would become useless.  This suggests, in the case of loans, that, if it can be shown that the "comparable commercial loan which the firm could actually obtain on the market" is *also* distorted because of the government's intervention, then it would follow that having recourse to other benchmarks could be possible on a reasonable basis.  Here, too, the key question is not whether the government loans are provided on more favourable terms than the market, but to what extent a "comparable commercial loan" can be found on the market despite the government's predominant role as a lender on the same market.  The European Union emphasizes that this "same market" is not another government loan, as China posits, but loans offered by private companies.  As for China's arguments with respect to the government's intervention in the market, the European Union considers that setting inter-bank interest rates is different from a situation where a central bank effectively dictates the actual lending rates of public or private banks to companies.  The European Union expresses the view that recourse to a proxy was appropriate in the circumstances of this case, namely where, in view of the government's "predominant role as a lender" together with "other factors showing government intervention in the lending market", there was no "comparable commercial loan which the firm could actually obtain on the market".  The European Union highlights that Article 14(b) contains no mention of any geographical considerations, and that the benchmark chosen must, nevertheless, relate or refer to, or be connected with, market conditions.

253.     With respect to the simultaneous imposition of anti-dumping duties calculated under an NME methodology and countervailing duties, the European Union does not disagree with the Panel's line of reasoning and notes that, while the potential for a double remedy exists, this must be determined on a case-by-case basis.  It cannot be presumed that the imposition of anti-dumping duties based on an NME methodology and countervailing duties will always lead to a double remedy, because subsidies do not always affect prices and may have other effects that have no impact on the dumping margin.  Moreover, it is well established that subsidies can be countervailed without a demonstration of the effects on prices of the subsidized imports.  China's interpretation of Article 19.4 of the *SCM Agreement*—that, if the subsidy has been offset by virtue of the manner in which the importing Member calculates anti-dumping duties, the subsidy no longer exists within the meaning of Article 19.4—is incorrect, because the subsidy continues to exist until it is withdrawn, as stated in Article 19.1.  The European Union also submits that a subsidy may continue benefiting its recipient regardless of the imposition of a remedy to offset it, and that such situation is unlike that of a privatization, which directly speaks to the existence of benefit.

6.      India

254.    With respect to the definition of "public body" under Article 1.1(a)(1) of the *SCM Agreement*, India asserts that the degree of government ownership is not, in itself, sufficient to consider an entity to be a public body, but that the exercise of governmental authority and power is also necessary. India recalls that the panel in *EC – Countervailing Measures on DRAM Chips* found that, even in the case of 100-per cent government ownership of a bank, a demonstration that the government actually exercised its power and was able to direct the bank to take certain actions was necessary for an entity to be considered a "public body".

255.    With respect to the rejection of in-country benchmarks under Article 14(d) of the *SCM Agreement*, India suggests that the Appellate Body should reverse the Panel's finding, because it is inconsistent with the Appellate Body's interpretation of that provision in *US – Softwood Lumber IV*. India recalls that the Appellate Body found in that case that, in order for investigating authorities to use an out-of-country benchmark, it must be established that in-country private prices are distorted because of the predominant role of the government in the market as a provider of the same or similar goods. Therefore, investigating authorities are required to conduct an analysis of the relevant market and to establish the conditions under which the prices were established in that market, that is, that private suppliers have aligned their prices and that this alignment is due to the government's participation and dominance. India also asserts that the Panel was required to, but did not, make a finding as to whether the USDOC's determination that there was market distortion of prices was based on positive evidence.

7.      Japan

256.    Japan agrees with the Panel's finding that the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* refers to any entity controlled by the government. Japan contends that the question of whether an entity constitutes a "public body" relates to the nature of the entity, not the actions taken by the entity. Whether an action is public or private in nature is not determinative of whether an entity is a public body or a private body in the sense of Article 1.1(a)(1). Rather, according to Japan, an entity is a "public body" regardless of the acts it performs if the entity is, by its nature, controlled by the government.

257.    Japan further submits that the ILC Articles, and in particular Article 5, are not "relevant" rules in the sense of Article 31(3)(c) of the *Vienna Convention* for interpreting the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*, since Article 5 neither defines nor uses the term "public

body".  Article 5 stipulates a rule of attribution of conduct to a State, but it does not define the term "public body" as that term is used in the *SCM Agreement*.  Japan disagrees with China's characterization of how Japan's investigating authority treated government-owned or -controlled entities in the countervailing duty investigations on DRAMS from Korea, and maintains that the approach taken by Japan's investigating authority was consistent with the interpretation of "public body" by the panel in *Korea – Commercial Vessels*.  Japan submits that its investigating authorities relied on the fact that the Government of Korea had strong controlling power over the activities of the entity.

258.    With respect to the rejection of in-country benchmarks under Article 14(d) of the *SCM Agreement*, Japan considers that the Panel correctly relied upon the analytical framework provided by the Appellate Body in *US – Softwood Lumber IV* in analyzing the USDOC's approach to the effect of government predominance in the market for the goods in question, but does not take any position as to whether the Panel conducted an appropriate analysis on the facts of this case.  The Appellate Body recognized the possibility that the government's predominant role in the market may be such that it disqualifies transactions in the market as benchmarks for the good in question, but it did not conclude that such a governmental role could be found solely by reason of the fact that the government was a significant supplier.  Rather, the Appellate Body explained the necessity for a case-by-case analysis.  In this regard, China's allegation, that evidence that the government has a "significant" or "predominant" share of the market for the good in question is insufficient, on its own, to reject private market prices as "distorted", appears to be based on a misunderstanding of the Panel's decision.  The Panel found that evidence of government predominance as a supplier is not conclusive, but is "the principal evidence relevant to this question".[165]   Japan observes that the Panel also found that the USDOC did not apply a mechanical rule that in-country private prices are unusable as benchmarks when the government is found to be a significant supplier, but that its test was, rather, based on a case-by-case analysis of the particular facts of the investigation.

259.    Japan agrees with the Panel's framework for considering the issue of loan benchmarks under Article 14(b) of the *SCM Agreement* in circumstances where the in-country market of loans is distorted, but does not take any position as to whether the loan market in China is distorted or whether the USDOC applied appropriate adjustments to the third-country data.  The Appellate Body's reasoning in *US – Softwood Lumber IV* for approving out-of-country benchmarks under Article 14(d)―that the comparison contemplated by Article 14 would become circular when the government's role in the market is so predominant that it effectively determines private prices―is also

---

[165]Japan's third participant's submission, para. 18 (quoting Panel Report, para. 10.41).

valid in this dispute.  The text of Article 14 and the panel and Appellate Body reports in *Japan – DRAMs (Korea)* confirm that this Article provides Members with some latitude in choosing a method for calculating the amount of benefit, provided that such method is consistent with the guidelines contained in Article 14.  Thus, the investigating authorities' discretion to rely on third-country or hypothetical loans as a proxy benchmark would not be unfettered, and due care to apply appropriate adjustments to third-country data may be necessary, as the Appellate Body noted in *US – Softwood Lumber IV* in the case of Article 14(d).[166]  Japan also agrees with the Panel that, contrary to China's assertion, monetary policy is a separate matter from the actual determination of commercial interest rates in the market, and argues that the lending rates of commercial banks may be considered to be distorted if the government were to intervene in their considerations of economic and business factors.

260.    With respect to the simultaneous imposition of anti-dumping duties calculated under an NME methodology and countervailing duties, Japan agrees with the Panel that such simultaneous imposition creates the potential for a "double remedy".  Japan explains that, when authorities impose a countervailing duty against an export subsidy that lowers an export price (but not normal value), a double remedy always occurs if the authorities also impose an anti-dumping duty, which is why Article VI:5 explicitly prohibits the simultaneous imposition of anti-dumping and countervailing duties in such circumstances.  In contrast, a double remedy rarely occurs in the case of simultaneous imposition of an anti-dumping duty and a countervailing duty against a domestic subsidy.  Although this may occur when the anti-dumping duty is calculated under an NME methodology, Japan agrees with the Panel that the precise extent to which the NME calculation captures any subsidization is a factual issue that could be difficult to ascertain.  As the existence of a double remedy depends on the facts of a particular case, it is not sufficient for a complaining Member, for the purpose of establishing a claim that there is a double remedy, to simply point to the simultaneous application of anti-dumping duties calculated under an NME methodology and countervailing duties.  Rather, that complaining Member must demonstrate that there is a double remedy based on the facts and calculations of the particular case.  Japan also characterizes as without merit China's reference to the Appellate Body report in *US – Upland Cotton* and its criticism of the Panel's alleged *a contrario* analysis of Article VI:5 of the GATT 1994.  The Panel did not conclude that this provision *permits* the simultaneous imposition of anti-dumping and countervailing duties in the case of domestic subsidies, it simply found that Article VI:5 *does not prohibit* such simultaneous imposition.

---

[166]Japan's third participant's submission, para. 30 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 109).

8.      Mexico

261.    Mexico disagrees with China that the defining characteristic of a public body is that "it exercises authority vested in it by the government for the purpose of performing functions of a governmental character".[167]    This approach is incorrect because Article 1.1(a)(1) of the *SCM Agreement* does not address the authority, functions, or attributes of governments, but defines the term "subsidy".   Subparagraph (a)(1), in particular, spells out all the possible forms in which a financial contribution may be effectuated.   Mexico maintains that the term "public body" must be interpreted broadly and that a subsidy is deemed to exist where a body controlled by the government provides a financial contribution that confers a benefit.

9.      Norway

262.    Norway disagrees with the Panel's interpretation of the term "public body".   For Norway, the dividing line between "public bodies" and "private bodies" is not based on control or ownership, but on a functional delimitation based on whether the body in question performs governmental functions or not.   If the body in question performs governmental functions, then its conduct is to be attributed to the State according to Article 1.1(a)(1).   On the contrary, if the body in question does not perform governmental functions, any financial contribution it provides is attributable to the State only if the government has entrusted or directed the body to provide such contribution.   Norway bases this argument on the language of Article 1.1(a)(1)(iv), in particular the reference to functions that "would normally be vested in the government", which it considers relevant context for the interpretation of the term "public body".

263.    Norway maintains that both the panel report in *EC – Countervailing Measures on DRAM Chips* and the panel report in *Korea – Commercial Vessels* stand for the proposition that government ownership is not sufficient, in and of itself, to determine that a company is a "public body".   Other elements must be present, a key element of which is the exercise of governmental functions.   Norway also contends that the definition of the term "public entity" in paragraph 5(c) of the *Annex on Financial Services* to the *General Agreement on Trade in Services* (the "GATS"), albeit not directly applicable, sheds light on the definition of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*.   It supports Norway's position because it clarifies that an essential criterion is that

---

[167]Mexico's opening statement at the oral hearing (quoting China's appellant's submission, para. 16).

the entity in question must be "engaged in carrying out governmental functions or activities for governmental purposes".[168]

264.    With respect to the simultaneous imposition of anti-dumping duties calculated under an NME methodology and countervailing duties, Norway submits that the Appellate Body should find that, where a subsidy has already been offset through an anti-dumping duty that extinguishes the effects of subsidization, the imposition of a concurrent countervailing duty to offset the same subsidy already offset by the anti-dumping duty is not appropriate under Article 19.3 of the *SCM Agreement*.  The rationale of Article VI:5 of the GATT 1994, that the application of a "double remedy" is inappropriate in cases of the concurrent imposition of anti-dumping duties and countervailing duties to counter the same export subsidization, applies equally in situations where a countervailing duty is imposed to counter a domestic subsidy.  Furthermore, Norway contends that Article 32.1 of the *SCM Agreement* stipulates that any specific action against subsidies must be undertaken under the *SCM Agreement*, and that, therefore, the imposition of an anti-dumping duty to offset subsidization is inappropriate under Article 32.1 of the *SCM Agreement*.

10.    Saudi Arabia

265.    Saudi Arabia disagrees with the Panel's interpretation of the term "public body" and submits that a public body is an entity acting under government authority that also performs functions of a governmental character.  Saudi Arabia argues that, because the two terms "government" and "public body" are functionally equivalent for all purposes in the *SCM Agreement*, the actions of a "public body" must involve the essential attributes of a government, that is, the exercise of governmental authority in carrying out governmental functions.  Furthermore, an entity can only "entrust" or "direct" a private body when it possesses the authority to do so.  The fact that an entity is controlled or owned by a government would not, in itself, vest it with the requisite authority.  Saudi Arabia refers to the context provided by Article 1.1(a)(1)(iv) to submit that the *SCM Agreement* sets out a bright line test to determine whether an entity is a "public body", namely that, where an entity engages in government functions and practices, it should be considered a "public body".

266.    Saudi Arabia contests the Panel's interpretation of Article 2.1(a) of the *SCM Agreement* because it effectively eliminates the requirement that countervailing duties be imposed only on a specific subsidy as defined under the *SCM Agreement*.  The Panel's interpretation is inconsistent with the text of Articles 1 and 2, because every paragraph and subparagraph of Article 2 refers to the

---

[168]Norway's third participant's submission, para. 23 (quoting paragraph 5(c) of the *Annex on Financial Services* to the GATS).

specificity of a *subsidy*, and a subsidy, as defined in Article 1.1, encompasses *both* financial contribution and benefit.  An authority therefore may not find *de jure* specificity under Article 2.1(a) based merely on the fact that a financial contribution is expressly limited to a certain group of enterprises or industries.  The authority must also find that the financial contribution conferred a benefit that is expressly limited to those recipients.  Furthermore, Saudi Arabia asserts that the Panel's interpretation impermissibly severs the requisite causal connection that the words "a benefit is *thereby* conferred" in Article 1.1 establish, and that must exist between a "financial contribution" and a "benefit".  Saudi Arabia illustrates this error by pointing to a "logical impossibility"[169] that flowed from the Panel's approach:  the Panel found that a financial contribution in the form of government allocation of credit to a specific industry conferred a specific benefit on that industry even though: (i) there was no evidence that any of the enterprises in that industry received an over-allocation of credit;  and (ii) the loans received by the enterprises in that industry carried the same interest rates that prevailed for all other enterprises in all other industries in the country of export.

267.   With respect to the rejection of in-country benchmarks under Article 14(d) of the *SCM Agreement*, Saudi Arabia submits that the Panel's finding that investigating authorities may find market distortion based solely on evidence of government predominance is erroneous and inconsistent with the Appellate Body's ruling in *US – Softwood Lumber IV*.  Although the Appellate Body emphasized that the possibility for investigating authorities to consider an out-of-country benchmark under Article 14(d) is very limited, the Panel set up a presumption whereby evidence of government predominance in the domestic market alone justifies a finding of market distortion.  This is inconsistent with the Appellate Body's statements that "[t]he fact that the government is a significant supplier of goods *does not, in itself, establish that all prices for the goods are distorted*" and that "[t]he determination of whether private prices are distorted because of the government's predominant role in the market, as a provider of certain goods, *must be made on a case-by-case basis*, according to the particular facts underlying each countervailing duty investigation."[170]  Furthermore, as the Appellate Body stated, any benchmark used must reflect the prevailing market conditions in the country of provision, and countervailing duties must not be used to offset differences in comparative advantages between countries.  Saudi Arabia cautions, in this regard, that an external benchmark is a blunt instrument that could readily negate the natural comparative advantages of the country under investigation, particularly given the inevitably subjective nature of the adjustment process.  Lastly, Saudi Arabia points to the requirement, in Article 11.9 of the *SCM Agreement*, to determine the existence of each of the elements of a subsidy based on substantial evidence, which it considers

---

[169]Saudi Arabia's third participant's submission, para. 48.
[170]Saudi Arabia's third participant's submission, para. 52 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 102). (emphasis added by Saudi Arabia)

provides textual guidance in assessing the Panel's approach.  Saudi Arabia contends that Article 14(d) may not be interpreted in a manner that alleviates an investigating authority's burden to demonstrate "market distortion" based on sufficient evidence, and instead allows the authority to presume the existence of "market distortion" based on government predominance in the market.

11.    Turkey

268.    Turkey agrees with the Panel that government control should be the criterion for determining whether an entity is a "public body" within the meaning of Article 1.1(a)(1) of the *SCM Agreement*, and that ownership is the main, but not necessarily the exclusive, indicator of control.  China erroneously suggests that "government" and "public bodies" are equivalent expressions.  However, the drafters of the *SCM Agreement* did not use only one term, but instead made a clear distinction between "government" and "public body", and this distinction must be given effect.  Turkey observes that China's proposed interpretation is ambiguous, because what is inherently a governmental function varies from one political culture to another.  Turkey disputes China's contention that the meaning of terms in other WTO agreements, such as the *Agreement on Agriculture*, are relevant to the meaning of "public body" in the *SCM Agreement*, noting that each agreement has its own scope, definitions, and object and purpose.  Turkey also considers that Articles 5 and 8 of the ILC Articles are irrelevant to the meaning of "public body" because the ILC Articles and the *SCM Agreement* cover totally different issues, the ILC Articles are not context for the term "public body", and, in any event, as the Panel found, the *SCM Agreement* is a *lex specialis* that would override the *lex generalis* of the ILC Articles. While refraining from commenting on the facts of this case, Turkey reiterates that majority government ownership is strong evidence of control, and observes that separate legal personality, listing on domestic or foreign stock exchanges, and foreign ownership do not constitute evidence that an entity is an independent entity in the market.  Turkey further submits that there is no obligation, under WTO law, for the United States to apply the "five-factor test", and asserts that it is the obligation of China to prove that the entities in question are not controlled by the government.

269.    With respect to the rejection of in-country private prices as a benchmark under Article 14(d) of the *SCM Agreement*, Turkey shares the view of the Panel that the predominant role of the government in the domestic market itself constitutes sufficient evidence of the existence of price distortion in the market to allow recourse to an out-of-country benchmark.  In addition, it is accepted by WTO Members, and was acknowledged by China during its accession to the WTO, that the Chinese economy has some specific features that, for the time being, make it inappropriate to define it as a market economy for purposes of trade remedies.  Turkey considers that, by accepting the terms and conditions cited in the Accession Protocol, China confirmed the predominance of the

"government" in the Chinese economy.  It would be meaningless for investigating authorities to use in-country private prices as benchmarks in situations where the government predominance is a fact because the benefit would be found to be artificially low or even zero, the full extent of a subsidy would not be captured, and the rights of Members to "fully offset, by applying countervailing duties, the effect of the subsidy as permitted by the *SCM Agreement*"[171] would be undermined.  Thus, reasons Turkey, it cannot be assumed that such prices as the benchmark in the relevant investigations provide an appropriate basis for the analysis of benefit, and the rejection of Chinese in-country prices was not inconsistent with Article 14 of the *SCM Agreement*.

## III.    Issues Raised in This Appeal

270.    The following issues are raised in this appeal:

(a)    Whether the Panel erred in interpreting the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* to mean "any entity controlled by a government", and in failing to find that the USDOC acted inconsistently with that provision, by determining, in the four countervailing duty investigations at issue, that SOE input suppliers constituted "public bodies", and by determining, in the OTR investigation, that SOCBs constituted "public bodies";

(b)    Whether, with respect to specificity, the Panel erred in its interpretation and application of Article 2 of the *SCM Agreement*, and in particular:

(i)    whether the Panel erred in its interpretation of Article 2.1(a) of the *SCM Agreement*, and in failing to find that the USDOC acted inconsistently with that provision, by determining in the OTR investigation that lending by SOCBs to the OTR industry was *de jure* specific;  and

(ii)    whether, in its assessment of China's claim in respect of the USDOC's determination of regional specificity in the LWS investigation, the Panel erred in its interpretation of Article 2.2 of the *SCM Agreement*;

(c)    Whether, with respect to the benchmarks used to calculate benefit, the Panel erred in its interpretation and application of Article 14 of the *SCM Agreement*, and in particular:

---

[171]Turkey's third participant's submission, para. 37 (quoting Appellate Body Report, *US – Softwood Lumber IV*, para. 95).

(i)    whether the Panel erred in its interpretation of Article 14(d) of the *SCM Agreement*, and in failing to find that the USDOC acted inconsistently with the obligations of the United States under that provision, by rejecting in-country private prices in China as benchmarks for HRS in the CWP and LWR investigations;

(ii)   whether the Panel erred in its interpretation of Article 14(b) of the *SCM Agreement*, and in failing to find the USDOC acted inconsistently with the obligations of the United States under that provision:

   A.    by rejecting interest rates in China as benchmarks for calculating the benefit from RMB-denominated loans from SOCBs in the CWP, LWS, and OTR investigations;  and

   B.    by using a constructed proxy benchmark in respect of the RMB-denominated loans from SOCBs in the CWP, LWS, and OTR investigations;

(d)    Whether, with respect to "double remedies", the Panel erred in its interpretation of Articles 19.3 and 19.4 of the *SCM Agreement*, and Article VI:3 of the GATT 1994, and in failing to find that the USDOC acted inconsistently with the obligations of the United States under those provisions, by concurrently imposing anti-dumping duties calculated on the basis of its NME methodology and countervailing duties in the investigations at issue;

(e)    Whether, in reaching its findings and conclusions on the issues identified in paragraphs (a), (b)(i), (c)(i) and (ii)B. above, the Panel failed to make an objective assessment of the matter before it and acted inconsistently with its duties under Article 11 of the DSU;  and

(f)    If the Appellate Body finds that the Panel erred with regard to the issues identified in paragraphs (a), (b)(i), (c), (d) and/or (e) above and completes the analysis and finds that the United States acted inconsistently with Article 1.1(a)(1), Article 2.1(a), Article 14(b) and/or (d), Article 19.3 and/or 19.4 of the *SCM Agreement*, and/or Article VI:3 of the GATT 1994, then whether the United States, in consequence, also acted inconsistently with its obligations under Articles 10 and 32.1 of the *SCM Agreement*.

A.    *Introduction*

271.    Before commencing our analysis of the issues of law and legal interpretations raised in this appeal, we briefly outline certain pertinent facts and background information.  This dispute concerns four sets of anti-dumping and countervailing duty investigations conducted by the United States Department of Commerce (the "USDOC"), and the resulting definitive anti-dumping and countervailing duties imposed by the United States on each of the following four products from China:  (i) circular welded carbon quality steel pipe ("CWP");  (ii) light-walled rectangular pipe and tube ("LWR");  (iii) laminated woven sacks ("LWS");  and (iv) certain new pneumatic off-the-road tyres ("OTR").[172]

272.    In respect of each product under investigation, the relevant anti-dumping and countervailing duty investigations were initiated in tandem in July or August 2007.[173]  The periods of investigation in respect of the four countervailing duty investigations at issue were identical in range, as were the periods of investigation in respect of the four companion anti-dumping duty investigations.[174]  In each of the four anti-dumping duty investigations, the USDOC treated China as a non-market economy ("NME") for the purpose of calculating the margin of dumping.[175]  For each product, the USDOC issued its final anti-dumping and countervailing duty determinations on the same day.[176]

273.    Only a sub-set of the issues raised before the Panel with regard to the determinations of the USDOC are before us.  More specifically, China appeals:  (i) the Panel's interpretation and application of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*;  (ii) the Panel's interpretation and application of Articles 2.1(a) and 2.2 regarding specificity;  (iii) the Panel's interpretation and application of Articles 14(d) and 14(b) regarding the USDOC's use of benchmarks for the calculation

---

[172]Panel Report, para. 2.1.  As a result of the determinations that it made in the investigations concerning these products, the USDOC imposed definitive anti-dumping and countervailing duties on each of the four investigated products, in the following amounts:  for CWP, a countervailing duty rate of 29.62 per cent to 616.83 per cent and an anti-dumping duty rate of 69.20 per cent to 85.55 per cent;  for LWR, a countervailing duty rate of 2.17 per cent to 200.58 per cent and an anti-dumping duty rate of 249.12 per cent to 264.64 per cent;  for LWS, a countervailing duty rate of 29.54 per cent to 352.82 per cent and an anti-dumping duty rate of 64.28 per cent to 91.73 per cent;  and, for OTR, a countervailing duty rate of 2.45 per cent to 14 per cent and an anti-dumping duty rate of 5.25 per cent to 210.48 per cent. (Panel Report, paras. 2.3, 2.6, 2.8, 2.10, 2.12, 2.14, 2.16, and 2.18)

[173]The CWP investigations were initiated on 5 July 2007;  the LWR investigations on 24 July 2007;  the LWS investigations on 25 July 2007;  and the OTR investigations on 7 August 2007. (Panel Report, paras. 2.2, 2.6, 2.7, 2.10, 2.11, 2.14, 2.15, and 2.18)

[174]Panel Report, paras. 2.2, 2.6, 2.7, 2.10, 2.11, 2.14, 2.15, and 2.18.

[175]Under Section 773(c) of the United States Tariff Act of 1930 (19 U.S.C. 1677b(c)), normal value in anti-dumping investigations involving products from NME countries is determined on the basis of values of factors of production in countries that the USDOC has designated as market economies. (Panel Report, footnote 6 to para. 2.1)

[176]Additional information regarding the factual aspects of these investigations and of the determinations made by the USDOC is set out in the Panel Report. (See, in particular, Panel Report, paras. 2.1-2.18)

of benefit;  and (iv) the Panel's findings under Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement*, and Article VI:3 of the GATT 1994 with regard to the alleged imposition of "double remedies" in the four investigations at issue.

274.   China's appeal regarding the Panel's interpretation and application of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*, relates, with respect to the State-owned enterprise ("SOE") "public body" determinations, to all four of the countervailing duty investigations, and, with respect to the State-owned commercial bank ("SOCB") "public body" determinations, to the OTR countervailing duty investigation only.   China's claims of error relating to Article 2.1(a) and Article 2.2 concern the OTR and LWS countervailing duty investigations, respectively.   China's appeal under Article 14(d) regarding the USDOC's use of benefit benchmarks for SOE-provided inputs relates to the CWP and LWR countervailing duty investigations, while China's appeal under Article 14(b) regarding the USDOC's use of benefit benchmarks for SOCB-provided loans relates to the CWP, LWS, and OTR investigations.   China's appeal of the Panel's findings on double remedies relates to all of the USDOC investigations at issue.

275.   In this Report, we adopt the order of analysis used by the Panel in respect of the issues raised by China on appeal.   Accordingly, we first consider China's claim that the Panel erred in its interpretation and application of Article 1.1(a)(1) of the *SCM Agreement*.   Second, we consider China's claims that the Panel erred in its interpretation and application of Article 2.1(a) of the *SCM Agreement*, and in its interpretation of Article 2.2 of the *SCM Agreement*.   Third, we consider China's claims that the Panel erred in its interpretation and application of Articles 14(d) and 14(b) of the *SCM Agreement*.   Lastly, with regard to the alleged imposition of double remedies, we consider China's claims that the Panel erred in its interpretation and application of Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement*, and Article VI:3 of the GATT 1994.

IV.   **Article 1.1(a)(1) of the *SCM Agreement*:  Public Bodies**

   A.   *Introduction*

276.   China appeals the Panel's finding that China failed to establish that the USDOC had acted inconsistently with the United States' obligations under Article 1.1(a)(1) of the *SCM Agreement* in determining in the CWP, LWR, LWS, and OTR countervailing duty investigations that SOE input producers were public bodies[177], and, in the OTR investigation, that SOCBs were public bodies.[178]

---

[177]Panel Report, paras. 8.138 and 17.1(a)(i).
[178]Panel Report, paras. 8.143 and 17.1(a)(i).

277.     The USDOC determined in all four investigations at issue that the relevant SOEs were public bodies.  In making these findings, the USDOC based itself on a rule of majority ownership, that is, the USDOC's findings that these entities constitute public bodies were "principally" based on the fact that the SOEs are majority government owned.[179]  In the OTR investigation, the USDOC also determined that SOCBs were public bodies.[180]  This finding was based on the USDOC's analysis of the same issue in its earlier CFS Paper determination.[181]

278.     The Panel interpreted the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* to mean "any entity controlled by a government".[182]  The Panel considered government ownership to be highly relevant and potentially dispositive evidence of government control[183] and, on that basis, upheld the USDOC's determinations in the investigations at issue that the SOEs and SOCBs constituted public bodies.

279.     China alleges that the Panel erred in interpreting the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* to mean any government-controlled entity and that this mistaken interpretation of the term "public body" rendered erroneous the Panel's findings upholding the USDOC's determinations.  China submits that government ownership or control is insufficient to establish that an entity is a public body.  For China, the defining characteristic of a public body is that it exercises authority vested in it by the government for the purpose of performing functions of a governmental character.[184]  China therefore requests us to reverse the Panel's finding that a "public body" in Article 1.1(a)(1) means "any government-controlled entity" and to find instead that a public body is an entity that exercises authority vested in it by the government for the purpose of performing functions of a governmental character.[185]  China also requests us to reverse the Panel's finding that China did not establish that the United States acted inconsistently with its obligations under Article 1.1(a)(1), and to find instead that the United States did act inconsistently with these obligations in determining that the provision of inputs by SOEs, and the provision of loans by SOCBs, were financial contributions by public bodies.  China further requests us to complete the analysis and find, consequentially, that the challenged measures are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

---

[179]Panel Report, para. 8.127.
[180]Panel Report, para. 8.139.
[181]Panel Report, para. 8.140.
[182]Panel Report, para. 8.94.
[183]Panel Report, para. 8.134.
[184]China's appellant's submission, para. 16.
[185]China's appellant's submission, para. 30.

280.    The United States responds that the Panel appropriately rejected China's argument that the term "public body" must be understood as referring only to entities vested with government authority and performing governmental functions.[186]  The United States requests the Appellate Body to uphold the Panel's finding that the term "public body" in the sense of Article 1.1(a)(1) means any entity controlled by a government[187] as well as its finding that China did not establish that the USDOC had acted inconsistently with the United States' obligations under Article 1.1(a)(1) in making its public body determination in the relevant investigations.

281.    Before turning to our analysis, we note that, while China and the United States advocate different definitions of the term "public body", their respective conceptions of the entities that may properly be considered "public bodies" are not mutually exclusive, and, in fact overlap significantly.  China, while requesting us to find that a public body is an entity that exercises authority vested in it by the government for the purpose of performing functions of a governmental character, does accept that such public bodies may also be entities that are controlled by the government.  The United States, in turn, while requesting us to uphold the Panel's finding that "any public body" in Article 1.1(a)(1) necessarily means "any government-controlled entity", accepts that an entity vested with governmental authority may constitute a "public body" provided that it is also "controlled" by the government.

B.      *Article 1.1(a)(1) of the SCM Agreement*

1.      The Meaning of the Term "Public Body"

282.    Article 1.1 of the *SCM Agreement* stipulates that a "subsidy" shall be deemed to exist for the purpose of the *SCM Agreement* if there is a "financial contribution by a government or any public body" and "a benefit is thereby conferred".[188]  China's claims relate to the first of the two elements, in particular, to the question of how to define the term "public body" in Article 1.1(a)(1).  In addressing China's claims relating to Article 1.1(a)(1), we first set out our understanding of the term "public body" in the phrase "a government or any public body".  Thereafter, we address a number of additional allegations raised by China with regard to the Panel's analysis of this interpretative issue. We subsequently address China's requests that we reverse all of the Panel's findings with respect to

---

[186]United States' appellee's submission, para. 45.

[187]United States' appellee's submission, para. 145.

[188]Articles 1.1(a)(2) and 1.1(b) of the *SCM Agreement* stipulate that a subsidy shall also be deemed to exist if there is any form of income or price support in the sense of Article XVI of the GATT 1994 and a benefit is thereby conferred.  This dispute does not raise the issue of subsidies granted in the form of income or price support.

the USDOC's public body determinations, and that we find those determinations to be inconsistent with Article 1.1(a)(1) and, as a consequence, with Articles 10 and 32.1 of the *SCM Agreement*.[189]

283.    Article 1.1 of the *SCM Agreement* states as follows:

> 1.1     For the purpose of this Agreement, a subsidy shall be deemed to exist if:
>
> (a)(1)    there is a financial contribution by a government or any public body within the territory of a Member (referred to in this Agreement as "government"), i.e. where:
>
> (i)    a government practice involves a direct transfer of funds (e.g. grants, loans, and equity infusion), potential direct transfers of funds or liabilities (e.g. loan guarantees);
>
> (ii)    government revenue that is otherwise due is foregone or not collected (e.g. fiscal incentives such as tax credits);
>
> (iii)    a government provides goods or services other than general infrastructure, or purchases goods;
>
> (iv)    a government makes payments to a funding mechanism, or entrusts or directs a private body to carry out one or more of the type of functions illustrated in (i) to (iii) above which would normally be vested in the government and the practice, in no real sense, differs from practices normally followed by governments.
>
> or
>
> (a)(2)    there is any form of income or price support in the sense of Article XVI of GATT 1994;
>
> and
>
> (b)    a benefit is thereby conferred.

284.    With respect to the architecture of Article 1.1 of the *SCM Agreement*, we note that the provision sets out two main elements of a subsidy, namely, a financial contribution and a benefit. Regarding the first element, Article 1.1(a)(1) defines and identifies the governmental conduct that constitutes a financial contribution. It does so both by listing the relevant conduct, and by identifying certain entities and the circumstances in which the conduct of those entities will be considered to be conduct of, and therefore be attributed to, the relevant WTO Member. Two principal categories of

---

[189]China's appellant's submission, paras. 31, 193, 195, 202, and 563(1) and (6).

entities are distinguished, those that are "governmental" in the sense of Article 1.1(a)(1):  "a government or any public body ... (referred to in this Agreement as 'government')";  and those in the second clause of subparagraph (iv):  "private body".  If the entity is governmental (in the sense referred to in Article 1.1(a)(1)), and its conduct falls within the scope of subparagraphs (i)-(iii) or the first clause of subparagraph (iv), there is a financial contribution.  When, however, the entity is a private body, and its conduct falls within the scope of subparagraphs (i)-(iii), then there is only a financial contribution if, *in addition*, the requisite link between the government and *that conduct* is established by a showing of entrustment or direction.  Thus, the second clause of subparagraph (iv) requires an affirmative demonstration of the link between the government and the specific *conduct*, whereas all conduct of a governmental entity constitutes a financial contribution to the extent that it falls within subparagraphs (i)-(iii) and the first clause of subparagraph (iv).[190]

285.    This appeal raises the question of the correct interpretation of the term "public body".  In keeping with the customary rules of interpretation of public international law, we consider the ordinary meaning of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*.  We note that, while it is not defined as a composite term, the individual words are defined in the dictionary.  The word "public" is defined, *inter alia*, as "of or pertaining to the people as a whole;  belonging to, affecting or concerning the community or nation", as "carried out or made by or on behalf of the community as a whole", or as "authorized by or representing the community".[191]  The word "body" in the sense of an aggregate of individuals is defined as "an artificial person created by legal authority;  a corporation;  an officially constituted organization, an assembly, an institution, a society."[192]  The composite term "public body" could thus refer to a number of different concepts, depending on the combination of the different definitional elements.  As such, dictionary definitions suggest a rather broad range of potential meanings of the term "public body", which encompasses a variety of entities, including both entities that are vested with or exercise governmental authority and entities belonging to the community or nation.[193]  We note that dictionary definitions of these words in Spanish and

---

[190]See Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, para. 112;  and Panel Report, *US – Export Restraints*, para. 8.53.
[191]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 2, p. 2394.
[192]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 261.
[193]We note a similar finding by the Panel at paragraph 8.59 of the Panel Report.

French would accommodate a similarly broad range of potential meanings of the term "public body".[194]

286.     The term "government" is used twice in Article 1.1(a)(1).  It appears, first, within the phrase "a government or any public body".  Second, "government" appears within a parenthetical phrase specifying that, for purposes of the *SCM Agreement*, this word refers collectively to "a government or any public body".  Where it is necessary to distinguish between these two uses of the term "government" for purposes of our analysis, we refer to the first use of the word as "government" in the narrow sense, and to the second use of the word as "government" in the collective sense, or the collective term "government".

287.     We recall that the Panel regarded the collective term "government" as "merely a device to simplify the drafting".[195]   China disagrees with the Panel's reasoning.  China refers to the Appellate Body Report in *Canada – Dairy* in support of its view that a public body is functionally equivalent to a government in the narrow sense.[196]   The United States agrees with the Panel's reasoning that the collective term "government" is merely a drafting device.  The United States further contends that, because China's interpretation of the term "public body" differs in no significant way from the word "government" in the narrow sense—which includes government agencies—accepting such an interpretation would reduce the term "public body" to redundancy.

288.     We note that Article 1.1(a)(1) of the *SCM Agreement* joins "government" in the narrow sense and "public body" under the collective term "government".  In contrast, Article 1 clearly juxtaposes the concepts of "government" (including "public body") and "private body".  As we see it, the juxtaposition of the collective term "government" on the one side and "private body" on the other side, as well as the joining under the collective term "government" of both a "government" in the narrow sense and "any public body" in Article 1.1(a)(1) of the *SCM Agreement*, suggests certain commonalities in the meaning of the term "government" in the narrow sense and the term "public body" and a nexus between these two concepts.  When Article 1.1(a)(1) stipulates that "a government" and "any public body" are referred to in the *SCM Agreement* as "government", the collective term

---

[194]We note that, in Spanish, the definition of "*organismo*" is "*conjunto de oficinas, dependencias o empleos que forman un cuerpo o institución*" and "*público*" is defined as "*se dice de la potestad, jurisdicción y autoridad para hacer algo, como contrapuesto a privado*". (*Diccionario de la Lengua Española*, 22nd edn (Real Academia Española, 2001), pp. 1107 and 1259)

In French, "*organisme*" is defined as "*ensemble des services, des bureaux affectés à une tache*" and "*public*" is defined as "*relatif aux collectivités sociales juridiquement définies; dressé par une autorité selon les formes légales*". (*Le Nouveau Petit Robert*, J. Rey-Debove and A. Rey (eds) (Dictionnaires Le Robert, Paris, 2003), pp. 1798 and 2114)

[195]Panel Report, para. 8.66.

[196]China's appellant's submission, paras. 41 (quoting Appellate Body Report, *Canada – Dairy*, para. 97) and 42.

"government" is used as a superordinate, including, *inter alia*, "any public body" as one hyponym. Joining together the two terms under the collective term "government" thus implies a sufficient degree of commonality or overlap in their essential characteristics that the entity in question is properly understood as one that is governmental in nature and whose conduct will, when it falls within the categories listed in subparagraphs (i)-(iii) and the first clause of subparagraph (iv), constitute a "financial contribution" for purposes of the *SCM Agreement*.

289.    We therefore disagree with the Panel's reasoning that the use of the collective term "government" has no meaning besides facilitating the drafting of the Agreement.  We also disagree with the Panel's view that the words "a", "or", and "any" within the phrase "a government or any public body" indicate that "government" and "public body" are separate concepts with distinct meanings.[197]  The term "government" as a shorthand for "a government or any public body" may well have been employed as a drafting device.  However, speculation that the use of the collective expression was "merely a device to simplify the drafting" and that, therefore, the collective expression has no interpretative significance, is not consonant with the principle of effective treaty interpretation. It ignores that the structure and the wording of the treaty is significant in determining the common intention of the parties.

290.    Turning then to the question of what essential characteristics an entity must share with government in the narrow sense in order to be a public body and, thus, part of government in the collective sense, we note, that the term "government" is defined as the "continuous exercise of authority over subjects;   authoritative direction or regulation and control".[198]   In this vein, the Appellate Body found, in *Canada – Dairy*, that the essence of government is that it enjoys the effective power to regulate, control, or supervise individuals, or otherwise restrain their conduct, through the exercise of lawful authority.  The Appellate Body further found that this meaning is derived, in part, from the *functions* performed by a government and, in part, from the government having the *powers* and *authority* to perform those functions.[199]  As we see it, these defining elements of the word "government" inform the meaning of the term "public body".  This suggests that the performance of governmental functions, or the fact of being vested with, and exercising, the authority to perform such functions are core commonalities between government and public body.

---

[197]Panel Report, para. 8.65.  We do, however, agree with the Panel that the word "any" before "public body" suggests that there may be different kinds of public bodies, and that all such entities fall within the scope of the collective term "government".

[198]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 1139.

[199]Appellate Body Report, *Canada – Dairy*, para. 97.

291.    In seeking to refine our understanding of the concept of "public body" in Article 1.1(a)(1) of the *SCM Agreement*, and, in particular, of the core characteristics that such an entity must share with government in the narrow sense, we consider next the context provided by Article 1.1(a)(1)(iv).  As noted above, this provision introduces the concept of "private body".  The meaning of the term "private body" may be helpful in illuminating the essential characteristics of public bodies, because the term "private body" describes something that is *not* "a government or any public body".  The panel in *US – Export Restraints* made a similar point when it observed that the term "private body" is used in Article 1.1(a)(1)(iv) as a counterpoint to government or any public body, that is, any entity that is neither a government in the narrow sense nor a public body would be a private body.[200]

292.    The definition of the word "private" includes "of a service, business, etc:  provided or owned by an individual rather than the state or a public body" and "of a person:  not holding public office or an official position".[201]  We note that both the definition of "public" and of "private" encompass notions of authority as well as of control.  The definitions differ, most notably, with regard to the subject exercising authority or control.

293.    We also consider that, because the word "government" in Article 1.1(a)(1)(iv) is used in the sense of the collective term "government", that provision covers financial contributions provided by a government or any public body where "a government or any public body" entrusts or directs a private body to carry out one or more of the type of functions or conduct illustrated in subparagraphs (i)-(iii).  Accordingly, subparagraph (iv) envisages that a public body may "entrust" or "direct" a private body to carry out the type of functions or conduct illustrated in subparagraphs (i)-(iii).

294.    The verb "direct" is defined as to give authoritative instructions to, to order the performance of something, to command, to control, or to govern an action.[202]  The verb "entrust" means giving a person responsibility for a task.[203]  The Appellate Body has interpreted "direction" as referring to situations where a government exercises its authority, including some degree of compulsion, over a private body, and "entrustment" as referring to situations in which a government gives responsibility to a private body.[204]  Thus, pursuant to subparagraph (iv), a public body may exercise its authority in order to compel or command a private body, or govern a private body's actions (direction), and may

---

[200]Panel Report, *US – Export Restraints*, para. 8.49.
[201]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 2, p. 2351.
[202]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 692.
[203]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 844.
[204]Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, paras. 111 and 116.

give responsibility for certain tasks to a private body (entrustment).  As we see it, for a public body to be able to exercise its authority over a private body (direction), a public body must itself possess such authority, or ability to compel or command.  Similarly, in order to be able to give responsibility to a private body (entrustment), it must itself be vested with such responsibility.  If a public body did not itself dispose of the relevant authority or responsibility, it could not effectively control or govern the actions of a private body or delegate such responsibility to a private body. This, in turn, suggests that the requisite attributes to be able to entrust or direct a private body, namely, authority in the case of direction and responsibility in the case of entrustment, are common characteristics of both government in the narrow sense and a public body.

295.    This raises the question as to what kind of authority or responsibility an entity must exercise or be vested with to constitute a public body in the sense of the *SCM Agreement*.  We note that subparagraph (iv) refers to entrustment or direction to carry out the type of functions illustrated in subparagraphs (i)-(iii) "which would normally be vested in the government".  We recall the Panel's statement that the provision of loans and loan guarantees referred to in subparagraph (i), and the provision of goods and services referred to in subparagraph (iii), are "functions that are typically carried out by, indeed in the first instance are the core business of, firms or corporations rather than governments."[205]  China disagrees with this statement and contends that the provision of loans and goods or services is not inherently governmental or inherently non-governmental.  The United States maintains that the provision of loans and loan guarantees, and the provision of goods and services, are not inherently the functions of governments or entities vested with authority to perform governmental functions, but rather of firms or businesses, including sometimes those owned or controlled by the government.

296.    We observe that the Panel identifies no basis for its statement that certain acts listed in subparagraphs (i) and (iii) are "in the first instance [] the core business of [] firms or corporations rather than governments".[206]  In any event, we consider that whether a particular means of making a financial contribution is more *commonly* used by public or private entities has no direct bearing on, nor allows any inference regarding, the constituent elements of a public body in the context of Article 1.1(a)(1) of the *SCM Agreement*.  On the contrary, we consider relevant that, while the types of conduct listed in Article 1.1(a)(1)(i) and (iii) can be carried out by a government as well as by private bodies, a decision to forego or not collect government revenue that is otherwise due, which is

---

[205]China's appellant's submission, para. 64 (quoting Panel Report, para. 8.70).
[206]Panel Report, para. 8.70.

set out in subparagraph (ii), appears to constitute conduct inherently involving the exercise of governmental authority.  Taxation, for instance, is an integral part of the sovereign function.  Thus, if anything, the context of Article 1.1(a)(1)(i)-(iii) and in particular subparagraph (ii) lends support to the proposition that a "public body" in the sense of Article 1.1(a)(1) connotes an entity vested with certain governmental responsibilities, or exercising certain governmental authority.

297.    This brings us to the next contextual element, namely, the phrase "which would normally be vested in the government" in subparagraph (iv).  As we see it, the reference to "normally" in this phrase incorporates the notion of what would ordinarily be considered part of governmental practice in the legal order of the relevant Member.  This suggests that whether the functions or conduct are of a kind that are ordinarily classified as governmental in the legal order of the relevant Member may be a relevant consideration for determining whether or not a specific entity is a public body.  The next part of that provision, which refers to a practice that, "in no real sense, differs from practices normally followed by governments", further suggests that the classification and functions of entities within WTO Members generally may also bear on the question of what features are normally exhibited by public bodies.

298.    We next consider the term "public body" in the light of the object and purpose of the *SCM Agreement*.  The Panel was of the view that:

> [t]o read "any public body" in Article 1.1(a)(1) as excusing from a Member government's direct responsibility a wide swathe of government-controlled entities engaging in exactly the sorts of transactions listed in Article 1.1(a)(1)(i)-(iii) of the SCM Agreement would fundamentally undermine the Agreement's logic, coherence and effectiveness, and thus would be at odds with its object and purpose.[207]

299.    Furthermore, the Panel considered that its reading of the term "public body":

> [E]nsures that whatever form a public entity takes (whether agency, Ministry, board, corporation, etc.) the government that controls it is directly responsible for those of its actions that are relevant under the Agreement.[208]

---

[207]Panel Report, para. 8.79.
[208]Panel Report, para. 8.79.

300.     China takes issue with this reasoning and contends, first, that the Panel wrongly believed that China's definition of "public body" was limited to formal arms or organs of government and could not encompass government-owned or -controlled entities.   Second, even if a government-owned or -controlled corporation were not regarded as a public body, its conduct could still be captured by the *SCM Agreement* under Article 1.1(a)(1)(iv).  The United States submits that interpreting the term "public body" as referring to entities controlled by the government preserves the strength and effectiveness of the *SCM Agreement*'s subsidy disciplines.   For the United States, such an interpretation also inhibits circumvention, by ensuring that governments cannot escape those disciplines by using entities under their control to accomplish tasks that would potentially be subject to those disciplines were the governments themselves to undertake them.

301.     We note, first, that the *SCM Agreement* does not contain a preamble or an explicit indication of its object and purpose.  However, the Appellate Body has stated that the object and purpose of the *SCM Agreement* is "to increase and improve GATT disciplines relating to the use of both subsidies and countervailing measures".[209]  Furthermore, in *US – Softwood Lumber IV*, the Appellate Body noted that the object and purpose of the *SCM Agreement* is to "strengthen and improve GATT disciplines relating to the use of both subsidies and countervailing measures, while, recognizing at the same time, the right of Members to impose such measures under certain conditions".[210]  Finally, we note that, with respect to the object and purpose of the *SCM Agreement*, the Appellate Body stated in *US – Countervailing Duty Investigation on DRAMS* that the *SCM Agreement* "reflects a delicate balance between the Members that sought to impose more disciplines on the use of subsidies and those that sought to impose more disciplines on the application of countervailing measures".[211]

302.     As we see it, considerations of object and purpose are of limited use in delimiting the scope of the term "public body" in Article 1.1(a)(1).  This is so because the question of whether an entity constitutes a public body is *not* tantamount to the question of whether measures taken by that entity fall within the ambit of the *SCM Agreement*.  A finding that a particular entity does not constitute a public body does not, without more, exclude that entity's conduct from the scope of the

---

[209]In making this observation, the Appellate Body based itself on the 1986 Punta del Este Ministerial Declaration, which initiated the Uruguay Round, and charted the course of the negotiations. (See Appellate Body Report, *US – Carbon Steel*, footnote 65 to para. 73 (quoting Ministerial Declaration on the Uruguay Round, GATT Doc. No. MIN.DEC (20 September 1986), p. 7))
[210]Appellate Body Report, *US – Softwood Lumber IV*, para. 64. (footnote omitted)
[211]Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, para. 115.

*SCM Agreement*.  Such measures may still be attributed to a government and thus fall within the ambit of the *SCM Agreement* pursuant to Article 1.1(a)(1)(iv) if the entity is a private entity entrusted or directed by a government or by a public body.[212]

303.    We consider that the Panel's object and purpose analysis did not take full account of the *SCM Agreement*'s disciplines.  It is important to keep in mind that entities that are considered not to be public bodies are not, thereby, immediately excluded from the *SCM Agreement*'s disciplines or from the reach of investigating authorities in a countervailing duty investigation.  The Panel was concerned with what it saw as the implications of too narrow an interpretation.  As we see it, however, too broad an interpretation of the term "public body" could equally risk upsetting the delicate balance embodied in the *SCM Agreement* because it could serve as a license for investigating authorities to dispense with an analysis of entrustment and direction and instead find entities with any connection to government to be public bodies.  Thus, in our view, considerations of the object and purpose of the *SCM Agreement* do not favour either a broad or a narrow interpretation of the term "public body".  We therefore disagree with the Panel's finding that interpreting "any public body" to mean any entity that is controlled by the government best serves the object and purpose of the *SCM Agreement*.

304.    In interpreting the term "public body", we next turn to consider—in accordance with Article 31(3)(c) of the *Vienna Convention*—any relevant rules of international law applicable in the relations between the parties.  Article 31(3)(c) provides:

> 3.  There shall be taken into account, together with the context:
>
>     ...
>
>     (c)    any relevant rules of international law applicable in the
>            relations between the parties.

305.    China submits that the rules of attribution reflected in the International Law Commission's (the "ILC") Articles on *Responsibility of States for Internationally Wrongful Acts*[213] (the "ILC

---

[212]Moreover, a finding that an entity is a public body does not, in itself, result in the application of the "disciplines" of the *SCM Agreement*, as the financial contribution by the public body must confer a benefit and the subsidy granted must be specific for such disciplines to apply.

[213]*Responsibility of States for Internationally Wrongful Acts*.  Text adopted by the ILC at its fifty-third session, in 2001, and submitted to the United Nations General Assembly as a part of the ILC's report covering the work of that session.  The General Assembly "[took] note of the articles on responsibility of States for internationally wrongful acts" for the first time in General Assembly Resolution 56/83 of 12 December 2001, corrected by document A/56/49(Vol. I)/Corr.4, and subsequently in Resolution 59/35 of 2 December 2004, Resolution 62/61 of 6 December 2007, and Resolution 65/19 of 6 December 2010.  The ILC's report, which also contains commentaries on the draft articles, appears in the *Yearbook of the International Law Commission, 2001*, Vol. II, Part Two.

Articles"), in particular, Articles 4[214], 5[215], and 8[216], reflect customary rules of international law or general principles of law.   As such, they are "rules of international law applicable in the relations between the parties" in the sense of Article 31(3)(c) of the *Vienna Convention* and relevant to the interpretation of Article 1.1(a)(1) of the *SCM Agreement*.   China contends that the three categories of attribution set forth in Articles 4, 5, and 8, respectively, of the ILC Articles closely parallel the attribution of financial contributions to WTO Members under the *SCM Agreement* when they are provided by:  (i) a government;  (ii) a public body;  or (iii) a private body entrusted or directed by a government or a public body.   According to China, Article 5 of the ILC Articles encompasses the type of entity characterized as a "public body" in Article 1.1(a)(1) of the *SCM Agreement*.   Further, because Article 5 stipulates that conduct of non-State organs may be attributable to the State only where such organs exercise elements of governmental authority, the term "public body" in Article 1.1(a)(1) must, according to China, be interpreted to mean an entity that exercises authority vested in it by a government for the purpose of performing functions of a governmental character.

306.    The United States contends that the Panel properly asked whether the ILC Articles "would override [its] analysis and conclusions based on the text of the SCM Agreement itself", and correctly answered this question in the negative.[217]   The United States asserts that the ILC Articles are not a subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions because they make no reference to the *SCM Agreement*, and also because they are in any event not an "agreement", as the United Nations General Assembly has merely "taken note of"

---

[214]Article 4 of the ILC Articles reads:
> *Article 4. Conduct of organs of a State*
> 1.    The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
> 2.    An organ includes any person or entity which has that status in accordance with the internal law of the State.

[215]Article 5 of the ILC Articles reads:
> *Article 5. Conduct of persons or entities*
> *exercising elements of governmental authority*
> The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.

[216]Article 8 of the ILC Articles reads:
> *Article 8. Conduct directed or controlled by a State*
> The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.

[217]United States' appellee's submission, para. 109 (quoting Panel Report, para. 8.84).

them.  That some parts of the ILC Articles might reflect customary international law does not mean that all of the details of the ILC Articles, including the ILC Commentaries, have attained this status. The United States contends that, given the level of detail and fine-line distinctions constructed in Articles 5 to 8 of the ILC Articles, it remains an open, and contested, question whether all of these details and distinctions have risen to the status of customary international law.

307.     We note that Article 31(3)(c) of the *Vienna Convention*, quoted above, contains three elements.  First, it refers to "rules of international law";  second, the rules must be "relevant";  and third, such rules must be "applicable in the relations between the parties".  We will address these three elements in turn.

308.     First, the reference to "rules of international law" corresponds to the sources of international law in Article 38(1) of the Statute of the International Court of Justice and thus includes customary rules of international law as well as general principles of law.[218]  Second, in order to be relevant, such rules must concern the same subject matter as the treaty terms being interpreted.  To the extent that Articles 4, 5, and 8 of the ILC Articles concern the same subject matter as Article 1.1(a)(1) of the *SCM Agreement*, they would be "relevant" in the sense of Article 31(3)(c) of the *Vienna Convention*. With respect to the third requirement, the question is whether the ILC Articles are "applicable in the relations between the parties".  We observe that Articles 4, 5, and 8 of the ILC Articles are not binding *by virtue of* being part of an international treaty.  However, insofar as they reflect customary international law or general principles of law, these Articles are applicable in the relations between the parties.[219]

309.     Before addressing whether the attribution rules reflected in the ILC Articles, in particular Article 5, constitute customary international law or general principles of law, we consider to what extent these rules provide guidance for the interpretation of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*.  Both Article 1.1(a)(1), on the one hand, and Articles 4, 5, and 8 of the ILC Articles, on the other hand, set out rules relating to the question of attribution of conduct to a State. At the same time, we note certain differences in the approach reflected in these two sets of rules.  The connecting factor for attribution pursuant to the ILC Articles is the particular *conduct*, whereas, the connecting factors in Article 1.1(a)(1) of the *SCM Agreement* are *both* the particular *conduct* and the *type of entity*.  Under the *SCM Agreement*, if an entity is a public body, then its conduct is attributed directly to the State, provided that such conduct falls within the scope of subparagraphs (i)-(iii), or the

---

[218]See M.E. Villiger, "Commentary on the 1969 *Vienna Convention on the Law of Treaties*" (Martinus Nijhoff, 2009), p. 433.
[219]Appellate Body Reports, *US/Canada – Continued Suspension*, para. 382.  See also Panel Report, *US – Gambling*, para. 6.128.

first clause of subparagraph (iv).   Conversely, if an entity is a private body in the sense of Article 1.1(a)(1)(iv), its conduct can be attributed to the State only *indirectly* through a demonstration of entrustment or direction of that body by the government or a public body.   By contrast, the sole basis for attribution pursuant to the ILC Articles is the particular conduct at issue.   Articles 4, 5, and 8 each stipulates the conditions in which *conduct* shall be attributed to a State.

310.    More specifically, however, with regard to Article 5 of the ILC Articles, we note that despite certain differences between the attribution rules of the ILC Articles and those of the *SCM Agreement*, our above interpretation of the term "public body" coincides with the essence of Article 5.   We have indicated that being vested with, and exercising, authority to perform governmental functions is a core feature of a "public body" in the sense of Article 1.1(a)(1).   Here, we note that the commentary on Article 5 explains that Article 5 refers to the true common feature of the entities covered by that provision, namely that they are empowered, if only to a limited extent or in a specific context, to exercise specified elements of governmental authority.   The commentary also states that the existence of a greater or lesser State participation in its capital, or ownership of its assets are not decisive criteria for the purpose of attribution of the entity's conduct to the State.[220]   This corresponds to our above interpretation of the term "public body" in Article 1.1(a)(1).   As we have said above, being vested with governmental authority is the key feature of a public body.   State ownership, while not being a decisive criterion, may serve as evidence indicating, in conjunction with other elements, the delegation of governmental authority.

311.    In this context, we observe that the United States acknowledges that the ILC Articles might reflect customary international law to some extent.   Yet, the United States contends that given the "fine line distinctions"[221] constructed in Articles 5 to 8 of the ILC Articles, it remains an open and contested question whether all of these details and distinctions have risen to the status of customary international law.   Our analysis, however, does not draw on any details or "fine line distinctions" that might exist under Article 5 of the ILC Articles.   Rather, we see similarities in the core principles and functions of the respective provisions.   Our consideration of Article 5 of the ILC Articles does not contradict our analysis of Article 1.1(a)(1) above.   Rather, it lends further support to that analysis. Yet, because the outcome of our analysis does not turn on Article 5, it is not necessary for us to

---

[220]Commentary on Article 5 of the ILC Draft Articles, para. 3.
[221]United States' appellee's submission, para. 115.   The United States argues that only if the ILC Articles were customary international law could they be said to be "applicable in the relations between the parties" and, as a result, possibly relevant in this dispute under Article 31(3)(c) of the *Vienna Convention*.

resolve definitively the question of to what extent Article 5 of the ILC Articles reflects customary international law.[222]

312.    China takes issue with the Panel's finding that the ILC Articles need not be taken into account because, *inter alia*, they are not "relevant" to the interpretation of Article 1.1 of the *SCM Agreement*.[223]   In our view, the Panel misconstrued the role of the ILC Articles when it set out to analyze "whether [the ILC Articles] would override [the Panel's] analysis and conclusions based on the text of the SCM Agreement itself".[224]   The question is not whether intermediate results of one element of the interpretative exercise "override" the results of another.   Rules of international law within the meaning of Article 31(3)(c) are one of several means to ascertain the common intention of the parties to a particular agreement reflected in Article 31 of the *Vienna Convention*.

313.    We are puzzled by the Panel's statement that the ILC Articles have been cited by panels and the Appellate Body "as conceptual guidance only to supplement or confirm, but not to replace, the analyses based on the ordinary meaning, context and object and purpose of the relevant covered Agreements".[225]   The Panel elaborated that, while in some WTO disputes the ILC Articles "have been cited as containing similar provisions to those in certain areas of the WTO Agreement, in others they have been cited by way of contrast with the provisions of the WTO Agreement, as a way to better understand the possible meaning of the provisions of the WTO Agreement".[226]   The Panel considered this to indicate that panels and the Appellate Body have not considered the ILC Articles to constitute rules of international law in the sense of Article 31(3)(c).[227]   To us, this demonstrates the opposite.   If, as the Panel states, certain ILC Articles have been "cited as containing similar provisions to those in certain areas of the WTO Agreement" or "cited by way of contrast with the provisions of the WTO Agreement", this evinces that these ILC Articles have been "taken into account" in the sense of Article 31(3)(c) by panels and the Appellate Body in these cases.

314.    We briefly address the participants' arguments relating to the Panel's statement that Articles 4, 5, and 8 of the ILC Articles would, in any event, be superseded by Article 1.1(a)(1) of the *SCM Agreement* as *lex specialis* regarding attribution pursuant to Article 55 of the ILC Articles. Article 55 provides:

---

[222]We recall that, with respect to Article 4 of the ILC Articles, the panel in *US – Gambling* stated that the principle set out in Article 4 of the ILC Articles reflects customary international law concerning attribution. (Panel Report, *US – Gambling*, para. 6.128)
[223]China's appellant's submission, para. 147.
[224]Panel Report, para. 8.84.
[225]Panel Report, para. 8.87. (footnote omitted)
[226]Panel Report, para. 8.87.
[227]Panel Report, para. 8.87.

*Lex specialis*

> These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.

315.    China submits that for the *lex specialis* principle to apply it is not enough that the same subject matter is dealt with by two provisions; there must be some actual inconsistency between them, or else a discernible intention that one provision is to exclude the other.[228]   The United States responds that there is "plainly" an inconsistency between China's interpretation of the ILC Articles and the interpretation of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*, and that the Panel so found.[229]

316.    As we see it, Article 55 of the ILC Articles does not speak to the question of whether, for the purpose of interpreting Article 1.1(a)(1) of the *SCM Agreement*, a panel or the Appellate Body can take into account provisions of the ILC Articles.   Article 55 stipulates that "[t]hese articles do not apply where ...".   Article 55 addresses the question of which rule to *apply* where there are multiple rules addressing the same subject matter.   The question in the present case, however, is not whether certain of the ILC Articles are to be *applied*, that is, whether attribution of conduct of the SOEs and SOCBs at issue to the Government of China is to be assessed pursuant to the ILC Articles instead of Article 1.1(a)(1) of the *SCM Agreement*.   There is no doubt that the provision being applied in the present case is Article 1.1(a)(1).   Rather, the question is, whether, when interpreting the terms of Article 1.1(a)(1), the relevant provisions of the ILC Articles may be taken into account as one among several interpretative elements.   Thus, the treaty being *applied* is the *SCM Agreement*, and the attribution rules of the ILC Articles are to be *taken into account* in interpreting the meaning of the terms of that treaty.   Article 55 of the ILC Articles does not speak to the issue of how the latter should be done.

317.    Having completed our analysis of the interpretative elements prescribed by Article 31 of the *Vienna Convention*, we reach the following conclusions.   We see the concept of "public body" as sharing certain attributes with the concept of "government".   A public body within the meaning of Article 1.1.(a)(1) of the *SCM Agreement* must be an entity that possesses, exercises or is vested with governmental authority.   Yet, just as no two governments are exactly alike, the precise contours and characteristics of a public body are bound to differ from entity to entity, State to State, and case to

---

[228]China's appellant's submission, para. 184 (quoting the commentary on Article 55 of the ILC Draft Articles, para. 4).   China also refers to a statement along the same lines made by the panel in *Korea – Procurement*, at paragraph 7.96 of its report.
[229]United States' appellee's submission, para. 125.

case.  Panels or investigating authorities confronted with the question of whether conduct falling within the scope of Article 1.1.(a)(1) is that of a public body will be in a position to answer that question only by conducting a proper evaluation of the core features of the entity concerned, and its relationship with government in the narrow sense.

318.    In some cases, such as when a statute or other legal instrument expressly vests authority in the entity concerned, determining that such entity is a public body may be a straightforward exercise.  In others, the picture may be more mixed, and the challenge more complex.  The same entity may possess certain features suggesting it is a public body, and others that suggest that it is a private body.[230]  We do not, for example, consider that the absence of an express statutory delegation of authority necessarily precludes a determination that a particular entity is a public body.  What matters is *whether* an entity is vested with authority to exercise governmental functions, rather than *how* that is achieved.  There are many different ways in which government in the narrow sense could provide entities with authority.  Accordingly, different types of evidence may be relevant to showing that such authority has been bestowed on a particular entity.  Evidence that an entity is, in fact, exercising governmental functions may serve as evidence that it possesses or has been vested with governmental authority, particularly where such evidence points to a sustained and systematic practice.  It follows, in our view, that evidence that a government exercises meaningful control over an entity and its conduct may serve, in certain circumstances, as evidence that the relevant entity possesses governmental authority and exercises such authority in the performance of governmental functions. We stress, however, that, apart from an express delegation of authority in a legal instrument, the existence of mere formal links between an entity and government in the narrow sense is unlikely to suffice to establish the necessary possession of governmental authority.  Thus, for example, the mere fact that a government is the majority shareholder of an entity does not demonstrate that the government exercises meaningful control over the conduct of that entity, much less that the government has bestowed it with governmental authority.  In some instances, however, where the evidence shows that the formal indicia of government control are manifold, and there is also evidence that such control has been exercised in a meaningful way, then such evidence may permit an inference that the entity concerned is exercising governmental authority.

---

[230]In this context, we note that the panel in *US – Countervailing Duty Investigation on DRAMS* commented, with respect to certain entities, that the USDOC had treated as "private bodies", that, "[d]epending on the circumstances", the evidence "might well have justified treatment of such creditors as public bodies." (Panel Report, *US – Countervailing Duty Investigation on DRAMS*, footnote 29 to para. 7.8)  While we do not agree with that panel's implication that the particular evidence to which it referred—evidence of government ownership—could be decisive, we do consider that the statement illustrates that the analysis of whether the conduct of a particular entity is conduct of the government or a public body or conduct of a private body is indeed multi-faceted and that an entity may display characteristics pointing into different directions.

319.    In all instances, panels and investigating authorities are called upon to engage in a careful evaluation of the entity in question and to identify its common features and relationship with government in the narrow sense, having regard, in particular, to whether the entity exercises authority on behalf of government.  An investigating authority must, in making its determination, evaluate and give due consideration to all relevant characteristics of the entity and, in reaching its ultimate determination as to how that entity should be characterized, avoid focusing exclusively or unduly on any single characteristic without affording due consideration to others that may be relevant.[231]

320.    We recall that the Panel interpreted the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* to mean "any entity controlled by a government".[232]  We note that the Panel did not further clarify its notion of control, although it considered government ownership to be "highly relevant (indeed potentially dispositive)".[233]  In that context, the Panel relied on the "everyday financial concept of a 'controlling interest' in a company".[234]  The above analysis, however, indicates that control of an entity by a government, in itself, is not sufficient to establish that an entity is a public body.  We, therefore, disagree with the Panel's interpretation.

321.    The Panel may have been led to its interpretation as a consequence of the particular approach to the interpretative exercise it undertook.  To us, it appears that, at each step of the interpretative exercise, the Panel tested the interpretation advocated by China, which it characterized as that "any public body" is limited to government agencies or other entities vested with and exercising governmental authority.  At each step, the Panel rejected China's proposition.  At the end of its interpretative exercise, having consistently rejected China's proposition, the Panel agreed with the United States that the term public body "refers to entities owned or controlled by the government".[235] The Panel did not, however, consider whether any criteria other than those relied upon by the parties could potentially be relevant to the enquiry, or whether any indicia other than State ownership are relevant to government control.  Nor did the Panel sufficiently analyze the interpretative elements that served as the basis for its finding that State ownership or control is in itself sufficient to establish that an entity constitutes a public body.

322.    For all of the above reasons, we consider that the Panel's interpretation of "public body" lacks a proper legal basis.  We therefore *reverse* the Panel's finding, in paragraph 8.94 of the Panel Report,

---

[231]We note that similar obligations apply to panels in the context of claims relating to provisions in Parts II and III of the *SCM Agreement*.
[232]Panel Report, para. 8.94.
[233]Panel Report, para. 8.134.
[234]Panel Report, para. 8.134.
[235]United States' first written submission to the Panel (as corrected, 2 July 2009), para. 101.

that the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* means "any entity controlled by a government".

### 2.    Further Allegations of Error

323.    In this section, we address a number of additional allegations of error made by China relating to the Panel's analysis of Article 1.1(a)(1) of the *SCM Agreement*.

324.    China maintains that the Panel improperly considered as "context" definitions of terms not found in Article 1.1, namely, "private enterprise" and "public sector".[236]  China alleges that the Panel's reasoning amounts to an ersatz and erroneous "ordinary meaning" analysis, in which the Panel effectively replaced the actual terms in Article 1.1 with terms that do not appear in the text and therefore cannot constitute context.  We observe that neither the term "private enterprise" nor the term "public sector" are used in Article 1.1 of the *SCM Agreement*.  Dictionary definitions of these terms are thus of limited relevance, if any, for determining the meaning of the term "public body" in Article 1.1(a)(1).

325.    Second, China contends that the Panel considered, as part of its *contextual* analysis of Article 1.1(a)(1) of the *SCM Agreement* a concern explained by the panel in *Korea – Commercial Vessels* regarding what the Panel considered to be a similar issue to the one of the present case.[237]  We note that the definition of "context" in Article 31(2) of the *Vienna Convention* makes no mention of jurisprudence.  Panel reports in previous disputes do not form part of the context of a term or provision in the sense of Article 31(2) of the *Vienna Convention*.[238]  Rather, the legal interpretation embodied in adopted panel and Appellate Body reports become part and parcel of the WTO *acquis* and have to be taken into account as such.[239]

326.    Third, China takes issue with the Panel's statement that if the term "public body" is understood as being limited to entities vested with governmental authority, governments could easily hide behind the presumptively "private" nature of an entity, even while running such entity "so as deliberately to provide trade-distorting subsidies".[240]  In this respect, we recall, first, that according to Article 31 of the *Vienna Convention*, a treaty is to be interpreted in good faith.  That means, *inter alia*,

---

[236]China's appellant's submission, para. 61 (referring to Panel Report, para. 8.69).

[237]China's appellant's submission, para. 68 (referring to Panel Report, para. 8.72).

[238]We note that, similarly, the Appellate Body has found that "panel reports adopted by the GATT [Members] and the WTO Dispute Settlement Body [do not] constitute subsequent practice in a specific case" in the sense of Article 31 of the *Vienna Convention*. (Appellate Body Report, *Japan – Alcoholic Beverages II*, p. 14, DSR 1996:I, 97, at 108)

[239]Appellate Body Report, *US – Stainless Steel (Mexico)*, para. 160;  Appellate Body Report, *Japan – Alcoholic Beverages II*, p. 14, DSR 1996:I, 97, at 108.

[240]Panel Report, para. 8.82.

that terms of a treaty are not to be interpreted based on the assumption that one party is seeking to evade its obligations and will exercise its rights so as to cause injury to the other party.  Yet, the United States' argument that "a government would be able to hide behind its ownership interest in an entity and engage in entrustment or direction behind closed doors"[241] pleads for an interpretation founded on this very assumption, and the above statement by the Panel reveals an interpretation on this basis.  A proper interpretation in accordance with Article 31 of the *Vienna Convention*, however, cannot proceed based on such an assumption.  Furthermore, as our analysis above reveals, we do not consider that Article 1.1(a)(1) establishes that entities are either presumptively private or presumptively public bodies.  Rather, in order to determine properly that a financial contribution has been made by an entity that is not formally part of government in the narrow sense, an investigating authority must point to positive evidence either establishing that the entity is a public body or demonstrating entrustment or direction.

327.    We consider the Panel's approach to be all the more inappropriate under Article 1.1 of the *SCM Agreement*, because the treaty itself contains a specific provision seeking to ensure that governments do not evade their obligations under the *SCM Agreement* by using private bodies to take actions that would otherwise fall within the scope of Article 1.1(a)(1), were they to be taken by the government itself.   This provision is, as the Appellate Body has expressly recognized, Article 1.1(a)(1)(iv).[242]   This, too, precludes reliance on considerations of circumvention in the interpretation of the very provision whose circumvention Article 1.1(a)(1)(iv) seeks to prevent.

328.    Fourth, China argues that "public body" in Article 1.1(a)(1) of the *SCM Agreement* should be interpreted harmoniously with "government agencies" in Article 9.1 of the *Agreement on Agriculture*, because the Spanish text of the covered agreements uses the term "organismo público" both in Article 1.1(a)(1) of the *SCM Agreement* and, in the plural, in Article 9.1 of the *Agreement on Agriculture*.  China submits that, in *Canada – Dairy*, the Appellate Body interpreted the term "governments and their agencies" in Article 9.1 of the *Agreement on Agriculture* as entities that exercise powers vested in them by a government for the purpose of performing functions of a governmental character.  China argues that panels and the Appellate Body have sought the meaning that gives effect simultaneously to the text as it appears in all three official languages of the WTO.[243] China argues that, therefore, the Panel should have treated the English terms "public body" and

---

[241]United States' appellee's submission, para. 104.
[242]Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, para. 113;  Appellate Body Report, *US – Softwood Lumber IV*, para. 52.
[243]China's appellant's submission, para. 94 (referring to Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, para. 111 and footnote 176 thereto;  and Panel Report, *China – Auto Parts*, para. 7.165).

"government agency" as functional equivalents and read the term "public body" as a synonym of "government agency".[244]

329.     The United States responds that the Panel was correct in rejecting China's arguments based on Article 9.1 of the *Agreement on Agriculture* and the interpretation of the terms of that provision by the Appellate Body in *Canada – Dairy*.  The United States contends that, because the language of Article 9.1 of the *Agreement on Agriculture* is different from that of Article 1.1(a)(1) of the *SCM Agreement*, and because it is situated in a different context and in a different agreement that has its own object and purpose, the term "public body" must mean something different than the term "government agency".[245]

330.     As a preliminary matter, we do not consider it determinative that the term used in Article 9.1 of the *Agreement on Agriculture* and Article 1.1(a)(1) of the *SCM Agreement*, "*organismo público*", is the same only in the Spanish version.  The covered agreements are authentic in all three languages. Therefore, pursuant to Article 33(3) of the *Vienna Convention*, the terms of the treaty are presumed to have the same meaning in each authentic text.  Nonetheless, specific terms may not have identical meanings in every covered agreement.  Where the ordinary meaning of the term is broad enough to allow for different interpretations, and the context as well as the object and purpose of the relevant agreements point in different directions, the meaning of a term used in different places of the covered agreements may differ.

331.     We note that the Panel rejected China's argument relating to the harmonious interpretation of "government or any public body" in Article 1.1(a)(1) of the *SCM Agreement* and "governments or their agencies" in Article 9.1 of the *Agreement on Agriculture*, because it had found definitions and usages showing a broader possible scope of the term "public body".[246]  However, we do not see that China argued simply that the term "public body" or "*organismo público*" in itself has a narrow scope. Rather, we understand China's argument to be that the same term "*organismo público*" is used in Article 1.1(a)(1) of the *SCM Agreement* and Article 9.1 of the *Agreement on Agriculture*, and that, since the Appellate Body has interpreted the term "organismo público" in Article 9.1 of the *Agreement on Agriculture* to mean an entity which exercises powers vested in it by a government for the purpose of performing functions of a governmental character[247], the same term, albeit identical only in the Spanish version of the covered agreements, should be interpreted in the same way in the context of Article 1.1(a)(1) of the *SCM Agreement*.

---

[244]China's appellant's submission, para. 99 (quoting Appellate Body Report, *Canada – Dairy*, para. 97).
[245]United States' appellee's submission, paras. 94-99.
[246]Panel Report, para. 8.63.
[247]Appellate Body Report, *Canada – Dairy*, para. 97.

332.     In any event, for the purpose of the present appeal, it suffices to note that the Panel's statement that it had "found other definitions and usages showing a broader possible scope"[248] of the term "public body", provides no support to the conclusion of the Panel's analysis under Article 1.1(a)(1) of the *SCM Agreement*.  In our view, the Panel failed to address properly the substance of China's argument about a harmonious interpretation of the term "*organismo público*" in the *SCM Agreement* and in the *Agreement on Agriculture*.

333.     Fifth, and finally, we address China's allegation that the Panel dismissed the interpretation that would give effect simultaneously to the text as it appears in all three official languages of the WTO solely on the basis that other definitions and usages showed a broader possible scope.[249]  China asserts that all of the usages to which the Panel referred, and on which it relied as showing a broader possible scope of the meaning of the term "public body", came from the Panel's recourse to, and interpretation of, various municipal laws.  China argues that the Panel erred, first, in relying on municipal law usages to interpret the *SCM Agreement*, and, second, in concluding that these usages supported its finding that government control, without more, is the single criterion that defines a "public body", "*organismo público*", or "*organisme public*".[250]

334.     The United States asserts that the Panel's reference to municipal laws was not the "sole reason" why the Panel did not agree with China's proposed interpretation of the term "public body".[251]  Rather, the Panel examined the dictionary definitions of the term "public body" and found that these were not limited to the meaning suggested by China.  Since the Appellate Body has cautioned that dictionary definitions alone are not always capable of resolving the question of interpretation, the Panel's further reference to the definitions and practices in different jurisdictions as to what entities are considered public bodies was appropriate.  In the view of the United States, this examination of the use of the term "public body" in the "municipal law" of various jurisdictions was merely part of the Panel's consideration of the ordinary meaning of that term.

335.     Turning to our analysis, we recall that dictionaries are not, as the Appellate Body has previously recognized, the sole source of information for determining the meaning of a treaty term.[252]  Nonetheless, we have some reservations relating to the way in which the Panel had recourse to usages of the term "public body" or similar terms in the municipal law of a number of jurisdictions in this

---

[248]Panel Report, para. 8.63.
[249]China's appellant's submission, para. 103 (referring to Panel Report, para. 8.63).
[250]China's appellant's submission, para. 106.
[251]United States' appellee's submission, para. 59 (referring to China's appellant's submission, paras. 103-132).
[252]Appellate Body Report, *US – Gambling*, para. 164.

dispute.  First, the Panel did not clearly explain why it considered that an examination of the understanding of the concept of a public body in municipal law would assist in answering the particular interpretative question with which it was confronted.  Second, while the Panel refers to the definition of "public body" or similar terms in four different jurisdictions, it is not clear whether the Panel assessed the usage of the relevant terms only in these four jurisdictions or whether the Panel surveyed other jurisdictions as well.  If the former, it is not evident why the Panel picked those particular jurisdictions;  if the latter, the Panel did not disclose or discuss the results of its survey in their entirety.  Nor did the Panel, as it might usefully have done, seek input from the parties and third parties as to which municipal law usages of the term "public body" were of assistance, if any, and why.

336.    In any event, as we see it, the Panel's excursion into Scottish, European Union, Québécois, and Spanish law was not vital to its finding that the ordinary meaning of the term "public body" could be broader than the meaning suggested by China.  That part of the Panel's analysis would stand even without this element of the reasoning.  Therefore, we do not address this argument further and, consequently, also refrain from addressing further arguments by China to the effect that the Panel also erred in its understanding of Scottish, European Union, Québécois, and Spanish law.

337.    China also alleges that the Panel's reliance on municipal law was inconsistent with Articles 3.2 and 11 of the DSU.[253]  China does not present any arguments in support of this allegation. We recall that the Appellate Body has held that a challenge under Article 11 of the DSU must stand by itself and be substantiated with specific arguments, rather than merely being put forth as a subsidiary argument or claim in support of a claim of a panel's failure to construe or apply correctly a particular provision of a covered agreement.[254]  This is not the case with the present Article 11 challenge and we therefore reject it.

---

[253]China's appellant's submission, para. 114.
[254]Appellate Body Report, *US – Steel Safeguards*, para. 498;  Appellate Body Report, *Australia – Apples*, para. 406.

3.      Application of Article 1.1 of the *SCM Agreement* to the USDOC's Determinations

338.    We now turn to China's further claims relating to the application of Article 1.1 of the *SCM Agreement* to the USDOC's determinations.   China claims that the Panel's erroneous interpretation of the term "public body" requires reversal of its finding upholding the USDOC's determinations that the SOEs and SOCBs at issue were public bodies in the sense of Article 1.1(a)(1).

339.    China submits that, because they are based on an erroneous finding that majority ownership by the government is sufficient on its own to establish that an entity is a public body[255], the Panel's conclusions on the USDOC's public body findings are equally erroneous.   The United States submits that the Panel, based on its correct legal interpretation of the term "public body", properly found that the USDOC's determinations in the CWP, LWR, LWS, and OTR investigations that certain SOEs are public bodies, and in the OTR investigation that certain SOCBs are public bodies were not inconsistent with Article 1.1(a)(1) of the *SCM Agreement*, and that the Appellate Body should affirm this finding.

340.    We have found above that the Panel erred in interpreting the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* to mean "any entity controlled by a government".[256]   The Panel's further finding that China did not establish that the USDOC had acted inconsistently with the obligations of the United States under the *SCM Agreement* was dependent on, and was made as a consequence of, that erroneous interpretation.   Therefore, we must also reverse the Panel's ultimate finding, in paragraph 17.1(a)(i) of its Report, that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 1.1(a)(1) of the *SCM Agreement* in determining in the investigations at issue that the relevant SOEs and SOCBs constituted public bodies.[257]

341.    China further requests us to find that the USDOC's determinations that the provision of inputs by SOEs and the provision of loans by SOCBs were financial contributions by public bodies were inconsistent with the proper interpretation of the term "public body".   The United States observes that the Panel found that there was "no legal error, in analyzing whether an entity is a public body, in giving primacy to evidence of majority government-ownership"[258], and noted that, in the USDOC

---

[255]China's appellant's submission, para. 192 (referring to Panel Report, para. 8.135).
[256]Panel Report, para. 8.94.
[257]See also Panel Report, paras. 8.138 and 8.143.
[258]United States' appellee's submission, para. 147 (quoting Panel Report, para. 8.136).

proceedings, the respondents and the Government of China did not provide evidence, and for the most part there was none on the record, beyond evidence of government ownership.  The United States maintains that China does not challenge these aspects of the Panel's findings.

342.     In order to determine whether a finding that the United States acted inconsistently with Article 1.1(a)(1) of the *SCM Agreement* is warranted, we must ourselves examine the USDOC's public body determinations and ascertain whether these determinations are consistent with the requirements of Article 1.1(a)(1), properly interpreted.  We are mindful that we may only complete the analysis to the extent that there are sufficient factual findings by the Panel or undisputed facts on the Panel record.  We first address the question of whether a reasonable and objective investigating authority could, based on the evidence before the USDOC, have determined that the SOEs at issue are public bodies.  Thereafter, we turn to the question of whether a reasonable and objective investigating authority could have made the same determination in respect of the SOCBs at issue.

343.     With respect to the SOEs, we recall the Panel's findings that in all of the investigations at issue, the USDOC determined that the relevant SOEs were public bodies[259] based on the fact that the Government of China held the majority ownership of the shares in the respective companies.[260]  These companies were producers of steel, rubber and petrochemical inputs sold to the investigated companies or to trading companies.  We further recall that China had argued before the USDOC that in order to determine whether the relevant entities were public bodies, the USDOC should conduct the five-factor test that it had applied in prior investigations.[261]  The five factors that the USDOC had examined in the past are:  (i) government ownership;  (ii) government presence on the board of directors;  (iii) government control over activities;  (iv) pursuit of governmental policies or interests;  and (v) whether the entity was created by statute.[262]  In the CWP, LWR, and LWS investigations, the USDOC stated that there was insufficient evidence on the record of these investigations to apply the five-factor test.[263]  In the OTR investigation, the USDOC stated that conducting the five-factor test in

---

[259]The Panel noted that "public bodies" are referred to as "authorities" in the relevant United States statute and, thus, in the USDOC's determinations as well.  The United States explained that, under its domestic law, the definition of the term "authority" includes the term "public entity", and this latter term means "public body".  There is no disagreement between the parties as to the equivalence of the terms "public entity" under United States law and "public body" in Article 1.1(a)(1) of the *SCM Agreement*. (Panel Report, para. 8.99 and footnote 199 thereto)

[260]Panel Report, paras. 8.100, 8.104, 8.110, and 8.114.

[261]Panel Report, paras. 8.101, 8.105, 8.111, and 8.114.

[262]Panel Report, para. 8.101.

[263]Panel Report, paras. 8.102, 8.106, and 8.112.  At the oral hearing in this appeal, the United States explained that there is no consistent USDOC practice of applying a five-factor test.  While the USDOC does apply such a test in some cases, in others it does not.

respect of an SOE that supplied rubber to investigated companies was not necessary absent information calling into question whether government ownership does not mean government control.[264]  In the CWP, LWR, and OTR investigations, the USDOC added that it would reconsider the feasibility of applying the five-factor test during an administrative review.[265]  Finally, we recall that in all of the investigations at issue, the USDOC expressly declined to undertake an entrustment and direction analysis pursuant to Article 1.1(a)(1)(iv).[266]

344.    We note that investigating authorities have a duty to seek out relevant information and to evaluate it in an objective manner.[267]  The reasoning of the authority must be coherent and internally consistent, and the conclusions reached and the inferences drawn by the authority must be based on positive evidence.[268]  Accordingly, in the present case, the USDOC was under an obligation to actively seek out information relevant to the analysis of whether a financial contribution had been made.  This included information relevant to the potential characterization of SOEs as public bodies.

345.    It is undisputed that the SOEs at issue are not part of government in the narrow sense.  The question is whether they are public bodies or private bodies.  We have found above that the determination of whether a particular conduct is that of a public body must be made by evaluating the core features of the entity and its relationship to government in the narrow sense.  That assessment must focus on evidence relevant to the question of whether the entity is vested with or exercises governmental authority.  As we have pointed out above, determining whether an entity is a public or private body may be a complex exercise, particularly where the same entity exhibits some characteristics that suggest it is a public body, and other characteristics that suggest that it is a private body.

---

[264]Panel Report, para. 8.114.
[265]Panel Report, paras. 8.102, 8.106, and 8.114.
[266]*Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe from the People's Republic of China* (Panel Exhibit CHI-1) (the "CWP Issues and Decision Memorandum"), p. 63;  *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Light-Walled Rectangular Pipe and Tube from the People's Republic of China* (Panel Exhibit CHI-2) (the "LWR Issues and Decision Memorandum"), p. 30; *Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination: Laminated Woven Sacks from the People's Republic of China* (Panel Exhibit CHI-3) (the "LWS Issues and Decision Memorandum"), p. 67;  and *Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination: Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of China* (Panel Exhibit CHI-4) (the "OTR Issues and Decision Memorandum"), p. 77.
[267]Appellate Body Report, *US – Corrosion Resistant Steel Sunset Review*, para. 199.  See also Appellate Body Report, *US – Wheat Gluten*, para. 53.
[268]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93.

346.    We recall the Panel's finding that the USDOC had determined that the SOEs at issue were public bodies "by applying a rule of majority government-ownership".[269]   The Panel also stated that the USDOC did not apply a "simple *per se* majority ownership test", because the USDOC "examined all of the evidence and arguments that were before it in reaching its conclusions that the SOEs were public bodies".[270]   In making this statement, however, the Panel did not identify or refer to any particular passages from the USDOC's determinations.[271]   The Panel further observed that the determinations concerning SOEs in the CWP, LWR, LWS, and OTR investigations "were principally based on the uncontested fact that these entities were majority government-owned".[272]   In response to questioning at the oral hearing in this appeal, the United States explained that the USDOC asked for ownership information but did not ask for other information relating to the elements of the five-factor test.   To us, this indicates that the USDOC did not comply with its duty to seek out relevant information and to evaluate it in an objective manner in order to ensure that its determinations were based on a sufficient factual basis.[273]   The USDOC relied "principally" on information about ownership.  In our view, this is not sufficient because evidence of government ownership, in itself, is not evidence of meaningful control of an entity by government and cannot, without more, serve as a basis for establishing that the entity is vested with authority to perform a governmental function. Accordingly, such evidence, alone, cannot support a finding that an entity is a public body.

347.    The USDOC's approach was thus inconsistent with a proper understanding of the term "public body" in Article 1.1(a)(1) of the *SCM Agreement*.   Accordingly, we *find* that the USDOC's public body determinations in respect of SOEs in the CWP, LWR, LWS, and OTR investigations are inconsistent with Article 1.1(a)(1).

---

[269]Panel Report, para. 8.99.
[270]Panel Report, para. 8.127.
[271]Similar statements by the Panel are made in paragraphs 8.132, 8.137, and 8.143, in all instances without reference to any particular part of the USDOC's reasoning in the determinations.
[272]Panel Report, para. 8.127.
[273]See also Appellate Body Report, *US – Wheat Gluten*, para. 53.

348.     Next, we turn to the USDOC's determination in the OTR investigation that the relevant SOCBs were public bodies.  The USDOC explained that:

> [a] complete analysis of the facts and circumstances of the Chinese banking system that have led us to find that Chinese policy banks and SOCBs constitute a government authority is included in [CFS Paper] and [the Issues and Decision Memorandum in that investigation] at Comment 8.  Parties in the instant case have not demonstrated that conditions within the Chinese banking sector have changed significantly since that previous decision such that a reconsideration of that decision is warranted.  See e.g., the discussion in Tianjin Government Verification Report at 5 (a Tianjin municipal government official confirmed that SOCBs are under [Tianjin State-owned Assets Supervision and Administration Commission] supervision).  In addition, there are scholarly publications on the record which report that SOCBs are required to support the [Government of China]'s industrial policies.[*][274]  (original underlining)
>
> [* original footnote 45] See, e.g. IMF Working Paper – China's Banking Sector Reform at 18-19, which states that "it is difficult to find clear evidence that SOCBs have changed their behaviour and became commercially oriented" and that governments should avoid "interference for policy purposes."

349.     In CFS Paper, the USDOC's determination that the SOCBs in that investigation constituted public bodies was based on the following considerations:  (i) "near complete state-ownership of the banking sector in China";  (ii) Article 34 of the Commercial Banking Law, which states that banks are required to "carry out their loan business upon the needs of [the] national economy and the social development and under the guidance of State industrial policies";  (iii) record evidence indicating that SOCBs still lack adequate risk management and analytical skills;  and (iv) the fact that "during [that] investigation the [USDOC] did not receive the evidence necessary to document in a comprehensive manner the process by which loans were requested, granted and evaluated to the paper industry".[275]

350.     We note that the USDOC's analysis regarding the public body character of the SOCBs in the OTR investigation—albeit elaborated principally in the earlier investigation in CFS Paper—is broader than its analysis regarding the SOEs in the four investigations at issue.  In the former analysis, the USDOC relied on information regarding ownership and control.  In addition, however, it considered other factors, such as a provision in China's Commercial Banking Law stipulating that banks are

---

[274]OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 101.

[275]Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Coated Free Sheet from the People's Republic of China (Panel Exhibit CHI-93) (the "CFS Paper Issues and Decision Memorandum"), pp. 58-60.

required to "carry out their loan business upon the needs of [the] national economy and the social development and under the guidance of State industrial policies".[276]  The USDOC also took into consideration an excerpt from the Bank of China's Global Offering, which states that the "Chinese Commercial Banking Law requires commercial banks to take into consideration government macroeconomic policies in making lending decisions", and that accordingly "commercial banks are encouraged to restrict their lending to borrowers in certain industries in accordance with relevant government policies".[277]  The USDOC also considered a 2005 OECD report, stating that "[t]he chief executives of the head offices of the SOCBs are government appointed and the party retains significant influence in their choice".[278]  In addition, the USDOC considered evidence indicating that SOCBs still lack adequate risk management and analytical skills.

351.    We also note that the present OTR determination itself contains some analysis with respect to SOCBs.  It refers to the USDOC's determination in CFS Paper and states that the parties in the OTR investigation had not demonstrated that there had been significant changes in conditions in the Chinese banking sector since that determination.  In addition, it refers to a statement by a Tianjin municipal government official reproduced in the Tianjin Government Verification Report, and to an International Monetary Fund working paper in support of the proposition that SOCBs are required to support China's industrial policies.[279]

352.    As a preliminary matter we wish to clarify that it was for the USDOC to establish, based on positive evidence, that SOCBs in China constitute public bodies.  To the extent that the above statement that the parties in the OTR investigation had not demonstrated that the Chinese banking sector had significantly changed since the CFS Paper determination suggests that the initial burden was on China and the investigated OTR producers to adduce evidence that the SOCBs are *not* public bodies, that statement would reflect a misconception of the investigating authority's task.

353.    We now turn to the question of whether the USDOC provided a reasoned and adequate explanation of the basis for its determination that the SOCBs were public bodies in the OTR investigation.  The Panel considered the "lengthy discussion" in the CFS Paper determination of the evidence that the SOCBs were either wholly or majority government owned during the period of

---

[276]CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 58.
[277]CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 58.
[278]CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 55 (quoting Economic Survey of China, Organization for Economic Cooperation and Development (2005), pp. 140 and 141).
[279]OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 101.

investigation in that case, and of evidence that there was extensive government involvement in and control over their operations, and found that this constituted a sufficient basis for the USDOC's public body determination in respect of the SOCBs in the OTR investigation.[280]

354.     In our view, merely incorporating by reference findings from one determination into another determination will normally not suffice as a reasoned and adequate explanation.   Nonetheless, where there is close temporal and substantive overlap between the two investigations, such cross reference may, exceptionally, suffice.   We do see substantive overlap between the CFS Paper and the OTR determinations, as both investigations were concerned with the nature of SOCBs in China.   With respect to the temporal element, we note that there was only one year's difference between the period of investigation in CFS Paper (calendar year 2005) and the period of investigation in OTR (calendar year 2006).   We also note that, notwithstanding the USDOC's express acknowledgement in CFS Paper that the "scope and extent of government control over SOCBs is changing"[281], China has not challenged, either before the Panel or before us, the USDOC's reliance in the OTR investigation on its findings in CFS Paper.   In the light of these considerations, we do not see that the USDOC's reliance on its finding, in CFS Paper, was inconsistent with the USDOC's obligations to base its public body determination on positive evidence and to provide a reasoned and adequate explanation of how the evidence on the record supported that determination.

355.     As we have explained above, the USDOC, in CFS Paper, discussed extensive evidence relating to the relationship between the SOCBs and the Chinese Government, including evidence that the SOCBs are meaningfully controlled by the government in the exercise of their functions.   Whether or not we would have reached the same conclusion, it seems to us that in its CFS Paper determination, the USDOC did consider and discuss evidence indicating that SOCBs in China are controlled by the government and that they effectively exercise certain governmental functions.   In the OTR investigation, this analysis was incorporated by reference.   In addition, in the OTR investigation, the USDOC also referred to certain other evidence on the record of that investigation demonstrating that SOCBs are required to support China's industrial policies.   In our opinion, these considerations, taken together, demonstrate that the USDOC's public body determination in respect of SOCBs was supported by evidence on the record that these SOCBs exercise governmental functions on behalf of the Chinese Government.

---

[280]Panel Report, para. 8.143.
[281]CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 56.

356.     We therefore *find* that China has not established that the USDOC's public body determination in respect of SOCBs in the OTR investigation is inconsistent with Article 1.1(a)(1) of the *SCM Agreement*.

4.     China's Consequential Claims under Articles 10 and 32.1 of the *SCM Agreement*

357.     China also requests the Appellate Body to find that, as a consequence of the fact that the USDOC's determinations are inconsistent with Article 1.1(a)(1) of the *SCM Agreement*, the United States is also in violation of its obligations under Articles 10 and 32.1 of the *SCM Agreement*. We note that the Panel stated that it would exercise "judicial economy" with respect to these claims, because China had presented no argumentation in support of these consequential claims, but simply requested findings.[282]

358.     We have found the USDOC's public body determinations in respect of SOEs in the CWP, LWR, LWS, and OTR investigations to be inconsistent with Article 1.1(a)(1).  We recall that the Appellate Body has treated claims under Articles 10 and 32.1 of the *SCM Agreement* as consequential claims in the sense that, where it has not been established that the essential elements of the subsidy definition in Article 1 are present, the right to impose a countervailing duty has not been established and this, as a consequence, means that the countervailing duties imposed are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.[283]  Accordingly, we are of the view that China was not required to advance further arguments to establish a consequential violation of Articles 10 and 32.1. We therefore *find* that the USDOC's public body determinations with respect to SOEs in the four investigations at issue are also inconsistent with the United States' obligations under Articles 10 and 32.1 of the *SCM Agreement*.

C.     *Conclusion*

359.     In the light of the above considerations, we *reverse* the Panel's finding in paragraph 8.94 that the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* means "any entity controlled by a government".  We also *reverse* the Panel's finding in paragraph 17.1(a)(i) that "China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 1.1(a)(1) of the SCM Agreement in determining in the relevant investigations that the SOEs and SOCBs constituted 'public bodies'".[284]  In completing the analysis, first, we *find* that the USDOC acted inconsistently with Article 1.1(a)(1) and with the United States' obligations under Articles 10 and 32.1

[282]Panel Report, para. 13.1.
[283]Appellate Body Report, *US – Softwood Lumber IV*, para. 143.
[284]See also Panel Report, paras. 8.138 and 8.143.

of the *SCM Agreement* by determining, in the CWP, LWR, LWS, and OTR investigations, that SOE input suppliers constituted public bodies;  and, second, we *find* that China did not establish that the USDOC acted inconsistently with Article 1.1(a)(1) of *the SCM Agreement* by determining in the OTR investigation that SOCBs constituted public bodies.

## V.     Article 2 of the *SCM Agreement*:  Specificity

360.     China appeals the Panel's interpretation and application of Article 2.1(a) of the *SCM Agreement* in respect of the USDOC's determination that the provision of SOCB lending in the OTR investigation was specific to the tyre industry.  Moreover, China claims that the Panel erred in its interpretation of the term "subsidy" in Article 2.2 of the *SCM Agreement* when reviewing the USDOC's regional specificity determination in the LWS investigation, and in stating that a subsidy would be regionally specific if it is provided as part of a "distinct regime", even if an identical subsidy is available elsewhere.  We address these issues in turn.

### A.     *Article 2.1(a) of the SCM Agreement*

361.     China appeals the Panel's finding that:

> China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 2.1(a) of the SCM Agreement by determining in the OTR investigation that lending by SOCBs to the OTR tire industry was *de jure* specific.[285]

362.     China takes issue with the Panel's interpretation of Article 2.1(a) of the *SCM Agreement* as it relates to the terms "subsidy" and "explicitly".  China further makes two allegations of error in relation to the Panel's application of Article 2.1(a) of the *SCM Agreement* to the USDOC's determination of *de jure* specificity in respect of SOCB lending in the OTR investigation.  First, China argues that the Panel failed to apply its own interpretation of the terms "subsidy" and "explicitly" to the facts of this dispute.  Second, China contends that the Panel erred in finding that the policy lending subsidy was limited to "certain enterprises" within the meaning of Article 2.1(a) of the *SCM Agreement*.  China requests the Appellate Body to complete the analysis and find that the USDOC's specificity determination in respect of SOCB lending in the OTR investigation was inconsistent with Article 2.1(a) and, as a consequence, also inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

---

[285]Panel Report, para. 17.1(b)(i).

1.      Interpretation of Article 2.1 of the *SCM Agreement*

363.     China's appeal requires us to consider, for the first time, certain issues of interpretation under Article 2 of the *SCM Agreement*.  We begin by noting that the first mention of the concept of specificity is found in Article 1.2 of the *SCM Agreement*, which provides:

> A subsidy as defined in paragraph 1 shall be subject to the provisions of Part II or shall be subject to the provisions of Part III or V only if such a subsidy is specific in accordance with the provisions of Article 2.

364.     Thus, only subsidies that are "specific" are countervailable in accordance with the provisions of Part V of the *SCM Agreement*.  Article 2 elaborates the concept of "specificity".  Its first paragraph sets out a number of principles for determining whether a subsidy is specific by virtue of its limitation to an enterprise or industry or group of enterprises or industries ("certain enterprises").  Article 2.2 of the *SCM Agreement* identifies limitations related to the geographical location of beneficiaries that render a subsidy "regionally" specific.  Article 2.3 deems all prohibited subsidies within the meaning of Article 3 (export subsidies and import substitution subsidies) to be specific.  Lastly, Article 2.4 requires that any determination of specificity be "clearly substantiated on the basis of positive evidence".

365.     This appeal raises the issue of the interpretation of Article 2.1 of the *SCM Agreement*, which provides:

> *Article 2*
> *Specificity*
>
> 2.1     In order to determine whether a subsidy, as defined in paragraph 1 of Article 1, is specific to an enterprise or industry or group of enterprises or industries (referred to in this Agreement as "certain enterprises") within the jurisdiction of the granting authority, the following principles shall apply:
>
> (a)     Where the granting authority, or the legislation pursuant to which the granting authority operates, explicitly limits access to a subsidy to certain enterprises, such subsidy shall be specific.
>
> (b)     Where the granting authority, or the legislation pursuant to which the granting authority operates, establishes objective criteria or conditions[*] governing the eligibility for, and the amount of, a subsidy, specificity shall not exist, provided that the eligibility is automatic and that such

criteria and conditions are strictly adhered to.  The criteria or conditions must be clearly spelled out in law, regulation, or other official document, so as to be capable of verification.

(c)   If, notwithstanding any appearance of non-specificity resulting from the application of the principles laid down in paragraphs (a) and (b), there are reasons to believe that the subsidy may in fact be specific, other factors may be considered.  Such factors are:  use of a subsidy programme by a limited number of certain enterprises, predominant use by certain enterprises, the granting of disproportionately large amounts of subsidy to certain enterprises, and the manner in which discretion has been exercised by the granting authority in the decision to grant a subsidy.[**]  In applying this subparagraph, account shall be taken of the extent of diversification of economic activities within the jurisdiction of the granting authority, as well as of the length of time during which the subsidy programme has been in operation.

[*original footnote 2] Objective criteria or conditions, as used herein, mean criteria or conditions which are neutral, which do not favour certain enterprises over others, and which are economic in nature and horizontal in application, such as number of employees or size of enterprise.

[**original footnote 3] In this regard, in particular, information on the frequency with which applications for a subsidy are refused or approved and the reasons for such decisions shall  be considered.

366.    The chapeau of Article 2.1 offers interpretative guidance with regard to the scope and meaning of the subparagraphs that follow.  The chapeau frames the central inquiry as a determination as to whether a subsidy is specific to "certain enterprises" within the jurisdiction of the granting authority and provides that, in an examination of whether this is so, the "principles" set out in subparagraphs (a) through (c) "shall apply".  We consider that the use of the term "principles"—instead of, for instance, "rules"—suggests that subparagraphs (a) through (c) are to be considered within an analytical framework that recognizes and accords appropriate weight to each principle.  Consequently, the application of one of the subparagraphs of Article 2.1 may not by itself be determinative in arriving at a conclusion that a particular subsidy is or is not specific.

367.    Article 2.1(a) establishes that a subsidy is specific if the granting authority, or the legislation pursuant to which the granting authority operates, *explicitly* limits access to that subsidy to eligible enterprises or industries.  Article 2.1(b) in turn sets out that specificity "shall not exist" if the granting authority, or the legislation pursuant to which the granting authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, the subsidy, provided that eligibility is automatic, that such criteria or conditions are strictly adhered to, and that they are clearly

spelled out in an official document so as to be capable of verification.[286]  These provisions thus set out indicators as to whether the conduct or instruments of the granting authority discriminate or not: Article 2.1(a) describes limitations on eligibility that favour certain enterprises, whereas Article 2.1(b) describes criteria or conditions that guard against selective eligibility.  Finally, Article 2.1(c) sets out that, notwithstanding any appearance of non-specificity resulting from the principles laid down in subparagraphs (a) and (b), other factors may be considered if there are reasons to believe that a subsidy may, in fact, be specific in a particular case.[287]

368.     We observe that Article 2.1(a) and (b) identify certain common elements in the analysis of the specificity of a subsidy.  For instance, these principles direct scrutiny to the eligibility requirements imposed by "the granting authority, or the legislation pursuant to which the granting authority operates".  This is a critical feature of both provisions as it situates the analysis for assessing any limitations on *eligibility* in the particular legal instrument or government conduct effecting such limitations.  We also note that both provisions turn on indicators of *eligibility* for a subsidy.  Article 2.1(a) thus focuses not on whether a subsidy has been granted to certain enterprises, but on whether *access* to that subsidy has been explicitly limited.  This suggests that the focus of the inquiry is on whether certain enterprises are eligible for the subsidy, not on whether they in fact receive it.  Similarly, Article 2.1(b) points the inquiry towards "objective criteria or conditions governing the eligibility for, and the amount of, a subsidy".  Article 2.1(b) also indicates other legal and practical considerations relevant to the analysis, all of which centre on the manner in which the criteria or conditions of eligibility are prescribed and adhered to.

369.     Notwithstanding the fact that the principles under subparagraphs (a) and (b) may point to opposite results, there may be situations in which assessing the eligibility for a subsidy will give rise to indications of specificity and non-specificity as a result of the application of Article 2.1(a) *and* (b).  This is because Article 2.1(a) identifies circumstances in which a subsidy is specific, whereas Article 2.1(b) establishes circumstances in which a subsidy shall be regarded as non-specific.  We can conceive, for example, of situations in which an initial indication of specificity under Article 2.1(a)

---

[286]Footnote 2 further states that these criteria or conditions have to be neutral, do not favour certain enterprises over others, and are economic in nature and horizontal in application, such as the number of employees or size of enterprise.

[287]According to Article 2.1(c) of the *SCM Agreement*, these factors are:  (i) use of a subsidy programme by a limited number of certain enterprises;  (ii) predominant use by certain enterprises;  (iii) the granting of disproportionately large amounts of subsidy to certain enterprises;  and (iv) the manner in which discretion has been exercised by the granting authority in the decision to grant a subsidy.  Footnote 3 to Article 2.1(c) specifies that "in particular, information on the frequency with which applications for a subsidy are refused or approved and the reasons for such decisions shall be considered".  The final sentence of Article 2.1(c) adds that, in applying these four factors, account shall be taken of two general parameters, namely, the diversification of economic activities in the subsidizing country, and the length of time the programme has been in operation.

may need to be considered further if additional evidence demonstrates that the subsidy in question is available on the basis of objective criteria or conditions within the meaning of Article 2.1(b).  This therefore suggests that, where the eligibility requirements of a measure present some indications pointing to subparagraph (a) and certain others pointing to subparagraph (b), the specificity analysis must accord appropriate consideration to both principles.

370.     Furthermore, the introductory sentence of Article 2.1(c) establishes that "notwithstanding any appearance of non-specificity" resulting from the application of Article 2.1(a) and (b), a subsidy may nevertheless be found to be "in fact" specific.  The reference in Article 2.1(c) to "any appearance of non-specificity" resulting from the application of Article 2.1(a) and (b) supports the view that the conduct or instruments of a granting authority may not clearly satisfy the eligibility requirements of Article 2.1(a) or (b), but may nevertheless give rise to specificity in fact.  In such circumstances, application of the factors under Article 2.1(c) to factual features of a challenged subsidy is warranted. Since an "appearance of non-specificity" under Article 2.1(a) and (b) may still result in specificity in fact under Article 2.1(c) of the *SCM Agreement*, this reinforces our view that the principles in Article 2.1 are to be interpreted together.

371.     Accordingly, we consider that a proper understanding of specificity under Article 2.1 must allow for the concurrent application of these principles to the various legal and factual aspects of a subsidy in any given case.  Yet, we recognize that there may be instances in which the evidence under consideration unequivocally indicates specificity or non-specificity by reason of law, or by reason of fact, under one of the subparagraphs, and that in such circumstances further consideration under the other subparagraphs of Article 2.1 may be unnecessary.  For instance, Article 2.1(c) applies only when there is an "appearance" of non-specificity.  Likewise, a granting authority or authorizing legislation may explicitly limit access to a subsidy to certain enterprises within the meaning of Article 2.1(a), but not provide objective criteria or conditions that could be scrutinized under Article 2.1(b).  We do, however, caution against examining specificity on the basis of the application of a particular subparagraph of Article 2.1, when the potential for application of other subparagraphs is warranted in the light of the nature and content of measures challenged in a particular case.

372.     China's appeal focuses, in particular, on the proper interpretation of subparagraph (a) of Article 2.1 which provides that a subsidy is specific "[w]here the granting authority, or the legislation pursuant to which the granting authority operates, explicitly limits access to a subsidy to certain enterprises".  The word "explicitly" qualifies the phrase "limits access to a subsidy to certain enterprises".  In its adverbial form, the term "explicitly" signifies "[d]istinctly expressing all that is

meant;  leaving nothing merely implied or suggested;  unambiguous;  clear".[288]  Moreover, "express" is a synonym for "explicit".[289]  We therefore consider that a subsidy is specific under Article 2.1(a) if the limitation on access to the subsidy to certain enterprises is express, unambiguous, or clear from the content of the relevant instrument, and not merely "implied" or "suggested".

373.     Furthermore, a subsidy is specific under Article 2.1(a) of the *SCM Agreement* when the explicit limitation reserves access to that subsidy to "certain enterprises".  The chapeau of Article 2.1 establishes that the term "certain enterprises" refers to "an enterprise or industry or group of enterprises or industries".  We first note that the word "certain" is defined as "[k]nown and particularized but not explicitly identified: (with sing. noun) a particular, (with pl. noun) some particular, some definite".[290]  The word "group", in turn, is commonly defined as "[a] number of people or things regarded as forming a unity or whole on the grounds of some mutual or common relation or purpose, or classed together because of a degree of similarity".[291]  Turning to the nouns qualified by "certain" and "group", we see that "enterprise" may be defined as "[a] business firm, a company"[292], whereas "industry" signifies "[a] particular form or branch of productive labour; a trade, a manufacture".[293]  We note that the panel in *US – Upland Cotton* considered that "an industry, or group of 'industries', may be generally referred to by the type of products they produce";  that "the concept of an 'industry' relates to producers of certain products";  and that the "breadth of this concept of 'industry' may depend on several factors in a given case".[294]  The above suggests that the term "certain enterprises" refers to a single enterprise or industry or a class of enterprises or industries that are known and particularized.  We nonetheless agree with China that this concept involves "a certain amount of indeterminacy at the edges"[295], and with the panel in *US – Upland Cotton* that any determination of whether a number of enterprises or industries constitute "certain enterprises" can only be made on a case-by-case basis.[296]

---

[288]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 901.

[289]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 903.

[290]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 375.

[291]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 1167.

[292]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 841.

[293]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 1371.

[294]Panel Report, *US – Upland Cotton*, para. 7.1142.  We note that understanding "industry" by reference to the producers of a particular product is also consistent with Article 16.1 of the *SCM Agreement*, which defines "domestic industry" as "the domestic producers as a whole of the like products ... ".

[295]China's appellant's submission, para. 255.

[296]Panel Report, *US – Upland Cotton*, para. 7.1142.

374.    China's appeal relates to the Panel's interpretation of Article 2.1(a) of the *SCM Agreement* and to its finding that there is no requirement that the limitation on access necessarily be set forth explicitly with respect to both the financial contribution and the benefit in order for a subsidy to be specific under that provision.[297]   China maintains that the relevant inquiry under Article 2.1(a) is "whether the actual words of the legislation limit access to the particular financial contribution *and* its associated benefit that the investigating authority has found to satisfy the two-part definition of a 'subsidy' under Article 1 of the SCM Agreement".[298]

375.    The United States responds that China's suggested interpretation "is not supported by the text of that provision".[299]   The United States adds that the Panel correctly determined, based on the text and context of Article 2.1(a), that there are "many ways in which access to a subsidy could be explicitly limited", and that it did not "see that both the financial contribution and the benefit necessarily would have to be set forth explicitly to effect such a limitation".[300]

376.    Thus, the interpretative question before us is whether a subsidy is specific in the sense of Article 2.1(a) only if the granting authority, or the legislation pursuant to which the granting authority operates, explicitly limits access *both* to the financial contribution *and* to its corresponding benefit, as China suggests, or whether, as the Panel found, an explicit limitation on access *either* to the financial contribution *or* to the benefit may prove sufficient for a subsidy to be specific under Article 2.1(a) of the *SCM Agreement*.   As an initial matter, we observe that this aspect of China's appeal relies upon the reference in the chapeau of Article 2.1 to "a subsidy, as defined in paragraph 1 of Article 1" of the *SCM Agreement*.   Article 1.1, in turn, sets forth that "a subsidy shall be deemed to exist" if there is a financial contribution, or any form of income or price support, and a benefit is thereby conferred.

377.    We do not share China's view that the use of the word "subsidy" in the chapeau of  Article 2.1 of the *SCM Agreement* means that each of the definitional elements of a subsidy bears upon the question of whether a subsidy is specific under Article 2.1(a).   Rather, what must be made explicit under Article 2.1(a) is the *limitation on access* to the subsidy to certain enterprises, regardless of how this explicit limitation is established.   In this respect, we consider that, generally, a legal instrument explicitly limiting access to a financial contribution to certain enterprises, but remaining silent on access to the benefit, would nevertheless constitute an explicit limitation on access to that subsidy. This is because, in our view, an explicit limitation on access to a financial contribution would necessarily entail a limitation on access to the benefit conferred, since only the enterprises or

---

[297]China's appellant's submission, para. 213 (referring to Panel Report, para. 9.28).
[298]China's appellant's submission, para. 212. (emphasis added)
[299]United States' appellee's submission, para. 166 (quoting Panel Report, para. 9.28).
[300]United States' appellee's submission, para. 163 (quoting Panel Report, para. 9.26).

industries eligible for that financial contribution would be eligible to enjoy the benefit resulting therefrom.  We therefore agree with the Panel that "there are many ways in which access to a subsidy could be explicitly limited", and that it is not the case "that both the financial contribution and the benefit necessarily would have to be set forth explicitly to effect such a limitation".[301]

378.    For these reasons, we disagree with China that the relevant inquiry under Article 2.1(a) is whether the actual words of the legislation limit access to both the particular financial contribution and its associated benefit.[302]   The necessary limitation on access to the subsidy can be effected through an explicit limitation on access to the financial contribution, on access to the benefit, or on access to both.

2.        Application of Article 2.1(a) of the *SCM Agreement*

379.    China also appeals two aspects of the Panel's application of Article 2.1(a) of the *SCM Agreement* to the USDOC's specificity determination in respect of SOCB lending in the OTR investigation.  First, China raises a conditional appeal in the event that the Appellate Body disagrees with China's proposed interpretation of Article 2.1(a).  Second, China appeals the Panel's application of the term "certain enterprises" in Article 2.1(a) to the relevant facts in the OTR investigation. Before addressing these specific points on appeal, we recall that the standard of review applicable to a panel reviewing a countervailing duty determination precludes a panel from engaging in a *de novo* review of the facts of the case "or substitut[ing] its judgement for that of the competent authorities".[303] At the same time, a panel is required to "undertake an in-depth examination of whether the explanations given disclose how the investigating authority treated the facts and evidence in the record and whether there was positive evidence before it to support the inferences made and conclusions reached by it"[304], and such examination "must be critical and searching, and be based on the information contained in the record and the explanations given by the authority in its published

---

[301]Panel Report, para. 9.26.  We therefore agree with the two illustrative examples set out by the Panel in paragraph 9.27 of its Report.  First, a subsidy would be specific under Article 2.1(a) if the relevant instrument explicitly limits access to the financial contribution alone, since this will necessarily lead to a limitation on access to the benefit.  Second, and as China itself recognizes in paragraph 220 of its appellant's submission, an explicit limitation on access to the benefit would also suffice to find that a subsidy is specific under Article 2.1(a) of the *SCM Agreement*, even in the absence of an explicit limitation on access to the financial contribution.
[302]China's appellant's submission, para. 212.
[303]Appellate Body Report, *US – Steel Safeguards*, para. 299 (referring to Appellate Body Report, *Argentina – Footwear (EC)*, para. 121).
[304]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93.

report".[305]   Furthermore, we recall the prescription in Article 2.4 of the *SCM Agreement* that "[a]ny determination of specificity ... shall be clearly substantiated on the basis of positive evidence".

>   (a)   Whether the Panel erred in finding that the USDOC identified an
>         explicit limitation on access to the subsidy

380.   China's conditional appeal assumes, *arguendo*, that it is sufficient, under Article 2.1(a), for the explicit limitation to restrict access to the financial contribution alone.  China argues that, even on such an interpretation, the measures relied upon by the USDOC did not contain any such limitation, and the Panel erred in finding otherwise.  Before proceeding to the substantive analysis of this claim of error on appeal, it is necessary, briefly, to set out the relevant facts and, in particular, to recall the basis for the USDOC's finding that access to the policy lending subsidy was explicitly limited.

381.   The Panel found that, in the OTR investigation, the USDOC determined that China had, through SOCBs, provided preferential lending to the tyre industry, in particular to two Chinese producers, GTC and Starbright.[306]   The Panel understood that these subsidies were found to be *de jure* specific because a number of central, provincial, and municipal laws, plans and policies explicitly limited access to these subsidies to the OTR industry.[307]   In particular, the Government of China's 11th Five-Year Plan (2006-2010) called for "increasing the development of important spare parts for the automobile industry".[308]   Moreover, the *Decision of the State Council on Promulgating the "Interim Provisions on Promoting Industrial Structure Adjustment" for Implementation*[309] (the "Implementing Regulation") of the 11th Five-Year Plan established four categories of projects/industries[310], namely, "encouraged", "restricted", "eliminated" and "permitted".[311]   The projects/industries falling within the "encouraged", "restricted", and "eliminated" categories were

---

[305]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93.
[306]Panel Report, para. 9.45.
[307]Panel Report, para. 9.46.
[308]Panel Report, para. 9.53.
[309]Panel Exhibit US-87.  See Panel Report, para. 9.53.
[310]We note that the participants disagree as to the proper characterization of the items listed in the GOC Catalogue.  China consistently refers to the items listed in the GOC Catalogue as "industries".  The United States, on the contrary, argues that the Panel found that the items listed in the "encouraged" categories were not "industries" but "individual project types, described in very specific and narrowly-circumscribed terms". (United States' appellee's submission, paras. 28 and 215)  The Panel seems to have rejected China's proposition that the items falling within the "encouraged" category constitute "industries" noting that "the Catalogue lists types of projects, and not, for example, either whole industries or single enterprises". (Panel Report, para. 9.62) It is not evident to us that *all* of the entries in the GOC Catalogue necessarily have the same character, whether that be "industries" or "projects".  In any event, for the purpose of this appeal, we do not consider it necessary to determine the nature of the items contained in the "encouraged" category or in the GOC Catalogue as a whole. Accordingly, we will refer to the items listed therein as "projects/industries".
[311]Panel Report, para. 9.59.

described in the *Guiding Catalogue of the Industrial Restructuring (2005)*[312] (the "GOC Catalogue"), whereas those projects/industries not listed under either of these categories were deemed to belong to the "permitted" category, provided that they conformed to "the relevant laws, regulations and policies of the state".[313]   The Panel found, in this regard, that the USDOC had determined that the Chemical Industry Sector within the "encouraged" category of the GOC Catalogue included the following entry: "[p]roduction of advanced belt tyre radial, its supporting materials and equipment production".[314]

382.    China argues that, even under the Panel's interpretation of "subsidy" and "explicit", for a subsidy to be specific under Article 2.1(a), it "would need to contain an explicit limitation of access to the relevant *financial contribution*"[315], and that "the finding that SOCBs were 'instructed to provide financing to the "encouraged" projects' does not, by its own terms, identify an explicit *limitation of access* to the relevant financial contribution".[316]   China further alleges that it is undisputed that SOCBs also provided loans to the industries under the "permitted" category which encompasses "the entire range of economic activity in China that does not fall within the [encouraged, restricted and eliminated] categories".[317]   Therefore, China contends that access to the financial contribution was not limited (explicitly or otherwise) to the "encouraged" industries and that, consequently, the alleged subsidy was not specific under Article 2.1(a) of the *SCM Agreement*.

383.    In response, the United States argues that China fails to identify any evidence on the record to support its assertion that SOCB lending is also available to the "permitted" category, and that the Panel made no findings on this issue.[318]   The United States further alleges that China's arguments are "flawed" because they are premised on a single piece of evidence—Article 13 of the Implementing

---

[312]Panel Exhibit CHI-70.  After approval of the State Council, the GOC Catalogue was promulgated by the National Development and Reform Commission. (See Panel Report, para. 9.6)

[313]Panel Report, para. 9.59.  According to the Panel and the USDOC, the Implementing Regulation identified the GOC Catalogue as the "important basis for funding investments directions, etc." (*Ibid.*, para. 9.56 (quoting OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 13))

[314]Panel Report, para. 9.63.  The Panel noted that off-the-road tyres can be bias ply tyres, meridian tyres, and radial tyres. (*Ibid.*, footnote 351 to para. 9.74 (referring to OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), pp. 14 and 99))

[315]China's appellant's submission, para. 237. (original emphasis)

[316]China's appellant's submission, para. 238. (original emphasis)

[317]China's appellant's submission, para. 241.

[318]United States' appellee's submission, paras. 185-189.

Regulation[319]—whereas the Panel's analysis was based on the totality of the evidence before the USDOC, and that this approach enabled the Panel to find that the USDOC's specificity determination was in accordance with Article 2.1(a) of the *SCM Agreement*.[320]

384.   China's arguments on this issue focus on whether access to SOCB loans was limited to the industries in the "encouraged" category or whether, on the contrary, the "permitted" industries were also beneficiaries of such loans.   The Panel found that, in terms of financing from financial institutions, the projects/industries under the "encouraged" category were designated as those to which "all financial institutions are *required* to provide credit supports in compliance with economic principles".[321]   The Panel also considered that for projects/industries under the "restricted" category, investments were prohibited but "nevertheless, under certain circumstances, enterprises with existing production capacities in a restricted industry can be allowed to transform or upgrade themselves, and that in those circumstances, the financial institutions shall, in compliance with the credit principles, continue providing supports".[322]   As regards the projects/industries under the "eliminated" category, the Panel considered that the Implementing Regulation mandated the abolition of such projects/industries and withdrawal of any type of financing.[323]   Finally, with regard to the permitted category, the Panel simply observed that the Implementing Regulation states that projects/industries not falling within either of the three categories were to be regarded as "permitted", and that such projects/industries are not listed in the GOC Catalogue.[324]

385.   In our view, in arguing that "[i]t is undisputed that SOCBs also provided loans to the *permitted* category of industries"[325], China seeks to attribute to the Panel a "finding" regarding the "permitted" category that the Panel did not make.   The Panel did not find that the projects/industries under the "permitted" category were eligible to receive the same loans as the "encouraged" projects/industries and China does not claim that the Panel erred in not making such a finding.   What

---

[319]Article 13 of the Implementing Regulation provides that:
> The "Catalogue for the Guidance of Industrial Structure Adjustment" is composed of three categories, namely, the encouraged category, the restricted category and the eliminated category.   The industries not belonging to the encouraged category, the restricted category or the eliminated category, but conforming to the relevant laws, regulations and policies of the state, shall belong to the permitted category.   The industries of the permitted category are not listed in the "Catalogue for the Guidance of Industrial Structure Adjustment.

(Implementing Regulation (Panel Exhibit US-87), p. 10)
[320]United States' appellee's submission, paras. 190-195.
[321]Panel Report, para. 9.59. (emphasis added)
[322]Panel Report, para. 9.59.
[323]Panel Report, para. 9.59.
[324]Panel Report, para. 9.59.
[325]China's appellant's submission, para. 241. (original emphasis)

the Panel found is only that those projects/industries not listed in either of the three categories were deemed to be "permitted" under the Implementing Regulation. Both the Implementing Regulation and the Panel Report are silent on the issue of how financial institutions are to conduct themselves with regard to projects/industries in the "permitted" category.[326] Therefore, we consider that the Panel did not err in considering that the policy lending provided for in China's central level planning documents was explicitly limited to the "encouraged" projects/industries, and consequently, we reject China's "conditional" ground of appeal. We also highlight that, as explained in the next subsection of this Report, neither the Panel nor the USDOC limited its consideration of specificity to these central level documents.

> (b)    Whether the Panel erred in finding that the USDOC had a sufficient basis on which to determine that the subsidy was limited to "certain enterprises"

386.    As an initial matter, we observe that China's appeal does not appear to concern the interpretation by the Panel of the term "certain enterprises". In fact, China seems to agree with the Panel, which essentially adopted the same analysis as the panel in *US – Upland Cotton*, that the term refers to a "limited group of producers of certain products"[327], and that "a subsidy is provided to 'certain enterprises' if the recipients of the subsidy constitute no more than a 'discrete segment' of the economy of the Member granting the subsidy".[328] Rather, we understand China to appeal the Panel's application of the term "certain enterprises" to the particular facts in this dispute. China alleges that the Panel erred in finding that the 539 "encouraged" industries are "described in very specific and narrowly-circumscribed terms", since, in China's view, many of these industries, individually, "represent[] a broad segment of economic activity".[329] China also contends that the Panel erroneously relied on the "restricted" and "eliminated" categories in reaching its conclusion that the "encouraged" industries, taken as a whole, collectively constituted "certain enterprises" within the meaning of Article 2.1(a) of the *SCM Agreement*.

387.    The United States responds that the Panel's finding that the 539 "encouraged" projects/industries are "described in very specific and narrowly-circumscribed terms" is a factual finding and, thereby, not subject to appellate review under Article 17.6 of the DSU.[330] Furthermore,

---

[326]Furthermore, the United States has expressed disagreement with China's assertion that it is an "undisputed fact" that the industries falling under the "permitted" category receive loans from SOCBs, arguing that, according to Article 13 of the Implementing Regulation of the 11th Five-Year Plan (2006-2010), the "permitted" category was expressly excluded from the GOC Catalogue and, therefore, from the Government of China's policy priorities for lending. (United States' responses to questioning at the oral hearing)
[327]China's appellant's submission, para. 248 (quoting Panel Report, *US – Upland Cotton*, para. 7.1142).
[328]China's appellant's submission, para. 248 (quoting Panel Report, *US – Upland Cotton*, para. 7.1151).
[329]China's appellant's submission, para. 250.
[330]United States' appellee's submission, paras. 215 (quoting Panel Report, para. 9.68) and 217.

the United States contends that China's allegations that the Panel "appears to have been influenced in its conclusion by the existence of the 'restricted' and 'eliminated' categories of industries described in the GOC Catalogue", do not take proper account of the approach that the Panel actually adopted.[331] According to the United States, the Panel engaged in a comprehensive analysis of all the evidence before the USDOC, including evidence of the "restricted" and "eliminated" categories, and it was on the basis of all the evidence that the Panel found that the USDOC's specificity determination in respect of SOCB lending in the OTR investigation was not inconsistent with Article 2.1(a) of the *SCM Agreement*.

388.    Before addressing the specific arguments that China raises, which target one part of the Panel's analysis of the facts, we consider it useful to set out, more generally, how the Panel conducted its analysis.  At the outset of its analysis, the Panel expressed its understanding that the USDOC had based its specificity determination "on a finding that a number of central, provincial and municipal government planning documents provided for the development of the OTR tire industry, *inter alia*, through the provision of loan financing by SOCBs (i.e., government financial contributions) to the tire producers, in some instances identified by name".[332]  The Panel then set out to assess "whether that determination is reasonably supported by the documents on which it was based".[333]  The Panel took note of the USDOC's finding that "central level plans should be considered a central government policy or programme that local governments adopt and implement through their own five-year plans".[334]  The Panel considered that this amounted to "a finding that the 'policy lending programme' was a central-government programme ... implemented at the provincial and municipal levels".[335]  On this basis, the Panel identified its "first and principal task [as analyzing] whether the central government-level planning documents could support the USDOC's finding of *de jure* specificity".[336] The Panel further explained that, "by its own terms, the USDOC's specificity determination in respect of SOCB lending to the OTR tire industry was based on the 'totality' of the evidence" and that, therefore, it would follow the same approach in its review of that determination.[337]  The Panel then

---

[331]United States' appellee's submission, para. 218 (quoting China's appellant's submission, para. 251).
[332]Panel Report, para. 9.46.
[333]Panel Report, para. 9.47.
[334]Panel Report, para. 9.48.
[335]Panel Report, para. 9.49.
[336]Panel Report, para. 9.49.
[337]Panel Report, para. 9.52.

went on to conduct a detailed and lengthy examination of policy planning documents at the central, provincial and municipal levels that had been relied upon by the USDOC.[338]

389.    The Panel considered the USDOC's findings that at the central-government level:  (i) the Government of China's 11th Five-Year Plan (2006-2010) provided for the development of important spare parts for the automotive industry[339];  (ii) the Implementing Regulation of the 11th Five-Year Plan served as the basis for, *inter alia*, funding investment directions, and established in Article 13 four categories under which different projects were to be "encouraged", "restricted", "eliminated" or "permitted"[340];  and (iii) the GOC Catalogue established the specific projects falling under the "encouraged", "restricted" and "eliminated" categories—including the "[p]roduction of advanced belt tyre radial, its supporting materials and equipment production" as an "encouraged" project within the Chemical Industry Sector.[341]  The Panel further found that the GOC Catalogue and the categories thereof are mandatory and that "a principal function of the GOC Catalogue is the allocation of loan financing by financial institutions".[342]  The Panel found that the items listed in the GOC Catalogue "are individual project types, described in very specific and narrowly-circumscribed terms"[343], and that the "encouraged", "restricted", and "eliminated" projects do not describe all economic activity in China since the Implementing Regulation establishes a default "permitted" category, which covers all activities not expressly listed under either of the three categories foreseen in the GOC Catalogue.[344]  Therefore, the Panel was of the view that a reasonable and objective investigating authority could

---

[338]In the circumstances of this dispute, while the Panel did not expressly examine the potential application of Article 2.1(b) and (c), it nevertheless stressed "the balance struck in Article 2 of the SCM Agreement – a subsidy to which access is automatic based on neutral, horizontally-applicable economic criteria is not specific, and thus falls outside the scope of the SCM Agreement, but the appearance of non-specificity can be overridden by the facts of how the subsidy is allocated in practice." (Panel Report, para. 9.22)  We also observe that the Panel found that the provision at issue in this dispute was Article 2.1(a) of the *SCM Agreement*. (Panel Report, para. 9.23)  Moreover, in response to questioning at the oral hearing in this appeal, neither participant asserted that the principle in Article 2.1(b) was relevant in the OTR investigation. China considered that Article 2.1 consists of three interrelated provisions, and that, if anything, Article 2.1(c) was the one that had the most relevance for the USDOC's analysis.  The United States expressed the view that there was no indication that there were objective criteria or conditions governing the eligibility for the subsidy and that recourse to Article 2.1(c) was unwarranted, given that the evidence on the record established *de jure* specificity.
[339]Panel Report, paras. 9.54 and 9.55.
[340]Panel Report, paras. 9.56-9.60.
[341]Panel Report, paras. 9.61-9.63.
[342]Panel Report, para. 9.60.
[343]Panel Report, para. 9.68.  The Panel also found that in a number of cases, "closely related projects appear in two or three of the categories, with one variant to be encouraged, a second to be restricted, and a third to be abolished". (Panel Report, para. 9.69)
[344]Panel Report, para. 9.70

conclude that any subsidies granted on the basis of "the 'encouraged' category were to a sufficiently discrete segment of the economy as to be limited to 'certain enterprises'".[345]

390.    The Panel then observed that at provincial and municipal levels, the USDOC had found that policy lending was specific to the tyre industry or to named tyre producers.  In particular, the Panel found that, through their respective Five-Year Plans, Guizhou province and Guiyang municipality singled out GTC (a tyre producer) for technology renovation of two meridian line tyres with respect to its 5-million-unit semi-steel radial tyre project, and called for policy bank loans and loans from abroad to be allocated according to the plans and in conformity with economic policies.[346]  The Panel also noted that the USDOC had found that, while the Five-Year Plan of Hebei province did not identify any particular producer, it generally identified automobile parts and the rubber industry as key projects and that a tyre producer, Starbright, was located in one of the cities designated as the basis for automobile development.[347]  The Panel concluded that it was reasonable for the USDOC to have found that these documents implemented the central-level plans for the development of the tyre industry, which included the provision of financing to that industry.[348]

391.    China focuses on the alleged finding by the Panel that the GOC Catalogue explicitly identified "certain enterprises" in the sense of Article 2.1(a) of the *SCM Agreement* for encouragement and development, including the tyre industry.  In evaluating this ground of appeal, we first consider whether the Panel in fact made such a finding, and then address the substance of China's arguments.

392.    On the one hand, the Panel seems to have ascribed great significance to the GOC Catalogue, which the Panel described as "the central document in the USDOC's specificity determination".[349]  The Panel expressed the view that its conclusions on the USDOC's *de jure* specificity finding "must necessarily hinge on whether the encouraged projects, taken as a whole, could reasonably be viewed

---

[345]Panel Report, para. 9.71.  The Panel also reviewed the USDOC's finding that, under the Government of China's 10th Five-Year Plan (2001-2005), the SETC Circular 716 identified the production of "meridian tires" (radial tyres) as a national priority and stated that the contribution of public funds should be reasonably directed "so as to ... guarantee the realization of the target". (*Ibid*., para. 9.74)  The Panel considered that the wording of the Circular supported the USDOC's finding that this document conveyed policy directions concerning investment in the OTR industry to other levels of governments. (*Ibid*., paras. 9.73-9.79)
[346]Panel Report, para. 9.87.  The Panel also noted the USDOC's finding that the Guizhou 10th Five-Year Plan referred to "the technology renovation project of meridian line tires of GTC" as a project to "be supported". (*Ibid*., para. 9.86)
[347]Panel Report, para. 9.91.  The Guidelines for the Implementation of Hebei Province Science & Technology 11th Five-Year Plan stated that "policy financial institutions 'shall support' national and provincial key technology projects and key technology industrialization projects". (*Ibid*., para. 9.92)
[348]Panel Report, paras. 9.89 and 9.94.
[349]Panel Report, para. 9.61.

as a sufficiently discrete segment of the economy as to constitute, collectively, 'certain enterprises'"[350]; and described its task as an inquiry into "whether the USDOC could reasonably have concluded on the basis of positive evidence before it that the list of encouraged projects taken as a whole, in spite of being lengthy and diverse, constituted a 'sufficiently discrete segment of the economy' as to constitute 'certain enterprises'".[351]

393.    On the other hand, however, the Panel expressly stated that the USDOC's specificity determination was premised on the totality of the evidence, that is, on evidence pertaining to all levels of government.[352]  The Panel pointed out that it would undertake its review on the same basis, and proceeded to scrutinize, not only the GOC Catalogue, but various other documents at the central government level, as well as numerous policy planning documents at the provincial and municipal levels.  At the conclusion of its analysis, the Panel found that the USDOC's specificity determination in the OTR investigation was "that lending by SOCBs to the OTR tire industry (in particular to GTC and Starbright) was *de jure* specific".[353]  The wording of this finding is, in our view, significant, because it reveals that the relevant explicit limitation was *not*, or not *only*, the one set out in the GOC Catalogue.[354]  Instead, the finding represents an acknowledgement by the Panel that the alleged subsidy was explicitly limited, as well, by documents at the provincial and municipal government levels.  This seems to us to have been both a proper and a sufficient basis for the Panel to conclude that the USDOC had not acted inconsistently with Article 2.1(a) of the *SCM Agreement* in determining in the OTR investigation that SOCB lending to the tyre industry was *de jure* specific.

394.    For these reasons, we see tension between certain statements made by the Panel, which emphasize that the GOC Catalogue is key to, and dispositive of, a finding of specificity, and which are the focus of China's appeal, and other statements made by the Panel, along with its overall approach, which suggest that the GOC Catalogue played a lesser, non-determinative role in the specificity analysis.  We observe, in this regard, that the Panel does not appear to have pointed to any language in the USDOC's specificity determination in the OTR investigation suggesting that the USDOC itself considered that its specificity analysis had to be undertaken principally or solely based

---

[350]Panel Report, para. 9.61.
[351]Panel Report, para. 9.67.
[352]Panel Report, para. 9.52.
[353]Panel Report, para. 9.107.  The USDOC's determination in the OTR investigation on which the Panel relied (Panel Exhibit CHI-4) also reveals that it was on the basis of the totality of the information that the USDOC found that the Government of China directed policy lending to the tyre industry or to specific enterprises in the tyre industry.
[354]We recall that the relevant entry in the "encouraged" category of the GOC Catalogue referred to "production of advanced belt tyre radial, its supporting materials and equipment production".

on the GOC Catalogue, or that the USDOC found that *all* of the entries in the "encouraged" category constituted "certain enterprises".  Nor do we see any such indication in the determination.  Rather, the USDOC conducted its specificity analysis taking into account all relevant legal instruments at the central, provincial and municipal levels, and on the basis of all this evidence, together, reached its ultimate conclusion that SOCB lending is explicitly specific to the tyre industry, notably to GTC and Starbright.

395.    We do not understand China to contest that the relevant item in the GOC Catalogue on which the USDOC relied—"[p]roduction of advanced belt tyre radial, its supporting materials and equipment production"[355]—is "described in very specific and narrowly-circumscribed terms".[356]  Rather, China argues that certain other entries in the GOC Catalogue, and the "encouraged" category taken as a whole, "represent[] a broad segment of economic activity".[357]  However, for the reasons just given, we are uncertain whether the Panel made the finding, challenged by China on appeal, that the entirety of the "encouraged" category constitutes "certain enterprises" within the meaning of Article 2.1(a).  Since the Panel found that the USDOC had established that several planning documents, at central, provincial and municipal levels of government singled out the tyre industry, or specific companies, we do not see that the Panel needed to make a finding as to whether the entirety of the "encouraged" category constituted "certain enterprises" in the sense of Article 2.1(a).  Nor are we called upon to undertake such an analysis.  Accordingly, we consider it unnecessary to examine whether that category as a whole, or entries in that category other than "[p]roduction of advanced belt tyre radial, its supporting materials and equipment production", are not described in "very specific, narrowly-circumscribed" terms.

396.    China also challenges the Panel's reliance on the "restricted" and "eliminated" categories, as well as the Panel's alleged failure to take proper account of the significance of the "permitted" category in its analysis.[358]  However, we recall, again, that certain aspects of the Panel's approach departed from that of the USDOC to the extent that they implied that the specificity analysis in respect of SOCB lending in the OTR investigation had to be ascertained at the central-government level, and

---

[355]Panel Report, para. 9.63 (quoting Panel Exhibit US-86).  The Panel decided to rely principally on the United States' version of the GOC Catalogue in the light of the discrepancy between the United States' and China's translations of this item.  In this respect, China's translation reads:  "high-performance meridian tires and the special materials and equipment".  (Panel Report, footnote 338 to paragraph 9.63 (quoting GOC Catalogue (Panel Exhibit CHI-70), p. 7))

[356]Panel Report, para. 9.68.

[357]China's appellant's submission, para. 250.  In particular, China states that "[d]escriptions such as 'reform and construction of power networks', 'petroleum and natural gas exploration', 'development and production of vaccines and medicines', 'manufacture of agricultural equipment', and 'software development and production' – to name just a handful – are not 'specific and narrowly-circumscribed'."

[358]China's appellant's submission, para. 251.

that the GOC Catalogue was the crucial document in the USDOC's specificity determination. We also observe that the USDOC itself did not refer to the content or significance of the "restricted", "eliminated", and "permitted" categories.

397.     As we have already explained, the "encouraged" category in the GOC Catalogue did not form the basis of the USDOC's specificity determination in respect of SOCB lending in the OTR investigation. Rather, the USDOC determined that the policy lending subsidy was specific based upon its examination of multiple policy planning documents at all relevant levels of government, which, taken together, identified the OTR industry or tyre producers. It follows that the Panel's discussion of this category, including its reliance on the "restricted", "eliminated" and "permitted" categories, was not reflective of the analysis conducted by the USDOC in the OTR investigation. By implication, therefore, China's appeal does not take issue with the USDOC's specificity determination as such. Rather, China challenges those elements of the Panel's analysis that superimposed additional considerations upon the USDOC's approach. Because we have found above that the Panel's review of the USDOC's specificity determinations was properly based on documents at all levels of government, we consider it unnecessary to examine further the Panel's evaluation of the significance of the "restricted", "eliminated" and "permitted" categories in the GOC Catalogue.

398.     Since we consider that certain elements of the Panel's reasoning do not parallel the rationale employed by the USDOC in its specificity determination, the question becomes whether this means that we must reverse the Panel's ultimate finding that China has not established that the USDOC's specificity determination in respect of SOCB lending in the OTR investigation was inconsistent with Article 2.1(a) of the *SCM Agreement*. For the reasons set out below, we do not believe that this is the case.

399.     We observe that the Panel made at least four intermediate findings concerning the USDOC's specificity determination in the OTR investigation. First, the Panel found that it was reasonable for the USDOC to rely on central documents implementing the Government of China's 11th Five-Year Plan (2006-2010), and in particular on the GOC Catalogue, in finding that SOCB lending was explicitly limited to the OTR industry in the light of the explicit reference in the GOC Catalogue to "'advanced belt tires …' as an 'encouraged' project".[359]  Second, the Panel found that the SETC Circular 716, which relates to the Government of China's 10th Five-Year Plan (2001-2005), also supported the USDOC's finding that the central government planning documents conveyed policy

---

[359]Panel Report, para. 9.72.

directions to other levels of government concerning investment in the OTR industry.[360]   Third, the Panel found that the USDOC reasonably concluded that Guizhou province and Guiyang municipality had, through central-government documents, been directed to implement central-government plans "for development of the OTR tires industry, including in respect of the provision of credit financing".[361]   Fourth, the Panel found that the USDOC reasonably concluded that a number of Five-Year Plans in Hebei province had identified the development of auto parts as "key" or "mainstay" industries and that other documents had, in furtherance of these provincial plans, mandated that financial institutions support these projects/industries.[362]

400.     The Panel's analysis, viewed in its entirety, reveals that the USDOC found that the OTR industry was explicitly identified in the planning documents at all government levels as a target for development and that all financial institutions were instructed to provide financing to that industry. Thus, despite the Panel's apparent understanding that central-government documents were the relevant basis for the USDOC's specificity determination, we note that, ultimately, the Panel conducted a proper factual analysis based on the totality of evidence, at all levels of government, on which the USDOC supported its specificity determination.   The Panel appears to have accepted that such documents, taken together, demonstrate a clear lending policy directed to favour the tyre industry. We, therefore, conclude that the Panel's ultimate finding, that "China has failed to establish that the USDOC's finding in the OTR investigation, that lending by SOCBs to the OTR tire industry (in particular to GTC and Starbright) was *de jure* specific, was inconsistent with the obligations of the United States under Article 2.1(a) of the SCM Agreement"[363], does not amount to legal error.

401.     Accordingly, we *uphold* the Panel's finding, in paragraph 17.1(b)(i) of the Panel Report[364], that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 2.1(a) of the *SCM Agreement* by determining in the OTR investigation that SOCB lending was specific to the tyre industry.

---

[360]Panel Report, para. 9.79.
[361]Panel Report, para. 9.89.
[362]Panel Report, para. 9.94.
[363]Panel Report, para. 9.107.
[364]See also Panel Report, para. 9.107.

B.      *Article 2.2 of the SCM Agreement*

402.     In this section, we address China's appeal regarding Article 2.2 of the *SCM Agreement*.  The Panel ruled in favour of China on its claim under Article 2.2, and found that:

> The USDOC acted inconsistently with the obligations of the United States under Article 2 of the SCM Agreement by determining that the government provision of land-use rights, in the LWS investigation, was regionally-specific.[365]

403.     Although China does not disagree with the Panel's conclusion that the USDOC's determination was inconsistent with Article 2.2, China nevertheless appeals this finding because it disagrees with the basis on which the Panel reached it, and is concerned about certain systemic implications that may flow from the Panel's reasoning.

404.     We recall that Article 2.2 of the *SCM Agreement* provides:

> A subsidy which is limited to certain enterprises located within a designated geographical region within the jurisdiction of the granting authority shall be specific.  It is understood that the setting or change of generally applicable tax rates by all levels of government entitled to do so shall not be deemed to be a specific subsidy for the purposes of this Agreement.

405.     As an initial matter, we observe that, in its analysis, the Panel considered that the claims raised by China posed two specific interpretative questions with respect to the scope and meaning of Article 2.2 of the *SCM Agreement*, namely:  (i) whether the reference to "certain enterprises" means that, in order for a subsidy to be regionally specific, there must be a limitation to a *subset* of enterprises located within the designated geographical region, or whether, instead, a limitation on a purely geographical basis is sufficient[366];  and (ii) whether a "designated geographical region" must necessarily have some sort of formal administrative or economic identity, or whether any identified

---

[365]Panel Report, para. 17.1(b)(ii);  see also para. 9.161.  The Panel found that the USDOC had determined that the provision of land-use rights to a Chinese producer of LWS, Aifudi, was regionally specific because the land was physically located in a designated area within the jurisdiction of the granting authority—the New Century Industrial Park (the "Industrial Park").  The Panel concluded that the USDOC's determination was inconsistent with Article 2.2 of the *SCM Agreement* because the USDOC failed to establish that the provision of land-use rights in the designated area constituted a "distinct regime"—for instance, by virtue of price differences—compared with the provision of land-use rights outside of the Industrial Park. (*Ibid.*, paras. 9.159 and 9.160)

[366]Panel Report, paras. 9.125 and 9.128.

tract of land within the territory of a granting authority can be a "designated geographical region" for the purposes of a finding of regional specificity.[367]  The Panel resolved these questions as follows:

> ... the term "certain enterprises" in Article 2.2 of the SCM Agreement refers to those enterprises located within, as opposed to outside, the designated geographical region in question, with no further limitation within the region being required.[368]

> ... a "designated geographic region" in the sense of Article 2.2 of the SCM Agreement can encompass any identified tract of land within the jurisdiction of a granting authority.[369]

406.    China has not appealed either of these interpretations by the Panel.  Accordingly, they are not before us in this appeal and we neither endorse, nor reject, the Panel's view as to the meaning of these two terms.

407.    China's appeal is of a much narrower scope.  China requests that we:  (i) find that the Panel erred in interpreting Article 2.2 of the *SCM Agreement* to permit a finding of specificity based solely on a finding that the financial contribution—rather than the *subsidy*—was geographically limited;  and (ii) reverse the Panel's finding that the existence of a "distinct regime" is relevant to a determination of specificity under Article 2.2.  We consider each of these issues in turn.

1.    The Panel's Interpretation of the Term "Subsidy" in Article 2.2

408.    The first part of China's appeal under Article 2.2 of the *SCM Agreement* concerns the Panel's finding that:

> ... it is not necessary for a granting authority or the relevant legislation to identify all elements of a specific subsidy for a valid finding of *de jure* specificity. We thus find no legal error in the USDOC having based its determination of regional specificity on the element of the financial contribution, i.e., on the provision of land-use rights by Huantai County.[370]

409.    China appeals the Panel's interpretation of the term "subsidy" in Article 2.2 of the *SCM Agreement*.  In particular, China claims that the Panel erred in its interpretation of the term "subsidy" in Article 2.2 by finding "no legal error" in the LWS investigation when the USDOC based its regional specificity determination on the element of the financial contribution, thus failing to

---

[367]Panel Report, paras. 9.126 and 9.140.
[368]Panel Report, para. 9.135.
[369]Panel Report, para. 9.144.
[370]Panel Report, para. 9.155.

identify all elements of a specific subsidy.[371]   China adds that undisputed record evidence demonstrates that the provision of land-use rights that the USDOC considered to be at less than adequate remuneration was not limited to enterprises located within the New Century Industrial Park (the "Industrial Park"), and that enterprises located outside the Industrial Park received land-use rights at the same or at a lower price.

410.   In response, the United States considers that China's claim regarding the Panel's interpretation of "subsidy" in Article 2.2 of the *SCM Agreement* is unfounded, and that China puts forth the same arguments as it did in the context of its claims of error relating to Article 2.1(a).  The United States, therefore, refers to, and relies on, its arguments advanced in relation to the Panel's analysis of Article 2.1(a).

411.   We understand that China's appeal on this point consists essentially of the same arguments as those advanced in respect of its claim under Article 2.1(a) of the *SCM Agreement*.  Specifically, China argues that "[a]s with its erroneous interpretation of Article 2.1(a)", the Panel's interpretation of Article 2.2 failed to require that there be a limitation on the access *both* to a financial contribution and to a benefit, and thus ignored "the express definition of the term 'subsidy'".[372]

412.   We note that China made the same arguments before the Panel and that, in rejecting them, the Panel simply referred to the reasons that it gave for rejecting China's interpretation of the significance of the word "subsidy" in Article 2.1(a).[373]

413.   Like the Panel, we are not persuaded by China's arguments with respect to the term "subsidy" in Article 2.1(a).   In the same way as the Panel did, we consider that our reasoning under Article 2.1(a) is sufficient to dispose of this claim of error by China under Article 2.2 of the *SCM Agreement*.  We recall that the purpose of Article 2 of the *SCM Agreement* is not to identify the elements of the subsidy as set out in Article 1.1, but to establish whether the availability of the subsidy is limited *inter alia* by reason of the eligible recipients (Article 2.1(a)) or by reason of the geographical location of beneficiaries (Article 2.2).  We also consider that a limitation on access to a subsidy may be established in many different ways and that, whatever the approach investigating authorities or panels adopt, they must ensure that the requisite limitation on access is clearly

---

[371]China's appellant's submission, para. 263.
[372]China's appellant's submission, para. 264.
[373]Panel Report, para. 9.155.  In disposing of this issue in its Article 2.2 analysis, the Panel referred to "our finding, *supra*, that it is not necessary for a granting authority or the relevant legislation to identify all elements of a specific subsidy for a valid finding of *de jure* specificity".  We understand the Panel to have been referring to the finding and reasoning set out in paragraphs 9.28-9.32 of its Report, where it addressed the same arguments made by China in the context of its Article 2.1(a) claim.

substantiated on the basis of positive evidence.  We consider that, under Article 2.2, as under Article 2.1(a), a limitation on access to a financial contribution will also limit access to any resulting benefit, since only those obtaining the financial contribution can be beneficiaries of that subsidy.[374]

414.    Accordingly, we *find* the Panel did not err in its interpretation of the term "subsidy" in Article 2.2 of the *SCM Agreement*, or in finding that the USDOC committed no legal error in basing "its determination of regional specificity on the element of the financial contribution, i.e., on the provision of land-use rights by Huantai County".[375]

2.    The Panel's Statements Regarding a "Distinct Regime"

415.    The second part of China's appeal under Article 2.2 of the *SCM Agreement* concerns certain statements by the Panel that, according to China, suggest that a subsidy would be regionally specific if it were provided as part of a "distinct regime" even if the identical subsidy were also available elsewhere.[376]

416.    The Panel scrutinized the USDOC's determination, in the LWS investigation, that the provision of land-use rights to an investigated company (Aifudi) was regionally specific because the land was physically located in a designated area (the Industrial Park) within the jurisdiction of the granting authority (Huantai County).  The Panel found that the USDOC had failed to assess whether the provision of land-use rights in the Industrial Park constituted a "distinct regime"—for instance, by virtue of price differences—compared with the land-use rights outside the Industrial Park.  The Panel further found that record evidence indicated that "there was no separate land policy for land in industrial zones, and that as long as land was for industrial use, it had to be in accordance with industrial land policy, which applied whether the land was inside or outside an industrial zone".[377]  The Panel concluded that the USDOC had not established that the provision of land-use rights (the financial contribution) was limited, within the meaning of Article 2.2, to Aifudi.

417.    We observe that, after reaching its finding that the USDOC's regional specificity determination in the LWS investigation was inconsistent with Article 2.2 of the *SCM Agreement*, the Panel expressed some qualifying statements regarding its regional specificity finding.  First, the Panel pointed out that it was not making a finding as to whether "the intrinsic geographic nature of land-use

---

[374]*Supra*, paras. 377 and 378 of this Report.
[375]Panel Report, para. 9.155.
[376]China's appellant's submission, paras. 265-270.
[377]Panel Report, para. 9.160 (referring to Panel Exhibit US-79, p. 8).

rights would always preclude a regional specificity finding in respect of the provision of land-use rights".[378]   Second, the Panel stressed that it was not making a "factual finding" as to whether the provision of land-use rights in the Industrial Park did, or did not, constitute a "unique land-use regime".   Rather, the Panel explained, it was simply observing that the USDOC had not inquired into whether such a "unique regime" existed in the Industrial Park and that, had evidence relevant to these points been placed on the USDOC record, "it might have resulted in a finding of regional specificity consistent with Article 2.2 of the SCM Agreement".[379]

418.   China takes issue with the latter statement of the Panel.   China views this statement as an endorsement of an interpretation of Article 2.2 that would lead to a subsidy being regionally specific if it is provided as part of a "distinct regime" even if the identical subsidy is available elsewhere. Alluding to the implications of such an interpretation for the United States' compliance obligations, China contends that the same subsidy does not become "a different subsidy merely because it is provided under a distinct 'program' or 'regime'".[380]   China adds that such an interpretation would defeat the clear purpose of Article 2.2 of the *SCM Agreement*.[381]

419.   The United States responds that the Panel did not make any "finding" or "legal interpretation" that the existence of a "distinct regime" is legally relevant for a specificity determination under Article 2.2 of the *SCM Agreement*, and that the Panel expressly stated that it was not making a "factual finding".   The United States submits that the scope of appellate review is limited to issues of law and legal interpretation and that, accordingly, China's appeal is not properly before the Appellate Body.   In any event, argues the United States, China's concern that the statements could have a bearing on implementation is unfounded because the Panel did not suggest ways in which the United States could implement under Article 2.2.   The United States adds that the Panel never discussed what it would have found if an identical subsidy were available elsewhere in Huantai County.[382]

---

[378]Panel Report, para. 9.162.
[379]Panel Report, para. 9.162.   The Panel found that the USDOC had not made inquiries with respect to these issues during the LWS investigation.   Therefore, the Panel clarified that depending on the outcome of those inquiries, "our conclusions as to the WTO-consistency of the USDOC's regional specificity finding in respect of the provision of land-use rights to Aifudi might have been different". (*Ibid*., para. 9.163)
[380]China's appellant's submission, para. 267.
[381]China's appellant's submission, para. 269.
[382]United States' appellee's submission, para. 245.

420.     At the outset, we note that China's appeal concerns *statements* made by the Panel in order to clarify the narrow and fact-specific nature of its finding of violation of Article 2.2 of the *SCM Agreement*.  These statements identify certain unanswered questions and posit that, *if* evidence relevant to those questions existed, and *if* it had been placed on the record before the USDOC, this "might have" resulted in a finding of regional specificity consistent with Article 2.2.[383]

421.     Whether or not these statements by the Panel can be characterized as "findings" on issues of law or legal interpretations[384], they were very much focused on the particular facts of the LWS investigation, and it is clear to us that they were *obiter* in nature.  What is not at all clear to us, however, is that these statements somehow imply, as China suggests, that the Panel considered that the mere existence of a "distinct" regime would enable a subsidy to be found to be specific to a designated geographical region, even if the identical subsidy were also available to enterprises outside that designated geographical region.  Nor do we think that the statements suggest that "the Panel would have found the alleged land-use rights subsidy to be regionally specific if it had been provided as part of a 'distinct regime', even if the identical subsidy was available elsewhere in Huantai County".[385]

422.     If anything, several elements of the Panel's reasoning appear to us to suggest the opposite. The Panel stated, for example, that evidence "of differences in land-use prices within and outside the Industrial Park, [could constitute] possible factual evidence of the existence of a separate land-use regime for the Industrial Park".[386]  The Panel criticized the USDOC for failing to make "findings as to any clear basis on which the provision of a financial contribution in the form of land-use rights differed as between land inside and outside the Park".[387]  Finally, the Panel observed that:

> ... had the USDOC made further inquiries into these or similar issues, and *depending on the outcome of those inquiries*, our conclusions as to the WTO-consistency of the USDOC's regional specificity finding in respect of the provision of land-use rights to Aifudi *might have been* different.[388]

---

[383]Panel Report, para. 9.162.
[384]We note that, although China's Notice of Appeal and appellant's submission challenge the Panel's "interpretation" of Article 2.2 of the *SCM Agreement* in this regard, the relevant paragraph of the Panel Report cited by China (paragraph 9.155) is contained in the section of the Panel Report dealing with the *application* of Article 2.2 to the USDOC's specificity determination in the LWS investigation.  Neither China's Notice of Appeal nor its appellant's submission alleges any error in the section of the Panel Report dealing with the *interpretation* of Article 2.2 (paragraphs 9.124-9.144).
[385]China's appellant's submission, para. 266.
[386]Panel Report, para. 9.160.
[387]Panel Report, para. 9.163.
[388]Panel Report, para. 9.163. (emphasis added)

423.     Accordingly, we do not accept the premise upon which the second part of China's appeal under Article 2.2 of the *SCM Agreement* is founded, and it is not necessary for us to consider it further.

424.     In the light of all of the above, we *find* that China has not established any relevant error in the Panel's interpretation of the term "subsidy" in Article 2.2, and we *reject* China's allegations of error in respect of the Panel's statement concerning a "distinct regime" in the context of the LWS investigation.[389]  We refrain from reviewing other aspects of the Panel's interpretation of Article 2.2, which have not been appealed by the participants, and on which we express no view.

## VI.     Article 14 of the *SCM Agreement*:  Calculation of the Benefit

### A.     *Article 14(d):  Benchmarks for Input Prices*

#### 1.     Introduction

425.     We now turn to China's appeal of the Panel's findings concerning the USDOC's rejection, in the CWP and LWR investigations, of in-country private prices in China as benchmarks for calculating the benefit conferred by the provision, by SOEs, of hot-rolled steel ("HRS") inputs to investigated companies.

426.     The Panel interpreted Article 14(d) of the *SCM Agreement*, relying on the Appellate Body Report in *US – Softwood Lumber IV*, and found that "nothing in that report ... would prohibit, *a priori*, a finding of market distortion, and a decision to depart from in-country private prices, where the only relevant evidence was that the government is the predominant supplier of the good."[390]  The Panel understood the Appellate Body to have stated, in *US – Softwood Lumber IV*, that "the decision to reject in-country prices as the benchmark due to the role of the government in the market for the good in question can only be made on a case-by-case basis, in accordance with the relevant evidence in the particular investigation, rather than in the abstract."[391]  The Panel then applied this interpretation of

---

[389]We recall that the Panel ultimately concluded, in paragraph 17.1(b)(ii) of its Report, that the USDOC had acted inconsistently with the obligations of the United States under Article 2.2 of the *SCM Agreement* by determining that the government provision of land-use rights, in the LWS investigation, was regionally-specific. This Panel finding is not affected by China's appeal.  China does, however, in its appeal, make a general request that we find consequential violations of Articles 10 and 32.1 of the *SCM Agreement* wherever we find a violation of a substantive obligation under the *SCM Agreement*.  Since, however, the finding of inconsistency with Article 2.2 is a finding made by the Panel, rather than by us, and since China has not appealed the Panel's application of judicial economy, in respect of China's claims of consequential violations of Articles 10 and 32.1 of the *SCM Agreement* (Panel Report, para. 17.1(d)), we need not address those claims of consequential violation.
[390]Panel Report, para. 10.45.
[391]Panel Report, para. 10.47.

Article 14(d) of the *SCM Agreement* to the USDOC's determination in the two investigations at issue and found that:

> China has not established that the USDOC acted inconsistently with the obligations of the United States under Article 14(d) of the SCM Agreement by rejecting in-country private prices in China as benchmarks for HRS in either the CWP or the LWR investigations.[392]

427.    China appeals these findings by the Panel and requests us to:  (i) find that the Panel erred in interpreting Article 14(d) of the *SCM Agreement* to permit investigating authorities to reject in-country private prices as a benchmark based solely on evidence that the government is the predominant supplier of the good in question;  (ii) reverse the Panel's finding that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 14(d) by rejecting private prices in China as benchmarks for HRS inputs;  and (iii) find that the Panel acted inconsistently with Article 11 of the DSU by attributing to the USDOC a rationale for its finding of distortion other than the rationale that appears in its published determinations.  Upon and as a consequence of such findings, China further requests that we complete the analysis in respect of China's consequential claims and find that the challenged measures are inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

428.    The United States responds that the Panel properly concluded that, under Article 14(d) of the *SCM Agreement*, evidence that the government is the predominant supplier of a good in a country is sufficient to justify rejection of in-country private prices as benchmarks for determining benefit.  Regarding China's Article 11 of the DSU claim, the United States argues that the Panel did not attribute to the USDOC a rationale or explanation other than that provided by the USDOC in its determinations.

429.    In the CWP and LWR investigations, the USDOC rejected private prices of HRS in China as benchmarks for measuring the existence and amount of benefit conferred by SOE-provided inputs of HRS.  The USDOC determined that, because China's SOEs accounted for the "overwhelming" majority of the production and sale of HRS (96.1 per cent), private prices of HRS in China were not suitable as subsidy benchmarks.[393]  The USDOC also found that China's assertions concerning factors other than government market shares were either not relevant or "did not mitigate the fact that the

---

[392]Panel Report, para. 10.61.
[393]The USDOC arrived at the 96.1 per cent figure using facts available. (Panel Report, paras. 10.49 and 10.54;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 11;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 4)

government accounted for" a significant portion of production.[394]  Having rejected private prices of HRS in China, the USDOC selected external prices as subsidy benchmarks, based on world market prices for HRS as reported in "Steel Benchmarker", an international steel industry publication.[395]

430.    In addressing China's claims under Article 14(d) of the *SCM Agreement*, we focus first on the Panel's interpretation of Article 14(d).  We then consider the Panel's findings concerning the USDOC's rejection, in the CWP and LWR investigations, of in-country private prices in China as benchmarks for HRS inputs.  Finally, we address China's claim that the Panel acted inconsistently with Article 11 of the DSU, by attributing to the USDOC a rationale for its determinations that the USDOC did not, in fact, adopt.

2.      Interpretation of Article 14(d) of the *SCM Agreement*

431.    At the outset of its analysis of Article 14(d) of the *SCM Agreement*, the Panel framed the "central legal question" before it as whether, given the findings of the Appellate Body in *US – Softwood Lumber IV*, evidence that the government was the predominant supplier of a good can be sufficient, on its own, to establish market distortion such that rejection of in-country private prices as benchmarks would be permissible under Article 14(d) of the *SCM Agreement*, or whether, alternatively, some evidence in addition to the government's share of the market for the good in question would always be required before in-country private prices could be rejected.[396]

432.    The Panel read the Appellate Body report in *US − Softwood Lumber IV* as suggesting that "the evidence of the government's predominance as supplier of the good is the central fact that must be established for a decision to depart from in-country private prices to be valid".[397]  The Panel stated that it did not consider that the Appellate Body report in *US − Softwood Lumber IV* countenanced the application of a "*per se*" rule, whereby in every case and regardless of any other evidence, the fact that a government was the predominant supplier of a particular good would be a sufficient basis for rejecting in-country private prices as a benchmark.[398]  The Panel, however, stated that it saw "nothing

---

[394]Panel Report, para. 10.53;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 65;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36.
[395]Panel Report, para. 10.50;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), pp. 11, 12, and 66;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 37.
[396]Panel Report, para. 10.38.
[397]Panel Report, para. 10.45.
[398]Panel Report, para. 10.40.

in that report that would prohibit, *a priori*, a finding of market distortion, and a decision to depart from in-country private prices, where the only relevant evidence was that the government is the predominant supplier of the good".[399]

433.    China contests the Panel's understanding of Article 14(d) and of the Appellate Body report in *US – Softwood Lumber IV*.  China asserts that, in *US – Softwood Lumber IV*, the Appellate Body concluded that evidence of "significant" or "predominant" government market share is insufficient, on its own, to demonstrate the distortion of private prices.  The Panel's reasoning, in contrast, implies that an investigating authority's finding that the government is a "predominant", rather than a "significant", supplier would be legally sufficient, on its own, to reject private market prices as a benchmark under Article 14(d).[400]  China stresses that the Appellate Body could not have meant to establish such a *per se* rule.  According to China, the Appellate Body stated, in *US – Softwood Lumber IV*, that the determination of whether private prices are distorted because of the government's predominant role in the market must be made on a case-by-case basis according to the particular facts underlying each investigation.  China contends that such a "case-by-case" determination would be unnecessary if the government's predominant role were sufficient to establish distortion.  China adds that nothing in the Appellate Body's interpretation of Article 14(d) suggests that there is some quantitative threshold of "predominance" at which a finding of "distortion" can be inferred in the absence of any other evidence.

434.    In the view of the United States, the Panel properly interpreted Article 14(d) and, consistent with a correct understanding of the Appellate Body's interpretation of that provision in *US – Softwood Lumber IV*, properly concluded that evidence that the government is the predominant supplier of a good in a country is sufficient to justify the rejection of in-country private prices as benefit benchmarks.  According to the United States, there is no requirement in Article 14(d) to establish price distortion, in addition to the predominance of the government in the market, before resorting to out-of-country benchmarks.

---

[399]Panel Report, para. 10.45.
[400]China's appellant's submission, para. 297.

435.    Article 14 of the *SCM Agreement* states in relevant part:

> For the purpose of Part V, any method used by the investigating authority to calculate the benefit to the recipient conferred pursuant to paragraph 1 of Article 1 shall be provided for in the national legislation or implementing regulations of the Member concerned and its application to each particular case shall be transparent and adequately explained.  Furthermore, any such method shall be consistent with the following guidelines:
>
> ...
>
> (d)      the provision of goods or services or purchase of goods by a government shall not be considered as conferring a benefit unless the provision is made for less than adequate remuneration, or the purchase is made for more than adequate remuneration.  The adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service in question in the country of provision or purchase (including price, quality, availability, marketability, transportation and other conditions of purchase or sale).

436.    Article 14 deals with the "Calculation of the Amount of a Subsidy in Terms of the Benefit to the Recipient".[401]  The Appellate Body found, in *Canada – Aircraft*, that a government financial contribution confers a benefit if the "'financial contribution' makes the recipient 'better off' than it would otherwise have been, absent that contribution", and that "the marketplace provides an appropriate basis for comparison".[402]  According to Article 14(d), this benefit is to be found when a recipient obtains goods from the government for "less than adequate remuneration", and such adequacy is to be evaluated in relation to prevailing market conditions in the country of provision.

437.    In *US – Softwood Lumber IV*, the Appellate Body found that, taken together, the terms of Article 14 "establish mandatory parameters within which the benefit must be calculated, but they do

---

[401]We observe that China's Accession Protocol also addresses the issue of benchmarks under Article 14 of the *SCM Agreement*.  Specifically, Section 15(b) affords importing WTO Members investigating Chinese imports additional flexibility in the methodology used to identify and measure subsidy benefits, if there are "special difficulties" in the usual application of, *inter alia*, Articles 14(b) and 14(d) of the *SCM Agreement*, and recognizes "the possibility that prevailing terms and conditions in China may not always be available as appropriate benchmarks."  Yet, the same provision also specifies that, in applying such methodologies, the importing Member should, "where practicable, ... adjust such prevailing terms and conditions before considering the use of terms and conditions prevailing outside China."  We note that, in its request for the establishment of the Panel, China raised claims under Section 15(b) and (c) of its Accession Protocol in connection with all the instances in which the USDOC resorted to a benchmark outside of China for the purpose of determining the existence and amount of any alleged subsidy benefit.  China did not, however, pursue these claims before the Panel, "reserv[ing] its right to present arguments under Section[] 15(b) and (c) of its Protocol in the event that the United States invoked the disciplines contained therein".  After both parties confirmed to the Panel that they were not seeking a ruling by the Panel under Section 15 of China's Accession Protocol, the Panel decided not to address this provision. (Panel Report, paras. 10.9-10.12)

[402]Appellate Body Report, *Canada – Aircraft*, para. 157.

not require using only one methodology for determining the adequacy of remuneration for the provision of goods by a government".  Moreover, "the use of the term 'guidelines' in Article 14 suggests that paragraphs (a) through (d) should not be interpreted as 'rigid rules that purport to contemplate every conceivable factual circumstance'."[403]

438.     Returning to the issue raised by China in this appeal, we recall that, in *US – Softwood Lumber IV*, the Appellate Body posed and answered several questions with respect to the interpretation of Article 14(d), including two that are of particular relevance here.  First, the Appellate Body asked whether that provision permits investigating authorities to use a benchmark other than private prices in the country of provision for determining if goods have been provided by a government for less than adequate remuneration.  The Appellate Body answered that question in the affirmative, albeit subject to a number of qualifications.  The Appellate Body considered that an interpretation of Article 14(d) that required the use of private prices in the country of provision as the exclusive benchmark in all situations would frustrate the purpose of Article 14, as well as the object and purpose of the *SCM Agreement*.[404]  The Appellate Body found, instead, that "prices in the market of the country of provision are the primary, but not the exclusive, benchmark for calculating benefit".[405]

439.     Second, the Appellate Body addressed the question of *when* investigating authorities may use a benchmark other than private prices in the country of provision.  The Appellate Body emphasized that such circumstances are "very limited"[406] and found that:

> ... an investigating authority may use a benchmark other than private prices of the goods in question in the country of provision, when it has been established that those private prices are distorted, because of the predominant role of the government in the market as a provider of the same or similar goods.[407]

440.     China considers that these findings stand for the proposition that an investigating authority is *always* required to analyze factors other than the government's market share as evidence that private prices are distorted in the market.  China's argument, in this regard, relies upon the Appellate Body's statements, in *US – Softwood Lumber IV*, that "an allegation that a government is a significant

---

[403]Appellate Body Report, *US – Softwood Lumber IV*, para. 92.
[404]Appellate Body Report, *US – Softwood Lumber IV*, para. 95.  The Appellate Body referred to the situation in which the government's role in providing the financial contribution is so predominant that it effectively determines the price at which private suppliers sell the same or similar products, so that the comparison contemplated by Article 14(d) would become circular. (*Ibid.*, para. 93)
[405]Appellate Body Report, *US – Softwood Lumber IV*, para. 97.  See also para. 96.
[406]Appellate Body Report, *US – Softwood Lumber IV*, para. 102.
[407]Appellate Body Report, *US – Softwood Lumber IV*, para. 103.

supplier would not, on its own, prove distortion and allow an investigating authority to choose a benchmark other than private prices in the country of provision" and that "[t]he determination of whether private prices are distorted because of the government's predominant role in the market, as a provider of certain goods, must be made on a case-by-case basis, according to the particular facts underlying each countervailing duty investigation."[408]

441.     According to China, in these two statements, the Appellate Body used the concepts of the government as a "significant supplier" and of "the government's predominant role in the market, as a provider" interchangeably.   China, therefore, faults the Panel for understanding otherwise.   We, however, like the Panel, view the Appellate Body in *US – Softwood Lumber IV* as having intended to use the terms "predominant" and "significant" to refer to two different sets of circumstances, and not as interchangeable concepts.   We read that Appellate Body report as indicating that, if the government is a significant supplier, this fact alone cannot justify a finding that prices are distorted.   Instead, where the government is the predominant supplier, it is *likely* that private prices will be distorted, but a case-by-case analysis is still required.

442.     Several elements of the Appellate Body's reasoning in that appeal support this view.   Notably, the Appellate Body considered that, as far as market distortion and effect on prices are concerned, "there may be little difference between situations where the government is the sole provider of certain goods and situations where the government has a predominant role in the market as a provider of those goods".   The Appellate Body reasoned that "[w]henever the government is the predominant provider of certain goods, even if not the sole provider, it is *likely* that it can affect through its own pricing strategy the prices of private providers for those goods."[409]

443.     This reasoning, in our view, excludes the application of a *per se* rule, according to which an investigating authority could properly conclude in every case, and regardless of any other evidence, that the fact that the government is the predominant supplier means that private prices are distorted. At the same time, we do not consider that, in cases in which the government is the "predominant" supplier, an investigating authority would be required to conduct the same type of analysis as in cases where the government is only a "significant" supplier.   In both cases, the investigating authority would have to reach its conclusions based on all the evidence that is put on the record, including evidence regarding factors other than government market share.   However, when the government is a "significant" supplier, evidence pertaining to factors other than government market share will be

---

[408]Appellate Body Report, *US – Softwood Lumber IV*, para. 102.
[409]Appellate Body Report, *US – Softwood Lumber IV*, para. 100. (emphasis added)

needed, as the government's role as a significant supplier cannot, on its own, prove distortion of private prices.

444.    With this, we are not suggesting that there is a threshold above which the fact that the government is the predominant supplier in the market alone becomes sufficient to establish price distortion, but clearly, the more predominant a government's role in the market is, the more *likely* this role will result in the distortion of private prices.   Moreover, we note that the concept of predominance does not refer exclusively to market shares, but may also refer to market power.   We consider this conclusion to be consistent with the statement of the Appellate Body in *US – Softwood Lumber IV* that, when the "government's role in providing the financial contribution is *so predominant* that it effectively determines the price at which private suppliers sell the same or similar goods, ... the comparison contemplated by Article 14 would become circular".[410]   Such influence on prices presupposes that sufficient market power exists.

445.    The Panel stated that "nothing in [the *US – Softwood Lumber IV*] report ... would prohibit, *a priori*, a finding of market distortion, and a decision to depart from in-country private prices, where the only relevant evidence was that the government is the predominant supplier of the good."[411]   We do not read this statement by the Panel as endorsing a *per se* rule based on the government's role as the predominant supplier of the good.   To the contrary, we understand the Panel's reasoning to mean that evidence that the government is the predominant supplier may ultimately lead to a finding of market distortion, depending on the circumstances of the case, including how predominant the government's role is and the evidence pertaining to factors other than government market share that is on the record and that must be considered.   In this respect, we note that the Panel stated, relying on the Appellate Body report in *US – Softwood Lumber IV*, that "the decision to reject in-country prices as the benchmark due to the role of the government in the market for the good in question can only be made on a case-by-case basis, in accordance with the relevant evidence in the particular investigation, rather than in the abstract."[412]   We disagree, therefore, with China that the Panel understood the Appellate Body report in *US – Softwood Lumber IV* as establishing a *per se* rule, according to which an investigating authority can reject private prices based only on a finding that the government is the predominant supplier in the market.[413]

---

[410]Appellate Body Report, *US – Softwood Lumber IV*, para. 93. (emphasis added)
[411]Panel Report, para. 10.45.
[412]Panel Report, para. 10.47 (referring to Appellate Body Report, *US – Softwood Lumber IV*, para. 102).
[413]The Panel expressly agreed with China that the Appellate Body report in *US – Softwood Lumber IV* does not establish a *per se* rule of predominance. (Panel Report, para. 10.40)

446.     In sum, we are of the view that an investigating authority may reject in-country private prices if it reaches the conclusion that these are too distorted due to the predominant participation of the government as a supplier in the market, thus rendering the comparison required under Article 14(d) of the *SCM Agreement* circular.  It is, therefore, price distortion that would allow an investigating authority to reject in-country private prices, not the fact that the government is the predominant supplier *per se*.  There may be cases, however, where the government's role as a provider of goods is so predominant that price distortion is likely and other evidence carries only limited weight.  We emphasize, however, that price distortion must be established on a case-by-case basis and that an investigating authority cannot, based simply on a finding that the government is the predominant supplier of the relevant goods, refuse to consider evidence relating to factors other than government market share.

447.     In the light of the above, we do not consider that the Panel interpreted Article 14(d) of the *SCM Agreement* as permitting the rejection of in-country private prices as benchmarks through the application of a *per se* rule based on the role of the government as the predominant supplier of the goods.  Rather, the Panel correctly interpreted Article 14(d) of the *SCM Agreement* as requiring that the issue of whether in-country private prices are distorted such that they cannot meaningfully be used as benchmarks is one that must be determined on a case-by-case basis, having considered evidence relating to other factors, even in situations where the government is the predominant supplier in the market.

> 3.     The Panel's Assessment of the USDOC's Determination to Reject In-Country Private Prices in China as Benchmarks for HRS Inputs

448.     Having concluded that the Panel correctly interpreted Article 14(d) of the *SCM Agreement* as permitting the rejection of in-country private prices if these are too distorted, we now turn to the Panel's assessment of the USDOC's decision to reject Chinese in-country private prices for HRS inputs in the CWP and LWR investigations.

449.     The Panel disagreed with China that, in the investigations at issue, the USDOC applied a "*per se*" rule based on the government's predominant role as a supplier of the goods.  The Panel considered that, "given the extensive summaries and discussion contained in the determinations, it is clear that the USDOC received from parties on both sides of the investigation, and considered, arguments and evidence relevant to the role of the government in the Chinese HRS market."[414]  The Panel noted that "[t]he fact that the USDOC ultimately did not find that ... other information led to the

---

[414]Panel Report, para. 10.55.

conclusion that government predominance did not distort the market provides no indication ... that a *'per se'* rule was applied in these investigations."[415]   The Panel concluded that China had not established that the USDOC had acted inconsistently with the obligations of the United States under Article 14(d) of the *SCM Agreement* by rejecting in-country private prices in China as benchmarks for HRS in either the CWP or the LWR investigations.[416]

450.    China claims that, in the CWP and LWR investigations, the USDOC's rejection of Chinese market prices as benchmarks was predicated exclusively on evidence relating to the market share of SOE suppliers of HRS.  China submits that it placed evidence on the record of the CWP and LWR investigations concerning the actual nature and structure of the Chinese HRS industry which, in its view, demonstrated that, in spite of government market share, the market was functioning and prices were not distorted.  China asserts, in particular, that it demonstrated, on the basis of undisputed facts, that:  (i) SOE producers of HRS are profitable;  (ii) private investment in the Chinese HRS industry has been growing;  (iii) many SOE producers of HRS are publicly listed corporations that operate under the same Chinese company law as companies with no State ownership;  (iv) the Chinese HRS market is heavily fragmented, with numerous SOE and non-SOE suppliers competing for sales;  (v) there is no uniform or government-set price for HRS;  and (vi) prices for HRS fluctuate by producer, by time, and by region.

451.    In both the CWP and LWR determinations, the USDOC found, relying at least to some extent on facts available, that SOEs produced 96.1 per cent of all HRS produced in China and that all the SOE suppliers are majority owned by the government.[417]  China did not contest these determinations by the USDOC before the Panel.[418]  We also note that, according to the USDOC's determinations, the remaining market shares are taken up mainly by imports (3 per cent) and that the USDOC considered using prices of imported HRS as a possible benchmark under Article 14(d) of the *SCM Agreement*, but concluded that "import quantities of HRS were small relative to the Chinese domestic production" and that, therefore, "unit values of imports into China were not sufficient to serve as reliable benchmarks".[419]

452.    The USDOC also reproduced the arguments made by China and by the respondents based on factors other than government market share.  The USDOC concluded, however, that, "because of the government's overwhelming involvement in [China's] HRS market, the use of private producer prices

---

[415]Panel Report, para. 10.56.
[416]Panel Report, para. 10.61.
[417]Panel Report, paras. 8.128, 8.129, 10.54, and 10.55.
[418]Panel Report, para. 10.55.
[419]Panel Report, para. 10.54.

in China would be akin to comparing the benchmark to itself" and that, therefore, private prices in China could not be used to determine the adequacy of remuneration.[420]

453.     We recall that, while a government's predominant role as a supplier in the market makes it "likely" that private prices will be distorted, whether this is the case must be established "on a case-by-case basis, according to the particular facts underlying each countervailing duty investigation".[421] As explained above, we read this statement by the Appellate Body in *US – Softwood Lumber IV* to suggest that, even in cases in which the government is the predominant supplier, an investigating authority may not establish distortion of prices without considering evidence of other factors that have been presented to the authority as evidence.  Instead, an investigating authority should always consider all evidence regarding other factors on the record, but the extent to which such evidence carries weight depends on how predominant the government's role is and on the relevance of other factors.

454.     Although the Panel refers to "extensive summaries and discussion contained in the determinations"[422], the USDOC's consideration of any evidence other than government market share appears to have been somewhat cursory and largely limited to the conclusion that such evidence was either irrelevant or insufficient to override the distortion caused by the government's overwhelming involvement in the market.  In *US – Softwood Lumber IV*, the Appellate Body considered that a government may be so predominant as to effectively determine private prices.  In this case, therefore, the key issue is whether the Panel erred in finding that a reasonable and objective investigating authority could reach the conclusion that in-country private prices were unreliable benchmarks, based on evidence that the government accounted for 96.1 per cent of HRS production in China and a somewhat cursory examination of evidence relating to other characteristics of the market.

455.     We observe that, with 96.1 per cent market share, the position of the government in the market is much closer to a situation where the government is the sole supplier of the goods than to the situation where it is merely a significant supplier of the goods.  This, in our view, makes it *likely* that the government as the predominant supplier has the market power to affect through its own pricing strategy the pricing by private providers for the same goods, and induce them to align with government prices.  In such a situation, evidence of factors other than government market share will have less weight in the determination of price distortion than in a situation where the government has only a "significant" presence in the market.  Thus, while it is true that the USDOC's consideration of

---

[420]CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), pp. 64 and 65;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36.
[421]Appellate Body Report, *US – Softwood Lumber IV*, para. 102.
[422]Panel Report, para. 10.55.

factors other than government market share in the CWP and LWR investigations was somewhat cursory, this must be contrasted with the USDOC's finding that, with 96.1 per cent market share, the government had an "overwhelming" involvement in the HRS market.[423]  We further observe that the Panel also discussed the USDOC's analysis of the role of imports in the market, noting that the USDOC had concluded that import quantities (3 per cent of the market) were small relative to State-owned production of HRS.[424]

456.     In the present dispute, it seems to us that, given the evidence regarding the government's predominant role as the supplier of the goods, that is, the 96.1 per cent market share, and having considered evidence of other factors, the Panel properly concluded that the USDOC could, consistently with Article 14(d) of the *SCM Agreement*, determine that private prices were distorted and could not be used as benchmarks for assessing the adequacy of remuneration.

457.     China asserts that the USDOC disregarded evidence submitted by the respondents regarding factors other than government market share.  However, the Panel found that "the USDOC received from parties on both sides of the investigation, and considered, arguments and evidence relevant to the role of the government in the Chinese HRS market"[425] and that, in both determinations, "the USDOC considered and rejected as unpersuasive"[426] arguments regarding factors other than government market share submitted by the respondents.

458.     In the light of the above, we do not consider that the Panel committed legal error in applying its interpretation of Article 14(d) to the USDOC's determinations in the CWP and LWR investigations.  We, therefore, *uphold* the Panel's finding, in paragraph 17.1(c)(vi) of the Panel Report[427], that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 14(d) of the *SCM Agreement* by rejecting in-country private prices in China as benchmarks for HRS in the CWP and LWR investigations.  Having upheld this finding, it is unnecessary to address China's consequential claims under Articles 10 and 32.1 of the *SCM Agreement*.

4.     Article 11 of the DSU

459.     China claims that the Panel appears to have attributed to the USDOC a rationale that the USDOC did not adopt.  China contends that the "rationale or explanation" provided by the USDOC in

---

[423]Panel Report, paras. 10.49, 10.54, and 10.64.
[424]Panel Report, para. 10.27.
[425]Panel Report, para. 10.55.
[426]Panel Report, para. 10.53.
[427]See also Panel Report, para. 10.61.

its determinations was based exclusively on government market share, and it was solely on this basis that the Panel could examine the consistency of these determinations with the covered agreements. Thus, in China's view, to the extent that the Panel attributed to the USDOC an implicit "consideration" of other factors and evidence, this was inconsistent with the Panel's obligation under Article 11 of the DSU to limit its examination to the USDOC's stated rationale.  China argues that, if the Panel's view was that the USDOC not merely received and considered, but expressly relied upon, the arguments and evidence relating to factors other than the government's market share, such view is incorrect.

460.     As explained above, the Panel found that the USDOC did not apply a *per se* rule based on the government's predominant role as the supplier of the goods in rejecting Chinese HRS private prices as benchmarks.  The Panel first found that the USDOC determined the figure of 96.1 per cent SOEs market share, based on facts available, because China had failed to provide information regarding the total amount of domestically produced HRS.  Then, the Panel noted that the USDOC "received" and "considered" evidence relating to China's arguments, including the factors set out above, to determine "the role of the government in the Chinese HRS market".[428]

461.     The question before us is, therefore, whether the Panel attributed to the USDOC a rationale that was not set out in the CWP and LWR determinations, rather than analyzing the rationale that the USDOC set out in those determinations.  In this respect, we recall that, as clarified by the Appellate Body in previous disputes, under Article 11 of the DSU, "[a] panel's examination of those conclusions must be critical and searching, and be based on the information contained in the record and the *explanations given by the authority in its published report*."[429]  The Appellate Body has also clarified that during panel proceedings a Member is precluded from providing an *ex post* rationale to justify the investigating authority's determination.[430]

462.     We recall that the USDOC reproduced the arguments made by China and by the respondents based on factors other than government market share, but it disagreed that it must "'look beyond the degree of state-ownership' [of the HRS industry in China] and consider the actual nature and structure of the HRS industry".[431]  The USDOC concluded that China's assertions that there is no single government set price, that the HRS industry is highly fragmented, that SOEs operate as private companies, that private investment is growing, and that prices fluctuate from day-to-day across

---

[428]Panel Report, para. 10.55.
[429]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93. (emphasis added)
[430]Appellate Body Report, *Japan – DRAMS (Korea)*, para. 159.
[431]Panel Report, footnote 480 to para. 10.25 and para. 10.53;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 65;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36.

regions, "did not mitigate the fact that the government accounted for" a significant portion of production.[432]  Moreover, the USDOC stated that "the profitability of state-owned HRS producers was irrelevant for determining whether HRS was provided for less than adequate remuneration".[433]

463.     This review of the reasons reflected in the USDOC determinations demonstrates that there was an express basis in those determinations that supports the Panel's statement that the USDOC "received and considered" evidence pertaining to factors other than government market share.  The USDOC reproduced the respondents' arguments relating to these factors, considered them, albeit in a cursory fashion, and then found that they either were not relevant to the question of price distortion or did not mitigate the fact that the government was the predominant supplier, accounting for 96.1 per cent of HRS production.  This, in our view, is sufficient to conclude that the USDOC "received and considered" evidence, and ultimately reached the conclusion that this evidence was not relevant.  In these circumstances, we do not consider that the Panel attributed to the USDOC a rationale that was not contained in the USDOC's determinations.

464.     In the light of the above, we are of the view that the Panel did not attribute to the USDOC a rationale that was not in the CWP and LWR determinations, and, therefore, did not act inconsistently with Article 11 of the DSU.

        B.      *Article 14(b):  Benchmarks for Loans*

                1.      Introduction

465.     We now turn to China's appeal of the Panel's findings concerning the USDOC's rejection, in the CWP, LWS, and OTR investigations, of interest rates in China as benchmarks, and the use of an external proxy benchmark, to determine whether Chinese renminbi ("RMB")-denominated loans provided by SOCBs conferred a benefit in accordance with Article 14(b) of the *SCM Agreement*.[434]

466.     The Panel interpreted Article 14(b) of the *SCM Agreement* and considered that "inherent in Article 14(b), as in Article 14(d), is sufficient flexibility to permit the use of a proxy in place of

---

[432]Panel Report, paras. 10.53 and 10.54;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 65;  and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36.
[433]Panel Report, para. 10.53;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 65; and LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 36.
[434]Before the Panel, China also raised a claim in respect of the benefit benchmark used by the USDOC for loans denominated in United States dollars. (Panel Report, paras. 10.1, 10.8, 10.85, and 10.210)  The Panel found that the USDOC had acted inconsistently with the obligations of the United States under Article 14(b) of the *SCM Agreement* by using average annual interest rates as benchmarks for United States dollar-denominated loans from SOCBs in the OTR investigation (*ibid.*, para. 17.1(c)(viii);  see also para. 10.219).  This finding has not been appealed.

observed rates in the country in question where no 'commercial' benchmark can be found".[435]  The Panel then applied its interpretation of Article 14(b) of the *SCM Agreement* to the USDOC's determinations in the three investigations at issue.  With respect to the USDOC's rejection of interest rates in China, the Panel found that:

> ... China has not established that the USDOC's decision not to rely on Chinese interest rates as benchmarks for SOCB loans denominated in RMB was inconsistent with the obligations of the United States under Article 14(b) of the SCM Agreement.[436]

467.    With respect to the use by the USDOC of a proxy benchmark to calculate benefit under Article 14(b) of the *SCM Agreement*, the Panel found that:

> ... China has not established that the benchmark actually used by the USDOC to calculate the benefit from RMB-denominated SOCB loans was inconsistent with the obligations of the United States under Article 14(b) of the SCM Agreement.[437]

468.    China appeals these findings by the Panel and requests us to:  (i) reverse the Panel's finding that China did not establish that the United States acted inconsistently with its obligations under Article 14(b) of the *SCM Agreement* by rejecting interest rates in China as benchmarks to calculate the benefit conferred by RMB-denominated loans;  (ii) reverse the Panel's finding that China did not establish that the benefit benchmark that the USDOC actually used was inconsistent with Article 14(b) of the *SCM Agreement*;  and (iii) find that the Panel acted inconsistently with Article 11 of the DSU by failing to assess the conformity of the benchmark used by the USDOC with the legal requirements of Article 14(b).  Upon and as a consequence of such findings, China requests that we complete the analysis in respect of China's consequential claims under Articles 10 and 32.1 of the *SCM Agreement* and find that the challenged measures are inconsistent with these provisions.

469.    The United States considers that the Panel properly interpreted Article 14(b) of the *SCM Agreement* as permitting the use of proxies, including loans denominated in a different currency, and requests us to uphold the Panel's interpretation of this provision.  The United States considers that the Panel correctly found that the USDOC's rejection of interest rates in China as benchmarks in the CWP, LWS, and OTR investigations as well as the benchmark used by the USDOC were consistent with Article 14(b) of the *SCM Agreement*.  The United States also contends that the Panel did not act inconsistently with Article 11 of the DSU.

---

[435]Panel Report, para. 10.130.
[436]Panel Report, para. 10.148.
[437]Panel Report, para. 10.209.

470.     In the CWP, LWS, and OTR countervailing duty investigations, the USDOC rejected interest rates from all sources of loans in China as benchmarks for measuring the existence and amount of benefit conferred by SOCB-provided loans, because of pervasive government intervention in the banking sector, which created significant distortions, restricting and influencing even foreign banks within China.  Having rejected interest rates in China as benchmarks, the USDOC resorted to an external benchmark.  Specifically, the USDOC constructed, using a regression-based methodology, an interest rate benchmark based on inflation-adjusted interest rates of a group of countries with a gross national income ("GNI") similar to that of China (the "USDOC's proxy benchmark").[438]  Relying on its previous findings in CFS Paper, the USDOC justified this approach on the basis of a "broad inverse relationship" between income levels and real interest rates.[439]

2.     Interpretation of Article 14(b) of the *SCM Agreement*

471.     We begin our review with the Panel's interpretation of Article 14(b).  According to the Panel, the "central question of legal interpretation ... is whether, and if so under what circumstances, Article 14(b) of the SCM Agreement permits the rejection of in-country interest rates as benchmarks for government-provided loans."[440]  The Panel viewed the situation under Article 14(b) "as analogous to that analyzed by the Appellate Body in *US – Softwood Lumber IV* (government predominance as a supplier of a good)", and concluded that "in Article 14(b), as in Article 14(d), [there] is sufficient flexibility to permit the use of a proxy in place of observed rates in the country in question where no 'commercial' benchmark can be found".[441]

472.     China requests us to find that the Panel erred in its interpretation of Article 14(b) of the *SCM Agreement*.  For China, the central question of legal interpretation before the Panel was what constitutes a "comparable commercial loan which the firm could actually obtain on the market", rather than the question identified by the Panel, namely, "whether, and if so under what circumstances, Article 14(b) of the SCM Agreement permits the rejection of in-country interest rates as benchmarks

---

[438]Panel Report, para. 10.193.  In each investigation, the USDOC noted that the regression-based methodology used was the same as the methodology used in its CFS Paper determination.  In CFS Paper, the USDOC used interest rate, inflation, and governance quality data for 33 lower-middle-income market economy countries.  By running regressions of these countries' real (inflation-adjusted) interest rates on their respective composite governance indicators, the USDOC derived models to estimate a country's real interest rate based on its governance indicators.  The USDOC then factored China's composite governance indicators into these equations to calculate a benchmark real interest rate. (See CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), pp. 6-8)

[439]Panel Report, para. 10.193;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), pp. 7 and 8;  LWS Issues and Decision Memorandum (Panel Exhibit CHI-3), pp. 12 and 13;  and OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), pp. 7 and 8.

[440]Panel Report, para. 10.105.

[441]Panel Report, para. 10.130.

for government-provided loans".[442]   Article 14(b) does not have an express notion of territoriality, and, therefore, the paradigm of "in the country" versus "out of the country" does not arise.   China considers that the Panel should, therefore, have asked whether the use of an external benchmark is consistent with the three essential elements that a benchmark loan must satisfy in order to be consistent with Article 14(b), namely, being a loan that is:  (i) comparable;  (ii) commercial;  and (iii) one that the firm receiving the government-provided loan could actually obtain on the market.

473.     We recall that Article 14 of the *SCM Agreement* reads, in relevant part:

> For the purpose of Part V, any method used by the investigating authority to calculate the benefit to the recipient conferred pursuant to paragraph 1 of Article 1 shall be provided for in the national legislation or implementing regulations of the Member concerned and its application to each particular case shall be transparent and adequately explained.   Furthermore, any such method shall be consistent with the following guidelines:
>
> ...
>
> (b)     a loan by a government shall not be considered as conferring a benefit, unless there is a difference between the amount that the firm receiving the loan pays on the government loan and the amount the firm would pay on a comparable commercial loan which the firm could actually obtain on the market.   In this case the benefit shall be the difference between these two amounts.

474.     Article 14(b) provides that, in calculating the amount of the benefit resulting from a financial contribution in the form of a loan, the benchmark to be used is "a comparable commercial loan which the firm could actually obtain on the market".   The Appellate Body has not previously interpreted Article 14(b) of the *SCM Agreement*.   Nonetheless, as discussed above in section VI.A. of this Report, the Appellate Body addressed the issue of benefit benchmarks with regard to Article 14(d) of the *SCM Agreement* in *US – Softwood Lumber IV*.

475.     We start by considering the constituent elements of a benchmark loan under Article 14(b), that is "comparable", "commercial", and a "loan which the firm could actually obtain on the market".

476.     A benchmark loan under Article 14(b) must be a loan that is "comparable" to the investigated government loan.   Comparable is defined as "able to be compared", "worthy of comparison", and "fit to be compared (to)".[443]   This, in our view, suggests that something can be considered "comparable",

---

[442]China's appellant's submission, para. 398 (quoting Panel Report, para. 10.105).
[443]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 468.

when there are sufficient similarities between the things that are compared as to make that comparison worthy or meaningful.  Thus, a benchmark loan under Article 14(b) should have as many elements as possible in common with the investigated loan to be comparable.  The Panel noted that, ideally, an investigating authority should use as a benchmark a loan to the same borrower that has been established around the same time, has the same structure as, and similar maturity to, the government loan, is about the same size, and is denominated in the same currency.  The Panel, however, also considered that, in practice, the existence of such an ideal benchmark loan would be extremely rare, and that a comparison should also be possible with other loans that present a lesser degree of similarity.[444]  We agree with both of these observations by the Panel.

477.    China claims that the Panel's "distortion" analysis was based on an erroneous interpretation of the word "commercial".  According to China, the Panel erred to the extent it considered that the fact that the Government of China holds ownership interests in certain banks renders all of their loans *ipso facto* "non-commercial", and points out, in this regard, that Article 14(b) requires a comparison between "the government loan in question" and a "commercial" loan, *not* a "non-governmental" loan.

478.    A loan only confers a benefit when and to the extent that it has been granted on terms that are not otherwise available in the marketplace.[445]  A key element in ensuring a meaningful comparison under Article 14(b) is that a benchmark loan be "commercial".  The comparison between an investigated loan and a commercial loan, therefore, reveals whether a benefit has been conferred, and its amount.  We observe that the term "commercial" is defined as "interested in financial return rather than artistry; likely to make a profit; regarded as a mere matter of business".[446]  Thus the term "commercial" does not speak of the identity of the provider of the loan.

479.    Although the Panel did not explicitly rule on the issue, it stated that one possible interpretation of "commercial" could be that any loan made by the government would *ipso facto* not be "commercial".  In our view, it would not be correct to conclude that any loan made by the government (or by private lenders in a market dominated by the government) would *ipso facto* not be "commercial".  We see nothing to suggest that the notion of "commercial" is *per se* incompatible with the supply of financial services by a government.  Therefore, the mere fact that loans are supplied by a government is not in itself sufficient to establish that such loans are not "commercial" and thus incapable of being used as benchmarks under Article 14(b) of the *SCM Agreement*.  An investigating

---

[444]Panel Report, para. 10.115.
[445]Appellate Body Report, *Canada – Aircraft*, paras. 155-158.
[446]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 462.

authority would have to establish that the government presence or influence in the market causes distortions that render interest rates unusable as benchmarks.

480.     Finally, a benchmark loan under Article 14(b) must be a "loan which the firm could actually obtain on the market".  The use of the conditional tense, "could", suggests that a benchmark loan under Article 14(b) need not in every case be a loan that exists or that can *in fact* be obtained in the market.  In this respect, we agree with the Panel that this refers "first and foremost" to the borrower's risk profile, that is, whether the benchmark loan is one that could be obtained by the borrower receiving the investigated government loan.[447]  Thus, we consider that Article 14(b) does not preclude the possibility of using as benchmarks interest rates on commercial loans that are not actually available in the market where the firm is located, such as, for instance, loans in other markets or constructed proxies.

481.     In interpreting Article 14(b), the Panel considered that the Appellate Body's interpretation of benchmarks under Article 14(d) in *US – Softwood Lumber IV*, as permitting the rejection of in-country private prices as benchmarks, would also apply under Article 14(b), which, unlike Article 14(a) and (d), does not set forth any "*a priori* restriction to any geographical market ... or any prohibition of any particular approach to constructing a proxy".[448]

482.     We observe that, under Article 14(b), the benchmark to measure benefit is "the amount the firm would pay on a comparable commercial loan which the firm could actually obtain on the market", while, under Article 14(d), it is the "prevailing market conditions for the good or service in question in the country of provision or purchase".  In contrast to Article 14(d), which clearly connects the relevant "market" to "the country of provision or purchase", Article 14(b) does not specify expressly any geographical or national scope for what is the relevant "market" within which a comparable commercial loan should be identified.[449]  We, therefore, agree with China that the relevant question under Article 14(b) is not whether an investigating authority may resort to an "out-of-country" benchmark as opposed to an "in-country" benchmark.  It is, rather, to what extent Article 14(b) requires strict and formalistic compliance with *all* of the conditions specified therein, even when doing so would frustrate the purpose of that provision and prevent any calculation of the

---

[447]Panel Report, para. 10.113.
[448]Panel Report, para. 10.119.
[449]We consider that Article 14(b) may well accommodate, in any given case, a conception of the relevant market as one defined on the basis of the particular product or service (a loan), as well as one defined on a geographic basis.  In some cases, the product market may be a national market, such as when loans in a particular currency are available only within a particular country.  It seems to us that the word "comparable", and some of the factors that the Panel identified as indications of comparability—the timing, structure, maturity, and currency of loans—may equally well be factors relevant to the identification of the product market as well as the geographic market for the loan.

benefit.  Thus, the relevant question is whether there is enough flexibility in Article 14(b), as the Appellate Body found that there is in Article 14(d), to allow for the use of a benchmark other than one that is always, and in every respect, "a comparable commercial loan which the firm could actually obtain on the market".

483.    We have recalled above, in addressing China's appeal of the Panel's finding under Article 14(d), that in *US – Softwood Lumber IV* the Appellate Body found that, taken together, the terms of Article 14 "establish mandatory parameters within which the benefit must be calculated, but they do not require using only one methodology for determining the adequacy of remuneration for the provision of goods by a government" and that "the use of the term 'guidelines' in Article 14 suggests that paragraphs (a) through (d) should not be interpreted as 'rigid rules that purport to contemplate every conceivable factual circumstance'."[450]  The Appellate Body further clarified that the guideline in Article 14(d) "does not require the use of private prices in the market of the country of provision in every situation", but rather, "that the method selected for calculating the benefit must relate or refer to, or be connected with, the prevailing market conditions in the country of provision, and must reflect price, quality, availability, marketability, transportation and other conditions of purchase or sale, as required by Article 14(d)."[451]  Thus, while the use of an out-of-country benchmark may be permissible in a given case, it would nevertheless have to approximate the conditions specified in Article 14(d).

484.    It seems to us that, notwithstanding the differences between Article 14(b) and (d), there may also be under Article 14(b) limited circumstances where an excessively formalistic interpretation of this provision could frustrate its purpose and prevent the calculation of the benefit.  Reading Article 14(b) as always requiring a comparison with loans denominated in the same currency as the investigated loans, even in circumstances where all loans in the same currency are distorted by government intervention, would lead to a comparison with government distorted loans, thus frustrating the purpose of Article 14(b).  If loans in a given market and in a given currency are distorted by government intervention, an investigating authority should be permitted, in certain circumstances also under Article 14(b), to use a benchmark other than "a comparable commercial loan which the firm could actually obtain on the market".  However, such a benchmark would have to approximate "a comparable commercial loan which the firm could actually obtain on the market".

---

[450]Appellate Body Report, *US – Softwood Lumber IV*, para. 92.
[451]Appellate Body Report, *US – Softwood Lumber IV*, para. 96.

485.    We observe that the Panel reasoned that the identification of an appropriate benchmark under Article 14(b) can be seen as a "series of concentric circles"[452], where the investigating authorities

---

[452]Panel Report, para. 10.118.

should first seek commercial loans to the same borrower that are identical or nearly identical to the investigated loan. As the Panel stated, it is not reasonable to assume that, when there is no actually obtainable commercial loan that is comparable in every respect, an investigating authority must conclude that there is no benchmark, and that, therefore, no benefit amount can be determined.[453] In the absence of an identical or nearly identical loan, an investigating authority should seek, in turn, other similar commercial loans held by the same borrower, then similar commercial loans granted to another borrower with a similar credit risk profile to the investigated borrower. In this process, an investigating authority will need to make adjustments to reflect differences from investigated loans, such as date of origination, size, maturity, currency, structure, or borrower's credit risk.[454] Yet, there may be situations where the actual differences between any of the existing commercial loans and the investigated government loan are so significant that it is not realistically possible to address them through adjustments. In such situations, the Panel considered that an investigating authority should be allowed to use proxies as benchmarks.[455]

486.     We agree that selecting a benchmark under Article 14(b) involves a progressive search for a comparable commercial loan, starting with the commercial loan that is closest to the investigated loan (a loan to the same borrower that is nearly identical to the investigated loan in terms of timing, structure, maturity, size and currency) and moving to less similar commercial loans while adjusting them to ensure comparability with the investigated loan.

487.     We see no inherent limitations in Article 14(b) that would prevent an investigating authority from using as benchmarks interest rates on loans denominated in currencies other than the currency of the investigated loan, or from using proxies instead of observed interest rates, in situations where the interest rates on loans in the currency of the investigated loan are distorted and thus cannot be used as benchmarks. In fact, to read Article 14(b) as imposing such limitations on the selection of a benchmark would potentially frustrate the purpose of that provision, as no suitable benchmarks could be identified in situations where the interest rates on loans in a given currency were distorted by government presence or influence in the market and no loan in that currency exists in other markets. We further note that, as already discussed above, the possibility of resorting to a proxy under Article 14(b) is consistent with the use of the conditional tense: "*would* pay" and "*could* actually obtain on the market". In the absence of an actual comparable commercial loan that is available on the market, an investigating authority should be allowed to use a proxy for what "would" have been paid on a comparable commercial loan that "could" have been obtained on the market.

---

[453]Panel Report, para. 10.116.
[454]Panel Report, para. 10.118.
[455]Panel Report, para. 10.119.

488.     We also consider that the further away an investigating authority moves from the ideal benchmark of the identical or nearly identical loan, the more adjustments will be necessary to ensure that the benchmark loan approximates the "comparable commercial loan which the firm could actually obtain on the market" specified in Article 14(b).  As discussed above, we consider this to be consistent with, and parallel to, the requirement affirmed by the Appellate Body in *US – Softwood Lumber IV* under Article 14(d), that, in situations where an investigating authority does not use the private prices in the market of the country of provision, it should nevertheless select a method for calculating the benefit that relates or refers to, or is connected with, the prevailing market conditions in the country of provision.[456]

489.     In sum, we consider that, in spite of the different formulations used in Article 14(b) and (d), some of the reasoning of the Appellate Body in *US – Softwood Lumber IV* concerning the use of out-of-country benchmarks and proxies under Article 14(d) is equally applicable under Article 14(b).  In particular, we are of the view that a certain degree of flexibility also applies under Article 14(b) in the selection of benchmarks, so that such selection can ensure a meaningful comparison for the determination of benefit.  At the same time, when an investigating authority resorts to a benchmark loan in another currency or to a proxy, it must ensure that such benchmark is adjusted so that it approximates the "comparable commercial loan".  Moreover, in accordance with the chapeau of Article 14, any such method, as well as how it approximates the loan in another currency or the proxy to a "comparable commercial loan which the firm could actually obtain on the market", must be transparent and adequately explained.

490.     In the light of the above, we consider that the Panel did not commit an error in the interpretation of Article 14(b) of the *SCM Agreement*, in finding that "inherent in Article 14(b), as in Article 14(d), is sufficient flexibility to permit the use of a proxy in place of observed rates in the country in question where no 'commercial' benchmark can be found".[457]

3.     The Panel's Assessment of the USDOC's Decision Not to Rely on Interest Rates in China as Benchmarks for SOCB Loans Denominated in RMB

491.     Having concluded that the Panel correctly interpreted Article 14(b) of the *SCM Agreement* as permitting the use of proxy benchmarks when interest rates in a given market are distorted, we now turn to China's claim that the Panel erred in the application of Article 14(b) of the *SCM Agreement* to the facts of this dispute.  We address, in particular, China's claim that the Panel erred in finding that China had not established that the USDOC's determinations in the CWP, LWS, and OTR

---

[456]Appellate Body Report, *US – Softwood Lumber IV*, para. 96.
[457]Panel Report, para. 10.130.

investigations not to rely on interest rates in China as benchmarks for SOCB loans denominated in RMB were inconsistent with Article 14(b).

492.    In the three investigations at issue, the USDOC relied on its previous finding in the CFS Paper investigation that the Chinese Government's intervention in the lending market distorted that market.  According to the Panel, that determination "formed the principal substantive basis"[458] for the USDOC's determinations in the three investigations at issue.  The Panel added that, in these three investigations, little new evidence relating to the Chinese Government's role in the banking sector was adduced and that such evidence did not lead the USDOC to change the assessment of the Government's role in the banking sector that it had made in CFS Paper.  Furthermore, China did not argue before the Panel that "there had been a major change in the government's role in the banking sector between the determination in the *CFS Paper* investigation and those in the CWP, LWS and OTR investigations."[459]   On this basis, the Panel proceeded to examine the USDOC's determination concerning the Chinese banking sector in the CFS Paper investigation.

493.    In respect of the USDOC's determination in CFS Paper, the Panel found that "a reasonable and objective investigating authority could have concluded that the government played a predominant role in the Chinese commercial lending market as both a lender and in terms of controlling the operation of this market, and thus distorted interest rates, such that the observed rates were not suitable as benchmarks."[460]   The Panel reached this conclusion having recalled the extensive evidence submitted, verification conducted, and analysis undertaken in the CFS Paper investigation, all of which led to and supported the USDOC's "basic finding that the Chinese government played a predominant role in the Chinese banking sector and distorted interest rates".[461]

494.    In establishing whether a lending market is distorted, and thus cannot provide a benchmark for the purpose of Article 14(b), the Panel considered that a clear distinction should be drawn "between, on the one hand, the government as the setter and implementer of the general monetary policy of a country;  and, on the other hand, the government participating as a lender and/or otherwise intervening in the lending market as such, in a way and to an extent that effectively it is the government, and not the market, that establishes the lending rates."[462]   In the Panel's view, it is the second type of government intervention that may justify a decision to reject interest rates in a given market as benchmarks under Article 14(b).

---

[458]Panel Report, para. 10.145.
[459]Panel Report, para. 10.145.
[460]Panel Report, para. 10.147.
[461]Panel Report, para. 10.146.
[462]Panel Report, para. 10.126.

495.    The Panel's analysis was based on the premise that the government's role in setting benchmark interest rates is not inconsistent with the existence of a competitive commercial lending market.  The Panel noted, however, that this is different from situations in which the government is the only lender in the country or simply dictates the lending rates to be charged by commercial banks. The Panel further noted that there may also be cases where some combination of a large government role in the market, and direct governmental control over lending rates to borrowers, may result in a situation where interest rates charged to commercial borrowers do not reflect the operation of market forces, but are distorted.[463]

496.    China argues that "the Panel failed to evaluate how the government's 'predominant role' as a commercial lender could have *any* effect on benchmark interest rates, let alone an effect that is 'clearly distinct' from the implementation of monetary policy and that would cause benchmark interest rates to be lower than they otherwise would be."[464]  In particular, China claims that the Panel erred in finding that there was a clear distinction between, on the one hand, the government's implementation of monetary policy and, on the other hand, the government participating as a lender and otherwise intervening in the lending market.  According to China, the necessary legal consequence of the Panel's "distortion" standard is that all interest rate benchmarks are "distorted", and that there is no such thing as a "commercial" loan.

497.    China submits that the Panel's analogy to the Appellate Body's decision in *US – Softwood Lumber IV* was misplaced because governments do not ordinarily establish prices for goods, whereas they do ordinarily establish "benchmark" interest rates.[465]  China further contends that neither the USDOC nor the Panel demonstrated how certain factors, such as China's regulatory limits on interest rates, the fact that observed interest rates are undifferentiated and tend to cluster around the benchmark rate determined by the central bank, and the alleged government influence over SOCBs' lending decisions had any effect on observed RMB interest rates and, in particular, how such factors caused interest rates to be lower than they otherwise would be.

498.    We do not consider that the Panel was wrong in drawing a distinction between a government's role in implementing monetary policy, on the one hand, and market distortions that may result from governmental participation and intervention in the commercial lending market, on the other hand. While the first is a necessary element of all commercial lending markets, the second may turn a

---

[463]Panel Report, para. 10.130.
[464]China's appellant's submission, para. 437. (original emphasis)
[465]China's appellant's submission, para. 464.

competitive commercial loan market into a distorted one, whose interest rates cannot be used as benchmarks under Article 14(b) of the *SCM Agreement*.

499.     We also do not share China's view that the Panel's analogy to the Appellate Body's decision in *US – Softwood Lumber IV* was misplaced because governments do not ordinarily establish prices for goods, whereas they do ordinarily establish benchmark interest rates.  As we have already explained, in our view, the government's role in implementing monetary policy does not, in and of itself, eliminate the scope for a competitive lending market.

500.     For example, governments may establish or act to influence the  "discount rate", that is, the interest rate on the loans that the central bank makes to banks.  There is, however, a fundamental difference between the discount rate and the interest rates that banks charge to individual borrowers.  The latter interest rates are based on the discount rate, but are determined by market forces.  The rate a borrower is able to obtain in the market will depend on many factors including its risk profile, the size of the loan, its structure, its maturity, as well as what the borrower is able to negotiate with the lender.  For instance, if the discount rate is set at 1 per cent, a borrower may negotiate a loan for 1,000,000 currency units over 10 years at the fixed interest rate of 4 per cent with one bank, while another bank may offer the same loan to the same borrower at 3.5 per cent.  The mere fact that central banks establish discount rates does not in itself eliminate competition among lenders and thus make commercial rates distorted.  Therefore, while it is true that governments, through their central banks, may effectively establish discount rates, by this fact alone governments do not establish the interest rates available to individual borrowers, which are, rather, determined by market forces.

501.     We further note that China accepts the proposition that, notwithstanding governments' role in setting and implementing monetary policy, a competitive commercial lending market may exist.[466]  Indeed, China argues that despite the role of the Chinese Government in setting interest rates, the Chinese market for commercial lending is competitive.[467]  In our view, therefore, the central issue in applying Article 14(b) is not whether a "clear distinction" exists in the roles of government, but rather, whether there is evidence and reasoning demonstrating that the Chinese Government, by participating in the RMB-lending market and by intervening in that market (beyond its monetary policy role), is able to and does in fact distort interest rates.

502.     We observe that the USDOC's analysis of the Chinese lending market in the three investigations at issue is very brief, but that the USDOC incorporates by reference its determination in

---

[466]China's appellant's submission, para. 409.
[467]China's appellant's submission, para. 410.

an earlier investigation, CFS Paper, where it had already analyzed the Chinese lending market.  The Panel noted that China did not argue that there had been a major change in the government's role in the banking sector between the determination in the CFS Paper investigation and those in the CWP, LWS, and OTR investigations.[468]  We note that there was only one year's difference between the period of investigation in CWP, LWS, and OTR and the period of investigation in CFS Paper, and that, in CFS Paper, the USDOC expressly acknowledged that "banking reforms in China may be starting to take effect" and that "the scope and extent of government control over SOCBs was changing".[469]  Had a longer period of time elapsed between CFS Paper and the investigations at issue, we question whether it would have been appropriate or sufficient for the USDOC to simply incorporate by reference its earlier determination in CFS Paper, without explaining why, despite the passage of time, such determination remained valid.  As indicated above[470], we are of the view that merely incorporating by reference findings from one determination into another will normally not suffice as a reasoned and adequate explanation.

503.     In CFS Paper, the USDOC appears to have based its decision to reject interest rates in China as benchmarks under Article 14(b) of the *SCM Agreement* on several characteristics of the Chinese banking sector, including:  (i) the Chinese Government's role in the banking sector and influence on interest rates, as shown by publications by outside institutions (the Organisation for Economic Co-operation and Development and the International Monetary Fund), laws, internal documents, including, *inter alia*, published reports of Chinese banks and by statements made by various officials during verification;  (ii) the fact that lending rates were largely undifferentiated, with most loans being made at rates close to the government-set benchmark rate, which the USDOC considered to be evidence that market forces were not operating and that banks still lacked adequate risk management and analysis skills;  (iii) that foreign banks in China were subject to the same government controls as domestic banks;  and (iv) that privately owned Chinese banks accounted for a very small percentage of total lending.[471]

504.     We have explained above[472], that the Panel did not find that any loan made by the government would *ipso facto* not be commercial.  Rather, the Panel noted that the USDOC's decision to reject interest rates was not based exclusively on the Chinese Government's predominant role in the market, but also on other factors showing its influence on and distortion of interest rates.[473]

---

[468]Panel Report, para. 10.145.
[469]Panel Report, para. 10.134.
[470]See *supra*, para. 354 of this Report.
[471]Panel Report, para. 10.146.
[472]See *supra*, para. 479.
[473]Panel Report, para. 10.111.

505.     We note China's claim that, regardless of the merits of each individual factor, the Panel and the USDOC failed to explain how each of these factors had any effect on observed interest rates and, in particular, how each caused RMB interest rates to be lower than they would otherwise be.  Based on *US – Softwood Lumber IV*, China argues that, for a benchmark interest rate to be rejected under Article 14(b), an investigating authority must have explained, on the basis of positive evidence, how government intervention causes interest rates to be artificially low.

506.     We do not consider China's understanding of *US – Softwood Lumber IV* on this issue to be correct.  In *US – Softwood Lumber IV*, the Appellate Body found that, if private prices are aligned with government prices because of the government's influence, "[t]he resulting comparison of prices ... would indicate a 'benefit' that is artificially low, or even zero, such that the full extent of the subsidy would not be captured".[474]  Therefore, in *US – Softwood Lumber IV*, the Appellate Body took account of the consequences for the calculation of the *benefit* that would flow from an interpretation of Article 14(d) of the *SCM Agreement* that would require a comparison of government prices with private prices aligned to government prices.  The Appellate Body did not, however, establish a specific requirement that, to reject in-country prices, investigating authorities must show that government prices are artificially low.

507.     Similarly, under Article 14(b) of the *SCM Agreement*, a comparison would not be meaningful if the investigated loans are compared to other loans, whether private or from the government, that are distorted due to government intervention in the market.  Under Article 14(b), investigating authorities must show that government intervention as a whole distorts the market, not that each factor taken in isolation has that effect.  When such distortion is demonstrated, however, it would frustrate the purpose of Article 14 to require nevertheless that observed market rates serve as the basis for comparison and, thereby, for the calculation of the benefit.

508.     We do not consider, therefore, that the USDOC or the Panel was required to determine whether factors such as the government's predominant role as a lender, government regulation of interest rates, evidence of undifferentiated interest rates, and government influence over SOCB-lending decisions, each resulted in interest rates that were lower than they otherwise would have been. In our view, it was, as the Panel found, sufficient for the USDOC to establish that all of these factors taken together distorted the commercial lending market such that comparing the interest rates of the investigated loans with observed interest rates in the same market would not be meaningful for the purpose of Article 14(b).

---

[474]Appellate Body Report, *US – Softwood Lumber IV*, para. 100.

509.    For the reasons expressed above, we consider that the Panel did not err in finding that the USDOC's decision not to rely on interest rates in China as benchmarks was reasoned and adequate, and one that a reasonable and objective investigating authority could reach based on the record before it.  We, therefore, *uphold* the Panel's finding, in paragraph 10.148 of the Panel Report[475], that China did not establish that the USDOC's decision not to rely on interest rates in China as benchmarks for SOCB loans denominated in RMB in the CWP, LWS, and OTR investigations was inconsistent with the obligations of the United States under Article 14(b) of the *SCM Agreement*.

4.    The Panel's Assessment of the Proxy Benchmark Actually Used by the USDOC to Calculate the Benefit from RMB-Denominated SOCB Loans

510.    In the CWP, LWS, and OTR investigations, the USDOC also incorporated by reference some of its findings in the CFS Paper investigation in constructing a proxy to serve as the benchmark for calculating the benefit associated with the RMB-denominated loans from SOCBs.  This proxy was based on a regression analysis of inflation-adjusted interest rates in 33 lower-middle-income countries, on the basis of a "broad inverse relationship" that the USDOC found between income levels and lending rates.[476]  The USDOC found, based on its findings in CFS Paper, that countries with lower per capita GNI tend to have higher interest rates than countries with higher per capita GNI.[477]  In addition, and as it did in CFS Paper, the USDOC made certain adjustments to ensure the "comparability" of the proxy benchmark, relating to institutional qualities (political stability, government effectiveness, and rule of law) and inflation.[478]  The USDOC also eliminated the interest rates of non-market economies as well as those of countries whose interest rates it found to be anomalous.[479]

511.    China claims that the Panel erred in finding that the proxy benchmark actually used by the USDOC in the CWP, LWS, and OTR investigations was a "comparable commercial loan which the firm could actually obtain on the market" within the meaning of Article 14(b) of the *SCM Agreement*.  China also claims that, in assessing the conformity of the USDOC's proxy benchmark with

---

[475]See also Panel Report, para. 17.1(c)(vii).
[476]Panel Report, para. 10.193 and footnote 716 thereto.
[477]Panel Report, para. 10.193 and footnote 716 thereto;  CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), pp. 7 and 8;  LWS Issues and Decision Memorandum (Panel Exhibit CHI-3), p. 12;  OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 8;  and CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 71.
[478]Following comments made by China and by the respondents, the USDOC adjusted the benchmark countries' interest rates for inflation, so as to allow a comparison between the real cost of money in China and in the group of benchmarked countries. (Panel Report, para. 10.193;  see also CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 72)
[479]Panel Report, para. 10.207.

Article 14(b) of the *SCM Agreement*, the Panel failed to make an objective assessment of the matter, and thus acted inconsistently with Article 11 of the DSU.

512.    According to China, there was no basis on which the Panel could properly have considered that the proxy used by the USDOC—namely, a multi-currency regression model based on per capita GNI and institutional quality—was a "comparable commercial loan which the firm could actually obtain on the market".   China considers that there are three essential elements that a benchmark loan must satisfy in order to be consistent with Article 14(b), namely, it must be a loan that is: (i) comparable;  (ii) commercial;  and (iii) one that the firm receiving the government-provided loan could actually obtain on the market.   For China, the fundamental flaws in the USDOC's loan benchmark were that it was not comparable and was not one that the respondent borrowers could actually obtain on the market.

513.    We begin by addressing China's claim that the Panel acted inconsistently with Article 11 of the DSU.   Thereafter, we shall address China's claims under Article 14(b) of the *SCM Agreement*.

(a)        China's Claim under Article 11 of the DSU

514.    China claims that the Panel failed to fulfil its duties under Article 11 of the DSU because, in finding that the USDOC's benchmark was *not unreasonable*, it simply accepted the USDOC's conclusions without demanding any meaningful explanation, rather than undertaking an in-depth examination of whether the USDOC's benchmark was supported by positive evidence.[480]   China observes that the Panel saw its task as limited to "evaluat[ing] the internal logic of the methodology employed, and the soundness and appropriateness of the data relied upon by the USDOC, in constructing the proxy".[481]   China also observes that the Panel conducted—in a single paragraph—a perfunctory examination of the USDOC's benchmark and concluded that it was "not … unreasonable under the circumstances".[482]

515.    Article 11 of the DSU states in relevant part:

> ... a panel should make an objective assessment of the matter before it, including an objective assessment of the facts of the case and the applicability of and conformity with the relevant covered agreements, and make such other findings as will assist the DSB in making the recommendations or in giving the rulings provided for in the covered agreements.

---

[480]China's appellant's submission, para. 377.
[481]China's appellant's submission, para. 375 (quoting Panel Report, para. 10.206).
[482]China's appellant's submission, para. 375 (quoting Panel Report, para. 10.207).

516.     Article 11 of the DSU sets out the standard of review applicable in WTO proceedings in general, including a panel's review of the determinations of an investigating authority under the *SCM Agreement*.  On several occasions, the Appellate Body has explained that, when reviewing the determinations of national investigating authorities, a panel must neither conduct a *de novo* review nor simply defer to the conclusions of those authorities.  Rather, a panel should test whether the conclusions reached by the investigating authority are reasoned and adequate, in the light of the evidence on the record and other plausible alternative explanations.[483]  We recall the detailed guidance regarding the appropriate standard of review provided by the Appellate Body in *US – Softwood Lumber VI (Article 21.5 – Canada)* and, in particular, its explanation that a panel's examination of an investigating authority's conclusions "must be critical and searching, and be based on the information contained in the record and the explanations given by the authority in its published report".[484]  The Appellate Body indicated that a panel should not limit its analysis to the determinations of the investigating authority, and that only by verifying these determinations in the light of alternative explanations can a panel come to the positive conclusion that these are "reasoned and adequate".[485]

517.     In *US – Softwood Lumber VI (Article 21.5 – Canada)*, the Appellate Body also stated that a panel that simply tested whether the conclusions of the investigating authority were "not unreasonable" would be applying a standard of review that is too deferential and, thus, fail to engage in the type of "critical and searching analysis" called for by Article 11 of the DSU.  The Appellate Body explained that inquiring into whether an authority's finding is "not unreasonable" does not necessarily answer the question of "whether that finding is based on positive evidence rather than conjecture or remote possibility".[486]

518.     In this dispute, the Panel observed that in evaluating the proxy benchmark actually used by the USDOC, "the appropriate approach is to consider whether the methodology applied by the USDOC is one that a reasonable and objective investigating authority could use, in the particular

---

[483]See Appellate Body Report, *Argentina – Footwear (EC)*, paras. 119-121;  Appellate Body Report, *US – Cotton Yarn*, paras. 74-78;  Appellate Body Report, *US – Countervailing Duty Investigation on DRAMS*, paras. 183, and 186-188;  Appellate Body Report, *US – Hot-Rolled Steel*, para. 55;  Appellate Body Report, *US – Lamb*, paras. 101, and 105-108;  Appellate Body Report, *US – Steel Safeguards*, para. 299;  Appellate Body Report, *US – Wheat Gluten*, paras. 160 and 161;  and Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93.
[484]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 93.  See also Appellate Body Report, *US – Lamb*, para. 106.
[485]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 117.
[486]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 113.

situation found to exist in the CWP, LWS and OTR investigations".[487]   The Panel, however, subsequently considered that its task in reviewing the USDOC's proxy benchmark was limited to

---

[487]Panel Report, para. 10.205.

"evaluat[ing] the internal logic of the methodology employed, and the soundness and appropriateness of the data relied upon by the USDOC, in constructing the proxy".[488]  In explaining its approach, the Panel also noted that:  (i) in the absence of undistorted RMB interest rates in China that could be used as benchmarks, there was no point of reference in the record evidence on the basis of which it could judge the absolute value of the benchmark used[489];  and (ii) China made no arguments as to specific flaws in the USDOC's methodology that could and should have been corrected, because its argument was that no such proxy methodology based on other countries' interest rates was permissible as a matter of law.[490]

519.    We start by noting that we do not see how the Panel could have fulfilled its duties under Article 11 of the DSU through an approach that involved only an evaluation of "the internal logic of the methodology employed, and the soundness and appropriateness of the data relied upon by the USDOC, in constructing the proxy".[491]  Instead, to make an objective assessment of the matter, the Panel was also required to test the reasonableness of the methodology employed, including in the light of alternative plausible explanations.  The Panel should have verified whether the USDOC provided a reasonable explanation as to how the proxy benchmark approximated a "comparable commercial loan which the firm could actually obtain on the market" within the meaning of Article 14(b) of the *SCM Agreement*.

520.    Virtually the entirety of the Panel's reasoning regarding the consistency of the USDOC's proxy benchmark with Article 14(b) of the *SCM Agreement* is contained in paragraph 10.207 of its Report.  In this paragraph, the Panel conducted a cursory review of the USDOC's proxy benchmark and the adjustments made by the USDOC to conclude that the methodology used by the USDOC was "not unreasonable" under the circumstances of the three investigations at issue.  In particular, the Panel found that the USDOC's approach of selecting a basket of currencies was "permissible" under the circumstances of the investigation, that the USDOC's reliance on the World Bank grouping of countries in the same income category as China based on GNI per capita (lower-middle-income countries) seemed "not unreasonable", and that the adjustments made to ensure comparability were "appropriate" and "not unreasonable".

521.    In drawing its conclusions on the USDOC's determinations on the proxy benchmark, the Panel used the very language that the Appellate Body had pointed to in *US – Softwood Lumber VI (Article 21.5 – Canada)* as revealing that the panel in that dispute had not applied a sufficient degree

---

[488]Panel Report, para. 10.206.
[489]Panel Report, para. 10.205.
[490]Panel Report, para. 10.205.
[491]Panel Report, para. 10.206.

of scrutiny to the determinations of the investigating authority.  As the Appellate Body explained, inquiring into whether an authority's finding is "not unreasonable" does not necessarily answer the question of "whether that finding is based on positive evidence rather than conjecture or remote possibility".[492]

522.      The Panel appears to have suggested that it did not need to scrutinize carefully the propriety of the benchmark selected, or consider whether there were other benchmarks available that better satisfied the requisite criteria because, according to the Panel, there was no point of reference in the record evidence on the basis of which it could judge the absolute value of the benchmark used.  China made no arguments as to specific flaws in the USDOC's methodology that could, and should, have been corrected.  Instead, the Panel observed, China's "argument is that no such proxy methodology based on other countries' interest rates is permissible as a matter of law".[493]

523.      We disagree with this statement by the Panel on two levels.  First, the Panel was obliged to engage in a critical and searching review of whether the reasons put forth by the USDOC justified the proxy that it constructed, including in the light of other plausible alternatives.  This was so even if, as the Panel observed, in the absence of undistorted RMB interest rates in China that could be used as benchmarks, there was no point of reference in the record evidence on the basis of which it could judge the absolute value of the benchmark used.  The Panel could, for instance, have looked at the USDOC proxy benchmark in the light of alternative proxies based, as proposed by China before the USDOC, on countries selected based on national saving rates, rather than GNI, or in the light of a benchmark based on interest rates from a third, surrogate country.

524.      Second, it is not clear to us, on the face of the Panel Report, that China made "no arguments as to specific flaws in the USDOC's methodology that could and should have been corrected".[494]  The Panel itself noted that "China rejects the United States' assertion that its benchmark loan was 'comparable' because it was 'based upon lending rates from countries with similar [*per capita* gross national incomes] and institutional quality as measured by World Bank governance indicators'."[495]  The Panel also reproduced China's argument that "neither the USDOC nor the United States has provided any coherent explanation as to why these factors (i.e., *per capita* GNI and institutional quality) somehow relate to whether loans are 'comparable' within the meaning of Article 14(b)."[496]  Finally, the Panel indicated that, according to China, "the USDOC provided no explanation of how

---

[492]Appellate Body Report, *US – Softwood Lumber VI (Article 21.5 – Canada)*, para. 113.
[493]Panel Report, para. 10.205.
[494]Panel Report, para. 10.205.
[495]Panel Report, para. 10.195.
[496]Panel Report, para. 10.195.

'governance indicators' such as government effectiveness, regulatory quality and political stability had any bearing upon the process of interest formation or the policy choices of monetary authorities as regards the direction of monetary conditions and interest rates."[497]   In our view, these arguments that China made before the Panel were sufficient to require that the Panel engage in a robust and meaningful review of the USDOC's regression model in assessing its consistency with Article 14(b) of the *SCM Agreement*.

525.     The Panel appears to have simply accepted the USDOC's determinations and relevant supporting evidence without engaging in a critical and searching analysis, or testing the adequacy and reasonableness of the USDOC's determinations in the light of other plausible alternative explanations. For instance, the Panel characterized the USDOC's basic position that there is a "broad inverse relationship" between income levels and lending rates as "not unreasonable".  The Panel, however, did not identify any support in the record before the USDOC, or in the Panel record, for this relationship. Nor did the Panel itself test the economic underpinnings supporting the USDOC's position.  Similarly, the Panel found the USDOC's reliance on the World Bank grouping of lower-middle-income countries "not unreasonable", but did not engage in a critical discussion of why this is so, apart from stating that "this is a pre-existing grouping, not one created for the investigations".[498]  In assessing the adjustments made by the USDOC to the regression model, the Panel found them to be "appropriate" and "not unreasonable" but did not engage in a critical examination of these adjustments or of other alternative or additional adjustments the USDOC did not make, such as the adjustment for national saving rates suggested by China in the proceedings before the USDOC.

526.     We thus consider that the Panel did not conduct a sufficiently rigorous review of the USDOC's construction of its proxy benchmark.  Instead, it seems to us that in its analysis of the consistency of the USDOC's proxy benchmark with Article 14(b) of the *SCM Agreement*, the Panel adopted a standard of review that does not comport with the standard of review to be applied in countervailing duty cases.  The Panel rather passively accepted the reasons provided by the USDOC for its determinations, without engaging in a critical and searching analysis and without considering the USDOC's determinations in the light of plausible alternative explanations.

527.     In the light of the above, we *find* that the Panel failed to make an objective assessment of the matter before it as required by Article 11 of the DSU.  We, therefore, *reverse* the Panel's finding, in paragraph 10.209 of the Panel Report[499], that China did not establish that the benchmark actually used

---

[497]Panel Report, footnote 719 to para. 10.195 (quoting China's first written submission to the Panel, para. 266).
[498]Panel Report, para. 10.207.
[499]See also Panel Report, para. 17.1(c)(vii).

by the USDOC to calculate the benefit from RMB-denominated SOCB loans in the CWP, LWS, and OTR investigations was inconsistent with the obligations of the United States under Article 14(b) of the *SCM Agreement*.

> (b)   Completion of the Analysis Regarding the Consistency of the USDOC's Proxy Benchmark with Article 14(b) of the *SCM Agreement*

528.   Having reversed the Panel's finding regarding the USDOC's proxy benchmark under Article 11 of the DSU, we must now consider whether we can complete the legal analysis and rule on China's claim that such benchmark is inconsistent with Article 14(b) of the *SCM Agreement*.  When the factual findings of the panel and the undisputed facts in the panel record provide the Appellate Body with a sufficient basis for its own analysis, the Appellate Body may complete the analysis with a view to facilitating the prompt settlement of the dispute.[500]

529.   In keeping with this approach, we must ascertain whether the factual findings made by the Panel and undisputed facts in the record provide a sufficient basis for us to rule on the consistency of the USDOC's proxy benchmark with Article 14(b) of the *SCM Agreement*.  We start by observing that there are no factual findings by the Panel that could assist us in completing the analysis of this issue.  As explained above, the Panel simply restated the USDOC's reasoning and determinations without engaging in a critical and searching review.  The Panel made no findings regarding the basis for or the soundness of the elements used to construct the benchmark, nor as to how these elements reasonably approximated a comparable commercial loan that a firm could actually obtain on the market.  Thus, the Panel made no relevant findings that would assist us in completing the analysis.

530.   In the absence of any factual findings by the Panel, we turn to the Panel record to consider whether it contains any undisputed facts that would allow us to complete the analysis.  As it did in respect of its rejection of interest rates in China, in the three investigations at issue (CWP, LWS, and OTR), the USDOC relied on its previous findings in the CFS Paper investigation in constructing a proxy benchmark to establish the existence of a benefit under Article 14(b) of the *SCM Agreement*.[501]  In CFS Paper and in the three investigations at issue, China argued that an external benchmark could not be used and that the USDOC should measure the extent of the subsidy based on a benchmark comprised of lending rates within China.

---

[500]See, for example, Appellate Body Report, *Australia – Apples*, paras. 367 and 368;  Appellate Body Report, *Australia – Salmon*, paras. 117, 118, and 193;  Appellate Body Report, *Canada – Autos*, paras. 133 and 144;  Appellate Body Report, *Korea – Various Measures on Beef*, para. 128;  and Appellate Body Report, *US – Continued Zeroing*, paras. 189, and 195-197.
[501]Panel Report, para. 10.193 and footnote 716 thereto.

531.     In CFS Paper, China also argued that if the USDOC continued to reject interest rates in China as appropriate benchmarks, then the USDOC should make several changes to its methodology when constructing a proxy benchmark.  First, China argued that the USDOC should not rely on GNI to determine the appropriate basket of comparison countries, because this category developed by the World Bank—and used by the USDOC in its preliminary determination—was "outdated and, given the recent dramatic changes in China's economy, inappropriate".[502]   China contended that the USDOC's benchmark methodology was contrary to its practice in anti-dumping cases involving China, in which the USDOC had designated five countries as being at a level of economic development comparable to China in terms of GNI.  According to China, only one of those countries was included in the basket of countries used to calculate the proxy benchmark.[503]   In the OTR investigation, one of the respondents argued that many of the countries whose interest rates the USDOC used to construct its proxy benchmark were dissimilar to China in important ways.[504]

532.     China further argued in CFS Paper that, instead of relying on GNI, the USDOC should look at the national savings rate as the key variable for selecting comparable countries to construct an appropriate proxy benchmark.  Specifically, China argued—citing to a report that it had submitted to the USDOC[505]—that the national savings rate was the best proxy for the funds available to make loans in a country.  China also claimed that another key factor to consider was the inflation rate in order to determine the real cost of a loan.  China claimed that if national savings rates and inflation rates were not taken into account, the USDOC would continue to "overstate the benchmark".[506]

533.     In response to the arguments by China and by the respondents regarding the changes that it should make to its methodology for constructing an external benchmark, the USDOC maintained in CFS Paper that GNI, rather than the national savings rate, was the variable that should be used to determine the appropriate basket of comparison countries.  With respect to the adjustment of interest rates in the basket, in CFS Paper, the USDOC agreed with China that it should adjust for inflation. The USDOC explained that adjusting for inflation was a proxy for currency conversion, which would allow it to base its loan benefit calculation on comparable interest rates.  The USDOC, however, declined to adjust its proxy benchmark for levels of savings, as advocated by China.  The USDOC explained that controlling for savings would be an attempt to explain what factors might drive differences in the real cost of money across countries.  According to the USDOC, this would not be a

---

[502]See CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 64.
[503]See CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 64.
[504]See OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 102.
[505]See the Drazen Report (Panel Exhibit CHI-81).
[506]See CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 64.

useful exercise because the factors that drove lending rate formation in China were tainted by the government's domination of the financial system.[507]

534.     We observe that the record of the investigations at issue, as well as that of the CFS Paper investigation, which the USDOC relied on in the investigations at issue, reveal that China not only questioned the USDOC's entitlement to resort to an external benchmark, but that it also challenged the methodology adopted by the USDOC in constructing the proxy benchmark and suggested several changes to improve the comparability of the proxy benchmark.   As explained above, the USDOC accepted one of these suggested changes (adjustment for inflation) but rejected others.[508]

535.     Therefore, contrary to the Panel's observation at paragraph 10.205 of its Report, China not only rejected the use of a proxy methodology based on other countries' interest rates "as a matter of law", but also specifically challenged the methodology used by the USDOC in constructing the proxy benchmark by pointing to what it considered to be flaws and by suggesting changes to improve comparability.   We have already concluded that the Panel did not err in finding that the USDOC was entitled under Article 14(b) of the *SCM Agreement* to reject interest rates in China as benchmarks, if interest rates in the relevant market are distorted, and that Article 14(b) allows an investigating authority to resort to an external benchmark, including a proxy based on other countries' interest rates, provided that the proxy appropriately approximates the conditions specified in Article 14(b).

536.     We observe that, on the one hand, China challenges altogether the USDOC's entitlement to resort to an external proxy, questions the selection of countries based on GNI as not comparable, and suggests that the selection of countries, or at least adjustments to the GNI-based basket, should have been made based on national savings rates.   On the other hand, assuming that an external proxy may be used, China does not question the method of constructing a proxy based on a basket of currencies in itself and does not suggest, for instance, that the USDOC should have relied on interest rates from a single surrogate country.   China also argued that adjusting for inflation makes the proxy more comparable, and the USDOC accepted and incorporated this suggestion in its proxy benchmark. Based on the above, we consider that there are important facts on the record regarding the USDOC's proxy benchmark, which the Panel did not address and which remain disputed between the parties.

---

[507]See CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), p. 72.
[508]Panel Report, paras. 10.193 and 10.195.   See also CFS Paper Issues and Decision Memorandum (Panel Exhibit CHI-93), pp. 64 and 72.

537.     In sum, the Panel made no relevant factual findings on the USDOC's proxy benchmark that would assist us in the completion of the legal analysis.  Moreover, an analysis of the Panel's record reveals that China not only questioned altogether the legality of resorting to external benchmarks, but that it also challenged specific elements of the proxy benchmark constructed by the USDOC. Therefore, we *find* that there are insufficient undisputed facts on the Panel record regarding the USDOC's proxy benchmark to enable us to complete the legal analysis and ascertain the consistency of the USDOC's proxy benchmark with the United States' obligations under Article 14(b) of the *SCM Agreement*.

**VII.    Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994: "Double Remedies"**

        A.     *Introduction*

538.     Before the Panel, China made both "as such"[509] and "as applied"[510] claims in connection with the alleged imposition by the United States of "double remedies" resulting from the application, in each of the four sets of investigations at issue, of anti-dumping duties calculated under the United States' NME methodology simultaneously with countervailing duties on the same products.

---

[509]China claimed that the United States' failure to provide sufficient legal authority for the USDOC to avoid the imposition of double remedies when it imposes anti-dumping duties determined pursuant to its NME methodology simultaneously with the imposition of countervailing duties on the same products was inconsistent with Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Articles I:1 and VI of the GATT 1994 (Panel Report, paras. 14.11 and 14.12).  The Panel found that the measure to which these claims related and, thus, the claims fell outside its terms of reference. (*Ibid*., paras. 14.11, 14.12, 14.42, and 17.1(e)(i))

[510]Panel Report, para. 14.44.  China claimed that in each of the four sets of anti-dumping and countervailing determinations at issue:  (i) the USDOC's use of its NME methodology to determine normal value in anti-dumping determinations, concurrently with the imposition of countervailing duties on the same products, was inconsistent with Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the GATT 1994 (*ibid*., para. 14.8);   (ii) the USDOC's failure to extend to imports from China the same unconditional entitlement to the avoidance of double remedies that the USDOC extends to like products originating in other Members was inconsistent with Article I:1 of the GATT 1994 (*ibid*., para. 14.9);  and (iii) the United States had acted inconsistently with Articles 12.1 and 12.8 of the *SCM Agreement*, due to the USDOC's failure to provide interested parties notice of the information that the USDOC required to evaluate the existence of double remedies, and failure to inform China and interested parties of the essential facts under consideration that would "form the basis" for the USDOC's determinations in respect of the issue of "double remedy" (*ibid*, para. 14.10).

539.    With respect to one of China's "as applied" claims[511], the Panel found that:

> China did not establish that the United States acted inconsistently
> with its obligations under Articles 10, 19.3, 19.4, and 32.1 of the
> SCM Agreement or under Article VI:3 of GATT 1994 by reason of
> the USDOC's use of its NME methodology in the four anti-dumping
> investigations at issue and the imposition of anti-dumping duties on
> that basis concurrently with the imposition of countervailing duties
> on the same products in the four countervailing duty investigations at
> issue.[512]

540.    China appeals this finding and requests us to:  (i) find that the Panel erred in its interpretation
and application of Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of the
GATT 1994;  (ii) reverse the Panel's finding that China did not establish that the United States had
acted inconsistently with its obligations under these provisions by imposing anti-dumping duties
calculated under its NME methodology concurrently with the imposition of countervailing duties on
the same products, without taking steps to avoid offsetting the same subsidies twice;  and
(iii) complete the analysis and conclude that the USDOC acted inconsistently with the obligations of
the United States under Articles 10, 19.3, 19.4, and 32.1 of the *SCM Agreement* and Article VI:3 of
the GATT 1994, in all of the investigations at issue, by failing to take steps to avoid offsetting the
same subsidies twice.

541.    Before turning to the specific issues on appeal, we consider it useful to outline the concept of
"double remedies" at issue in this dispute.  In essence, "double remedies" may arise when both
countervailing duties and anti-dumping duties are imposed on the same imported products.  The term
"double remedies" does not, however, refer simply to the fact that both an anti-dumping and a
countervailing duty are imposed on the same product.  Rather, as explained below, "double remedies",
also referred to as "double counting", refers to circumstances in which the simultaneous application of
anti-dumping and countervailing duties on the same imported products results, at least to some extent,
in the offsetting of the same subsidization twice.  "Double remedies" are "likely" to occur in cases
where an NME methodology is used to calculate the margin of dumping.[513]

---

[511]With respect to the other "as applied" claims raised by China, the Panel found that China had not
established that the United States had acted inconsistently with its obligations under Articles 12.1 and 12.8 of
the *SCM Agreement* or under Article I:1 of the GATT 1994 (Panel Report, para. 17.1(e)(iii) and (iv)).
[512]Panel Report, para. 17.1(e)(ii).
[513]The Panel had "no difficulty" accepting:

> ... the general proposition that the use of an NME methodology likely
> provides some form of remedy against subsidisation, and therefore, that the
> simultaneous imposition of anti-dumping duties calculated under an NME
> methodology and of countervailing duties likely results in any subsidy
> granted in respect of the good at issue being offset more than once.

(Panel Report, para. 14.67)

542.     A more detailed explanation of how and why double remedies may occur is set out in paragraphs 14.67 through 14.75 of the Panel Report.  We recap the main points here.  When investigating authorities calculate a dumping margin in an anti-dumping investigation involving a product from an NME, they compare the export price to a normal value that is calculated based on surrogate costs or prices from a third country.[514]  Because prices and costs in the NME are considered unreliable, prices, or, more commonly, costs of production, in a market economy are used as the basis for calculating normal value.[515]  In the dumping margin calculation, investigating authorities compare the product's constructed normal value (not reflecting the amount of any subsidy received by the producer) with the product's actual export price (which, when subsidies have been received by the producer, is presumably lower than it would otherwise have been).  The resulting dumping margin is thus based on an asymmetric comparison and is generally higher than would otherwise be the case.[516]

543.     As the Panel explained, the dumping margin calculated under an NME methodology "reflects not only price discrimination by the investigated producer between the domestic and export markets ('dumping')", but also "economic distortions that affect the producer's costs of production", including specific subsidies to the investigated producer of the relevant product in respect of that product.[517]  An anti-dumping duty calculated based on an NME methodology may, therefore, "remedy" or "offset" a domestic subsidy, to the extent that such subsidy has contributed to a lowering of the export price.[518]  Put differently, the subsidization is "counted" within the overall dumping margin.  When a countervailing duty is levied against the same imports, the same domestic subsidy is also "counted" in the calculation of the rate of subsidization and, therefore, the resulting countervailing duty offsets the same subsidy a second time.  Accordingly, the concurrent imposition of an anti-dumping duty calculated based on an NME methodology, and a countervailing duty may result in a subsidy being offset more than once, that is, in a double remedy.  Double remedies may also arise in the context of domestic subsidies granted within market economies when anti-dumping and countervailing duties are

---

[514]Panel Report, para. 14.68.

[515]Panel Report, para. 14.68.  The use of surrogate, market economy values presumptively puts the producer in the position of having unsubsidized costs of production. (*Ibid.*, footnote 965 to para. 14.69)

[516]The asymmetry is due to the comparison of an *actual*, *subsidized* export price to a *constructed*, *unsubsidized* normal value, rather than to an actual, subsidized normal value. (Panel Report, paras. 14.69 and 14.72)

[517]Panel Report, para. 14.69.

[518]Panel Report, para. 14.70.  The potential for double remedies is even greater in the context of export subsidies, which benefit only exported goods and therefore presumably lower the export price. (*Ibid.*, footnote 972 to para. 14.72)

concurrently imposed on the same products and an unsubsidized, constructed, or third country normal value is used in the anti-dumping investigation.[519]

544.    The Panel understood the United States to have accepted the principle that double remedies may result from the concurrent imposition, on the same product, of countervailing duties and anti-dumping duties calculated using an NME methodology.[520]  The United States nevertheless argued that the existence of a double remedy depends on whether the subsidy leads to a reduction in the export price in any given instance, and contended that it cannot be presumed that domestic subsidies lower export prices pro rata, or one-for-one.[521]  The Panel was of the view that it would "be a rare case in which a subsidy ... has *no effect at all* on either the producer's costs of production or ... export prices."[522]  In any event, the Panel considered that the answer to the question of "whether a *complete* double remedy *necessarily* results from *all instances* of concurrent imposition of anti-dumping duties calculated under an NME methodology and of countervailing duties" would not "invalidate the general proposition that at least *some* double remedy will *likely* arise from the concurrent imposition of countervailing duties and anti-dumping duties calculated under an NME methodology."[523]

B.    *Interpretation of Articles 19.3 and 19.4 of the SCM Agreement and Article VI:3 of the GATT 1994*

545.    On appeal, China contends that the Panel erred in its interpretation of the relevant provisions of the *SCM Agreement* and the GATT 1994, and in reasoning that, because these provisions do not *expressly* prohibit a Member from offsetting the same domestic subsidies through the imposition of two different duties, it was the intention of the drafters to *authorize* such actions.  China emphasizes that an importing Member is under an affirmative legal obligation to ensure that it does not impose countervailing duties to offset a subsidy that is simultaneously offset through the manner in which it calculates anti-dumping duties in respect of the same imported product.  In China's view, such obligation arises from:   (i) Article 19.3 of the *SCM Agreement*, which requires investigating authorities to impose countervailing duties in the "appropriate" amounts;   (ii) Article 19.4 of the

---

[519]However, double remedies are unlikely to result in the context of domestic subsidies granted within market economies if normal value is based on domestic sales.  In such cases, both the normal value and the export price will be lowered as a result of the domestic subsidy, so that the dumping margin should not be affected. (See Panel Report, footnote 972 to paragraph 14.72)
[520]Panel Report, para. 14.71.
[521]Panel Report, footnote 968 to para. 14.71, and para. 14.73.  The United States observed that, while certain domestic production subsidies will result in increased production and a reduction in export prices, other more general subsidies may be used for other purposes (payments of dividends, severance payments, research and development), thus not resulting in any increase in production. (Panel Report, para. 14.71 and footnote 968 thereto;  United States' responses to Panel Questions 72 and 73 after the first Panel meeting)  A similar point is made by the European Union in its third participant's submission, at paragraph 56.
[522]Panel Report, para. 14.74. (original emphasis)
[523]Panel Report, para. 14.75. (original emphasis)  See also para. 14.67.

*SCM Agreement* and Article VI:3 of the GATT 1994, which prohibit Members from levying countervailing duties in excess of the amount of the subsidy found to exist;  (iii) Article 10 of the *SCM Agreement*, which requires Members to "take all necessary steps to ensure that the imposition of a countervailing duty ... is in accordance with the provisions of Article VI of [the] GATT 1994 and the terms of [the SCM] Agreement";  and (iv) Article 32.1 of the *SCM Agreement*, which prohibits Members from taking "specific action against a subsidy of another Member ... except in accordance with the provisions of [the] GATT 1994, as interpreted by [the SCM] Agreement".

546.     In addressing China's appeal of the Panel's "as applied" finding on double remedies in the four investigations at issue, we turn to the provisions of the *SCM Agreement* relied upon by China, beginning with Article 19.3.

### 1.     Article 19.3 of the *SCM Agreement*

547.     In its analysis of Article 19.3 of the *SCM Agreement*, the Panel found that:  (i) countervailing duties are collected "in the appropriate amounts" insofar as the amount collected does not exceed the amount of subsidy "found to exist"[524];  (ii) "the imposition of anti-dumping duties calculated under an NME methodology has no impact on whether the amount of the concurrent countervailing duty collected is 'appropriate' or not"[525];  and (iii) "it was not the intention of the drafters [of] the SCM Agreement to address the question of double remedies in Article 19.3".[526]  Accordingly, the Panel found that:

> ... China has failed to establish that the USDOC's use of its NME methodology in the anti-dumping determinations at issue in this dispute, concurrently with its determination of subsidization and the imposition of countervailing duties on the same products in the four countervailing duty determinations at issue, was inconsistent with Article 19.3 of the SCM Agreement.[527]

548.     China claims that these findings, and the Panel's interpretation of Article 19.3 of the *SCM Agreement*, were in error.  China relies on the reasoning of the panel in *EC – Salmon (Norway)*, which interpreted the corresponding provision set forth in Article 9.2 of the *Anti-Dumping Agreement*, and found that the "appropriate" amount of an anti-dumping duty "is the amount of duty that is 'proper' or 'fitting' in the context of an anti-dumping investigation".[528]  China submits that under

---

[524]Panel Report, para. 14.128.
[525]Panel Report, para. 14.128.
[526]Panel Report, para. 14.129.
[527]Panel Report, para. 14.130.
[528]China's appellant's submission, para. 550 (quoting Panel Report, *EC – Salmon (Norway)*, para. 7.704).

Article 19.3 of the *SCM Agreement* "any determination of the 'appropriate amount' of a countervailing duty must take into account the extent to which the investigating authority offsets the same subsidies through the manner in which it calculates anti-dumping duties in respect of the same imported products."[529]

549.    The United States considers that the Panel correctly found under Article 19.3 of the *SCM Agreement* that countervailing duties are collected in the "appropriate" amounts where the amount of countervailing duties collected does not exceed the amount of subsidy found to exist.[530]

550.    Thus, the main interpretative question before us concerns the meaning of the phrase "in the appropriate amounts in each case" in Article 19.3 of the *SCM Agreement* and whether, as China contends, it would *not* be appropriate, within the meaning of that provision, to levy countervailing duties that result in, or are likely to result in, the imposition of double remedies.

551.    Article 19.3 of the *SCM Agreement* reads:

> When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, *in the appropriate amounts in each case*, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted. Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter. (emphasis added)

552.    The first sentence of Article 19.3 of the *SCM Agreement* contains two elements:  first, a requirement that countervailing duties be levied in the appropriate amounts in each case, and, second, a requirement that these duties be levied on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except for imports from sources that have renounced the relevant subsidies or from which undertakings have been accepted.  Beginning with the term "appropriate amounts", we note that relevant dictionary definitions of the term "appropriate" include "proper", "fitting" and "specially suitable (*for, to*)".[531]  These definitions suggest that what is "appropriate" is not an autonomous or absolute standard, but rather something that must be assessed by reference or in relation to something else.  They suggest some core norm—"proper", "fitting",

---

[529]China's appellant's submission, para. 554.
[530]United States' appellee's submission, para. 382.
[531]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 106.

"suitable"—and at the same time adaptation to particular circumstances.  Within Article 19.3, the circumstance-specific quality of "the appropriate amounts" is further reinforced by the immediate context provided by the words "in each case".  We also note that the term "amount" is defined as something quantitative, a number, "a quantity or sum viewed as the total reached".[532]

553.    We consider that the two requirements in the first sentence of Article 19.3 inform each other.  Thus, it would not be appropriate for an importing Member to levy countervailing duties on imports from sources that have renounced relevant subsidies, or on imports from sources whose price undertakings have been accepted.  Similarly, because the requirement that the duty be levied in "appropriate amounts" implies a certain tailoring of the amounts according to circumstances, this suggests that the requirement that the duty be imposed on a non-discriminatory basis on imports from all subsidized sources should not be read in an overly formalistic or rigid manner.  The second sentence of Article 19.3 provides a specific example of circumstances in which it is permissible not to differentiate amongst individual exporters, as well as of when and how differentiated treatment in the establishment of a countervailing duty rate is required.

554.    We continue our consideration of the meaning of the term "appropriate amounts" in its context, by turning to other paragraphs of Article 19 of the *SCM Agreement*.[533]  We observe, in this regard, that in interpreting "appropriate amounts" in Article 19.3, the Panel appears to have ascribed great significance to Article 19.4 of the *SCM Agreement*, which provides that "[n]o countervailing duty shall be levied on any imported product in excess of the amount of the subsidy found to exist, calculated in terms of subsidization per unit of the subsidized and exported product."  Article 19.4 thus places a quantitative ceiling on the amount of a countervailing duty, which may not exceed the amount of the subsidization.

555.    The Panel's finding that countervailing duties are collected "in the appropriate amounts insofar as the amount collected does not exceed the amount of subsidy found to exist"[534] points to Article 19.4 as the key determinant of what is an "appropriate" amount, for purposes of Article 19.3.  We share the Panel's view that Article 19.4 provides context relevant to the interpretation of Article 19.3.  Yet, we are not persuaded, as the Panel seems to have been, that Article 19.4, alone,

---

[532]*Shorter Oxford English Dictionary*, 6th edn, A. Stevenson (ed.) (Oxford University Press, 2007), Vol. 1, p. 71.
[533]The Panel reviewed what it considered to be relevant contextual elements for its interpretation of Article 19.4 of the *SCM Agreement*.  However, the Panel also recalled these contextual elements in its interpretation of Article 19.3 and noted that "[t]he same considerations likewise suggest that it was not the intention of the drafters [of] the SCM Agreement to address the question of double remedies in Article 19.3 of the SCM Agreement". (Panel Report, para. 14.129)
[534]Panel Report, para. 14.128.

defines when the amount of duty is "appropriate".  Indeed, if any amount of countervailing duty that does not exceed the amount of the subsidy is an "appropriate" amount within the meaning of Article 19.3, then the requirement in Article 19.3 would be rendered redundant, as Article 19.4 already prescribes that duties not be levied in excess of the amount of the subsidy found to exist.

556.    Thus, while we agree that Article 19.4 informs Article 19.3, we do not see any indication that Article 19.4 exhausts the universe according to which "appropriateness" is to be gauged.  Article 19.4 makes clear that the amount that could be "appropriate" cannot be *more than* the amount of the subsidy.  However, Article 19.4 neither requires that the amount of countervailing duties *equal* the full amount of the subsidy found to exist, nor bears upon the question of whether there may be circumstances in which the "appropriate amount" of a countervailing duty will be an amount *less than* the full amount of the subsidy found to exist.[535]

557.    It is, rather, Article 19.2 of the *SCM Agreement* that appears more relevant to this question.  While expressly leaving to the importing Member's investigating authorities the decision as to whether the amount of the countervailing duty to be imposed shall be the full amount of the subsidy or less, Article 19.2 nevertheless states that it is "desirable" that "the duty should be less than the total amount of the subsidy if such lesser duty would be adequate to remove the injury".[536]    Article 19.2 thus encourages such authorities to link the actual amount of the countervailing duty to the injury to be removed.

558.    Moreover, once a causal link between the subsidized imports and injury has been demonstrated, the imposition and levying of countervailing duties are not hermetically isolated from any consideration related to injury.  In addition to Article 19.2, a link between the amount of the countervailing duty and the injury that the subsidized imports are found to be causing is reflected in

---

[535]We would like to emphasize that, in this context, we are considering Article 19.4 as context relevant to our interpretation of Article 19.3.  In doing so, we are not addressing China's claim that the Panel erred in finding that a double remedy does not result in an amount of countervailing duty in excess of the subsidy found to exist, within the meaning of Article 19.4.

[536]Article 19.2 of the *SCM Agreement* reads:

> The decision whether or not to impose a countervailing duty in cases where all requirements for the imposition have been fulfilled, and the decision whether the amount of the countervailing duty to be imposed shall be the full amount of the subsidy or less, are decisions to be made by the authorities of the importing Member.  It is desirable that the imposition should be permissive in the territory of all Members, that the duty should be less than the total amount of the subsidy if such lesser duty would be adequate to remove the injury to the domestic industry, and that procedures should be established which would allow the authorities concerned to take due account of representations made by domestic interested parties whose interests might be adversely affected by the imposition of a countervailing duty. (footnote omitted)

Article 19.3 itself, which provides that a "countervailing duty shall be levied, in the appropriate amounts in each case ... on imports of such product ... found to be subsidized and *causing injury*" (emphasis added).  Other provisions of the *SCM Agreement* also link the countervailing duty to the injury that the subsidized imports are found to be causing.  Article 19.1 allows for the imposition of countervailing duties when subsidized imports "are causing injury".[537]  The use of the present tense in this provision suggests that injury is a continuing prerequisite for the imposition and levying of countervailing duties.  This is confirmed by Article 21.1 that states that "[a] countervailing duty shall remain in force only as long as and to the extent necessary to counteract subsidization which is causing injury."

559.     Continuing with our examination of the context provided by other provisions of the *SCM Agreement*, we turn to Article 10, the first provision in Part V of the *SCM Agreement*, which provides:

*Application of Article VI of GATT 1994*[*]

> Members shall take all necessary steps to ensure that the imposition of a countervailing duty[**] on any product of the territory of any Member imported into the territory of another Member is in accordance with the provisions of Article VI of GATT 1994 and the terms of this Agreement.  Countervailing duties may only be imposed pursuant to investigations initiated[***] and conducted in accordance with the provisions of this Agreement and the Agreement on Agriculture.

> [* original footnote 35] The provisions of Part II or III may be invoked in parallel with the provisions of Part V;  however, with regard to the effects of a particular subsidy in the domestic market of the importing Member, only one form of relief (either a countervailing duty, if the requirements of Part V are met, or a countermeasure under Articles 4 or 7) shall be available. ...

> [** original footnote 36] The term "countervailing duty" shall be understood to mean a special duty levied for the purpose of offsetting any subsidy bestowed directly or indirectly upon the manufacture, production or export of any merchandise, as provided for in paragraph 3 of Article VI of GATT 1994.

> [*** original footnote 37] The term "initiated" as used hereinafter means procedural action by which a Member formally commences an investigation as provided in Article 11.

---

[537]Article 19.1 of the *SCM Agreement* reads:
> If, after reasonable efforts have been made to complete consultations, a Member makes a final determination of the existence and amount of the subsidy and that, through the effects of the subsidy, the subsidized imports are causing injury, it may impose a countervailing duty in accordance with the provisions of this Article unless the subsidy or subsidies are withdrawn.

560.     We believe that there are three main features of Article 10 of the *SCM Agreement* that are relevant to the interpretative task before us.   First, Article 10 establishes that Part V of the *SCM Agreement* relates to the application of Article VI of the GATT 1994, and that countervailing duties must conform to the dictates of that provision as well as to the *SCM Agreement*.   Second, by providing that "only one form of relief shall be available" for the effects of a subsidy, footnote 35 makes clear that, at least within the four corners of the *SCM Agreement*, there can be no "double remedies" against the same subsidization.   Third, footnote 36 to Article 10 defines a "countervailing duty" as a special duty levied for the purpose of "offsetting" a subsidy.

561.     The link between the GATT 1994 and the *SCM Agreement* also figures prominently in Article 32.1 of the *SCM Agreement*, which states:

> No specific action against a subsidy of another Member can be taken except in accordance with the provisions of GATT 1994, as interpreted by this Agreement.[*]
>
> ---
> [* original footnote 56] This paragraph is not intended to preclude action under other relevant provisions of GATT 1994, where appropriate.

562.     Footnote 56 to Article 32.1 reaffirms the right of Members to take action under other relevant provisions of the GATT 1994, and at the same time recognizes that not all such action will be "appropriate".

563.     In our view, therefore, Articles 10, 19.1, 19.2, 19.4, 21.1, and 32.1 all provide context relevant to the interpretation of Article 19.3.   These provisions identify two situations in which the importing Member is prohibited from imposing two remedial measures as a response to the same subsidization.   Importing Members are required to choose between accepting price undertakings *or* imposing countervailing duties, and between taking countermeasures under Parts II and III of the *SCM Agreement or* imposing countervailing measures under Part V of that Agreement.   These provisions also confirm the close link between the GATT 1994, in particular its Article VI, and Part V of the *SCM Agreement*, and suggest that, among the purposes of countervailing duties are:  to offset or counteract injurious subsidization, and to remove the injury to the domestic industry.   Moreover, they indicate that the appropriateness of the amount of countervailing duties is not unrelated to the injury that is being caused.   We note, in this connection, that the *Anti-Dumping Agreement* contains provisions that parallel Articles 10, 19.2, 19.3, 19.4, 21.1 and 32.1 in the context of anti-dumping duties, a subject to which we return below.[538]

---

[538]The equivalent provisions in the *Anti-Dumping Agreement* to Articles 10, 19.2, 19.3, 19.4, 21.1, and 32.1 of the *SCM Agreement* are, respectively, Articles 1, 9.1, 9.2, 9.3, 11.1, and 18.1.

564.    Before doing so, we turn to Article VI of the GATT 1994, which also provides context relevant to Article 19.3 of the *SCM Agreement*.    Article VI, entitled "*Anti-dumping and Countervailing Duties*", is the genesis of both the *SCM Agreement* and the *Anti-Dumping Agreement*. Paragraphs 1 and 2 deal exclusively with anti-dumping duties, paragraph 3 deals exclusively with countervailing duties, and the remaining four paragraphs each deals with both anti-dumping and countervailing duties.    Article VI:2 authorizes Members to levy anti-dumping duties "[i]n order to offset or prevent dumping", and Article VI:3 specifies that a countervailing duty is levied "for the purpose of offsetting any bounty or subsidy".

565.    Article VI:5 is the provision most pertinent to our inquiry.    It provides:

> No product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to both anti-dumping and countervailing duties to compensate for the same situation of dumping or export subsidization.

566.    The Panel relied on this provision as contextual support for its findings that Articles 19.3 and 19.4 of the *SCM Agreement* do not address the issue of double remedies.    The Panel considered that "these terms are self-explanatory in their intention to limit the scope of the prohibition in Article VI:5 to situations involving *export subsidies*".[539]    The Panel considered that, because the explicit prohibition in Article VI:5 is limited to potential double remedies in respect of *export* subsidies, Members could not have intended to prohibit the imposition of double remedies in respect of *domestic* subsidies in Articles 19.3 or 19.4 of the *SCM Agreement*, which are, on their face, silent on the issue of double remedies.[540]

567.    We have concerns about the Panel's rather mechanistic, *a contrario* reasoning in this connection.    While it is true that omissions have meaning[541], "omissions in different contexts may have different meanings, and omission, in and of itself, is not necessarily dispositive".[542]    In this instance, we do not agree with the Panel that the "explicit terms in which the drafters addressed the issue" of double remedies in Article VI:5 make it "all the more unlikely that they sought to prohibit the imposition of double remedies in respect of other types of subsidies".[543]    We note, rather, that Article VI:5 prohibits the concurrent application of anti-dumping and countervailing duties to compensate for the *same situation* of dumping or export subsidization.    In our view, the term "same situation" is central to an understanding of the rationale underpinning the prohibition contained in

---

[539]Panel Report, para. 14.117. (original emphasis)
[540]Panel Report, para. 14.118.  See also para. 14.129.
[541]Appellate Body Report, *Japan – Alcoholic Beverages II*, p. 18, DSR 1996:I, 97, at 111.
[542]Appellate Body Report, *Canada – Autos*, para. 138.
[543]Panel Report, para. 14.118.

Article VI:5, which in turn sheds light on the reason why, in the case of domestic subsidies, an express prohibition is absent.

568.     We recall that, in principle, an export subsidy will result in a pro rata reduction in the export price of a product, but will not affect the price of domestic sales of that product.[544]  That is, the subsidy will lead to increased price discrimination and a higher margin of dumping.  In such circumstances, the situation of subsidization and the situation of dumping are the "same situation", and the application of concurrent duties would amount to the application of "double remedies" to compensate for, or offset, that situation.  By comparison, domestic subsidies will, in principle, affect the prices at which a producer sells its goods in the domestic market and in export markets in the same way and to the same extent.  Since any lowering of prices attributable to the subsidy will be reflected on both sides of the dumping margin calculation, the overall dumping margin will not be affected by the subsidization.  In such circumstances, the concurrent application of duties would not compensate for the same situation, because no part of the dumping margin would be attributable to the subsidization.  Only the countervailing duty would offset such subsidization.

569.     To the extent that these assumptions hold true, then the presence, in Article VI, of an express prohibition on the concurrent application of duties to counteract the "same situation" of dumping or *export* subsidization, along with the absence of an express prohibition in connection with situations of *domestic* subsidization appears logical—at least when normal value is calculated on the basis of domestic sales prices.  We note, in this regard, that Article VI:1(a) of the GATT 1994, like Article 2.1 of the *Anti-Dumping Agreement*, provides that the usual method for calculating normal value will be based on the comparable price for the like product in the exporter's domestic market.  Thus, in anti-dumping investigations, normal value will typically be based on domestic sales prices and any domestic subsidy will have no impact on the calculation of the dumping margin.  Nonetheless, Article VI:1(b), like Article 2.2 of the *Anti-Dumping Agreement*, sets out exceptional methods for the calculation of normal value, which are *not* based on actual prices in the exporter's domestic market.  The second *Ad* Note to Article VI:1, which provides the legal basis for the use of surrogate values for NMEs in anti-dumping investigations[545], also authorizes recourse to exceptional methods for the

---

[544]See *supra*, footnote 518 of this Report;  and Panel Report, paras. 14.70, 14.72 and footnote 972 thereto, and 14.74.

[545]*Ad* Note to Article VI:1 of the GATT 1994 reads:

> It is recognized that, in the case of imports from a country which has a complete or substantially complete monopoly of its trade and where all domestic prices are fixed by the State, special difficulties may exist in determining price comparability for the purposes of paragraph 1, and in such cases importing Members may find it necessary to take into account the possibility that a strict comparison with domestic prices in such a country may not always be appropriate.

calculation of normal value in investigations of imports from NMEs.[546]   In case of domestic subsidization, it is only in these exceptional situations that there is any possibility that the concurrent application of anti-dumping and countervailing duties on the same product could lead to "double remedies".

570.      In our view, the references to Article VI of the GATT 1994 in Articles 10 and 32.1 of the *SCM Agreement*, Article VI itself, and the many parallels between the obligations that apply to Members imposing anti-dumping duties and those imposing countervailing duties, suggest that any interpretation of "the appropriate amounts" of countervailing duties within the meaning of Article 19.3 of the *SCM Agreement* must not be based on a refusal to take account of the context offered both by Article VI of the GATT 1994 and by the provisions of the *Anti-Dumping Agreement*. While we agree with the Panel that Articles 19.3 and 19.4 of the *SCM Agreement* are concerned with countervailing duties and not with anti-dumping duties, we are not persuaded that it necessarily follows that these provisions are, as the Panel noted, "oblivious to any potential concurrent imposition of anti-dumping duties".[547]   Such an interpretative approach is difficult to reconcile with the notion that the provisions in the WTO covered agreements should be interpreted in a coherent and consistent manner, giving meaning to all applicable provisions harmoniously.[548]   Members have entered into cumulative obligations under the covered agreements and should thus be mindful of their actions under one agreement when taking action under another.   We are reinforced in this view by the fact that, although the disciplines that apply to a Member's use of anti-dumping duties and its use of countervailing duties are legally distinct, the remedies that result are, from the perspective of

---

[546]We observe that, while Article VI:5 was included in the original text of the GATT in 1947, the second *Ad* Note to paragraph 1 of Article VI was added subsequently, following the 1954-1955 Review Session. L/334, adopted 3 March 1955, p. 2, para. 6, and Annex I, Section I.B, p. 10; 3S/222, 223, para. 6.

[547]Panel Report, paras. 14.112 and 14.129.

[548]Appellate Body Report, *US – Upland Cotton*, paras. 549 and 550.  We recall that in *Argentina – Footwear (EC)* and *US – Upland Cotton*, the Appellate Body affirmed that the Multilateral Agreements on Trade in Goods, contained in Annex 1A of the *WTO Agreement*, are "integral parts" of the same treaty, the *WTO Agreement*, and that their provisions, which are binding on all Members, are all provisions of one treaty, the *WTO Agreement*.  The Appellate Body thus considered that a treaty interpreter must read all applicable provisions of a treaty in a way that gives meaning to all of them, harmoniously. (Appellate Body Report, *US – Upland Cotton*, para. 549 (quoting Appellate Body Report, *Argentina – Footwear (EC)*, para. 81 and footnote 72 thereto (referring, in turn, to Appellate Body Report, *Korea – Dairy*, para. 81;  Appellate Body Report, *US – Gasoline*, p. 23, DSR 1996:I, 3, at 21;  Appellate Body Report, *Japan – Alcoholic Beverages II*, p. 12, DSR 1996:I, 97, at 106;  and Appellate Body Report, *India – Patents (US)*, para. 45)))  In *US – Upland Cotton*, the Appellate Body agreed with the panel that "Article 3.1(b) of the *SCM Agreement* can be read together with the *Agreement on Agriculture* provisions relating to domestic support in a coherent and consistent manner which gives full and effective meaning to all of their terms". (Appellate Body Report, *US – Upland Cotton*, para. 549 (quoting Panel Report, *US – Upland Cotton*, para. 7.1071))

producers and exporters, indistinguishable.[549]  Both remedial actions increase the amount of duty that must be paid at the border.

571.    It follows that a proper understanding of the "appropriate amounts" of countervailing duties in Article 19.3 of the *SCM Agreement* cannot be achieved without due regard to relevant provisions of the *Anti-Dumping Agreement* and recognition of the way in which the two legal regimes that these agreements set out, and the remedies which they authorize Members to impose, operate.  To us, the requirement that any amounts be "appropriate" means, at a minimum, that investigating authorities may not, in fixing the appropriate amount of countervailing duties, simply ignore that anti-dumping duties have been imposed to offset the same subsidization.  Each agreement sets out strict conditions that must be satisfied before the authorized remedy may be applied.  The purpose of each authorized remedy may be distinct, but the form and effect of both remedies are the same.   Both the *Anti-Dumping Agreement* and the *SCM Agreement* contain provisions requiring that the amounts of anti-dumping and countervailing duties be "appropriate in each case", as reflected in Articles 9.2 and 19.3 respectively.  Both agreements also set ceilings on the maximum amount of duties that can be imposed to remedy dumping and subsidization, respectively.  Article 19.4 of the *SCM Agreement* establishes that countervailing duties shall not exceed the amount of the subsidy found to exist and Article 9.3 of the *Anti-Dumping Agreement* establishes that anti-dumping duties shall not exceed the margin of dumping.

572.    Only if these provisions are read in wilful isolation from each other can it be maintained that the respective rules on the imposition and levying of duties are complied with when double remedies are imposed.  In contrast, reading the two agreements together suggests that the imposition of double remedies would circumvent the standard of appropriateness that the two agreements separately establish for their respective remedies.  In other words, considering that each agreement sets forth a standard of appropriateness of the amount and establishes a ceiling for the respective duties, it should not be possible to circumvent the rules in each agreement by taking measures under both agreements to counteract the same subsidization.  It is counterintuitive to suggest that, while each agreement sets forth rules on the amounts of anti-dumping duties and countervailing duties that can be levied, there is no obstacle to the levying of a total amount of anti-dumping and countervailing duties which, if added together, would not be appropriate and would exceed the combined amounts of dumping and subsidization found.

---

[549]Moreover, it may well be the case that the injury that the duties seek to counteract is the same injury to the same industry.  In this respect, we observe that, for each parallel anti-dumping and countervailing duty investigation at issue in this dispute, the USITC conducted a single injury determination in respect of imports of the relevant products. (United States' responses to questioning at the oral hearing)

573.     We consider, next, the object and purpose of the *SCM Agreement*, and whether this sheds light on the meaning of Article 19.3.[550]   We recall that, in *US – Carbon Steel*, the Appellate Body explained that "Part V of the Agreement is aimed at striking a balance between the right to impose countervailing duties to offset subsidization that is causing injury, and the obligations that Members must respect in order to do so."[551]   Similarly, in *US – Softwood Lumber IV*, the Appellate Body stated that "the object and purpose of the *SCM Agreement*, ... is to strengthen and improve GATT disciplines relating to the use of both subsidies and countervailing measures, while, recognizing at the same time, the right of Members to impose such measures under certain conditions".[552]   The object and purpose of the *SCM Agreement*, as identified by the Appellate Body in these disputes, sets important limitations to Members' right to impose countervailing duties.   Members' right to impose countervailing duties to offset subsidies is not unfettered, but subject to compliance with the obligations set forth in the *SCM Agreement*.   Such duties must be for the purpose of offsetting an injurious subsidy.   The object and purpose of the *SCM Agreement* thus reveals that Members intended to allow for the use of countervailing duties to offset injurious subsidization under certain circumstances and subject to specific limitations.

574.     We do not see that the object and purpose of the *SCM Agreement* provides clear indications as to the intentions of the drafters of the *SCM Agreement* in respect of double remedies in case of domestic subsidization.   To the extent that the object and purpose of the *SCM Agreement* links the application of countervailing duties to their purpose—to offset injurious subsidization—this supports an interpretation of Article 19.3 that would render "inappropriate" the application of countervailing duties that, together with anti-dumping duties, exceed the full amount of the subsidy.   We emphasize that we are not suggesting that the object and purpose of the *SCM Agreement* encompasses the imposition of disciplines on the use of anti-dumping duties.[553]   Rather, we simply consider that the object and purpose of the *SCM Agreement* is not inconsistent with an approach that would accept that, in fixing the amount of countervailing duties that will be imposed, it is appropriate to take account of anti-dumping duties that are being levied on the same products and that offset the same subsidization.

---

[550]See also *supra*, para. 301 of this Report.
[551]Appellate Body Report, *US – Carbon Steel*, para. 74.
[552]Appellate Body Report, *US – Softwood Lumber IV*, para. 64.
[553]The Panel observed that China's arguments with respect to object and purpose implied that "it is the object and purpose of the SCM Agreement to impose disciplines not only with respect to the use of countervailing duties, but also of anti-dumping duties".   The Panel expressed its view that "the object and purpose of Part V of the SCM Agreement is limited to imposition of disciplines with respect to the former".  (Panel Report, para. 14.122)

575.     The Panel rejected an argument by China based on the interpretation of Article 9.2 of the *Anti-Dumping Agreement* provided by the panel in *EC – Salmon (Norway)*.[554]  Article 9.2 establishes that an anti-dumping duty "shall be collected in the appropriate amounts in each case", and is thus the provision in the *Anti-Dumping Agreement* that corresponds to Article 19.3 of the *SCM Agreement*.  In *EC – Salmon (Norway)*, the panel found that the appropriate amount of an anti-dumping duty "must be an amount that results in offsetting or preventing dumping, when all other requirements for the imposition of anti-dumping duties have been fulfilled".[555]  We consider that the panel's interpretation of Article 9.2 of the *Anti-Dumping Agreement* in *EC – Salmon (Norway)* is consistent with our interpretation of the phrase "in the appropriate amounts" in Article 19.3 of the *SCM Agreement*, as prohibiting the imposition of double remedies, and with the notion that the two agreements should be read together in a consistent and coherent manner.  In fact, applying the reasoning of the panel in *EC – Salmon (Norway)*, an appropriate amount of countervailing duty should be an amount that results in offsetting subsidization, with due regard being had to the concurrent application of anti-dumping duties on the same product that offset the same subsidization.

576.     The Panel also considered as an "element of context" Article 15 of the Tokyo Round *Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade*[556] (the "*Tokyo Round Subsidies Code*").  According to the Panel, the fact that Article 15, which explicitly addressed the issue of the concurrent imposition of anti-dumping and countervailing duties on NME imports, was not carried forward in the *SCM Agreement* lent support to an interpretation of Articles 19.3 and 19.4 of the *SCM Agreement* as not addressing or encompassing the question of the permissibility of double remedies.[557]

577.     Article 15 of the *Tokyo Round Subsidies Code*, entitled "Special situations", reads in relevant part:

> 1.      In cases of alleged injury caused by imports from a country described in NOTES AND SUPPLEMENTARY PROVISIONS to the General Agreement (Annex I, Article VI, paragraph 1, point 2) the importing signatory may base its procedures and measures either
>
> (a)      on this Agreement, or, alternatively
>
> (b)      on the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade.

---

[554]Panel Report, para. 14.128.
[555]Panel Report, *EC – Salmon (Norway)*, para. 7.705.
[556]BISD 26S/56, entered into force 1 January 1980.
[557]Panel Report, para. 14.119.

578.    Article 15 of the *Tokyo Round Subsidies Code* imposed upon an importing signatory a choice between the use of anti-dumping duties and the use of countervailing duties against imports from NMEs.  This provision thus prohibited the concurrent application of the two types of duties, regardless of whether this in fact resulted in the imposition of double remedies.[558]

579.    In our view, Article 15 of the *Tokyo Round Subsidies Code* cannot be considered as context within the meaning of Article 31 of the *Vienna Convention*.  Article 31 does not refer to a predecessor agreement—that is, an agreement on the same matter that has ceased to exist and has been replaced by the agreement being interpreted—as context or as one of the elements to be taken into account together with the context.  Rather, a provision in a predecessor agreement may, at most, form part of the circumstances of the conclusion of a treaty under Article 32 of the *Vienna Convention* and thus be considered as supplementary means of interpretation.

580.    In the present dispute, having reviewed Article 19.3 of the *SCM Agreement* and its relevant context[559], we do not consider it necessary to confirm the interpretation of Article 19.3 of the *SCM Agreement* by relying on supplementary means of interpretation, such as the circumstances of conclusion of the treaty.  In any event, we are not persuaded that a provision that explicitly addressed the issue of the concurrent imposition of anti-dumping and countervailing duties in respect of imports from NMEs, clearly supports an interpretation of Articles 19.3 and 19.4 of the *SCM Agreement* "as not addressing or encompassing the question of the permissibility of double remedies".[560]

581.    In particular, we are not persuaded that the existence in a predecessor agreement of a provision prohibiting the concurrent imposition of anti-dumping and countervailing duties to imports from NMEs allows an interpreter to conclude, *a contrario*, that, in the *SCM Agreement*, Members intended to allow double remedies.  We have already cautioned, in respect of Article VI:5 of the

---

[558]As explained *supra*, paras. 541-544, "double remedies" does not refer simply to the fact that both anti-dumping and countervailing duties are imposed on the same product, but to circumstances in which the simultaneous application of anti-dumping and countervailing duties on the same imported products results, at least to some extent, in the offsetting of the same subsidization twice.
[559]The Panel also considered China's Accession Protocol, which "contains no provision explicitly addressing the issue of double remedies even though it appears to allow for the use of countervailing duties while China remains an NME".  For the Panel, the absence of any such provision also suggested that the drafters of Articles 19.3 and 19.4 of the *SCM Agreement* did not intend these provisions to address the issue of double remedies. (Panel Report, para. 14.121;  see also para. 14.129)  We do not agree with the Panel that the fact that China's Accession Protocol does not explicitly address the issue of double remedies suggests that Articles 19.3 and 19.4 of the *SCM Agreement* do not address double remedies.  In our view, the fact that China's Accession Protocol does not exclude the application of countervailing duties to China while it remained an NME may equally be read as suggesting a shared understanding that China would be protected against the imposition of double remedies by the provisions of the *SCM Agreement*.  On balance, however, we are not persuaded that the absence of a provision addressing double remedies in China's Accession Protocol suggests anything regarding the interpretation of Articles 19.3 and 19.4 of the *SCM Agreement*.
[560]Panel Report, para. 14.119.  See also para. 14.129.

GATT 1994, against mechanistic *a contrario* reasoning, and recalled that "omissions in different contexts may have different meanings, and omission, in and of itself, is not necessarily dispositive".[561] Article 15 of the *Tokyo Round Subsidies Code* does more than merely prohibit double remedies, in that it prohibits the concurrent application of anti-dumping and countervailing duties, regardless of whether they offset the same situation of subsidization.  In the light of this, the absence of a provision like Article 15 of the *Tokyo Round Subsidies Code* in the *SCM Agreement* cannot be interpreted as indicating that Members intended to exclude from the scope of the *SCM Agreement* a different and narrower obligation, such as a prohibition on double remedies.

582.    In sum, based on all of the above, we consider that the Panel erred in its interpretation of Article 19.3 of the *SCM Agreement* and failed to give meaning and effect to all the terms of that provision.   Under Article 19.3 of the *SCM Agreement*, the appropriateness of the amount of countervailing duties cannot be determined without having regard to anti-dumping duties imposed on the same product to offset the same subsidization.  The amount of a countervailing duty cannot be "appropriate" in situations where that duty represents the full amount of the subsidy and where anti-dumping duties, calculated at least to some extent on the basis of the same subsidization, are imposed concurrently to remove the same injury to the domestic industry.  Dumping margins calculated based on an NME methodology are, for the reasons explained above, likely to include some component that is attributable to subsidization.

583.    We, therefore, *reverse* the Panel's interpretation of Article 19.3 and, in particular, its findings that "the imposition of anti-dumping duties calculated under an NME methodology has no impact on whether the amount of the concurrent countervailing duty collected is 'appropriate' or not"[562], and that Article 19.3 of the *SCM Agreement* does not address the issue of double remedies.[563]  We find instead that the imposition of double remedies, that is, the offsetting of the same subsidization twice by the concurrent imposition of anti-dumping duties calculated on the basis of an NME methodology and countervailing duties, is inconsistent with Article 19.3 of the *SCM Agreement*.

---

[561]Appellate Body Report, *Canada – Autos*, para. 138.
[562]Panel Report, para. 14.128.
[563]Panel Report, para. 14.129.

2.        Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994[564]

584.    The Panel found that Article 19.4 of the *SCM Agreement* imposes a maximum limit on the amount of duties that may be levied, corresponding to the amount of subsidy that is found to exist[565], and that the use of an NME methodology in anti-dumping investigations does not have the effect of extinguishing the subsidy.[566]   In the Panel's view, Article 19.4 is "oblivious to any potential concurrent imposition of anti-dumping duties", and, therefore, "the narrowly-crafted discipline contained in Article 19.4 of the *SCM Agreement* does not address situations of 'double remedies'."[567]

585.    Accordingly, the Panel found that:

> ... China has failed to establish that the USDOC's use of its NME methodology in the anti-dumping determinations at issue, concurrently with its determination of subsidization and the imposition of countervailing duties on the same products in the four countervailing duty determinations at issue, was inconsistent with Article 19.4 of the SCM Agreement.[568]

586.    For the same reasons, the Panel also found that:

> ... China has not established that the United States imposed duties in excess of the subsidy "determined to have been granted" in the investigations at issue inconsistently with Article VI:3 of the GATT 1994.[569]

587.    China argues that the Panel erred in finding that Article 19.4 of the *SCM Agreement* does not address situations of double remedies and argues that, if a subsidy has been offset through the manner in which the importing Member calculates anti-dumping duties, the subsidy no longer "exists" within the meaning of Article 19.4, because it can no longer be attributed to the imported products as a cause

---

[564]Article 19.4 of the *SCM Agreement* states:
> No countervailing duty shall be levied on any imported product in excess of the amount of the subsidy found to exist, calculated in terms of subsidization per unit of the subsidized and exported product. (footnote omitted)

Article VI:3 of the GATT 1994 reads in relevant part:
> No countervailing duty shall be levied on any product of the territory of any Member imported into the territory of another Member in excess of an amount equal to the estimated bounty or subsidy determined to have been granted, directly or indirectly, on the manufacture, production or export of such product in the country of origin or exportation, including any special subsidy to the transportation of a particular product.

[565]Panel Report, para. 14.108.
[566]Panel Report, para. 14.113.
[567]Panel Report, para. 14.112.
[568]Panel Report, para. 14.123.
[569]Panel Report, para. 14.136.

of injury to domestic producers.  China thus claims that the imposition of double remedies is inconsistent with Article 19.4 of the *SCM Agreement*, because it results in the imposition and levying of countervailing duties in excess of the subsidy "found to exist".[570]  China makes similar arguments in respect of Article VI:3 of the GATT 1994.

588.    The United States considers that Article 19.4 of the *SCM Agreement* is not concerned with the existence of subsidies, but with ensuring that any countervailing duties imposed do not exceed the subsidies attributable to the imported goods, in terms of subsidization per unit.  The United States agrees with the Panel that, by its own terms, Article 19.4 only imposes disciplines with respect to *countervailing duties* (not anti-dumping duties), and is, thus, "oblivious to any potential concurrent imposition of anti-dumping duties".[571]  We understand the United States to make the same arguments in respect of Article VI:3 of the GATT 1994.

589.    In addressing China's claims under Article 19.3, we have explained that the provisions of the *Anti-Dumping Agreement* and the *SCM Agreement* should be interpreted together in a coherent and consistent manner, so as to avoid any possible circumvention of the rules governing, and ceilings on, anti-dumping and countervailing duties that are set forth in the respective provisions in the two agreements.  We, therefore, disagree with the Panel's statement that "Article 19.4 of the SCM Agreement is oblivious to any potential concurrent imposition of anti-dumping duties."[572]

590.    However, since we have already found that the imposition of double remedies is inconsistent with Article 19.3 of the *SCM Agreement*, we need not continue our analysis and address China's appeal with respect to the interpretation and application of Article 19.4 of the *SCM Agreement* and Article VI:3 of the GATT 1994.  We consider, rather, that a ruling on the interpretation of Article 19.4 of the *SCM Agreement* or Article VI:3 of the GATT 1994 is unnecessary for purposes of resolving this dispute.  The Panel's interpretation of these provisions is, in our estimation, moot and of no legal effect.

3.    Conclusion

591.    We have reversed the Panel's interpretation of Article 19.3 of the *SCM Agreement*.  Because it was based on an erroneous interpretation of Article 19.3, we must also *reverse* the Panel's ultimate finding in paragraph 17.1(e)(ii) of the Panel Report that China did not establish that the United States

---

[570]China's appellant's submission, paras. 499-509.
[571]United States' appellee's submission, para. 396 (quoting Panel Report, para. 14.112).
[572]Panel Report, para. 14.112.

acted inconsistently with its obligations under Articles 19.3[573], 10[574], or 32.1[575] of the *SCM Agreement*.

### C.    Completion of the Analysis

592.    Having reversed these findings, we must consider China's request that we complete the analysis and find the USDOC's concurrent imposition of anti-dumping duties calculated on the basis of its NME methodology, and countervailing duties on the same products in the four countervailing duty determinations at issue to be inconsistent with Article 19.3 of the *SCM Agreement*.

593.    China contends that it necessarily follows from any reversal of the Panel's legal interpretation of a relevant provision that the United States has acted inconsistently with its obligations under that provision.[576]  China argues that it is undisputed that the USDOC took no steps to investigate and avoid the imposition of double remedies, notwithstanding its recognition of the possibility of "double counting".  China emphasizes that, contrary to the suggestion of the Panel, it was not for China to "conclusively establish"[577] that double remedies resulted from the concurrent imposition of countervailing duties and anti-dumping duties calculated under an NME methodology.  Rather, the USDOC had an affirmative obligation to determine whether, and in what amount, double remedies would occur in these investigations, and it indisputably did not do so.  China also refers to submissions that it made before the Panel that it considers show that China did, in fact, demonstrate, based on undisputed evidence in the record, that double remedies occurred in the investigations at issue.

594.    The United States contests China's assertions that a finding of inconsistency would follow directly from the reversal of the Panel's legal interpretations, that there are no disputed facts that the Appellate Body need examine to rule on this issue, and that China's submissions before the Panel amount to a demonstration, based on undisputed evidence, that double remedies occurred in the investigations at issue.  The United States emphasizes that China bore the burden of proof in front of the Panel, yet made no attempt to present hard evidence that double remedies had occurred, just as it made no such attempt before the USDOC.

---

[573]See also Panel Report, para. 14.130.
[574]See also Panel Report, para. 14.138.
[575]See also Panel Report, para. 14.139.
[576]China's appellant's submission, para. 562.
[577]China's appellant's submission, para. 561 (quoting Panel Report, para. 14.76).

595.     The United States points out that the Panel made *no* findings as to whether double remedies resulted from the concurrent application of anti-dumping duties calculated under an NME methodology and countervailing duties, in the determination for any of the four products at issue, and the facts are not "undisputed".  Moreover, before the Panel, the United States argued that the existence of double remedies in any given instances depends on whether the subsidy leads to a reduction in the export price, and that it cannot be presumed that domestic subsidies lower export prices pro rata.  The United States observed that, while certain domestic production subsidies will result in increased production and a reduction in export prices, other more general subsidies may be used for other purposes (payments of dividends, severance payments, research and development), and may not affect production or export price.[578]  For all of these reasons, the United States asserts that there is no basis for the Appellate Body to complete the analysis and determine whether, as a factual matter, double remedies occurred.

596.     We begin by recalling that the Panel had "no difficulty" accepting the general proposition that double remedies would "likely" arise from the concurrent application of anti-dumping duties calculated based on an NME methodology, and of countervailing duties.[579]  Because, however, the Panel found that China had failed to establish that the imposition of double remedies is inconsistent with any of the provisions upon which it based its claims, the Panel considered that it did not need to examine "the extent to which the concurrent imposition of anti-dumping duties determined under the USDOC's NME methodology and of countervailing duties resulted in the imposition of 'double remedies' in the four investigations at issue".[580]  Thus, the Panel did not decide on whether China had "conclusively established that, in the investigations at issue, double remedies resulted from the concurrent imposition of anti-dumping duties calculated under the [United States'] NME methodology and of countervailing duties".[581]  For the same reasons, the Panel declined to "consider the specific examples submitted by China from these investigations".[582]

---

[578]Panel Report, para. 14.71 and footnote 968 thereto;  and United States' responses to Panel Questions 72 and 73 after the first Panel meeting.  A similar point was made by the European Union in its third participant's submission, at paragraph 56.
[579]Panel Report, para. 14.67.
[580]Panel Report, para. 14.76.
[581]Panel Report, para. 14.76.
[582]Panel Report, para. 14.76.

597.    At the same time, the Panel observed that the "USDOC's treatment of the issue of double remedies in the investigations at issue is not in debate", and explained:

> The parties agree that where interested parties raised "double remedy" arguments in the investigations at issue, the USDOC rejected them and that the USDOC did not take into consideration the anti-dumping duties imposed on the same products when it imposed countervailing duties in the four countervailing duty investigations at issue:  it imposed countervailing duties corresponding to the full amount of subsidies found to have been conferred on each investigated producer.[583]

598.    The Appellate Body has stated in previous disputes that, if the factual findings of the panel and the undisputed facts in the panel record provide the Appellate Body with a sufficient basis for its own analysis, the Appellate Body may complete the analysis with a view to facilitating the prompt settlement of the dispute.[584]

599.    We do not accept China's contention that a finding of inconsistency of the measures at issue must directly follow from our reversal of the Panel's interpretation of Article 19.3 of the *SCM Agreement*.  We have expressed the view that, as a *legal* matter, this provision prohibits double remedies.  But, we have not yet considered the question of when, as a *factual* matter, double remedies arise.  In principle, we agree with the statement by the Panel that double remedies would *likely* result from the concurrent application of anti-dumping duties calculated on the basis of an NME methodology and countervailing duties[585], but we are not convinced that double remedies *necessarily* result in every instance of such concurrent application of duties.  This depends, rather, on whether and to what extent domestic subsidies have lowered the export price of a product, and on whether the investigating authority has taken the necessary corrective steps to adjust its methodology to take account of this factual situation.

600.    On appeal, China claims that it is "the obligation of the investigating authority to *investigate* and make a determination as to whether it is offsetting the same subsidies twice"[586], whereas the United States argues that "the burden to establish the existence of such an alleged double remedy would be on China".[587]

---

[583]Panel Report, para. 14.105. (footnote omitted)
[584]See, for example, Appellate Body Report, *Australia – Salmon*, paras. 117, 118, and 193;  Appellate Body Report, *Canada – Autos*, paras. 133 and 144;  Appellate Body Report, *Korea – Various Measures on Beef*, para. 128;  and Appellate Body Report, *US – Continued Zeroing*, paras. 189, and 195-197.
[585]Panel Report, paras. 14.67 and 14.75.
[586]China's appellant's submission, para. 561. (original emphasis)
[587]United States' appellee's submission, para. 386.

601.     We observe that, in *US – Countervailing Measures on Certain EC Products*, the Appellate Body stated that, "under Article VI:3 of the GATT 1994, investigating authorities, before imposing countervailing duties, must ascertain the precise amount of a subsidy attributed to the imported products under investigation."[588]  We consider that a parallel can be drawn between the obligation of an investigating authority under Article VI:3 of the GATT 1994 to determine the precise amount of the subsidy, on the one hand, and the analogous obligations that an investigating authority has under Articles 19.3 and 19.4 of the *SCM Agreement*, on the other hand, to determine and levy countervailing duties in amounts that are appropriate in each case and that do not exceed the amount of the subsidy found to exist.

602.     In the same way, therefore, as an investigating authority is subject to an affirmative obligation to ascertain the precise amount of the subsidy, so too is it subject to an affirmative obligation to establish the appropriate amount of the duty under Article 19.3.  This obligation encompasses a requirement to conduct a sufficiently diligent "investigation" into, and solicitation of, relevant facts, and to base its determination on positive evidence in the record.  We recall our finding above that, among the factors to be taken into account by an investigating authority, in establishing the "appropriate" amount of countervailing duty to be imposed, is evidence of whether and to what degree the same subsidies are being offset twice when anti-dumping and countervailing duties are simultaneously imposed on the same imported products.  We also recall that such double remedies are "likely" when the concurrent anti-dumping duties are calculated on the basis of an NME methodology.[589]

603.     We now turn, more specifically, to the question of whether the USDOC, in the four sets of investigations at issue, acted inconsistently with the obligations of the United States under Article 19.3 of the *SCM Agreement*.  As mentioned above, the Panel observed that the parties agreed "that where interested parties raised 'double remedy' arguments in the investigations at issue, the USDOC rejected them and that the USDOC did not take into consideration the anti-dumping duties imposed on the same products when it imposed countervailing duties corresponding to the full amount of subsidies found to have been conferred on each investigated producer."[590]

---

[588]Appellate Body Report, *US – Countervailing Measures on Certain EC Products*, para. 139. (footnote omitted)

[589]Panel Report, paras. 14.67 and 14.75.  We also note that the Panel expressed the view that the USDOC had itself recognized the potential for double remedies in such circumstances. (See *ibid*., para. 14.71, and the statements quoted in footnote 966 thereto)

[590]Panel Report, para. 14.105.

604.     Thus, the USDOC made no attempt to establish whether or to what degree it would offset the same subsidies twice by imposing anti-dumping duties calculated under its NME methodology, concurrently with countervailing duties.  We recall that, in the investigations at issue, the USDOC dismissed China's claim of double remedies on the ground that *inter alia* it had no statutory authority to make adjustments in the context of countervailing duty investigations.[591]  Therefore, the USDOC did not initiate any examination of whether double remedies would arise in the four investigations at issue and refused outright to afford any consideration to the issue or to the submissions pertaining to the issue that were presented to it.[592]

605.     In our view, by declining to address China's claims concerning double remedies in the four countervailing duty investigations at issue, the USDOC failed to fulfil its obligation to determine the "appropriate" amount of countervailing duties within the meaning of Article 19.3 of the *SCM Agreement*.

606.     Consequently, we *find* that, in the circumstances of the four sets of anti-dumping and countervailing duty investigations at issue, by virtue of the USDOC's imposition of anti-dumping duties calculated on the basis of an NME methodology, concurrently with the imposition of countervailing duties on the same products, without having assessed whether double remedies arose from such concurrent duties, the United States acted inconsistently with its obligations under Article 19.3 of the *SCM Agreement*.

---

[591]LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 19;  LWS Issues and Decision Memorandum (Panel Exhibit CHI-3), p. 40;  and OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), p. 53.  See also CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 101, incorporating by reference the Issues and Decision Memorandum in the CWP anti-dumping investigation (Panel Exhibit CHI-9), pp. 21 and 22.

[592]In the four countervailing duty investigations at issue, China and the respondent producers raised the issue of double remedies before the USDOC.  Moreover, in the parallel anti-dumping investigations, China raised the issue of double remedies in the CWP and OTR investigations, but not in the LWR and LWS investigations.  China argued that double remedies arise from concurrent anti-dumping and countervailing duty investigations against NMEs because normal value is not based on home market prices or costs, but rather on surrogate values unaffected by subsidies in China.  Moreover, China argued that, in order to avoid the imposition of double remedies, the USDOC could adopt one of the following options:  (i) terminate its countervailing duty investigations;  (ii) adjust its anti-dumping calculations for the amount of any alleged domestic subsidies received by investigated producers;  or (iii) apply its standard market economy methodology in the parallel anti-dumping investigations. (CWP Issues and Decision Memorandum (Panel Exhibit CHI-1), p. 101, incorporating by reference the Issues and Decision Memorandum in the CWP anti-dumping investigation (Panel Exhibit CHI-9), pp. 19-21;  LWR Issues and Decision Memorandum (Panel Exhibit CHI-2), p. 19;  LWS Issues and Decision Memorandum (Panel Exhibit CHI-3), p. 31;  and OTR Issues and Decision Memorandum (Panel Exhibit CHI-4), pp. 51 and 52)

D.    *Articles 10 and 32.1 of the SCM Agreement*

607.    We have already reversed the Panel's ultimate finding regarding double remedies, including its finding that, because China had not established any violation of Articles 19.3 of the *SCM Agreement*, it also had not established any violation of Articles 10 or 32.1 of the *SCM Agreement*.

608.    China asks us to find that, by applying anti-dumping duties based on an NME methodology, and countervailing duties to the same imports in the four investigations at issue, the United States acted inconsistently with Articles 10 and 32.1 of the *SCM Agreement*.

609.    The Panel found "that a claim of violation of Article 10 of the SCM Agreement must necessarily be consequential to a claim of violation of other provisions of the covered agreements".[593] Since the Panel found that China had not established any violation of Articles 19.3 and 19.4 of the *SCM Agreement*, it concluded that "China [had] not demonstrated that the United States acted inconsistently with Article[] ... 10 of the SCM Agreement as a result of the concurrent imposition of anti-dumping duties calculated under the [United States'] NME methodology and of countervailing duties in the investigations at issue".[594]  The Panel also found that China's claim under Article 32.1 of the *SCM Agreement* was "purely consequential to its claims under Articles 10, 19.3 and 19.4 of the *SCM Agreement* and Article VI:3 of the GATT [] 1994" and, having found that China had failed to establish a violation of these provisions, also found that China had failed to establish that the United States had acted inconsistently with Article 32.1 of the *SCM Agreement*.[595]

610.    We have already explained that when a Member's measures do not satisfy the express conditions for the imposition of a countervailing duty set out in relevant provisions of the *SCM Agreement*, this means that the right to impose a countervailing duty has not been established and, as a consequence, such measures are also inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.[596]  Accordingly, we are of the view that China was not required to advance further arguments to establish a consequential violation of Articles 10 and 32.1.  Having found that the USDOC's concurrent imposition of anti-dumping duties calculated on the basis of its NME methodology, and countervailing duties on the same products in the four countervailing duty determinations at issue is inconsistent with Article 19.3 of the *SCM Agreement*, we *find* that this is also inconsistent with Articles 10 and 32.1 of the *SCM Agreement*.

---

[593]Panel Report, para. 14.137.
[594]Panel Report, para. 14.138.
[595]Panel Report, para. 14.139.
[596]See *supra*, para. 358.  See also Appellate Body Report, *US – Softwood Lumber IV*, para. 143.

## VIII.   Findings and Conclusion

611.   For the reasons set out in this Report, the Appellate Body:

(a)    with respect to "public bodies":

(i)    <u>reverses</u> the Panel's finding in paragraph 8.94 of the Panel Report that the term "public body" in Article 1.1(a)(1) of the *SCM Agreement* means "any entity controlled by a government";  and, accordingly, <u>reverses</u> the Panel's finding in paragraph 17.1(a)(i) of the Panel Report[597] that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 1.1(a)(1) of the *SCM Agreement* by determining in the relevant investigations at issue that SOEs and SOCBs constituted "public bodies";

(ii)   in completing the analysis of China's claims under Article 1.1(a)(1) of the *SCM Agreement*:

-    <u>finds</u> that the USDOC's determinations, in the four countervailing duty investigations at issue, that the SOE input suppliers constituted "public bodies", are inconsistent with Article 1.1(a)(1) and, consequently, with the United States' obligations under Articles 10 and 32.1 of the *SCM Agreement*;

-    <u>finds</u> that China did not establish that the USDOC's determination that the SOCBs in the OTR investigation constituted "public bodies" is inconsistent with Article 1.1(a)(1) of the *SCM Agreement*;  and

(iii)  <u>finds</u> that China has failed to substantiate its claim that the Panel acted inconsistently with Article 11 of the DSU by improperly relying on municipal law;

---

[597]See also Panel Report, paras. 8.138 and 8.143.

(b)    with respect to specificity:

    (i)    upholds the Panel's finding in paragraph 17.1(b)(i) of the Panel Report[598] that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 2.1(a) of the *SCM Agreement* by determining in the OTR investigation that SOCB lending was specific to the tyre industry;  and

    (ii)    finds that the Panel did not err in its interpretation of the term "subsidy" in Article 2.2 of the *SCM Agreement* and rejects China's allegations of error in respect of a Panel statement concerning a "distinct regime" in the context of the LWS investigation;

(c)    with respect to the benchmarks used to calculate benefit:

    (i)    upholds the Panel's finding in paragraph 17.1(c)(vi) of the Panel Report[599] that China did not establish that the USDOC acted inconsistently with the obligations of the United States under Article 14(d) of the *SCM Agreement* by rejecting in-country private prices in China as benchmarks for HRS in the CWP and LWR investigations;  and rejects China's claim that the Panel acted inconsistently with Article 11 of the DSU by attributing to the USDOC a rationale that was not found in the CWP and LWR determinations;

    (ii)    upholds the Panel's finding in paragraph 10.148 of the Panel Report[600] that China did not establish that the USDOC's decision not to rely on interest rates in China as benchmarks for SOCB loans denominated in RMB in the CWP, LWS, and OTR investigations was inconsistent with the obligations of the United States under Article 14(b) of the *SCM Agreement*;  and

    (iii)    finds that, in assessing the consistency of the proxy benchmark used by the USDOC with Article 14(b) of the *SCM Agreement*, the Panel failed to make an objective assessment of the matter before it as required by Article 11 of the DSU and, therefore, reverses the Panel's finding in paragraph 10.209 of the Panel Report[601] that China did not establish that the benchmark actually

---

[598]See also Panel Report, para. 9.107.
[599]See also Panel Report, para. 10.61.
[600]See also Panel Report, para. 17.1(c)(vii).
[601]See also Panel Report, para. 17.1(c)(vii).

used by the USDOC to calculate the benefit from RMB-denominated SOCB loans in the CWP, LWS, and OTR investigations was inconsistent with the obligations of the United States under Article 14(b) of the *SCM Agreement*; but <u>finds</u> that it is unable to complete the legal analysis of China's claim under that provision;

(d)    with respect to "double remedies":

(i)    <u>finds</u> that the imposition of double remedies, that is, the offsetting of the same subsidization twice by the concurrent imposition of anti-dumping duties calculated on the basis of an NME methodology and countervailing duties, is inconsistent with Article 19.3 of the *SCM Agreement*; and, therefore

(ii)    <u>reverses</u> the Panel's findings in paragraphs 14.129 and 14.130 of the Panel Report that Article 19.3 of the *SCM Agreement* does not address the issue of double remedies and that China did not establish that offsetting of the same subsidization twice through the concurrent imposition of anti-dumping duties calculated on the basis of an NME methodology and countervailing duties is inconsistent with Article 19.3 of the *SCM Agreement*[602]; and

(iii)    <u>finds</u> that, in the four sets of anti-dumping and countervailing duty investigations at issue, by virtue of the USDOC's imposition of anti-dumping duties calculated on the basis of an NME methodology, concurrently with the imposition of countervailing duties on the same products, without having assessed whether double remedies arose from such concurrent duties, the United States acted inconsistently with its obligations under Article 19.3, and, consequently, under Articles 10 and 32.1 of the *SCM Agreement*.

612.    The Appellate Body recommends that the DSB request the United States to bring its measures, found in this Report, and in the Panel Report as modified by this Report, to be inconsistent with the *SCM Agreement*[603], into conformity with its obligations under that Agreement.

---

[602]See also Panel Report, para. 17.1(e)(ii).
[603]The Panel also recommended that the United States bring its measures found to be inconsistent with the GATT 1994 into conformity with its obligations under that Agreement. (Panel Report, para. 17.3)  However, we do not see that the Panel made any such finding of inconsistency.  Nor have we.

Signed in the original in Geneva this 18th day of February 2011 by:


_____

Ricardo Ramírez-Hernández

Presiding Member


_____                    _____

Lilia R. Bautista                                              Peter Van den Bossche

Member                                                           Member

ANNEX I

# WORLD TRADE

# ORGANIZATION

**WT/DS379/6**
6 December 2010

(10-6557)

Original:  English

## UNITED STATES – DEFINITIVE ANTI-DUMPING AND COUNTERVAILING DUTIES ON CERTAIN PRODUCTS FROM CHINA

Notification of an Appeal by China
under Article 16.4 and Article 17 of the Understanding on Rules
and Procedures Governing the Settlement of Disputes (DSU),
and under Rule 20(1) of the *Working Procedures for Appellate Review*

The following notification, dated 1 December 2010, from the Delegation of China, is being circulated to Members.

_____

1.      Pursuant to Article 16.4 and Article 17 of the Understanding on Rules and Procedures Governing the Settlement of Disputes ("DSU") and Rule 20 of the Working Procedures for Appellate Review, China hereby notifies the Dispute Settlement Body of its decision to appeal to the Appellate Body certain issues of law and legal interpretation covered in the Panel Report in *United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China* (WT/DS379/R) (Panel Report).  Pursuant to Rule 20(1) of the *Working Procedures for Appellate Review*, China is simultaneously filing this Notice of Appeal with the Appellate Body Secretariat.

2.      The measures at issue are certain anti-dumping and countervailing duty determinations by the U.S. Department of Commerce ("USDOC"), and the definitive anti-dumping and countervailing duties imposed by the United States pursuant to their authority.  As further specified in China's Request for Establishment of a Panel (WT/DS379/2), these determinations were made in the investigations of *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China* ("CWP"), *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China* ("OTR"), *Light-Walled Rectangular Pipe and Tube from the People's Republic of China* ("LWR"), and *Laminated Woven Sacks from the People's Republic of China* ("LWS").

3.      The issues that China raises in this appeal relate to the Panel's findings and conclusions in respect of the consistency of the challenged measures with the *General Agreement on Tariffs and Trade 1994* ("GATT 1994") and the *Agreement on Subsidies and Countervailing Measures* ("SCM Agreement").

4.      China seeks review by the Appellate Body of the Panel's interpretation and application of Article 1.1 of the SCM Agreement as it relates to Commerce's determinations in all four

countervailing duty investigations that certain state-owned enterprises and/or state-owned commercial banks are "public bodies" within the meaning of that provision.  The Panel's errors of law and legal interpretation include:

> (a)    The Panel erred in its interpretation and application of the term "public body" in Article 1.1(a)(1) of the SCM Agreement.[1]

> (b)    The Panel acted inconsistently with Articles 3.2 and 11 of the DSU by relying on municipal law usages of certain terms to interpret the term "public body" in Article 1.1(a)(1) of the SCM Agreement.[2]

5.    China seeks review by the Appellate Body of the Panel's interpretation and application of Article 2.1(a) of the SCM Agreement as it relates to the finding by the USDOC in the OTR investigation that certain alleged loan subsidies were *de jure* specific.  The Panel's errors of law and legal interpretation include:

> (a)    The Panel erred in interpreting the term "subsidy" in Article 2.1(a) of the SCM Agreement to refer to either a financial contribution or a benefit, and by failing to give effect to the requirement of an explicit limitation of access to a subsidy.[3]

> (b)    The Panel erred in its interpretation of the term "certain enterprises" in Article 2 of the SCM Agreement and in its application of that term to the measures that formed the basis for the USDOC's specificity determination.[4]  To the extent that the Panel's findings in respect of "certain enterprises" were based on its assessment of the facts, that assessment was not objective as required by Article 11 of the DSU.[5]

> (c)    Conditionally, in the event that the Appellate Body sustains the Panel's interpretation of Article 2.1(a), China appeals the Panel's finding that the USDOC's specificity determination was not inconsistent with that interpretation of Article 2.1(a).  The Panel's findings were legally insufficient to sustain Commerce's determination of *de jure* specificity, even under the Panel's interpretation of Article 2.1(a).[6]

6.    China seeks review by the Appellate Body of the Panel's interpretation and application of Article 2.2 of the SCM Agreement as it relates to the finding by the USDOC in the LWS investigation that the provision of allegedly subsidized land-use rights was "limited to certain enterprises located within a designated geographical region within the jurisdiction of the granting authority".  The Panel's errors of law and legal interpretation include:

> (a)    The Panel erred in interpreting the term "subsidy" in Article 2.2 of the SCM Agreement to refer to either a financial contribution or a benefit, and in finding that Article 2.2 permits an investigating authority to make a finding of regional specificity based solely "on the element of the financial contribution".[7]

---

[1] Panel Report, paras. 8.55-8.94, 8.127-8.143.  The referenced paragraph numbers indicate the primary instances of the identified errors.  China appeals all findings and conclusions of the Panel that are derived from or related to the identified errors, as well as the relevant findings and conclusions of the Panel set forth in Section XVII of the Panel Report.
[2] Panel Report, paras. 8.60-8.63, para. 8.69.
[3] Panel Report, paras. 9.25-9.32, para. 9.95, paras. 9.106-9.107.
[4] Panel Report, paras. 9.66-9.72, para. 9.95, paras. 9.106-9.107.
[5] Panel Report, paras. 9.66-9.72, para. 9.95, paras. 9.106-9.107.
[6] Panel Report, paras. 9.66-9.72, para. 9.95, paras. 9.106-9.107.
[7] Panel Report, para. 9.155.

(b)     The Panel erred in its interpretation of Article 2.2 of the SCM Agreement in finding that the existence of a "distinct" or "unique" "regime" for the provision of a subsidy is legally relevant to a determination of specificity under this provision.[8]

7.     China seeks review by the Appellate Body of the Panel's interpretation and application of Article 14(d) of the SCM Agreement as it relates to the USDOC's rejection of in-country private prices for hot-rolled steel as a benchmark in the CWP and LWR investigations.  The Panel's errors of law and legal interpretation include:

(a)     The Panel erred in interpreting Article 14(d) to permit the rejection of in-country private prices as a benchmark where the only evidence relied upon by the investigating authority is that the government is a predominant supplier of the good in question.[9]

(b)     The Panel erred in interpreting Article 14(d) to permit investigating authorities to reject private prices as a benchmark based exclusively on evidence relating to government market share, so long as the investigating authority "consider[s] … arguments and evidence" relating to factors other than government market share.[10]

(c)     The Panel acted inconsistently with Article 11 of the DSU by appearing to attribute to the USDOC a rationale for its rejection of private prices that differs from the rationale that appears in the USDOC's published determinations.[11]

8.     China seeks review by the Appellate Body of the Panel's interpretation and application of Article 14(b) of the SCM Agreement as it relates to the USDOC's selection of loan benchmarks in the OTR, LWS, and CWP investigations.  The Panel's errors of law and legal interpretation include:

(a)     The Panel erred in finding that the benchmark used by the USDOC was "a comparable commercial loan which the firm could actually obtain on the market" within the meaning of Article 14(b).[12]

(b)     The Panel acted inconsistently with Article 11 of the DSU by failing to assess the conformity of the benchmark used by the USDOC with the legal requirements of Article 14(b).[13]  To the extent that the Panel's findings and conclusions in respect of the USDOC loan benchmark were based on its assessment of the facts, that assessment was not objective as required by Article 11 of the DSU.[14]

(c)     The Panel erred in its interpretation and application of Article 14(b) in finding that observed interest rates for loans denominated in a particular currency can be rejected as a "distorted" benchmark, and in finding that the USDOC had a legal basis to reject observed RMB interest rates as a loan benchmark.[15]

9.     China seeks review by the Appellate Body of the Panel's conclusion that, in respect of the imposition of countervailing duties, the covered agreements do not require the United States to take into account the extent to which it simultaneously offsets the same subsidies through the manner in

---

[8]Panel Report, paras. 9.159-9.164.
[9]Panel Report, paras. 10.38-10.47, para. 10.61.
[10]Panel Report, paras. 10.55-10.56.
[11]Panel Report, paras. 10.55-10.56.
[12]Panel Report, paras. 10.203-10.209.
[13]Panel Report, paras. 10.203-10.209.
[14]Panel Report, paras. 10.203-10.209.
[15]Panel Report, paras. 10.108-10.130; paras. 10.144-10.148.

which it calculates anti-dumping duties under its non-market economy (NME) methodology.   The
Panel's errors of law and legal interpretation include:

> (a)    The Panel erred in finding that Article VI:3 of the GATT 1994 and Article 19.4 of the
> SCM Agreement do not require the United States to take into account the extent to
> which the use of its NME methodology in a parallel anti-dumping investigation
> affects the existence and amount of the subsidy that remains attributable to the
> imported product under investigation.[16]

> (b)    The Panel erred in finding that Article 19.3 of the SCM Agreement does not require
> the United States to take into account the extent to which the use of its NME
> methodology in a parallel anti-dumping investigation affects the appropriate amount
> of the countervailing duty to be levied.[17]

> (c)    The Panel erred in finding that Article 10 of the SCM Agreement does not require the
> United States to take all necessary steps to ensure that it does not offset the same
> subsidies twice through the imposition of two different duties, and in finding that the
> United States did not act inconsistently with Article 10 in imposing the challenged
> countervailing duty measures.[18]

> (d)    The Panel erred in finding that the United States did not act inconsistently with
> Article 32.1 of the SCM Agreement in imposing the challenged countervailing duty
> measures.[19]

> (e)    The Panel erred in finding that it was China's obligation to "conclusively establish[]"
> that the USDOC offset the same subsidies twice in the investigations at issue.[20]

10.    China respectfully requests that the Appellate Body reverse the findings and conclusions of
the Panel that are based on the errors of law and legal interpretation identified above.   With respect to
the claims of error identified in paragraphs 5 and 9 above, China respectfully requests that the
Appellate Body complete the analysis to conclude that the challenged measures were inconsistent
with the obligations of the United States under the covered agreements.   China further requests that
the Appellate Body complete the analysis with respect to China's claims of consequential violations
under Articles 10 and 32.1 of the SCM Agreement as they pertain to all of the foregoing claims of
error, in respect of which the Panel exercised judicial economy.[21]

_____

---

[16]Panel Report, paras. 14.112-14.123, para. 14.136.
[17]Panel Report, paras. 14.128-14.130.
[18]Panel Report, paras. 14.137-14.138.
[19]Panel Report, para. 14.139.
[20]Panel Report, para. 14.76.
[21]Panel Report, para. 13.1.